1          **UNITED STATES DISTRICT COURT**
           **WESTERN DISTRICT OF NEW YORK**

2

3

4   UNITED STATES OF AMERICA,        )
                                      ) Case No. 1:15-CR-00010
5                                     )              (RJA)(HBS)
                      Plaintiff,      )
6                                     )
    vs.                               ) January 19th, 2018
7                                     )
    CHARLES WEBER,                    )
8                                     )
                      Defendant.      )
9

10

                  **TRANSCRIPT OF COMPETENCY HEARING**
11            **BEFORE THE HONORABLE RICHARD J. ARCARA**
                **SENIOR UNITED STATES DISTRICT JUDGE**
12

13

    <u>APPEARANCES</u>:
14
    For the Plaintiff:    JAMES P. KENNEDY, JR.
15                        ACTING UNITED STATES ATTORNEY
                          BY:  MARYELLEN KRESSE, ESQ.
16                            PATRICIA ASTORGA, ESQ.
                          ASSISTANT UNITED STATES ATTORNEYS
17                        138 Delaware Avenue
                          Buffalo, NY 14202
18
    For the Defendant:    FEDERAL PUBLIC DEFENDER'S OFFICE
19                        BY:  BRIAN COMERFORD, ESQ.
                          300 Pearl Street, Suite 200
20                        Buffalo, New York 14202

21  Court Reporter:       MEGAN E. PELKA, RPR
                          Robert H. Jackson Courthouse
22                        2 Niagara Square
                          Buffalo, NY 14202
23

24

25

1

**I N D E X**

WITNESSES                                                          PAGE

2

GOVERNMENT

3

DANIEL ANTONIUS

4    Direct Examination by Ms. Kresse                           16
     Cross-Examination by Mr. Comerford                        133
5    Redirect Examination by Ms. Kresse                        155

6

**E X H I B I T S**

7    GOVERNMENT                                                 PAGE

8    Exhibit 3501  Curriculum Vitae of Daniel Antonius          34
     Exhibit 1     Forensic Psychological Evaluation by
9                  Daniel Antonius, Ph.D. dated 7/27/17         35
     Exhibit 2     Forensic Evaluation by
10                 Ana Natasha Cervantes, M.D. and
                   Melissa D. Heffler, M.D. dated 10/30/16      52
11   Exhibit 3     Forensic Evaluation Addendum by
                   Ana Natasha Cervantes, M.D. dated 11/2/17    54
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  Criminal action 2015-10A.  United States

2  vs. Charles Weber.  Competency hearing.  Counsel, please state

3  your name and the party you represent for the record.

4          MS. KRESSE:  Good morning, Your Honor.  MaryEllen

5  Kresse and Patricia Astorga for the United States.

6          MR. COMERFORD:  Good morning, Your Honor.  Brian

7  Comerford for Charles Weber.  He is present this morning.

8          THE COURT:  Good morning.  Are the -- are you all

9  ready to proceed?

10          MR. COMERFORD:  We are, Judge.

11          THE COURT:  What we're going to be addressing here

12  today is the mental competency of Mr. Weber and we're

13  obviously operating under Title 18, United States Code 4241,

14  which is whether defendant has sufficient present ability to

15  consult with his attorney with a reasonable degree of rational

16  understanding and two, whether the defendant has a rational as

17  well as a factual understanding of the proceedings against

18  him.  That's basically the United States Supreme Court rule

19  under *Dusky* vs. United States.

20          Also -- and this is not other -- well, how can I put

21  this?  Let's assume, just for argument purposes, that the

22  Court finds that he is competent and he passes the mental

23  competency test.  He has written me a few times and I know

24  counsel is aware of it and that is the issue about whether or

25  not he can waive his right to counsel.  So, I think we should

1  incorporate that also into this proceeding so we're dealing

2  with his request.  I assume he still wishes to proceed pro se?

3          MR. COMERFORD:  He does, Your Honor.

4          THE COURT:  All right.  So, there's a two-part test

5  here.  The first one I just articulated.  The second one is

6  whether he can rationally represent himself.

7          MR COMERFORD:  And Judge, I think at least

8  Dr. Cervantes -- and I can't speak for the government -- would

9  be able to offer an opinion on that this morning.  I would

10  just ask for an opportunity to brief that issue, just looking

11  at that standard, whether or not there is a different standard

12  in the case law on it.

13          THE COURT:  I don't know if there is, but certainly

14  we're going to have --

15          MR. COMERFORD:  I just want to have an opportunity --

16          THE COURT:  When this is over with, I'm going to

17  request, you know, briefs on this.

18          MR. COMERFORD:  Thank you, Judge.

19          THE COURT:  And obviously, you may want copies of the

20  transcript of the hearing today.

21          MS. KRESSE:  Judge, it is the government's

22  understanding that under the Supreme court case of *Indiana vs.*

23  *Edwards* that it is a two-part analysis; in other words,

24  whether a person is competent to stand trial is not the same

25  issue --

```
1              THE COURT:  Right.

2              MS. KRESSE:  -- as whether they are competent to

3    represent themselves.

4              THE COURT:  I agree, but I think we should deal with

5    it all today.  I mean, this case has been going on for a long

6    time.

7              MS. KRESSE:  And the government will attempt to do

8    so.  The only thing, Judge, is that it's not a question that I

9    requested the government expert to opine on.  I have had some

10   discussions with him, but it -- again, I will attempt to

11   address it, because I understand about the age of the case,

12   but it's not something that he specifically addressed in his

13   report.

14             THE COURT:  Well, but the problem is this.  Let's --

15   the purpose is only for argument, that I may find that he's --

16   that he can -- is competent to stand trial.  Okay.  Then, I

17   got to deal with this other issue.

18             MS. KRESSE:  Yes.

19             THE COURT:  So, I'd rather do it all at one time.  If

20   you want time to talk to your witness before, I'll give you

21   the time to do that.  You want some time -- in fact, well,

22   since you probably weren't aware that I was going to do this,

23   why don't we just take a 10 or 15-minute break and both of you

24   can consult with your witnesses and determine whether or not

25   you can go forward.  If you indicate you can't, you feel you
```

1  need more, well, I'll have to deal with that.  Okay?  I just

2  want to make you aware of it.  Okay?

3      MS. KRESSE:  No, I -- the government appreciates

4  that, Judge and we'll certainly do that.  The other issue with

5  respect to competency is, you know, there's no clear holding

6  in terms of who has the burden of proof going forward.

7      THE COURT:  I think we talked about that and who

8  should go -- who has the burden and who should go first.  Did

9  you resolve that?

10     MR COMERFORD:  We did talk about it, Judge and we

11 both researched it.  There are a number of circuit courts that

12 go different ways.  The circuit court has said that it's an

13 open issue; that it's unclear from the statute and their

14 position is that they have made no finding as to who has the

15 burden yet.  They say that in most cases it doesn't matter

16 because it's -- who has the burden isn't going to make a

17 difference.  I think this case is kind of unique because you

18 have two respected experts offering two contrasting opinions.

19     So, we would take the position that, you know, just

20 as a matter of due process, the government having the burden

21 of proof, they should have the burden of proof on this issue

22 as well.  That's what we would ask the Court to do, in terms

23 of this hearing, but just in terms of the Second Circuit,

24 there's no -- and they said this is an open issue.

25     THE COURT:  All right.  What is your position?

1           MS. KRESSE:  That it is an open issue, but the

2  government is prepared to present the testimony of

3  Dr. Antonius and to assume the burden.  I just wanted to put

4  on the record that the issue in the Second Circuit is an open

5  issue.

6           THE COURT:  Okay.  Why don't we take a break until

7  10:30 and you discuss the issue about -- the pro se issue.

8           MR COMERFORD:  Judge, if I could put one other matter

9  linked to that on the record?

10           THE COURT:  Sure.

11           MR COMERFORD:  Speaking with Mr. Weber this morning,

12  he had previously indicated he wanted to proceed pro se and I

13  know the Court had indicated it would hold off on making any

14  sort of determination on that until competency was resolved.

15           THE COURT:  Right.

16           MR COMERFORD:  He just wants me to put on the record

17  his objection under *Faretta* to having me represent him, that

18  he wants to proceed pro se, he wants the ability to question

19  these witnesses and he wants --

20           THE COURT:  That request is denied at this time.

21           MR COMERFORD:  Thank you, Judge.

22           THE COURT:  Okay.  We'll take a break.

23           MS. KRESSE:  Thank you, Judge.

24           THE CLERK:  All rise.

25  (Brief recess)

 1              THE CLERK:  You may be seated.

 2              THE COURT:  Mr. Comerford, Mr. Weber's request that

 3   he proceed pro se for these proceedings, the law in the Second

 4   Circuit is pretty clear that he cannot, the case of

 5   *United States vs. Zedner*, which is cited at 193 F. 3d 562.

 6   All right?

 7              MR COMERFORD:  Thank you, Judge.

 8              THE COURT:  Okay.  So, are we ready?

 9              MS. KRESSE:  Yes, Judge.  There's just one

10   preliminary matter and that's with respect to exclusion of

11   witnesses.  It is the government's request that the defense

12   expert be excluded during the testimony of the government's

13   expert.

14              THE COURT:  That's pretty much the rule.

15              MR COMERFORD:  That's fine, Judge.

16              THE COURT:  Okay.

17              MR COMERFORD:  Yes.

18              THE COURT:  Just one second.  Let me get organized

19   here.

20              MR COMERFORD:  Judge, we have to make the same

21   request, just in the event there's any rebuttal case, we want

22   Dr. Antonius excluded while Dr. Cervantes testifies.

23              MS. KRESSE:  Yes, please.

24              THE COURT:  All right.  Yes, we all play by the same

25   rules.

1           MR COMERFORD:  Thank you.

2           THE COURT:  All right.  Why don't we make a brief

3    opening statement?

4           MS. KRESSE:  Absolutely, Judge.  Your Honor, we are

5    here this morning on the issue of the defendant's competence

6    not only to stand trial but also his competence to represent

7    himself going forward to trial.

8           The defendant was initially evaluated by Dr. Ana

9    Cervantes and found to have a delusional disorder mixed type.

10   At that time, Dr. Cervantes -- and this is a report issued in

11   October of 2016 -- Dr. Cervantes did not opine in terms of the

12   defendant's competency to stand trial.  Thereafter, the

13   government requested an independent evaluation of the

14   defendant by its own expert and that expert is Dr. Daniel

15   Antonius.

16          Dr. Antonius evaluated the defendant, interviewed

17   him, conducted testing and concluded that Dr. Weber did not

18   suffer from a delusional disorder mixed type and that he was

19   competent to stand trial.  Thereafter, the defense requested

20   an opportunity to have their expert Dr. Cervantes re-evaluate

21   the defendant.  Dr. Antonius interviewed the defendant on four

22   occasions in May and June of 2017, the last date being June

23   19th of 2017.

24          Dr. Cervantes re-evaluated the defendant on August

25   22nd, of 2017.  At that time and in a report that she issued

9

1    dated November 2nd, 2017, Dr. Cervantes opines that the

2    defendant -- she moves away from the original diagnosis of

3    delusional order mixed type and identifies cognitive issues, a

4    cognitive disorder, unspecified, that the defendant suffers

5    from and opines that he is not competent to stand trial,

6    although her findings in that regard, the government's

7    position are not terribly clear in the sense that much of her

8    analysis and much of her opinion deals with whether or not

9    Dr. Weber is competent to represent himself.  And whereas, the

10   standard may not be different, it is the two different

11   analyses and two different considerations that the Court needs

12   to make.

13         It's the government's position as we will set forth

14   through the testimony of Dr. Antonius that Charles Weber is an

15   individual who, over a period of time, developed an ideology

16   that, to most people, is very extreme and perhaps even bizarre

17   and this is an ideology that began with desire on his part not

18   to pay taxes.

19         And at a period of time in 2006, he hears something

20   on the radio about not having to pay taxes.  And being an

21   intelligent person, he does research and develops and falls

22   into this ideology, which is a well-known ideology.  It's

23   accepted and followed and there are proponents across the

24   country, their numbers are in like 300,000 to 800,000 people,

25   who accept these sort of ideological beliefs that are extreme

1   and there's a continuum of these beliefs and they start with

2   well, they're not citizens of the United States and so, they

3   don't have to pay taxes, they're non-resident aliens.

4           And then, it morphs into other things, like because

5   they are -- as in the case of Dr. Weber, because he's able to

6   trace his lineage back to the revolution, that that had some

7   sort of impact on what his status is in this country and what

8   rules he has to abide by.  This ideology, these ideologies, an

9   ideology like that, a political belief, when accepted by a

10  group of people, a substantial number of people, is not a

11  delusional disorder and it is not a basis for finding somebody

12  not competent to stand trial.

13          The other element referenced by Dr. Cervantes in her

14  report is somatic complaints that the defendant has,

15  specifically complaints about dizziness and memory loss and

16  mercury poisoning and a belief, sort of, in these holistic

17  methods and alternative medical treatments that are not

18  accepted by the medical field.  But, again, Judge, there are

19  hundreds of thousands of people across the country who, on an

20  everyday basis, subscribe to alternative medical treatment and

21  herbal supplements and things of that nature.

22          So, none of that relative to Dr. Weber renders him --

23  again, the only issue is whether he is competent to stand

24  trial and competent to represent himself.  And so, regardless

25  of the idealogical extremism of his beliefs regarding this

1   Court's jurisdiction over him, his ability to not pay taxes

2   and to pick and choose what rules reply to him, they may be

3   extreme, but they are his beliefs and they are not delusional.

4   They are not delusional under the DSM-5.  They are not

5   delusional for purposes of this proceeding.

6          And that's important, Judge, because if we start to

7   take extreme ideological beliefs, whether it's sovereign

8   citizen movements or Scientology or other religious extremism

9   and we start identifying those as mental disorders and bases

10  for not finding people competent to stand trial, then that's a

11  very bad precedent to set because that's not what the standard

12  is.  The standard is whether this defendant understands what

13  is he charged with, he understands what the role of this court

14  is, he understands how the trial is going to proceed.

15         In other words, whether he represents himself or

16  whether he's represented by counsel, does that he understand

17  that evidence will be presented, that the role of the

18  prosecutor is to present that evidence, that he has the right

19  either himself or through counsel to question that evidence to

20  cross-examine witnesses, that he has the right but cannot be

21  forced to present a case, to take the stand and he understands

22  all those things.

23         And the other thing that's clear from Dr. Antonius'

24  report is that Dr. Weber understands that his beliefs are not

25  accepted by many people, that this is his own idealogical

1  belief set that's very common among sovereign citizens and the

2  other groups related to sovereign citizens and that it doesn't

3  comport with how this Court tends to run the trial.  He has an

4  absolute understanding of that and that renders him competent

5  to stand trial and competent to represent himself.

6          There's a case -- and I am not sure what the cite of

7  it -- I can find it, Judge -- where -- and it's not in the

8  Second Circuit, but where the -- I believe that the Ninth

9  Circuit said he has the right to make foolish arguments and to

10 make bizarre arguments.  That's not the question.  The

11 questions is whether or not he's competent to stand trial and

12 whether he's competent to represent himself and the government

13 intends to show through the testimony of Dr. Antonius that the

14 answer to both those questions is yes.

15         THE COURT:  Okay.  Mr. Comerford?

16         MR COMERFORD:  Thank you, Judge.  Judge, Dr. Weber --

17 I think the two main arguments we make is one, that you can't

18 make a blanket statement that just because he's making

19 sovereign citizen arguments that he cannot be delusional.  You

20 can't just decide that because you make this sort of argument.

21 You're making -- that's an extreme belief, that can't be a

22 delusion.

23         The second argument we have is that he's not a

24 typical sovereign citizen case.  Now, the literature and the

25 case law, I don't disagree, says that most sovereign citizen

1   cases, while they present as delusional, they say a lot of

2   outlandish things, they make unpopular arguments, they say a

3   lot of things that don't make sense to those of us who do

4   this, most of them don't have a disorder; they have extreme

5   beliefs.  But the literature points out that for those people,

6   they are typically in some legal problem or some financial

7   problem that may prompt them to research these beliefs and get

8   into it.

9          Mr. Weber is not in that category.  He's a guy who in

10  his mid 50's.  He has a successful dental practice.  He's a

11  professional.  He's married.  He has a family.  He had been

12  paying his taxes and doing what he was supposed to do.  And

13  then, he hears about these sovereignties and ideas on a radio

14  program.  He wasn't seeking them out, but he hears about it

15  and then gets more and more interested in it.  He starts

16  researching it about 40 hours a week and over that period of

17  time, he engages in these sovereignties and activities that

18  really are very self-destructive to him.

19          He's not doing this to get himself out of trouble.

20  He does this to his own detriment.  His business falls apart.

21  Some of his employees don't like that he's doing this, so they

22  quit.  It leads to his -- he and his wife separate and

23  eventually divorce as -- Mr. Weber says as a result of his

24  activities here.  His clientele, his patients at the

25  dentistry, they stopped coming.  He said he couldn't take as

1   many patients because he was spending so much time doing

2   research.

3           So, it is to the detriment of his professional life,

4   it's to the detriment of his personal life and it's not

5   something that he has been able to say -- to reflect on and

6   say, maybe I shouldn't be doing this and kind of learn from

7   that.  It's something that he persists in to this day.  He's

8   doing more and more research as time goes on and persistent in

9   his belief and cannot get away from it.

10          And while those are things that are common to some

11  sovereign citizen cases, the things that Dr. Cervantes pointed

12  out that really makes him unique is that he was not in any

13  financial distress or legal distress at the time he got into

14  this.  On the contrary, him getting into this caused all these

15  problem.  And then secondarily, it's not just sovereign

16  citizen stuff that he gets into, it's all these -- some of the

17  alternative medicine things.

18          Yes, it is true that a lot of people get into

19  alternative medicine, but Dr. Weber is a trained dentist, he

20  was teaching at UB Dental School, he had a successful

21  practice, he's respected in the dental community and then, in

22  the reports, it's talking about how he had to get a body scan

23  and is taking algae because the wireless router in his house

24  killed his kidneys and now he can't process carbohydrates

25  anymore.  It's stuff that doesn't make sense for a typical

1   person, but really doesn't make any sense and is completely

2   irrational for someone who has medical training, has been a

3   health professional his whole life and has been accepted in

4   the dental community not as some crackpot, but as a guy who

5   knows what he's doing.

6          Those are what make him different than the typical

7   sovereign citizen and you can't make a blanket statement that

8   just because he has these sovereign-type arguments, he's not

9   delusional.  You have got to look more deeply than that.

10  That's what Dr. Cervantes did and she'll offer the opinion

11  today that he is not competent to proceed to trial and he is

12  not competent to represent himself.  Thank you, Judge.

13         THE COURT:  All right.  Ms. Kresse?

14         MS. KRESSE:  Thank you, Judge.  Your Honor, the

15  government calls Dr. Daniel Antonius.

16  (The witness was sworn at 10:50 a.m.)

17         THE CLERK:  Spell your first and last name for the

18  record.

19         THE WITNESS:  Last name is A-N-T-O-N-I-U-S.  First

20  name, D-A-N-I-E-L.

21         MS. KRESSE:  May I proceed, Judge?

22         THE COURT:  Yes, please.

23

24

25

1                        DIRECT EXAMINATION

2

3    BY MS. KRESSE:

4    Q.  Good morning.

5    A.  Good morning.

6    Q.  Dr. Antonius, can you tell the Court by whom you are

7    employed?

8    A.  Yeah.  I'm employed by the University of Buffalo

9    Department of Psychiatry.

10   Q.  Your current position is what?

11   A.  I am the director of the forensic division.

12   Q.  And what you say "forensic division," forensic?

13   A.  Forensic psychiatry division.

14   Q.  And you indicated that this is at the University of

15   Buffalo?

16   A.  That's true.

17   Q.  Is this division of forensic psychiatry, is it part of

18   the School of Medicine and Biomedical Sciences?

19   A.  Yes.

20   Q.  And how long have you held that position of director?

21   A.  About three years.

22   Q.  So, since about 2013 or?

23   A.  2014.

24   Q.  Can you tell the Court what your job responsibilities are

25   as the director of the division of forensic psychiatry?

17

1  A.  So, within that, I oversee all the forensic services that

2  we're providing in our department and that includes the

3  correctional settings in Erie County, so the holding center

4  and the other facility in Alden, so in the mental health

5  or -- anything that has to do with the psychiatrist or the

6  psychologist or nurse practitioner in those settings.

7            There's also some things that I am overseeing at

8  Erie County Medical Center and then, there's a training

9  program and a research program that I am overseeing as well.

10 Q.  Is there funding that you are in charge of as director?

11 A.  We have county funding, approximately $1.7 million and

12 that goes across both the juvenile and the adult setting,

13 correctional setting.

14 Q.  When you say "correctional setting," what are you

15 referring to?

16 A.  The sheriff's office, so they have a holding center and

17 the Erie County Correctional Facility out in Alden, those two

18 places primarily.

19 Q.  So, is it fair to say that geographically, your

20 department or your area is focused on Erie County?

21 A.  Yes.

22 Q.  And you -- I believe you made reference to providing

23 within the parameter of Erie County forensic services?

24 A.  That's true.

25 Q.  What do you mean by forensic services?

1   A.  Forensic services include forensic evaluation, competency

2   evaluation like we're talking about today, as well as just

3   making sure that anyone with a mental health problem that are

4   arrested, in a correctional setting, receive the help that

5   they need.

6   Q.  And so, is it fair to say that for anybody in the

7   correctional setting in Erie County who needs to be evaluated

8   for competence, for example, it would be your department that

9   would be responsible for that?

10  A.  That's correct.

11  Q.  As the director of the division of forensic psychiatry,

12  do you have any teaching responsibilities?

13  A.  It's not the normal teaching responsibility, but it's 15

14  weeks, 15 -- or 30 lessons over 15 weeks.  I have to run

15  seminars for residents, medical residents, medical students,

16  also where we see -- we have a practicum for doctoral

17  students in psychology.  So, within that, I oversee training,

18  anything from the undergrad students, graduate students,

19  doctoral students, medical students, residents and psychiatry

20  fellows.

21  Q.  And where is your office actually?

22  A.  I have one office at ECMC and one office downtown,

23  right -- 120 West Eagle Street, which is adjacent to the

24  holding center.

25  Q.  Did you also have office space -- and when I say "you," I

1   mean the Division of Forensic Psychiatry at the University of

2   Buffalo?

3   A.  We do not have it specifically at the University of

4   Buffalo because the department of psychiatry is actually

5   located at the ECMC, Erie County Medical Center, so that is

6   where all of our office space is.  And ECMC is the training

7   hospital for the medical school at UB.

8   Q.  Can you tell the Court about your educational background?

9   A.  I started my education in Norway, where I did one year of

10  psychology and six months of philosophy.  And then, I got an

11  academic scholarship and an athletic scholarship to come over

12  to Stony Brook.  Did my bachelor in psychology at Stony Brook

13  University on Long Island.  I moved on to get a master's in

14  forensic psychology at John Jay for Criminal Justice.  I

15  started working at Nathan Kline Institute for Psychiatric

16  Research.

17          At the same time, I started my doctorate in clinical

18  psychology, which I completed first a master's in general

19  psychology and then a Ph.D. in clinical psychology at the New

20  School For Social Research.  The last part of training for a

21  psychologist is an internship and I did an internship

22  approved by the American Psychiatric Association in forensic

23  psychology at New York University and that was the last part

24  of my training.  And then I moved on to post-doc at NYU,

25  New York University.

1    Q.  And before, did you say part of the internship was at

2    Bellevue?

3    A.  Yes, Bellevue Hospital.  Part of my rotations throughout

4    my training were through different city hospitals in

5    New York; Bellevue Hospital where I rotated on many different

6    units including the forensic unit.  That was actually -- I

7    was on the forensic unit for more than a year because there

8    wasn't any practicum previously there.

9         And then, I also worked at Kirby Forensic

10   Psychiatric Center, which is down towards Long Island right

11   outside Manhattan and I rotated throughout and done training

12   at Manhattan Psychiatric Center, Rockland Psychiatric Center,

13   Nathan Kline Institute for Psychiatric Research, New York

14   University Medical School, or Langold Medical Center.

15        THE COURT:  What kind of work did you do when you

16   were doing the post-doctorate work at NYU?

17        THE WITNESS:  So, I was actually at Bellevue doing it

18   on the top floor, 21st floor, where we did primarily research,

19   but also some clinical services.  And research -- I don't know

20   if we're going to talk about the research -- it was primarily

21   on serious mental illness, schizophrenia, psychotic disorders

22   and aggression, where my main interest is really looking at

23   what makes some people more aggressive or more impulsive and

24   looking at biological factors all the way up to societal

25   factors such as terrorism, things like that.

1       THE COURT:  Thank you.

2   BY MS. KRESSE:

3   Q.  You mentioned that you have a master's in forensic

4   psychology, correct?

5   A.  That's correct, yeah.

6   Q.  And is forensic psychiatry your current area of practice?

7   A.  Yes.

8   Q.  So, can you tell the Court what forensic psychiatry is?

9   A.  It's really the interface between the law and psychiatry

10  or psychology or mental health.  So, it's primarily dealing

11  with anybody with a legal problem who may or may not also

12  have mental health problems.

13  Q.  And your Ph.D. you indicated was in clinical psychology,

14  correct?

15  A.  In clinical psychology, correct.

16  Q.  And what does that involve?

17  A.  That is, again, looking at mental health issues, anything

18  from personality problems to more serious things like

19  depression and schizophrenia and psychosis and things like

20  that.  And for me, treatment would be research, it would be

21  various different things within mental health.

22  Q.  And you have just spoken for a few minutes about your

23  educational background.  Is that documented in your

24  Curriculum Vitae?

25  A.  Yes.

                                                                22

1    Q.  So, if I show you -- may I approach the witness, Judge?

2              THE COURT:  Yes, you may.

3    BY MS. KRESSE:

4    Q.  So, if I show you what's been marked as Government

5    Exhibit 3501 and ask if you on recognize that?

6    A.  Yes.  That's my CV.

7    Q.  Is that something you prepared and provided to me as part

8    of your evaluation in this case?

9    A.  Yes, I did.

10   Q.  And it is -- I don't know how many pages it is.  It's

11   many pages, right?

12   A.  That's correct.

13   Q.  How many pages?

14   A.  Twenty-five.

15   Q.  And in addition to your education, what other information

16   is set forth on your CV?

17   A.  Education, clinical positions -- and I am just going

18   through them -- academic positions, my licensure,

19   internships, practicum that I have been at, educational

20   activities, training that I am involved in; committees,

21   including forensic committees, including I'm currently on the

22   governing board of the New York State Psychological

23   Association, forensic division and then, memberships in

24   different organizations, to honors and awards that I

25   received, to my research projects that have been approved by

1    medical schools.

2            And then it goes into the journals that I reviewed

3    in, the journals where I served as an editor in chief; to

4    grants, grants that I received, to publications and then

5    presentations.  And then, it talks about my trainees, who my

6    trainees are and that's on the last couple of pages.  And

7    then, it ends with media coverage, where I have been

8    interviewed in the media for various things.

9    Q.  And so, there's a section there that talks about

10   publications?

11   A.  That's correct.

12   Q.  And have you published articles in various journals?

13   A.  Yes.

14   Q.  And approximately how many articles?

15   A.  The total number is 91.  That includes abstracts.  When

16   it comes to articles, peer-reviewed articles in, you know,

17   quality journals where we know that they are reviewed by our

18   peers, it's 58.  And then there are three books, two book

19   chapters and then, I did these conference abstracts, too,

20   that sometimes are published.

21   Q.  Have you ever written on the area of sovereign citizens

22   as it relates to forensic psychology?

23   A.  I have not.

24   Q.  Is this area, the area of sovereign citizens as it

25   relates to competency and legal matters, is this an area that

24

1   you were familiar with before you were contacted by the

2   government in connection with this particular case?

3   A.  Yes, I was.

4   Q.  Now, going back to your current position as director of

5   forensic psychology --

6           THE COURT:  Just one second.

7   (An off-the-record discussion was held.)

8   BY MS. KRESSE:

9   Q.  So, going back to your current position as director of

10  forensic psychiatry, you yourself are not a psychiatrist,

11  correct?

12  A.  I am not.

13  Q.  And the difference between a psychiatrist and a

14  psychologist is what?

15  A.  A psychiatrist goes through medical school.  The

16  psychologist goes through graduate school.  In laymen terms,

17  one prescribes medication, the other one does primarily

18  psychotherapy and psychologists also do psychological and

19  neuropsychological testing and psychiatrists do not.

20  Q.  Are there psychiatrists who are supervised by you?

21  A.  Within my division there are four psychiatrists, three

22  psychologists and two nurse practitioners.  So, those four

23  psychiatrists are under my directorship.

24  Q.  Are you familiar with a person named Ana Natasha

25  Cervantes?

1   A.   Yes, I am.

2   Q.   And how are you familiar with her?

3   A.   She runs the fellowship, the forensic fellowship in our

4   division and I also used to work with her previously at the

5   holding center when she was employed there.

6   Q.   Is she no longer employed at the holding center?

7   A.   She's no longer employed at the holding center, so my

8   only interaction at this point with her is as the director of

9   the fellowship.

10  Q.   And is the fellowship part of the UB division of forensic

11  psychiatry?

12  A.   Yes.

13          THE COURT:  Just one second.

14  (An off-the-record discussion was held.)

15          THE CLERK:  All rise.  You may be seated.

16          THE COURT:  All right.  Sorry for the delay.  We have

17  technical problems, but we can continue.  Go ahead,

18  Ms. Kresse.

19          MS. KRESSE:  Thank you, Judge.

20  BY MS. KRESSE:

21  Q.   Dr. Antonius, we were talking about your familiarity with

22  Dr. Cervantes.  Do you recall that?

23  A.   Yes, I do.

24  Q.   And in particular that she's part of the UB Division of

25  Forensic Psychiatry?

1   A.   That's correct.

2   Q.   Now, she -- is Dr. Cervantes one of the psychiatrists

3   that you referenced a few moments ago in your testimony as

4   being someone who is under your direction?

5   A.   Yes, she's under my direction.

6   Q.   Do you supervise her?

7   A.   I do not supervise her directly, no.

8   Q.   Have you consulted in the past with Dr. Cervantes on

9   forensic evaluations?

10  A.   Yes, I have.

11  Q.   And do you recall, was one such consultation in a federal

12  case *United States vs. Robert Baschmann*?

13  A.   Yes.

14  Q.   Okay.  And do you recall before which court that case

15  was?

16  A.   Yeah, I believe it was in this court.

17  Q.   And can you tell the Court what the nature of the

18  consultation was in the case of *U.S. vs. Robert Baschmann*?

19  A.   She had asked me to come in and do psychological testing

20  on Mr. Baschmann, which I did.  And we -- she already had a

21  preliminary diagnosis of delusional disorder, which I agreed

22  with based on my evaluation.

23  Q.   Do you recall whether your evaluation and Dr. Cervantes'

24  evaluation were in the context of whether or not

25  Mr. Baschmann was competent to stand trial?

1   A.   It was.

2   Q.   And do you recall what the determination of you and

3   Dr. Cervantes was on that case?

4   A.   That he was not competent to stand trial.

5   Q.   And I believe you indicated that the basis for that was

6   that Mr. Baschmann suffered from a delusional disorder?

7   A.   That is correct.

8   Q.   Now, you testified that your program at UB is contracted

9   by Erie County to provide forensic services, correct?

10  A.   Yes.

11  Q.   And that forensic services includes competency

12  evaluations?

13  A.   Yes, indeed.

14  Q.   How many competency evaluations have you performed?

15  A.   Somewhere between 1,400 and 1,500.

16  Q.   And in what time period, sir?

17  A.   That's since 2011.  We have a very high number of

18  competency evaluations.

19  Q.   And when you say that you have done between 1,400 and

20  1,500, have others in your department also done competency

21  hearings?

22  A.   Yes.

23  Q.   But this is you, yourself, who have done this many?

24  A.   The 14 to 1,500 is only me.

25  Q.   Have you found any individuals not competent to stand

1   trial?

2   A.   Yes.

3   Q.   In what percentage of your 1,400 to 1,500 evaluations

4   have you concluded that the individual is not competent to

5   stand trial?

6   A.   It's about 25 percent.

7   Q.   We talked about your involvement in the federal case

8   involving Mr. Baschmann.  Have you been involved in any other

9   federal cases?

10  A.   Yes, I have.

11  Q.   Can you explain how many and what the nature of your

12  involvement was?

13  A.   It's been a handful.  It's ranged from competency

14  evaluation to also making an opinion of whether somebody

15  should be tried as an adult versus a juvenile and I have done

16  evaluations for Mr. Comerford's office as well as for the

17  prosecutors, but, again, the number is about, I would say,

18  five or six.

19  Q.   And so, in those federal cases based on what you have

20  just said, you have been on both sides.  You've been retained

21  by both the Public Defender's Office and by the U.S.

22  Attorney's Office to render opinions?

23  A.   That is correct.

24  Q.   Have you testified previously on the issue of competency

25  to stand trial?

1   A.  Yes, I have.

2   Q.  About how often?

3   A.  So, again, it's somewhere between 10 to 15 times.

4   Q.  And in what courts?

5   A.  I've testified in local town courts, city court, state

6   court on competency.

7   Q.  Have you testified on competency in federal court?

8   A.  I have not.

9   Q.  Now, in terms of this case and this is the case against

10  Charles Weber, can you explain the nature and circumstances

11  of your involvement?

12  A.  Yes.  I was retained by your office to do an evaluation

13  on Dr. Weber and that's how we're here.

14  Q.  And what was your understanding of the nature of the

15  case?

16  A.  So, my understanding of the nature of the case was that

17  there was a criminal case and there was a question related to

18  his mental capacity and his mental health, whether or not

19  there was a psychiatric diagnosis or not and how that

20  impacted his -- again, his competency.  So, I was asked both

21  to look at the diagnosis as well as competency.

22  Q.  And your involvement in the case, did it include an

23  examination of the defendant, Charles Weber?

24  A.  Yes, it did.

25  Q.  And when did that occur, approximately?

1  A.  I saw him four times in May and June, so the Summer of

2  2017.

3  Q.  Did you create a report as a result of that evaluation?

4  A.  Yes, I did.

5  Q.  Was that at the request of the government?

6  A.  Yes.

7  Q.  Did you have an understanding at the time whether the

8  defendant had previously been examined by anyone else?

9  A.  Yes.  My understanding was he had previously been

10  examined by Dr. Cervantes.

11  Q.  Did you have an understanding of any conclusions that

12  Dr. Cervantes had reached relative to Charles Weber?

13  A.  I did know that he had been diagnosed with a delusional

14  disorder.

15  Q.  And in terms of delusional disorder, are there different

16  types of delusional disorders in your field?

17  A.  Yes, there are several types, including persecutory type,

18  or erotomanic type, somatic type and so on.  And then, one of

19  them is a mixed type when you are not really sure which one

20  it is, or maybe there's evidence of a couple of different

21  ones when you give it a mixed type.

22  Q.  And in this case with respect to Charles Weber, did

23  Dr. Cervantes give a particular disorder?

24  A.  It was delusional disorder of mixed type.

25  Q.  And was there a description of what the mixed type, like

1    what categories she believed that he fell in?

2    A.   She described it as it related to the persecutory type.

3    This, I believe to be the sovereign citizens' views as well

4    as within a somatic delusion that he believes in these

5    alternative treatments.

6    Q.   Is it fair to say that a somatic delusion involves like,

7    your personal health and physicality?

8    A.   Typically it does, yes.

9    Q.   And then in terms of the prosecutorial, that would

10   incorporate somebody's opinions about the government and the

11   government's role in connection with them?

12   A.   Yes.   It's not uncommon, that that is kind of like this

13   anti-government view.   And I just want to, if I may, explain

14   with somatic.

15   Q.   Sure.

16   A.   When we're talking about somatic delusions, we're

17   typically talking about a true somatic delusion, that

18   somebody has a tumor or somebody has some problem physically

19   that is just not there.   So, in this case, we're talking more

20   about somatic concerns where somebody has some, according to

21   the report, illogical beliefs how they are going to receive

22   the treatment for.   So, it's not a typical somatic delusion,

23   but that's still the area that it falls in under.

24   Q.   And we're jumping ahead a little bit, but with respect to

25   Charles Weber, would the somatic delusion relate, for

1    example, to his belief that he had mercury poisoning?

2    A.   It could, yes.

3    Q.   I mean, that could be a delusion.  Now, in order for

4    something -- strike that.  Can you have delusions without

5    being delusional for purposes of the DSM-5?

6    A.   You can absolutely have illogical beliefs that, to most

7    people, sounds crazy, but still, if those are beliefs that

8    many other people held, then it just doesn't fit the criteria

9    for a delusion.

10            THE COURT:  DSM-5?

11            MS. KRESSE:  Yeah.

12            THE COURT:  Could you explain that to me a little bit

13   more?

14            MS. KRESSE:  Yes, Judge.  I apologize.  Let me ask

15   some questions about that.

16            THE COURT:  Yeah, because I don't understand that.

17            MS. KRESSE:  That's because I jumped ahead, Judge.

18   Sorry.

19   BY MS. KRESSE:

20   Q.   In making diagnoses, is there a particular book or

21   reference guide that psychologists and psychiatrists use?

22   A.   Yes.  So, this is the DSM and we're now in the fifth

23   edition, so it's the DSM-5.  It's the Diagnostic and

24   Statistical Manual for mental disorders, that's the

25   definition of it and now it's in its fifth edition.

1    Q.  And so, is it kind of commonly referred to as the DSM-5?

2    A.  DSM, DSM-5.  Very commonly referred to.  It's kind of

3    like a law book.  So, attorneys have a book where they go to

4    and look for what is the criteria to breaking a law.

5    Similarly, psychiatrists, psychologists, mental health

6    professionals have the DSM, where they can go in and see

7    whether or not somebody meets the criteria for a mental

8    health disorder.

9    Q.  And in evaluating a particular person forensically, a

10   psychiatrist or psychologist will consult the DSM in terms of

11   finding whether somebody's behavior fits criteria for a

12   particular diagnosis?

13   A.  That is correct.

14   Q.  Going back be to Dr. Cervantes' report and the finding of

15   a delusional disorder mixed type, was there a finding in her

16   report relative to the defendant's competency to stand trial?

17   A.  No.

18   Q.  You indicated that you created a report following your

19   interview and examination of Charles Weber, correct?

20   A.  That's correct.

21          MS. KRESSE:  And Your Honor, if I could approach?

22          THE COURT:  Yes.

23   BY MS. KRESSE:

24   Q.  Showing you what has been marked as Government Exhibit 1.

25   Do you recognize this document, sir?

1    A.   Yes.  This is the report that I produced after I

2    evaluated Dr. Weber.

3    Q.   It's a multiple-page document, correct?

4    A.   That's correct.

5    Q.   Seventeen pages?

6    A.   Correct.

7    Q.   And at page 17, do you see a signature?

8    A.   Yes, I do.

9    Q.   And obviously, it's not your original signature, correct?

10   A.   That is correct.

11   Q.   But do you recognize it to be your own?

12   A.   That is my signature.

13          THE COURT:  By the way, do you have a CV on him?

14          MS. KRESSE:  We do, Your Honor.  It's 3501.

15          THE COURT:  3501.  Did you move that into evidence?

16          MS. KRESSE:  I will -- I did show it to the witness

17   and I would move it into evidence at this time.

18          THE COURT:  It will be received.

19          MR. COMERFORD:  No objection to this one.

20          THE COURT:  Okay.

21   (Government Exhibit 3501 was received in evidence.)

22

23          MS. KRESSE:  And the government also offers at this

24   time into evidence Government Exhibit 1, the report of

25   Dr. Antonius.

1          MR. COMERFORD:  No objection.

2          THE COURT:  It will be posted and is received.

3          MS. KRESSE:  Thank you, Judge.

4    (Government Exhibit 1 was received in evidence.)

5

6    BY MS. KRESSE:

7    Q.  So, if we look at the first page of this document, it's

8    titled "Forensic Psychological Evaluation," correct?

9    A.  Yes.

10   Q.  And directing your attention to a heading also on page 1,

11   "Reason For Referral."  Do you see that?

12   A.  Yes.

13   Q.  Okay.  And what information is set forth under that

14   caption?

15   A.  This states the reason why he came to see me; why I was

16   doing the evaluation on Dr. Weber.

17   Q.  And it references the fact that you were requested by the

18   United States Attorney's Office in this district to

19   independently evaluate Dr. Weber, correct?

20   A.  Yes.

21   Q.  Okay.  And is there an explanation in that section

22   "Reason For Referral" as to what you were asked to do?

23   A.  Yes.

24   Q.  And what was that?

25   A.  So, I am quoting here from my report.  "Specifically,

1   Ms. Kresse is requesting an evaluation of Dr. Weber's

2   historical and present psychiatric symptoms as well as

3   psychiatric diagnosis to clarify whether or not he meets

4   criteria for a delusional disorder and a good faith defense

5   under the assumption that he committed a tax crime under the

6   irrational belief that he owes no legal duty to pay taxes."

7   Q.  And was there something else that I had asked you to do?

8   A.  Additionally -- I'll continue quoting here.

9   "Additionally, Ms. Kresse is requesting the evaluation to

10  include whether there is reasonable cause to believe that

11  Dr. Weber may be presently suffering from a mental disease or

12  defect rendering him mentally incompetent to the extent that

13  he is unable to understand the nature and consequences of the

14  proceeding against him or to assist in his defense," end

15  quote.

16          MS. KRESSE:  And I'm just going to ask, is that too

17  fast for the stenographer?

18          THE COURT:  She got it.

19  BY MS. KRESSE:

20  Q.  Just sometimes when you are reading, just to go a little

21  slower.

22  A.  I apologize.

23  Q.  She's good.  She got it.  And so, the basis for the

24  conclusions by Dr. Cervantes of a delusional disorder was

25  what?

1  A.  I -- so, again, there's two parts for a basis of

2  delusional disorder.  Again, one, that he has these somatic

3  concerns that he's looking or -- he's getting treatment for

4  from alternative sources that have no scientific validity to

5  them.  And the second part, that seems to be more

6  problematic, is that he has these sovereign citizen views

7  that are more than the normal sovereign citizen.  So, it

8  doesn't fit the typical sovereign citizen.

9  Q.  And there's a reference to an irrational belief that he

10  owes no legal duty to pay taxes, correct?

11  A.  That is correct.

12  Q.  Is that sort of the manifestation of the delusional

13  disorder relative to Dr. Weber?

14  A.  My understanding from the report that she traced that

15  back to about 2006 when he initially listens to this radio

16  program that you brought up earlier and starts developing

17  thoughts about paying taxes, not paying taxes and so on.

18  Q.  And it's the failure to pay taxes that got Charles Weber

19  in trouble in federal court, correct?

20  A.  That's correct.

21  Q.  Okay.  Now, jumping ahead to your conclusions as set

22  forth in your forensic psychological evaluation, did you

23  reach a conclusion relative to the defendant whether or not

24  he had a delusional disorder?

25  A.  Yes.  In my opinion, I do not believe he does not meet

1   the criteria for delusional disorder.

2   Q.  And we'll get into that in more detail.  But as to the

3   second area that you were asked to opine on, did you reach a

4   conclusion as to whether or not the defendant was competent

5   to stand trial?

6   A.  Yes, I did.

7   Q.  And what was your conclusion in that regard?

8   A.  I found that he was competent to proceed with the

9   adjudication process and stand trial.

10  Q.  I will get into this in a little more detail later, but

11  one issue that I did not -- that you were not asked to opine

12  on was whether or not Charles Weber was competent to

13  represent himself at trial, correct?  You were not asked to

14  opine on that particular issue?

15  A.  That is correct.

16  Q.  Is that issue something that you have considered

17  subsequent to your evaluation of Dr. Weber?

18  A.  Yes, I have.

19  Q.  And have you reached an opinion relative to that issue?

20  A.  I do believe he has the ability to proceed pro se.

21  Q.  To represent himself?

22  A.  To represent himself.

23  Q.  Okay.  Now, prior to meeting with the defendant, with

24  Charles Weber, did you review any documents regarding the

25  criminal charge?

1   A.  Yes, I did.

2   Q.  Do you recall what you reviewed?

3   A.  It is also in my report what I reviewed, but I reviewed

4   the indictment as well as Dr. Cervantes' initial report.  I

5   also reviewed an MMPI, a psychological test, that was

6   completed as part of Dr. Cervantes' report.

7   Q.  Actually, let me stop you there.  So, you are referring

8   to your report, which is Government Exhibit 1.  And are you

9   referring to the section titled "Sources of Assessment"?

10  A.  Yes.

11  Q.  And then a subheading, "Review of Legal Records and Other

12  Available Records", beginning -- and this is beginning at the

13  bottom of page 1?

14  A.  That is correct.

15  Q.  Okay.  And you have referenced already the indictment,

16  correct?

17  A.  Correct.

18  Q.  And then, in terms of the prior assessment by

19  Dr. Cervantes, you indicated that you reviewed her evaluation

20  report?

21  A.  Correct.

22  Q.  And that evaluation report was actually authored both by

23  Dr. Cervantes and another doctor as well, correct?

24  A.  Yeah.  Her trainee, actually, our first fellow,

25  Dr. Heffler, was part of that evaluation.

1   Q.   Okay.  And Heffler is H-E-F-F-L-E-R, is that correct?

2   A.   Correct.

3   Q.   And her first name?

4   A.   Melissa.

5   Q.   You, then, reference as set forth on the bottom of page 1

6   in Government Exhibit 1 an MMPI score that you reviewed,

7   correct?

8   A.   That is correct.

9   Q.   By whom was that testing done?

10  A.   It was -- so, it's conducted -- it was conducted as part

11  of Dr. Cervantes' evaluation.  I believe it was probably sent

12  out to an agency that will do the interpretation of it, so

13  she is probably having Dr. Weber complete the -- it's a

14  questionnaire with around 500 or something questions.  He

15  completes it and then it is sent out for interpretation to

16  one of these testing agencies.

17  Q.   And when you refer to "she," just so the record is clear,

18  you mean either Dr. Cervantes or Dr. Heffler?

19  A.   That is correct.

20  Q.   One of the doctors who would have given this test to

21  Mr. Weber?

22  A.   Correct.

23  Q.   And then, I think, to understand your answer, is it that

24  neither Dr. Cervantes nor Dr. Heffler would be the ones

25  interpreting that test, that they would send it out?

1   A.   They did send it out, because there's a certain scoring

2   system that goes with it.  And I had mentioned this before.

3   Most psychiatrists do not do psychological testing, so when

4   they do these types of personality testing as part of an

5   examination, they typically will send it out to an agency

6   that, then, will run it through a scoring system and they'll

7   produce a result which are, then, sent back to the examiner.

8   Q.   And you may have just answered my next question, which

9   is, what is the MMPI-2?

10  A.   It is the Multiphasic Minnesota Personality Inventory.

11  Q.   So, it tests a person's personality?

12  A.   It tests one's personality.  It gives you a range of

13  clinical scales and personality scales and looks into

14  somebody's personality functioning and personality

15  characteristics as well as clinical characteristics to see if

16  there's anything wrong.

17  Q.   Was there anything that Dr. Cervantes and Dr. Heffler in

18  their initial report focused on in terms of the result of the

19  MMPI-2?

20  A.   There was nothing major.  They do report some findings

21  relating to somatic concerns.  That was the main finding.

22  And the other thing she points out is that it was a valid

23  protocol.  That means that it's a reliable protocol; that

24  Dr. Weber answered the questions as would be expected.

25  Q.   So, that there was no -- does it mean -- and correct me

ANTONIUS -- MS. KRESSE -- 01/19/18

42

1   if I'm wrong.  Does it mean that he was not malingering or

2   faking answers?

3   A.  That's correct.

4   Q.  Okay.

5   A.  And also that he answered the questions in a consistent

6   fashion.  And that's also important, because if you have an

7   invalid protocol, that is going to lead to some problems

8   later on when you are doing the testing.

9   Q.  And there was no indication of that as noted by

10  Dr. Cervantes and Dr. Heffler in that report?

11  A.  That's correct.  There were no problems noted.

12  Q.  Were any physical tests conducted by Dr. Cervantes and

13  Dr. Heffler?

14  A.  The closing of the physical test was the MRI.  There was

15  a head imaging test done as part of the evaluation.

16  Q.  An MRI?

17  A.  An MRI, yes.

18  Q.  And what part of the body?

19  A.  The scanning of the head and the brain.

20  Q.  I apologize if you answered that and I didn't catch it.

21  As part of your evaluation, did you review the report from

22  the MRI?

23  A.  I did.

24  Q.  Did it show any abnormalities relative to Charles Weber's

25  brain or brain functioning?

1    A.  No, it did not.

2    Q.  And if we could talk about MRIs for a moment, an MRI is a

3    diagnostic tool for what types of disorders, like what -- it

4    is a test for what types of disorders?

5    A.  Commonly in psychiatry it's used to -- it's a part of

6    diagnosing neurocognitive disorders.  What we typically talk

7    about here is someone with Parkinson's or Alzheimer's or

8    dementia or somebody with a specific head trauma.  So, think

9    about football players who have experienced concussions, or

10   nowadays they talk a lot about multiple concussions or sub-

11   concussions, but there's either specific head trauma or head

12   injury to the brain, so that's where you use an MRI.

13   Q.  So, first of all, cognitive disorders, is that a category

14   of psychological disorder that's found in the DSM?

15   A.  Yes, it is, neurocognitive disorder.

16   Q.  And the neurocognitive disorders, do they all relate to

17   brain functioning?

18   A.  Yes.

19   Q.  And those type of disorders can be diagnosed by a test

20   such as an MRI as opposed to just someone's subjective

21   statements about how they feel or what they believe?

22   A.  That's correct.  If I may explain a little bit further?

23   Q.  Absolutely.

24   A.  So, in the DSM, it's actually outlined that for a

25   neurocognitive disorder.  The key measure is testing.  A key

1   measure is neuropsychological testing.  So, in order to reach

2   a diagnosis, you really need to have done neuropsychological

3   testing that supports your diagnosis.  So, in other words,

4   you have to find impairment in neuropsychological testing and

5   an MRI would certainly be very helpful as well, before you

6   can diagnose a neurocognitive disorder.

7   Q.  And here, the MRI had no -- there was no evidence of any

8   sort of disorder, correct?

9   A.  Not on the MRI, that's correct.

10  Q.  As part of your evaluation, did you conduct any

11  neuropsychological testing?

12  A.  I did, yes.

13  Q.  And what did that show in terms of whether or not Charles

14  Weber demonstrated a neurocognitive disorder?

15  A.  In my opinion, he does not show the impairment that he

16  would need for diagnosing somebody with a neurocognitive

17  disorder.

18  Q.  And jumping ahead, there came a time where Dr. Cervantes

19  authored an addendum to her initial evaluation, correct?

20  A.  That is correct.

21  Q.  And in that addendum, were there findings about Dr. Weber

22  relative to having a neurocognitive disorder?

23  A.  She speculates that he has, at this point, an unspecified

24  neurocognitive disorder.

25  Q.  Was that based on the MRI?

1   A.   No.

2   Q.   Because there's no evidence in the MRI for that, correct?

3   A.   That is correct.

4   Q.   Was that based on any neuropsychological testing she

5   performed?

6   A.   No.

7   Q.   So, the only neuropsychological testing that was done was

8   done by you?

9   A.   That's correct.

10  Q.   And you reviewed those test results?

11  A.   I did.

12  Q.   And did you consider as part of your evaluation whether,

13  in fact, Dr. Weber had a neurocognitive disorder?

14  A.   Yes, I did.

15  Q.   And your conclusion was that?

16  A.   He does not have a neurocognitive disorder.

17  Q.   Is it possible for a person to have a cognitive disorder

18  without finding any evidence of it on an MRI?

19  A.   So, that is possible; where one may be in the early

20  stages of developing a neurocognitive disorder, Alzheimer's

21  where it's just not viewable on an MRI scan.  However, I have

22  to say in this case, it's just highly unlikely because we're

23  talking about a time period that seemed to go back to 2006

24  and the fact that over a time period of 12 years with

25  somebody with a cognitive disorder and then not seeing any

1   findings on an MRI, it is highly unlikely, if not impossible.

2   Q.  To follow up on that, so in terms of the year 2006, why

3   is that year relevant?

4   A.  So, this is just when he initially heard this radio show

5   that I am tracing it back to.  One could make the argument

6   that maybe he started having ideas about not paying taxes

7   even before that.

8   Q.  So, in 2006 -- when you say "he," you're referring to

9   Charles Weber?

10  A.  That's correct.

11  Q.  And so, 2006 is the first year that he identifies as when

12  he began to learn about and research sort of the sovereign

13  citizen idea, correct?

14  A.  This is the year that he traces it back to when he really

15  started his research and this radio program, although it

16  seems like he was having trouble with his taxes before 2006.

17  So, the idea about not paying taxes, I assume, came before

18  2006.

19  Q.  And in terms of somatic or physical complaints, did he

20  have physical complaints back in 2006 or in that time period?

21  A.  The physical concerns that he is describing started a

22  little bit later, actually, in 2009 and 2010 and then he

23  described to me several episodes that he had had in 2012 and

24  '13 as well.  And again, so there's a progression of these

25  complaints that he had.  They were feeling lightheaded,

1  nausea and increased heart rate, that other people have told

2  him that maybe it's just related to stress, but that's kind

3  of the time period that those go back to.

4  Q.  And taking that back to an MRI in terms of a diagnostic

5  tool for a neurocognitive disorder, is it your testimony that

6  because these deficits or these phenomenon in terms of the

7  tax issues, the sovereign citizen issues and the somatic

8  claims that happened a little later, because they began

9  earlier in the 2000s and the MRI was done in 2016, that

10 there -- it's highly unlikely because there should have been

11 some evidence of that, if it existed, on that MRI?

12 A.  That is correct.  As a matter of fact, if I just may

13 explain a little further, I know that the topic of an unusual

14 presentation of early dementia came up in an email, case

15 presentation.  That was part of the things that I reviewed.

16         And again, if somebody has an early presentation or

17 unusual presentation of early dementia that is starting back

18 ten years earlier, you would suspect that there would be some

19 evidence on a brain scan ten years later.  So, the fact that

20 there is no evidence on the brain scan makes it highly

21 unlikely that he's dealing with a cognitive disorder.

22 Q.  And again, a cognitive disorder would be something like

23 dementia or Parkinson's, something along those lines?

24 A.  Yes, dementia, Alzheimer's, or, again, a traumatic brain

25 injury.

1    Q.   Okay.  And there's no evidence that Charles Weber had a

2    traumatic brain injury?

3    A.   As part of my evaluation, I did screen for a lot of this,

4    because he talked about he played football, so everything we

5    know about football these days, about CTE and chronic

6    traumatic encephalomyelopathy, football players developing

7    problems later in life -- and actually, I am part of a

8    research group doing research on that -- it's important that

9    we screen for that as well and there was just no evidence

10   that a traumatic brain injury or concussion had caused any

11   cognitive difficulties for him.

12          If I may also just expound a little bit.  On a

13   cognitive disorder, what we're typically looking for, which

14   would be of concern, is somebody who has significant problems

15   in attention, so attending to things around them,

16   concentrating, focus.  Another main area is language, the

17   ability to produce language, understand language.

18          Another area is memory, short-term memory, long-term

19   memory, the ability to retain and form new memories.  Another

20   area is emotional control, social cognition, the ability to

21   use emotion, understand emotion, recognize emotions.  Another

22   area is visual-spatial ability, which is often related to

23   Parkinson, the ability to control one's movements.

24          And then, the last part that's brought up in

25   Dr. Cervantes' report is executive functioning so, again,

1    that somebody has cognitive control, that somebody -- his

2    ability to control and organize and structure one's thinking

3    and making decisions based on one's reasoning and thinking.

4    So, those are the things you are looking for.  Not only are

5    you looking for those things, but they have to be consistent,

6    they have to be daily, they have to impact somebody daily.

7    And in Dr. Weber's case, there's just, to me, not evidence

8    that that is happening.

9    Q.  In terms of executive functioning, is that, as a

10   practical matter, as an example of that, somebody who is able

11   to get out of bed, have breakfast, get dressed, if they want

12   to go somewhere, they're able to get there, do what they want

13   to do, come home.  Is that what executive function is talking

14   about?

15   A.  Yeah, executive functioning is -- that's exactly it.  It

16   is the ability to structure and organize one's day.  It's the

17   ability to eat, shop, doing things, again, throughout the

18   day.  It's one's ability to start activities, end activities.

19   That's really what you are looking at in terms of executive

20   functioning.

21        A lot of times, you can think as an example of your

22   six-year-old kid who is just making rash decisions all over

23   the place and never really thinking about what they're doing.

24   A six-year-old boy can certainly not structure their day in a

25   good way, so they develop that over time to be able to

1    control their thinking and organize what they do.

2           And again, when we, in our field, look at executive

3    functioning problems, the two diagnoses that are typically

4    associated with executive functioning problems is ADHD and

5    addiction.  Those are the two areas where we know there is

6    impairment in the prefrontal lobe, the area that has to do

7    with executive functioning, yes.

8    Q.  Is there any evidence or did you discover any evidence

9    that Dr. Weber had any symptomology related to ADHD?

10   A.  No.

11   Q.  And ADHD is attention deficient disorder.  Is the H

12   hypertension?

13   A.  It's Attention Deficit Hyperactivity Disorder.

14   Q.  Thank you.  What about addiction, any evidence of

15   addiction?

16   A.  No.

17   Q.  So, for a person like Charles Weber who, as indicated in

18   both your report and Dr. Cervantes' two reports, spends hours

19   per day researching the law and researching sovereign citizen

20   issues, is that a choice on his part or is that indicative of

21   a faulty ability to executively function?

22   A.  In my opinion, that's a choice that he had made and

23   there's been a progression of this where it started as an

24   idea and then over time it's taken on more and more of his

25   time.  So, it becomes kind of like, what we call, an

1   overvalued idea.  And then, some may argue that in terms of

2   the sovereign citizen views, it's an extreme belief, but

3   that, again, does not mean that he has a cognitive disorder

4   or a delusional disorder.

5   Q.  And so, we were talking about the MRI and the MRI is a

6   vehicle for diagnosing neurocognitive disorder.  Is an MRI

7   ever used to diagnose a delusional disorder?

8   A.  No.

9           MS. KRESSE:  If I may approach, Judge?

10          THE COURT:  Yes.

11  BY MS. KRESSE:

12  Q.  Showing you what has been marked as Government Exhibit 2.

13  Take a look at that.  Do you recognize that, sir?

14  A.  Yes, I do.

15  Q.  And what do you recognize Government Exhibit 2 to be?

16  A.  This is the initial report produced by Dr. Cervantes and

17  Dr. Heffler --

18  Q.  Is there --

19  A.  -- on --

20  Q.  Go ahead.

21  A.  -- Charles Weber.

22  Q.  And is there a date on that?

23  A.  The date is October 30th, 2016.

24  Q.  And to be clear, that's the date of the report, not the

25  date of the evaluation?

1   A.   That's the date of the report, correct.

2   Q.   Okay.   Is there listed on this forensic examination the

3   dates of evaluation of Charles Weber?

4   A.   Yes.

5   Q.   And what are those?

6   A.   August 18th, 2016 and August 25th, 2016.

7   Q.   And sir, this is -- if you page through it, it's a

8   multiple-page evaluation, 13 pages.   Do you see that?

9   A.   That's correct.

10  Q.   And in looking through that -- and take your time, if you

11  need it -- is this the report that you reviewed and which you

12  used as a basis for your report, in part your evaluation of

13  that report?

14  A.   Yes, that is correct.

15            MS. KRESSE:   Your Honor, the government offers

16  Government Exhibit 2 into evidence.

17            MR. COMERFORD:   No objection.

18            THE COURT:   All right.   It will be received.

19  (Government Exhibit 2 was received in evidence.)

20

21  BY MS. KRESSE:

22  Q.   And just for purposes of doing this, at the same time, I

23  am going to also show you what has been marked as Government

24  Exhibit 3 and ask if you recognize this.

25  A.   Yes.   This is the addendum report that was completed by

1   Dr. Cervantes.

2   Q.  And the addendum is -- there's only one name on that

3   addendum, correct?

4   A.  That is correct.

5   Q.  That is Dr. Cervantes' name?

6   A.  Correct.

7   Q.  All right.  Do you see a date on this document?

8   A.  The date of this report is November 2nd, 2017.

9   Q.  And is there a date indicated of a re-evaluation of

10  Charles Weber?

11  A.  Yes, there is.

12          THE COURT:  This is Exhibit 2 or?

13          MS. KRESSE:  This one is Exhibit 3, Judge, for

14  identification, at this point.

15          THE COURT:  Oh.  All right.  I did not realize you

16  switched.

17          THE WITNESS:  And the date of the re-evaluation here

18  is noted to be August 22nd, 2017.

19  BY MS. KRESSE:

20  Q.  Now, this Government Exhibit 3, the forensic examination

21  addendum, this was something that was created after you did

22  your evaluation and gave -- and provided your report,

23  correct?

24  A.  That's correct.

25  Q.  And is it fair to say that this addendum is in response

                                                                    54

1    in part to your evaluation?

2    A.   I assume so.

3    Q.   Well, in reading through it, are there references, for

4    example, to findings that you made in your evaluation?

5    A.   Yes, there is.

6    Q.   So, at least in part, it's responding to conclusions and

7    opinions that you reached after your evaluation of Charles

8    Weber?

9    A.   Correct.

10   Q.   Okay.  In looking through this document, sir, do you

11   recognize it as a report that you reviewed prior to your

12   testimony here today?

13   A.   The last report?

14   Q.   The last report, Government Exhibit 3.

15   A.   Yes, I did.

16        MS. KRESSE:  Your Honor, the government offers

17   Government Exhibit 3, which is the forensic evaluation

18   addendum by Dr. Cervantes, into evidence.

19        MR. COMERFORD:  No objection.

20        THE COURT:  It will be admitted.

21        MS. KRESSE:  Thank you, Judge.

22   (Government Exhibit 3 was received in evidence.)

23

24   BY MS. KRESSE:

25   Q.   So, you have in front of you both your report, which is

1    Government Exhibit 1 and the initial report by Drs. Cervantes

2    and Heffler, which is Government Exhibit 2.  You indicated

3    that in terms of Government Exhibit 2, which is the original

4    forensic evaluation by Drs. Cervantes and Heffler, that the

5    date of that report is October 30th, 2016, correct?

6    A.  Correct.

7    Q.  Did you review this report before or after you met with

8    Charles Weber?

9    A.  Before.

10   Q.  Is there a section -- and I am asking you to refer to

11   Government Exhibit 2, which is Cervantes' initial report.  Is

12   there a section of her report that addresses her forensic

13   opinion?  And I can direct your attention to the bottom of

14   page 10.

15   A.  Yes.

16   Q.  And there's a title "Forensic Opinion," correct?

17   A.  Correct.

18   Q.  Does that section of the report continue until the end,

19   which is page 13?

20   A.  Yes.

21   Q.  And you testified earlier about the conclusions by

22   Dr. Cervantes and Heffler that the defendant suffered from a

23   delusional disorder mixed type?

24   A.  Correct.

25   Q.  Is that referenced here on page 10 of Government

1   Exhibit 2, Dr. Cervantes' initial report?

2   A.  Yes, it is.

3   Q.  And looking at her forensic opinion, are the criteria for

4   delusional disorder set forth in the DSM set forth or

5   addressed by her?

6   A.  Yes, they are.

7   Q.  Are those the sections that are label A through -- going

8   on to page 11 -- F?

9   A.  Yes.

10  Q.  And if you could just go through what the requirements

11  are in order to conclude that somebody has a delusional

12  disorder?

13  A.  There has to be one or more delusions with a duration of

14  one month or longer.  Criteria A or criteria for

15  schizophrenia had never been met.  Hallucinations, if

16  present, are not prominent and are related to the delusional

17  theme.  Apart from the impact of the delusion or its

18  ramifications, functioning is not markedly impaired and

19  behavior is not obviously bizarre or odd.  If manic or

20  depressive symptoms have occurred, these have been brief

21  relative to the duration of the delusional periods.

22          The last part, the disturbance is not attributable

23  to the physiological effect of a substance or another medical

24  condition and is not better explained by another mental

25  disorder such as body dysmorphic disorder or obsessive

1  compulsive disorder.

2  Q.  And is there a requirement relative to the delusional

3  disorder that the evaluator consider the individual's beliefs

4  in the context of that person's culture and belief systems?

5  A.  It's the key aspect of diagnosing somebody with a

6  delusional disorder.

7  Q.  Can you explain that, please?

8  A.  It's laid out, again, in the DSM-5 that one has to

9  account for somebody's religious beliefs, cultural beliefs,

10  idealogical beliefs before you diagnose somebody with a

11  delusional disorder.

12  Q.  Is that a factor that is relevant in considering a

13  diagnosis for Charles Weber?

14  A.  Yes, indeed.

15  Q.  And why is that?

16  A.  Because he shares the view with what we consider

17  sovereign citizen views.  It's an anti-government view and

18  one has to certainly ensure that before you diagnose him with

19  a delusional disorder that his views are not just what is

20  common among sovereign citizens.

21  Q.  So, let me ask you a couple questions on that.  Can a

22  sovereign citizen be delusional for purposes of the DSM?

23  A.  He could, yes.

24  Q.  But is a sovereign citizen by definition delusional for

25  purposes of the DSM?

1    A.   No.

2    Q.   And the reason for that is because a sovereign citizen's

3    beliefs are held not by that person individually but by a

4    group of people?

5    A.   That is correct.

6    Q.   And as part of your evaluation of the defendant, did you

7    conduct some research relative to the sovereign citizen

8    movement, for example?

9    A.   Yes, I did.

10   Q.   And we're using the term "sovereign citizen" as a term

11   that's often used in literature, correct?

12   A.   Correct.

13   Q.   But the sovereign citizen movement incorporates many --

14   or let me ask you.  Does the sovereign citizen movement

15   incorporate many sort of side idealogical beliefs?

16   A.   Yes.

17   Q.   So, for example, sovereign citizens, some of them

18   manifest in terms of being tax protestors or tax defiers,

19   correct?

20   A.   That is true.

21   Q.   And there are others who focus on issues related to other

22   anti-government beliefs, maybe tracing their lineage to the

23   revolution, for example?

24   A.   That is correct.

25   Q.   And so, to use the term "sovereign citizen" and that

1   ideology, it incorporates many, many different beliefs,

2   correct?

3   A.   That's correct.

4   Q.   In assessing Dr. Weber, did you consider the world of

5   idealogical beliefs that sovereign citizens accept and focus

6   on?

7   A.   Yes, absolutely.

8   Q.   And what was your conclusion with respect to Dr. Weber

9   and that spectrum of beliefs?

10  A.   He actually fits pretty well into your common sovereign

11  citizen in terms of his views, which is anything from

12  believing that you are not a U.S. citizen because you are a

13  citizen of the state.  And there's a reason for that.  He

14  talked about the Fourteenth Amendment being related to that.

15       And the idea is that the ratification of the

16  Fourteenth Amendment was done by the federal government to

17  essentially move the citizen -- being a citizen of the state

18  into being a citizen of the government.  The idea is that the

19  government is a corporate entity created to make money off

20  individuals.  And so, we discussed a lot of those views.

21       Other views is that you have a -- sovereign citizen

22  view, is there is the real you and there is the fake you.

23  The fake you is the shell identity that's created by the

24  federal government to make money.  So, there's a certain

25  amount of money that goes into every time an individual is

1    born and this amount of money is distributed into a secret

2    account all over the world.  And Dr. Weber talked about this

3    and actually showed me paperwork where this money is hidden

4    by the government.

5            And the way you identify these -- this shell

6    identity, the fake you -- this is also called the straw man a

7    lot of times -- is by your birth certificate.  So, when the

8    birth certificate is created, that is actually not you, that

9    is the fake you that's created by the government to make

10   money.  And on the birth certificate that often comes up with

11   sovereign citizens is the fact that it is written in capital

12   letters, your name is written in capital letters.

13           So, from thereafter, any communication you receive

14   in capital letters is related to the straw man, the fake you,

15   the government you, not the real you.  So, any communication

16   that you get in lower case letters is you and that's

17   important, again, for license, because most licenses are in

18   capital letters, so licenses are not needed, including a

19   driver's license.

20   Q.  And the issue of the straw person and the real person, is

21   that a belief that has become a focus of Dr. Weber's

22   thinking?

23   A.  It's part of the whole belief system that's kind of

24   changed again from initially just being a tax protest to now

25   being the rationale for, like, why he does not have to pay

1    taxes, because, again, the federal government is fake and

2    he's a citizen of the state, not of the federal government

3    and thus, he does not have to pay federal taxes.  So --

4    Q.  And has Mr. Weber in his conversations with you talked to

5    you about that very specific idea of the capital letter

6    Charles Weber and the lower case Charles Weber?

7    A.  We talked about that and he also produced some

8    documentation related to these secret accounts and where

9    these secret accounts were, because, again, these websites

10   have been developed as part of this movement to show you

11   where all the monies are dispersed.

12   Q.  And ideas about there being straw man accounts and secret

13   accounts in every person's name into which money is secreted

14   sounds crazy, correct?

15   A.  It sounds illogical to most people, but this is a

16   movement that really has taken on its -- it is getting

17   bigger.  And what the reason for that is, I am not sure.  But

18   today -- I think you mentioned this earlier -- the Sovereign

19   Poverty Law Group, which is one of the main groups that

20   researches anti-government groups, they believe there is

21   about 300 to 800,000 people with sovereign citizen views and

22   at least 100,000 of these have, what we call, hardcore views

23   related to this.

24        It has come up in court cases and it's nothing new

25   and these sovereign citizen views have been listened to and

1   dealt with in federal courts and local courts.  And again,

2   there's been research on it from both psychiatry and

3   psychology published where it is -- we're all aware at this

4   point that it kind of like, mimics what looks like psychotic

5   delusional beliefs, but at the end of the day, it really just

6   fits with an extreme belief.

7          Most of us may find it irrational, may find it

8   crazy, but, again, it just follows this kind of idealogical

9   belief.  So, it's not a delusion.  It's more like what we

10  would consider, like, an overvalued idea or something.

11  Q.  "Overvalued idea," is that a term of art that's used in

12  psychology and psychiatry?

13  A.  Yeah.  Because, again, we want to make sure that --

14  people are allowed to have different opinions and just

15  because you have a different opinion does not mean that you

16  are delusional, or just because you think that somebody else

17  has an opinion that you don't believe in, that that person is

18  delusional.

19          So, that, again, could go to religion, politics

20  these days and to make sure that it's okay that people have

21  ideas, it's okay that people may have extreme ideas, but when

22  it comes to a delusional disorder, now we're talking about

23  something that is really just coming out of nowhere and it

24  takes over one's life from day one.  It's not a progression

25  over time.  It's not an extreme belief.  It's something that

63

1    kind of, like, takes over everything.

2    Q.  That's an important feature, right, whether or not this

3    way of thinking or this adherence to an ideology happened

4    like, overnight or like, whether it develops over time,

5    correct?

6    A.  Absolutely.

7    Q.  And for Mr. Weber and you have spoken about this, this

8    adherence to an extreme ideology developed over time,

9    correct?

10   A.  Yes.

11   Q.  Which would indicate that it's not delusional?

12   A.  Correct.

13   Q.  You mentioned in your testimony a moment ago research in

14   relevant psychiatric journals or psychological journals,

15   correct?

16   A.  Correct.

17   Q.  I am going to show you -- Judge, if I could approach --

18   Government Exhibit 4 and 5 and ask you if you recognize

19   those.

20   A.  Yes.  Those are two articles that I reviewed as part of

21   this case.  One is by Dr. Parker.  It is in the Journal of

22   American Academy Psychiatry and Law.

23   Q.  And let me stop you.  Which exhibit are you referring to?

24   A.  Exhibit 4.

25   Q.  Okay.

1    A.   And it's an article about "Competence to Stand Trial

2    Evaluations of Sovereign Citizens."  The other article is by

3    a Dr. Pytyck and there's another co-author by the name of

4    Dr. Chaimowitz and this article is titled "The Sovereign

5    Citizen Movement and Fitness to Stand Trial."

6    Q.   And is that the article that's marked as Government

7    Exhibit 5?

8    A.   The latter one is the Government Exhibit 5, correct.

9    Q.   Now, going back to the Government Exhibit 4.

10           THE COURT:  Are there dates on these articles?

11           THE WITNESS:  Yes.

12           THE COURT:  What's number Exhibit 4, what is the date

13   of that article?

14           THE WITNESS:  2014.

15           MS. KRESSE:  And Your Honor, if you look under,

16   there's a little synopsis and you see J, basically the

17   abbreviation for the journal.

18           THE COURT:  What page is that?

19           MS. KRESSE:  It's on the very first page of

20   Government Exhibit 4.  The citations -- and I have learned

21   this in journal articles -- it's a little different than

22   cases, that we look for the date to be more prominently

23   displayed, but do you see there's a little synopsis in smaller

24   type?

25           THE COURT:  Yes.

1          MS. KRESSE:  And then below that is the citation for

2    the journal and then it says 42:338-49.  And then 2014, that's

3    the date of the article.  Do you see that?

4          THE COURT:  2014?

5          MS. KRESSE:  Yes.

6          THE COURT:  It's the year?

7          MS. KRESSE:  It's the year.

8          THE COURT:  Oh, okay.  Now I see it.

9          MS. KRESSE:  And then, going through the same

10   exercise with respect to Government Exhibit 5, you'll see the

11   date on the top upper left.  It says International Journal of

12   Forensic Mental Health 12, which is the volume -- and I just

13   learned this myself -- pages 149 to 153 and the year there is

14   2013.

15         THE COURT:  Okay.  Thank you.

16         MS. KRESSE:  You're welcome.

17   BY MS. KRESSE:

18   Q.  So, looking at Government Exhibit 4, which is the article

19   authored by George F. Parker, M.D.?

20   A.  Yes.

21         MS. KRESSE:  First of all, Your Honor, I would move

22   both of those articles into evidence, both of those exhibits.

23         MR. COMERFORD:  No objection.

24         THE COURT:  All right.  They'll be received.

25   (Government Exhibits 4 and 5 were received in evidence.)

1         MS. KRESSE:  Thank you.

2   BY MS. KRESSE:

3   Q.  So, focusing on Government Exhibit 4, the Parker article,

4   is this something you reviewed prior to evaluating Charles

5   Weber?

6   A.  Yes.

7   Q.  And if you can, sort of summarize the gist of this

8   article, if that's possible.

9   A.  Yes.  So, the sovereign citizen anti-government views in

10  particular as it pertains to sovereign citizens has -- it's

11  come up more and more in our circles, in psychiatry and

12  psychology, so it's been a part of our annual conferences,

13  presentations on it and so on, so -- because it's just

14  becoming more prevalent in our setting.  We see more and more

15  people with anti-government views and we are seeing people

16  that share these sovereign citizen beliefs.

17         So, in the first article, Exhibit 4, which was

18  written by a psychiatrist, this is essentially an article

19  that gives some background information about sovereign

20  citizens, who they are and what to look for.  It also talks

21  about nine cases that this person evaluated of sovereign

22  citizens.

23         And it's important because of the nine, only one was

24  found not competent and the one that was found not competent

25  was the first one and he or she was diagnosed with a

1  delusional disorder, but even in the article they talk about

2  that in hindsight that person may not meet the criteria for

3  delusional disorder based on what the author knows today

4  about sovereign citizens.  The other article is a very

5  similar --

6  Q.  Let me stop you so I can ask you a couple more questions

7  about the first article, Government Exhibit 4.  So, the

8  author is Dr. Parker and the nine cases that he writes about

9  are nine people that he evaluated, correct?

10 A.  Correct.

11 Q.  And of the nine, only the first person he evaluated was

12 found to have a delusional disorder based on their sovereign

13 citizen beliefs, correct?

14 A.  Correct.

15 Q.  But is it fair to say that he opines in this article that

16 in retrospect, based on what he thereafter learned about the

17 sovereign citizen movement and its various beliefs, that in

18 retrospect, that first finding of delusional disorder was

19 probably not correct?

20 A.  Correct.

21 Q.  Okay.  And another thing that I just want to point out in

22 this article is the background that you referenced.  So, if

23 you look at page 339, beginning on page 339 of the article

24 and it is at the bottom right.  Do you see where I am?

25 There's a heading "Background"?

1   A.  Yes.

2   Q.  Okay.  And so, is it fair to say that in this section,

3   which continues for a number of pages, Dr. Parker lays out

4   sort of the background and development of the sovereign

5   citizen movement through various other extreme ideologies?

6   A.  That is correct.

7   Q.  And then -- I cut you off, but you were starting to talk

8   about Government Exhibit 5, which is the "Sovereign Citizen

9   Movement and Fitness to Stand Trial" article by Jennifer

10  Pytyck.  Let me ask you first, were you aware of this article

11  at the time you evaluated Dr. Weber?

12  A.  I was not.

13  Q.  Is this something that you reviewed subsequent to issuing

14  your report?

15  A.  Correct.

16  Q.  Have you, in fact, prior to testifying here today read

17  this article?

18  A.  Yes.

19  Q.  Okay.  And are you in a position where you can summarize

20  the findings of the article?

21  A.  Yes.  In very short terms, it's very similar to the other

22  article where it lays out the sovereign citizen movement,

23  gives you the background for it and then it provides you two

24  case studies and again, the same argument that these are

25  cases where if you are not really considering or

1  knowledgeable about the sovereign citizen movement, these

2  kind of mimic psychotic symptoms, even illogical thought, but

3  at the end of the day, they are competent; that they are not

4  psychotic.

5  Q.  And I may have asked you this question before and forgive

6  me if I have, but is it possible for a sovereign citizen who

7  espouses those beliefs to be found to have a delusional

8  disorder?

9  A.  It is possible to have a delusional disorder and be a

10  sovereign citizen, correct.

11  Q.  Right.  But -- okay.  So, that's a bad question, because,

12  right, they could have other delusional disorders that have

13  nothing to do with being a sovereign citizen, correct?

14  A.  Correct.

15  Q.  But in terms of if we're just talking about the

16  manifestation of sovereign citizen beliefs, can a person who

17  espouses those beliefs be outside of that culture such that

18  they are actually, in fact, delusional?

19  A.  If a person only has the beliefs that, again, is laid out

20  in these articles that we know of the sovereign citizen, even

21  though it might differ a little bit from person to person,

22  that does not qualify for a delusional disorder.

23  Q.  When Drs. Cervantes and Heffler evaluated the defendant,

24  did they reference in their report -- and that's Government

25  Exhibit 2, if you want to look through it -- did they

1    reference any research that they have conducted regarding

2    sovereign citizens or similar type groups?

3    A.   To my knowledge, they don't reference any particular

4    research that they had done.

5    Q.   If you look, actually, at Government Exhibit 2, which is

6    that initial report, there's a reference on page 1 continuing

7    to page 2 about the "Sources of Information."  Do you see

8    that heading?

9    A.   Yes.

10   Q.   And is there any reference in there regarding research on

11   extreme idealogical beliefs such as the sovereign citizen

12   movement?

13   A.   No.

14   Q.   Is there any reference in their report, Government

15   Exhibit 2, to the Parker article?

16   A.   No.

17   Q.   In your report, Government Exhibit 1, under your "Sources

18   of Assessment" beginning on page 1 and continuing on to

19   page 2, do you reference a review of information relative to

20   sovereign citizen and other such extreme beliefs?

21   A.   I reference the legal records, available records and then

22   this website, this tax protesting website.  The Parker

23   article is referenced later on in the report.

24   Q.   Right.  And so, directing your attention to page 2, the

25   last section above the heading "Information Requested But Not

1   Obtained," is that what you are referring to, the review of

2   relevant information posted at www.givemeliberty.org?

3   A.   This is actually -- this is the We the People.  This is a

4   tax protesting group.  This is the one that Dr. Weber

5   initially looked at in terms of starting his research.

6   Q.   And is it fair to say that We the People is sort of a

7   tax -- they are focused more on the tax aspect of the anti-

8   government movement?

9   A.   Correct.

10   Q.   And is that something that Dr. Weber researched?

11   A.   Yes.

12   Q.   Okay.  So, you reviewed that information and then you

13   mentioned that the Parker article is referred to and analyzed

14   in your report, correct?

15   A.   Yes.

16   Q.   And that's -- I know I have seen it.  Let's see.

17   A.   Page 16.

18   Q.   Thank you.

19   A.   Second paragraph.

20   Q.   Okay.  And it begins with the heading, "For Example in

21   Terms of Demographic Characteristics"?

22   A.   Correct.

23   Q.   Okay.  So, going back to Dr. Cervantes' and Dr. Heffler's

24   report, without having done any research on sovereign

25   citizens or We the People or other sort of extreme

1   idealogical beliefs, they concluded that Dr. Weber based

2   on --

3           MR. COMERFORD:  Objection to the question, Judge.

4   It's not a -- Dr. -- I'm sorry.  Dr. Antonius doesn't know

5   that they didn't do any research into sovereign citizens.

6           THE COURT:  Well, they made no reference to it in

7   their report.

8           MR. COMERFORD:  That's different.  You can't say they

9   didn't research --

10          THE COURT:  Rephrase your question.

11          MS. KRESSE:  I will, Judge.

12  BY MS. KRESSE:

13  Q.   There's no indication in the initial report by

14  Dr. Cervantes of having done research into the sovereign

15  citizen movement or other tax protestor type movements,

16  correct?

17  A.   That is correct.

18  Q.   And yet, the conclusion is that those idealogical beliefs

19  about not being a citizen and not having to pay taxes and

20  about the myriad of other permutations of that ideology, that

21  that constituted a delusional disorder, correct?

22  A.   That that was part of the delusional disorder mixed type

23  that they diagnosed, correct.

24  Q.   And did Dr. Cervantes and Dr. Heffler conclude that

25  Dr. Weber was somehow different than most sovereign citizens

1   and that's why he should be diagnosed with a delusional

2   disorder?

3   A.  Yes, they did.

4   Q.  In what way was he different?

5   A.  That somehow he was beyond what is normal for a sovereign

6   citizen and the specific things that they talk about, in my

7   opinion, is just what you see in sovereign citizens.  So,

8   there was nothing -- again, they talk about the idealogical

9   beliefs, the irrational beliefs and so on, the driver license

10  and also the decisions that he's making related to that.

11  But, again, in my opinion, this is typically what you see

12  among sovereign citizens and not uncommon.

13  Q.  And is it not uncommon that the decisions made by a

14  sovereign citizen relative to their beliefs about the

15  government and their need to have licenses and their need to

16  pay taxes, that those decisions are almost always to the

17  detriment of that person?

18  A.  Correct.

19  Q.  Because they don't fit into the way society works and the

20  rules of society?

21  A.  Correct.

22  Q.  Is it fair to say it's always going to get them into

23  trouble on some level?

24  A.  In most cases, correct.

25  Q.  So, the other aspect of the diagnosis of delusional

1  disorder was the defendant's somatic complaints, correct?

2  A.  Yes.

3  Q.  And you talked a little bit in your earlier testimony

4  about some of the complaints that the defendant made to you

5  regarding dizziness, for example and heart racing --

6  A.  Correct.

7  Q.  -- correct?  And if I direct you to look at Government

8  Exhibit 1, which is your report, page 7 -- actually, it

9  begins at the bottom of page 6.  Do you see the heading

10  "Medical History"?

11  A.  Yes.

12  Q.  And that section continues through the middle of page 8,

13  is that correct?

14  A.  Correct.

15  Q.  Is this the section of your report where you document the

16  complaints that Mr. Weber makes about his physical well

17  being, so-to-speak?

18  A.  Yes.

19  Q.  And I believe you mentioned earlier that you inquired of

20  Mr. Weber during one of your evaluations whether or not the

21  symptoms that he was experiencing could be the result of

22  increased stress?

23  A.  Yes.

24  Q.  And what was his answer?

25  A.  He didn't believe that, but, again, it was a question

1   that he had heard before.

2   Q.  And in fact, if you -- and now I am on page 7, sort of in

3   the middle of that top paragraph.  Do you see there's a

4   semicolon and then it says, "however, he acknowledged that

5   others had been concerned about his stress level at the time

6   due to his work and legal issues"?

7   A.  Yes.  He had seen his primary doctor for his concerns.

8   It sounded like they were not overly concerned.  He had blood

9   testing done that came back negative.  He still felt that he

10  was dealing with some symptoms.  At this point or -- at some

11  point, he then reaches out to alternative medicine, this

12  Dr. Steven and he -- the doctor -- Dr. Steven ended up

13  putting him on a different diet and he's the one who brings

14  up this mercury poisoning.

15           And Dr. Weber changes his diet, he throws in these

16  supplements.  And when I spoke to him, he said that that

17  helped him and there's also references in Dr. Cervantes'

18  addendum that he's saying that being on supplements has

19  helped his memory problems.

20  Q.  That he feels better being on these supplements?

21  A.  He feels better being on these supplements.  So, even if

22  I consider this as part of a concern where he is seeking

23  methods that are not scientifically proven, it's still very

24  important to look at that in terms of the impact of this.

25  He's actually getting better.  So, there's no somatic

1  delusions in this.  This is actually somebody who is reaching

2  out to alternative medicine and he's getting better using

3  that.

4  Q.  Are you referring to the fact that with a delusional

5  disorder, there has to be a negative impact on your life,

6  correct?

7  A.  There has to be a negative impact.

8  Q.  And for Dr. Weber, his belief and his acceptance of

9  holistic methods and various supplements, in his mind, has

10  made him feel better, correct?

11  A.  Correct.

12  Q.  So, whatever the somatic complaints, however crazy they

13  may sound, they, at this time, are not having any impact on

14  his functioning?

15  A.  Right.  And I think it's important to also acknowledge

16  that his somatic concerns in themselves is not crazy, like

17  feeling light-headed and feeling some nausea or even

18  increased heart rate.  Anybody under stress will feel those

19  symptoms.  The fact that he goes out and gets this treatment

20  that is not scientifically valid speaks to a different area,

21  but not that he's having somatic concerns that are delusional

22  in nature.

23        And again, there's many people with various

24  different degrees, famous people, that use this alternative

25  medicine because they feel it helps.  And it does have a

1  psychological effect that has been proven, that if you feel

2  better, it does not really matter what you are doing, but

3  that's going to have a good effect on your body as well and

4  your physical health.

5  Q.  So, the fact that Dr. Weber might be taking a clay

6  supplement or algae, even though you as a psychologist might

7  thank that's crazy, that does not mean that he's delusional

8  if he thinks it makes him feel better?

9  A.  Correct.

10 Q.  Because there are many people in society who take a lot

11 of supplements and do a lot of health-related things because

12 they think it makes them better, but there may be no clinical

13 proof of that fact, correct?

14 A.  No, that's correct.  In fact, if Tom Brady, the most

15 well-known quarterback, decides to use alternative treatments

16 and he feels like it helps, that does not make Tom Brady

17 delusional.

18 Q.  And following up on that, in Dr. Cervantes' report, both

19 of them, there's talk of the fact that this is an otherwise

20 in a previously successful dentist, who went to dental

21 school, who taught at the University of Buffalo at some

22 point, who had his own practice successfully and had patients

23 and that there can be no explanation for his current state,

24 facing tax charges, his practice is falling apart, his

25 marriage is falling apart, but there can be no explanation

1   except for some psychological diagnosis.  How do you respond

2   to that?

3   A.  Again, looking at the criteria within the DSM, he just

4   does not fit a delusional disorder, for that matter, a

5   cognitive disorder.  The fact that he decides to follow

6   alternative medicine, holistic medicines, there are hundred

7   of books written about this that follow nonscientific

8   methods.

9           And again, that does not make somebody delusional

10  that they decide to follow alternative medicine.  And

11  similarly with the sovereign citizens, again, there are

12  hundreds of thousands of people, as we know, that are

13  following similar views, but, again, that does not make

14  somebody delusional.

15  Q.  And if there's a smart, educated person who believes in

16  alternative medicine, does the fact that that person is smart

17  and educated and should know better, does that render them

18  delusional?

19  A.  Absolutely not.  There's many examples of doctors and

20  attorneys and other people that follow alternative medicine

21  because they don't feel that the scientifically proven

22  medicine is helping.

23  Q.  And as to the other aspect of this case, the fact that

24  somebody is educated and a dentist, a professional, does that

25  mean -- I kind of lost my train of thought there -- but does

1   that mean that they can't be a sovereign citizen, that

2   that's -- like, that the two don't go together?

3   A.  No.  Again, absolutely not.  One of the most famous cases

4   of a sovereign citizen is Mr. Glenn Unger, who actually was

5   an orthodontist and had his own dental practice in Albany,

6   New York and he eventually got convicted on tax fraud.  And

7   he shared his sovereign citizen views in court.  He ended

8   up -- I believe he actually represented himself at the end of

9   the court.  It certainly led to frustrations in the court,

10  but he was an orthodontist with his own dental practice.

11  Q.  So, they're not exclusively -- it's not an oxymoron.  You

12  can still be smart and a professional and hold these what

13  appear to most of us to be crazy beliefs?

14  A.  Correct.

15  Q.  And it does not make you delusional and it does not give

16  you a cognitive disorder, correct?

17  A.  Correct.

18  Q.  Even if you assume that his, Dr. Weber's, somatic

19  complaints form the basis for a delusional disorder, in your

20  opinion, would that render him not competent to stand trial?

21  A.  No.

22  Q.  Would it render him not competent to represent himself?

23  A.  No.

24  Q.  We talked a little bit about as part of your evaluation

25  of Charles Weber, you conducted your own testing?

1   A.  Correct.

2   Q.  And the testing that you conducted, was this in addition

3   to the time that you met with him, like one-on-one

4   conversations with him?  Let me actually strike that question

5   and go back and be clear.  If you go to page 1 of Exhibit 1,

6   which is your report?

7   A.  Yes.

8   Q.  And there's a heading at the very top -- or almost near

9   the top, "Dates of Examination".  Do you see that?

10  A.  Correct.

11  Q.  So, there are four dates listed, May 25th, 2017,

12  6/7/2017, 6/12/17 and 6/19/17.  Do you see that?

13  A.  Yes.

14  Q.  Are these the four days that you met with Dr. Weber?

15  A.  Correct.

16  Q.  And on each of those occasions, about how long did you

17  spend with him?

18  A.  Somewhere between an hour and a half to two and a half

19  hours.  I probably spent somewhere between 10 and 12 hours

20  with him.

21  Q.  And the 10 and 12 hours total that you spent with him,

22  does that include the time it took to administer testing?

23  A.  Yes.

24  Q.  And just generally, something that we haven't touched on

25  yet, how did Charles Weber present to you?  I mean, you met

1    with him on four occasions.  How did he present to you?

2    A.  Very well.

3    Q.  Can you explain that?

4    A.  Yeah.  He -- again, sitting with somebody for that much

5    time, it's important that there's some level of rapport

6    between one another.  He was very courteous, very pleasant,

7    polite throughout.  He's more engaged certainly when he's

8    talking about the legal issues and his sovereign citizen

9    views and very appropriately, he explained some frustration

10   with his legal case that has been going on for several years,

11   is my understanding.  So, all in all, he presented very well

12   in all four sessions, which is important for testing as well,

13   psychological testing.

14   Q.  And in terms of what you just testified about, his

15   general demeanor during your meetings with him, is that set

16   forth in your report?

17   A.  Yes.

18   Q.  And if you could just direct us to a page.  Is that

19   page 8?

20   A.  This is page 8, "Behavioral Observations and Mental

21   Status Examination."

22   Q.  And what you just testified about is in that section of

23   your report, correct?

24   A.  Yes.

25   Q.  So, going back to the testing, you list in your report

1   the types of testing that you performed, correct?

2   A.  Correct.

3   Q.  All right.  And if we look at --

4           THE COURT:  Why don't we -- I have another matter on,

5   so why don't we return here at, let's say, quarter to 2.  How

6   much longer are you going to be, just ballpark?

7           MS. KRESSE:  Maybe an hour.

8           THE COURT:  Okay.

9           MR. COMERFORD:  Judge, I believe Dr. Cervantes is

10  available the whole day.  I just want to confirm that with

11  her.

12          THE COURT:  Okay.  We'll be back at quarter to 2.

13          MS. KRESSE:  Thank you, Judge.

14          THE COURT:  Court will be in recess.

15          THE CLERK:  All rise.

16  (Brief recess)

17          THE CLERK:  All rise.  You may be seated.

18          THE COURT:  I don't know if were going to be able to

19  get to your witness today, Mr. Comerford.

20          MR. COMERFORD:  I appreciate the Court raising that,

21  Judge.  Would I be able to release her and then we schedule it

22  for another day?

23          THE COURT:  We'll schedule it for next week.  See

24  when she's -- because I don't want her just sitting around

25  here and it doesn't look -- we're talking maybe you said

1    another hour?

2          MS. KRESSE:  I usually estimate badly on time.  An

3    hour, maybe.

4          THE COURT:  And how long do you think your cross will

5    be?

6          MR. COMERFORD:  Half an hour to an hour, tops, Judge.

7          THE COURT:  I have another matter on at 4 o'clock

8    anyway.

9          MR. COMERFORD:  She'll be back here in 20 minutes,

10   half an hour.  I'll step out and talk to her.

11         THE COURT:  See what day is convenient for her for

12   next week.

13         MR. COMERFORD:  I will, Judge.

14         THE COURT:  If this other matter goes away at

15   4 o'clock today, it may free me up a little bit for next week.

16         MR. COMERFORD:  Thank you.

17         THE COURT:  Why don't you go out and talk to her.

18         MR. COMERFORD:  Judge, she's not back yet.  I told

19   her it would probably be a while anyway.  So, when she does

20   get back, if I could update the Court as to her availability

21   next week and then we can set a date.  Thank you.

22         THE COURT:  All right.  All right.  Ms. Kresse?

23         MS. KRESSE:  Thank you, Judge.

24   BY MS. KRESSE:

25   Q.  Dr. Antonius, before the break, we were talking about the

1    fact that Charles Weber is a dentist, that he is an

2    intelligent person, a professional person, but that those

3    factors don't take him outside of the scope of the typical

4    sovereign citizen, correct?

5    A.  Correct.

6    Q.  There's another element that Dr. Cervantes points to in

7    her addendum and it is the lack of criminal history that

8    Charles Weber had.  In other words, he's never had any run-

9    ins with the law, he's never broken any laws before the

10   conduct that got him in trouble here in this case.

11   A.  Yes.

12   Q.  Do you recall seeing that in her report?

13   A.  Yes.

14   Q.  Is it typical of sovereign citizens that they either have

15   a criminal history or they don't?

16   A.  It is not uncommon that they don't have it.

17   Q.  That they don't?

18   A.  Yeah.

19   Q.  So, the fact that Charles Weber has had no run-ins with

20   the law, it does not mean that he's different or outside of

21   the scope of the typical sovereign citizen?

22   A.  No.  It speaks to, again, that it's an idealogical

23   belief.  It really has nothing to do with criminality or

24   criminal behavior.

25   Q.  And the fact that in his 50's, after living a law-abiding

1    life, he suddenly espouses these beliefs, does that make him

2    delusional?

3    A.  No.

4    Q.  And does that render him incompetent to stand trial?

5    A.  No.

6    Q.  Or incompetent to represent himself?

7    A.  Incompetent?  I'm sorry.

8    Q.  I'm sorry.  Does it render him incompetent to represent

9    himself?

10   A.  No.

11   Q.  Before the break, you were talking or -- I had asked you

12   some questions about the Parker article, which is Government

13   Exhibit 4.  Do you recall talking about that?

14   A.  Yes.

15   Q.  And it was the Parker article that you referenced in your

16   report, your evaluation of the defendant?

17   A.  Correct.

18   Q.  Okay.  There's one area that I wanted to follow up on

19   here and let me just find my copy.  You testified that based

20   on your review of that article, that Parker, who was the

21   clinician who actually performed the evaluations of the case

22   studies, that he concluded that the one case, the first case,

23   in which he had determined that the sovereign citizen was

24   delusional, that, in retrospect, he questioned that finding.

25   Do you recall that?

1   A.  Correct.

2   Q.  And if you turn to -- and again, this is Government

3   Exhibit 4 and it's page 347 of that article and it is the

4   upper -- the top of the page, upper left column.  Do you have

5   that?

6   A.  Yes.

7   Q.  And if you could, just read the sentence beginning

8   with -- if you can find it -- "Since sovereign citizen

9   beliefs are akin to."

10  A.  So, quote, start:  "Since sovereign citizen beliefs are

11  akin to a shared belief system, sovereign citizens can be

12  understood as members of a cultural group.  They, thus, do

13  not qualify for a diagnosis of psychotic disorder based only

14  on the nature of the shared beliefs."

15  Q.  And if you could continue.

16  A.  "The first sovereign citizen defendant evaluated was also

17  thought to be incompetent to stand trial at the time of the

18  evaluation because of his apparent delusional disorder.

19  Although, in retrospect, with the benefit of additional

20  information about sovereign citizen beliefs, this defendant

21  was almost certainly competent to stand trial.  Once it

22  became clear that defendants who espoused sovereign citizen

23  beliefs share a set of quasi-legal beliefs that are derived

24  from an extreme political philosophy, subsequent defendants

25  who held similar beliefs were not diagnosed with a psychotic

1  disorder and were not ruled incompetent to stand trial."

2  Q.   Thank you.  And based on your reading of this article, is

3  it your opinion that Charles Weber falls within the same

4  parameter as the case studies that are described in this

5  article?

6  A.   Yes.

7  Q.   You testified that when you met with Mr. Weber, you met

8  with him on four occasions for a total of -- I believe you

9  said 10 to 12 hours total?

10 A.   Correct.

11 Q.   When Dr. Cervantes and Dr. Heffler met with the defendant

12 on the first occasion, is there any indication in their

13 report of how long they spent with him?  And their report

14 would be Government Exhibit 2 and if you look at page 1.

15 A.   There's nothing stated on page 1 in terms of how much

16 time they spent -- I take that back.

17 Q.   Under number 5?

18 A.   Under number 5, they spent approximately three hours on

19 one day and then two and a half hours on a separate day.

20 Q.   And in a parenthetical, it indicates that that two and a

21 half hours on the second day includes the administration of

22 that MMPI-2 test that you had testified about, correct?

23 A.   Correct.

24 Q.   So, they -- adding that together, Dr. Cervantes and

25 Heffler on the first occasion in which they rendered their

1   evaluation spent five and a half hours with Mr. Weber?

2   A.  Correct.

3          THE COURT:  Does that have any relevance or any

4   significance that one person would examine somebody for, let's

5   say, up to 10 or 12 hours versus, let's say, five and a half

6   hours?  Is that important?

7          THE WITNESS:  I think it just speaks to, again, like

8   how much psychological assessment you are doing and how much

9   time you feel you need to spend with the defendant to get all

10  the information needed to make a diagnosis.  And so, if you

11  make a diagnosis, you want to ensure that you have got

12  everything that you possibly can to make that.  So, for me

13  doing psychological testing, I spend a lot of time

14  administering the different tests and the different questions

15  and so on and in his case, I spent a lot of time getting an

16  understanding of his beliefs.

17          THE COURT:  Okay.  Thank you.

18  BY MS. KRESSE:

19  Q.  And the time spent getting an understanding of his

20  beliefs, was that one-on-one time with Charles Weber?

21  A.  Yeah.  All the hours that I spent with him was one-on-one

22  with Dr. Weber.

23  Q.  In terms of the testing that you performed, in your

24  report, do you have a listing of the various tests that you

25  gave to Dr. Weber?

1    A.  Yes, I do.

2    Q.  And where is that -- we're looking now at Government

3    Exhibit 1 and where on Government Exhibit 1 did you list

4    that?

5    A.  It's on page number 9 under the heading "Psychological

6    Assessment and Findings" and then the subheading, "Procedures

7    Used."

8    Q.  And suddenly I can't find my Exhibit 1, so bear with me

9    for one moment.  Got it.  Okay.  What page was that?

10   A.  Page number 9.

11   Q.  And you indicated that's under the heading "Psychological

12   Assessment and Findings"?

13   A.  Correct.

14   Q.  In looking at your report, is it fair to say that you

15   analyzed the results of the testing under three categories of

16   functioning?

17   A.  What -- yeah, if you could explain what these areas of

18   functioning are.

19   Q.  So, there's a larger heading on page 9 of Exhibit 1

20   "Psychological Assessment and Findings".  Do you see that?

21   A.  Yeah.

22   Q.  And then it says "Procedures Used," and there's a listing

23   of, in addition to the clinical interview and follow-up

24   interview, a number of very specific tests that you

25   performed?

ANTONIUS -- MS. KRESSE -- 01/19/18

1   A.   Correct.

2   Q.   And then there's a heading "Personality, Psychopathology

3   and Emotional Functioning".

4   A.   Correct.

5   Q.   Which begins in the middle of page 9 and continues to the

6   bottom of page 10 and then there's a heading "Cognitive

7   Functioning".

8   A.   Correct.

9   Q.   Which begins at the bottom of page 10 and continues

10  through mid-page 12.  And then another heading "Competency to

11  Stand Trial Assessment and Evaluation", which continues from

12  page 12 through the top of page 14.  Do you see that?

13  A.   Yes, correct.

14  Q.   And so, those subheadings that I read, "Personality,

15  Psychopathology and Emotional Functioning" being one;

16  "Cognitive Functioning" being two and "Competency to Stand

17  Trial Assessment and Evaluation" being three, was that the

18  methodology by which you described the test results that you

19  had performed?

20  A.   Yes.

21  Q.   So, focusing first on the first heading "Personality,

22  Psychopathology and Emotional Functioning," can you explain

23  to the Court what your findings were as it related to the

24  particular tests that you -- that reflect on that category?

25  A.   Sure.   The -- there was no significant impairment in any

1   of these functioning with regards to Dr. Weber, looking at

2   personality, psychopathology and emotional functioning based

3   on the testing that I conducted on him.

4   Q.  So, there was nothing out of the ordinary in that regard?

5   A.  Correct.

6   Q.  And then -- so, then, if we turn to sort of the second

7   category, at least as I have designated them, "Cognitive

8   Functioning" at the bottom of page 10, did you perform -- and

9   some of this we have talked a little bit about earlier in

10  your testimony, but did you perform tests to measure the

11  defendant's cognitive functioning?

12  A.  Yes.

13  Q.  Why?

14  A.  For a couple of reasons.  One is, again, there was this

15  email from Mr. Comerford to Ms. Kresse in regards to the case

16  presentation that had been conducted where the question of an

17  unusual presentation of early dementia had been mentioned.

18          The other thing, actually more importantly, was -- I

19  should also preface this by saying there was not a whole lot

20  of concern in Dr. Cervantes' first report, but when I spoke

21  to Dr. Weber, he mentioned that he has memory problems, some

22  concerns about remembering things.  So, I wanted to make sure

23  we did some cognitive testing that would look into his

24  overall cognitive functioning.

25          And then, lastly, I like to do some cognitive

1   testing to look at effort and that's one's ability to provide

2   full effort when they're doing psychological testing.

3   Somebody who is not putting forth full effort may provide an

4   invalid protocol; a protocol that's not valid.

5   Q.   And those are the reasons why you performed cognitive

6   functioning testing for Dr. Weber?

7   A.   Correct.

8   Q.   And the reasoning behind why you did that, that's set

9   forth under this heading on the bottom of page 10 and

10  continuing to page 11, correct?

11  A.   Correct.

12  Q.   For example, there's a reference in that section of your

13  report to the email about, "an unusual presentation of an

14  early dementia", correct?

15  A.   Correct.

16  Q.   And was that a case conference that involved

17  Dr. Cervantes?

18  A.   Correct.

19  Q.   And the quoted section there about early dementia, was

20  that something that Dr. Cervantes was suggesting?

21  A.   That, I don't know.

22  Q.   Okay.  It was just in an email that was between

23  Mr. Comerford and myself, as a prosecutor and which you

24  then -- which I then forwarded to you?

25  A.   Correct.

1   Q.  And based on the fact there was a reference to dementia,

2   which would be a cognitive impairment, you wanted to do some

3   testing?

4   A.  Correct.

5   Q.  You also mentioned that in Dr. Cervantes' and

6   Dr. Heffler's initial report, there was no findings relative

7   to cognitive functioning or impairments, correct?

8   A.  Correct.

9   Q.  Just generally, what are the tests that you perform to

10  test somebody's cognitive functioning?

11  A.  When we decide what tests to use, we normally put

12  together a battery of tests.  And in Dr. Weber's case, I

13  wanted to make sure we had some assessment of overall

14  functioning, so I conducted the Wechsler Adult Intelligent

15  Scale, which is a measure of not only intelligence, but it

16  also looks into various areas of cognitive functioning.

17          In addition to that, I did the repeated battery of

18  neuropsychological -- to assess neuropsychological status,

19  which is the RBANS, which is a test that also looks into

20  overall cognitive functioning.  It is a screener for

21  cognitive functioning as well as a screener for early

22  dementia, for dementia problems.  And within that test as

23  well, it looks into various domains of cognitive functioning,

24  including attention, language and other areas of cognitive

25  functioning.  In addition to that, I did some memory tests --

94

1    Q.  And is that referenced on the top of page 12 of your

2    report?

3    A.  That is referenced on the top of page 12 and these are

4    pretty brief memory tests, but it gives a good indication if

5    somebody has basic memory problems and it also looks into

6    whether somebody is faking the memory problems and these

7    memory tests are also known to look into effort; is somebody

8    actually producing enough effort that would be expected.

9    Q.  To perform on the test?

10   A.  To perform on the test, yes.

11   Q.  As a result of the tests that you just described, did you

12   reach any conclusions relative to Charles Weber's cognitive

13   functioning?

14   A.  Yes.  My overall conclusion is that his intelligence and

15   cognitive functioning ranges from, what we say, average to

16   high average or normal to very superior or superior.  His

17   intellect is in the superior range.  And there's a range

18   within the sub-testing that I used in the intelligence scales

19   that ranges, again, from normal to superior.  But his overall

20   finding for the global ability was in the superior range in

21   the intellectual scale.

22          On the other one, again, there's a range.  Overall,

23   it looks like it's in the normal to maybe a little bit of

24   normal range and the sub testing shows that he's in the

25   normal to way above normal range on the cognitive

1    functioning.

2        In terms of the memory tests that I did, there

3    wasn't any real conclusive finding of it.  It seems like he

4    may not have put forth full effort on those tests, but I also

5    want to preface that with that was a day that he actually --

6    he had filed other paperwork in the court.  It might have

7    been related to either the changing of his name or the

8    traffic court case and he seemed actually a little

9    distracted.

10        I did ask him about; that he did not think that it

11   had any impact on his testing on those tests, but the memory

12   tests showed -- it didn't look like a valid protocol for only

13   those memory tests.  All the other testing looked to be

14   valid.

15   Q.  And again, the valid protocol or the lack of a valid

16   protocol means that there might have been false responses or

17   malingering?

18   A.  Yeah.  In his case, it's not malingering, it would be

19   that false responses, or in this case, that he simply just

20   didn't pay enough attention on some of the memory questions

21   and thus, had some trouble with some of them, but it was an

22   inconsistent profile.

23        So, there's certain profiles that we would look for

24   in these tests and the one that he had did not look anything

25   similar to somebody with a cognitive disorder or somebody,

1   for that matter, with a serious mental illness or somebody

2   who had had -- who actually has memory problems.  It just

3   didn't really make sense, is the best way of describing it.

4   Q.  And did you summarize your overall findings relative to

5   the cognitive arena in your report?

6   A.  Yeah.  If I can quote her.  "In summary, the findings of

7   the psychological and neuropsychological assessment are

8   indicative of a person who is free from significant

9   psychological or cognitive functioning problems.  He had the

10  capacity to think logically and coherently.  He is likely to

11  experience the world accurately and is as capable as most

12  people to produce conventional and appropriate responses to

13  his experiences.

14          Although he has some concerns about his short-term

15  memory" -- this was only short-term memory, I point out --

16  "he presented as an intelligent man with fair cognitive

17  functioning.  There was no evidence that he has cognitive

18  deficits that impact his ability to reasonably process,

19  retain and recall important and pertinent information."

20          That was important to me because he had -- if there

21  were memory problems, that's certainly something you would

22  want to consider for competency and for other reasons.  But

23  there is, again, no evidence that -- first of all, he looks

24  normal in those testings that we did and there's no evidence

25  that he cannot recall or retain information that's important.

1    Q.  And those things are important -- are they also important

2    for representing himself, if he chose to do so?

3    A.  Yes.

4    Q.  And again and he found that he was well within normal

5    limits in those areas?

6    A.  Correct.

7    Q.  In front of you, you have Government Exhibit 3, which is

8    in evidence and that is the addendum report written by

9    Dr. Cervantes and dated November 2nd of 2017.  Do you have

10   that in front of you?

11   A.  Yes.

12   Q.  And in reviewing this report, what were the circumstances

13   under which this report or this addendum was created?

14   A.  I assume that she or the defense counsel asked for a

15   another or a re-evaluation based on my report.

16   Q.  And in terms of sources of information on page 1 of that

17   exhibit, the sources of information include your evaluation

18   dated July 27, 2017, correct?

19   A.  Correct.

20   Q.  And in addition to that, the other source of information

21   listed is an interview of Dr. Charles Weber on August 22nd,

22   2017, for approximately two hours and 30 minutes.  Do you see

23   that?

24   A.  Correct, yes.

25   Q.  And in terms of that interview on August 22nd, 2017, just

1   to put it in a time frame, your last interview of Dr. Weber

2   was in June of 2017 and specifically, June 19th of 2017,

3   correct?

4   A.  Correct.

5   Q.  So, this is a little more than two months after you

6   evaluated Charles Weber?

7   A.  Correct.

8   Q.  And in terms of your testing that you just went through,

9   your testing of the defendant's cognitive functioning, in

10  this supplemental or addendum report dated November 2nd,

11  2017, did Dr. Cervantes address the testing and conclusions

12  that you had made in your report regarding cognitive

13  functioning?

14  A.  Yes, he did.

15  Q.  And directing your attention to page 7 of the addendum

16  report, Government Exhibit 3 and at the top of the page

17  there's a sentence that begins -- well, actually, if we start

18  at the very beginning, do you see the sentence that begins,

19  "Based on the information obtained during the initial

20  interviews"?

21  A.  Yes.

22  Q.  "Further reflection and discussion about the case and the

23  additional information available since I last" --

24           THE COURT:  Where are you reading from, Ms. Kresse?

25           MS. KRESSE:  I am reading from Government Exhibit 3.

1          THE COURT:  Right.

2          MS. KRESSE:  Which is the addendum by Dr. Cervantes

3    and I am at the very top of page 7, Judge.

4          THE COURT:  Page 7?

5          MS. KRESSE:  Yes.

6          THE COURT:  Okay.

7    BY MS. KRESSE:

8    Q.  And I was reading from the first sentence.  And actually,

9    Dr. Antonius, if you want to read that, it's probably best

10   that you do so.

11   A.  "Based on the information obtained during the initial

12   interviews, further reflection and discussion about the case

13   and the additional information available since I last spoke

14   with Dr. Weber in 2016, it's my opinion to a reasonable

15   degree of medical certainty that there is evidence for a

16   substantial cognitive decline in Dr. Weber's premorbid level

17   of functioning over the last several years."

18   Q.  I'll have you stop there.  So, in this addendum, there is

19   a finding to a reasonable degree of medical certainty by

20   Dr. Cervantes of a substantial cognitive decline for

21   Dr. Weber, correct?

22   A.  Correct.

23   Q.  Was this finding new to Dr. Cervantes' conclusions; in

24   other words, was it different than what was in the original

25   report?

1    A.   Yes.

2    Q.   Was there anything about cognitive functioning or

3    cognitive deficiency in Dr. Cervantes' initial report?

4    A.   There was no diagnosis of cognitive disorder in her

5    initial report.

6    Q.   And reading on in that first paragraph at the top of page

7    7, if you could read the portion beginning, "Although the

8    results."

9    A.   "Although the results on the cognitive tests selected by

10   Dr. Antonius did not show evidence of cognitive dysfunction,

11   this does not mean that it does not exist."

12   Q.   I am going to stop you there.  Is that true?  Is that an

13   accurate statement?

14   A.   Let me just read it in my mind again here.  It is a

15   statement that I have some problems with, but it could be

16   true.  It's possible.

17   Q.   And maybe it's unfair of me to ask about one sentence

18   taken out of context.  If you keep reading in that paragraph.

19   A.   "Negative results do not conclusively prove that there is

20   nothing wrong.  In the absence of a specific finding, one can

21   conclude that those particular tests fail to show the

22   presence of impairment, but not that the impairment does not

23   exist.  There could be several reasons for this.  One is the

24   test choice; selecting a test that does not measure what it

25   intends to be measure.  And another is the false negative

1    rates; the negative test results despite the actual presence

2    of a finding."

3    Q.   And with respect to this conclusion, that the particular

4    test that you chose failed to show the presence of an

5    impairment, what is your opinion on that?

6    A.   I do have some trouble with that statement, because you

7    could pick a thousand tests and then if you say that -- you

8    can always say, at least, there's no finding.  Well, just

9    because you believe that there has to be something wrong and

10   then saying you didn't test for it, that's kind of like a

11   cop-out, in a way.

12          And in my case, there were very specific things that

13   I was looking for in terms of his memory impairment and not

14   only that, both the RBANS and the WAIS testings are measures

15   of overall cognitive functioning which, in this case, was

16   very important.  This later area that has been included now,

17   we're looking at executive functioning, is something that

18   came with this report that was not a concern in the first

19   report.  And again, it was not a concern when I met with him.

20   Q.   And so, is it fair to say that Dr. Cervantes is taking

21   issue with the tests that you chose and indicating that it's

22   because you picked the wrong tests that an impairment didn't

23   show?

24   A.   From my reading of her report, that looks to be correct.

25   Q.   Of her report?

1  A.  Yeah, from my reading of her report, it looks like she's

2  taking -- saying that there are other tests or particular

3  tests that could have been used that, I assume, may have

4  shown impairment, but I am speculating on that.

5  Q.  And she's speculating as well, correct?

6  A.  In my opinion, yes.

7  Q.  Did Dr. Cervantes suggest in her report what other tests

8  should have been or could have been performed?

9  A.  No.

10  Q.  Did Dr. Cervantes, to your knowledge, have any additional

11  testing of Charles Weber done?

12  A.  Other than the MRI, no.

13  Q.  And the MRI was done before you evaluated him, correct?

14  A.  Correct.

15  Q.  And again, it was the opinion of Dr. Cervantes in the

16  addendum that to a reasonable degree of medical certainty

17  there was evidence of a substantial cognitive decline in

18  Dr. Weber's premorbid level of cognitive functioning over the

19  last several years, correct?

20  A.  Correct.

21  Q.  Do you agree with this opinion?

22  A.  No.

23  Q.  Why not?

24  A.  In order to have a cognitive disorder, again, there are

25  certain domains that we're looking at.  There are certain

1   cognitive domains there has to be impairment in.  One is

2   attention, the ability to attend to things, concentrate,

3   focus.  One is language, the ability to produce language,

4   remembering things.  Another one is memory, as we have talked

5   about.  And another cognitive area that is important is this

6   issue with spatial ability.  And another area is social

7   cognition.  And the last area is executive functioning.

8         This is laid out in the DSM, that there has to be

9   impairment in one of those areas, but the impairment has to

10  be seen on a daily basis.  It has to be evident.  This can't

11  be just someone who one day is not attending to something or

12  is one day making a poor decision.  This is daily making poor

13  decisions.  This is somebody who is daily having trouble

14  focusing.  This is somebody daily that is dealing with

15  involuntarily movement, like in Parkinson's and then it has

16  some psychological impact.  So, in Dr. Weber's case, I don't

17  see that part of it.  So, even moving on to a cognitive

18  disorder is difficult for me.

19        The other problem I have diagnosing him with a

20  neurocognitive disorder, even a vague disorder as unspecified

21  neurocognitive disorders, is that we're not talking about a

22  cognitive decline.  That, again, in my estimation, has been

23  going on since at least 2006, when he first started having

24  these ideas about taxes.

25        And if there's evidence of a cognitive decline over

1    2006 until now, then the MRI -- I would expect to see some

2    finding on the MRI and again, there are no findings.  And my

3    findings again, finding is that he is in the normal to

4    superior range in cognitive function and intellect, without

5    any significant deficits in any area, again, tells me that

6    there's no cognitive decline.

7            Is it plausible that there could be some in one

8    area, where he's starting to have trouble like, the memory?

9    That is not uncommon with age as well, that people when they

10   start getting holder, they start thinking about, I don't

11   really remember this word anymore, I don't remember this

12   thing as well as I used to do, but that is self-report.  So,

13   his self-report, true, you do see that he is self-reporting

14   some memory problems, but when we do the testing, he actually

15   looks normal to superior.

16   Q.  On that --

17   A.  On memory, he looks average.  There is -- he looks a

18   little bit worse with memory, but that, again, does not say

19   that he is in cognitive decline in that area.  It still just

20   tells me that he is average or normal in memory.

21   Q.  How does the opinion regarding substantial cognitive

22   decline relate or compare to Dr. Cervantes' opinion in her

23   first report regarding delusional disorder?

24   A.  In my opinion, it does not relate at all.

25   Q.  Can you complain?

1  A.  Delusional disorder is under the category of psychotic

2  disorders and an unspecified neurocognitive disorder, the

3  second diagnosis, is under the category of cognitive

4  disorders.  The delusional disorder is a fixed false belief

5  and that is essentially what it is and as long as it's not

6  better accounted for by an idealogical belief, like we're

7  talking about here.

8        And a cognitive disorder is something where there

9  has to be an ideology and it can be organic such as when we

10  talk about Alzheimer's or Parkinson's, or it could be a brain

11  injury such as a traumatic brain injury or a concussion or

12  some type of trauma to the head.  That's a cognitive

13  disorder.

14  Q.  So, does the addendum by Dr. Cervantes move off of the

15  original diagnosis of a delusional disorder mixed type?

16  A.  Yes.

17  Q.  And if I can direct your attention to page 10 of

18  Exhibit 3, which is the addendum report by Dr. Cervantes and

19  the second full paragraph that begins, "Cognitive disorders

20  can have as associated features".  Do you see that?

21  A.  I'm sorry.  What page number?

22  Q.  Page 10.

23  A.  Yes.

24  Q.  The second full paragraph beginning with "Cognitive

25  disorders"?

1   A.   I see that, yes.

2   Q.   And so, if you look at that paragraph, does this reflect

3   a move off of the delusional disorder diagnosis?

4   A.   Yes.

5   Q.   And if you could read the first portion of that

6   paragraph, please.

7   A.   "Cognitive disorders can have, as associated features,

8   beliefs that can rise to the level of delusions.  Dr. Heffler

9   and I discussed Dr. Weber's beliefs in sovereign citizen

10  theories per se are not necessarily delusional.  If present

11  in isolation without other associated symptoms, they would

12  not be considered a delusional disorder."

13  Q.   So, this is different than what was in her original

14  report?

15  A.   Correct.

16  Q.   But going on in that paragraph, what does Dr. Cervantes

17  say relative to this new diagnosis of a cognitive disorder?

18  A.   She goes on to say, "However, in this case, there had

19  been a dramatic decline in Dr. Weber's functioning, including

20  the deterioration of work and personal relationships and his

21  apparent inability to critically and rationally evaluate the

22  financial situation.  The physical complaints and the

23  unconventional approach Dr. Weber is taking to address them

24  is a concern, first, because there may be as yet undetected a

25  medical diagnosis that explains Dr. Weber's extreme departure

1   from previous level of cognitive functioning in 2006 and

2   secondly, because they are distinct and unrelated to

3   sovereign citizen beliefs and are distressing, not self-

4   serving and learned as sovereign citizen beliefs tend to be."

5   Q.  Okay.  And what is your opinion on this statement?

6   A.  What part?  I do take -- I have some problems with this

7   when we start talking about an undetected medical diagnosis

8   that somehow could explain his extreme departure from a

9   previous level of cognitive functioning.  An undetected

10  medical diagnosis to start in 2006 and it continues to be

11  undetected today in an MRI, it's over -- it's very unusual

12  and I would say it's impossible.

13  Q.  Okay.  You would you say that it is impossible?

14  A.  Correct.

15  Q.  And in terms of the dramatic change in Dr. Weber's

16  functioning, including deterioration of work and personal

17  relationships, that part of that paragraph, in your opinion,

18  what are these changes in employment and personal

19  relationship linked to?

20  A.  These are two areas.  One is related to his marriage and

21  the other one is related to his work, that over a period of

22  time, he -- I guess his work deteriorated and he eventually

23  ended up selling his practice.

24  Q.  And what -- in your opinion, after evaluating of

25  Dr. Weber, what caused that or what was the genesis of this

1    decline?  Dr. Cervantes opines that it's a cognitive decline.

2    A.   Right.

3    Q.   But do you have an opinion of what explains the ending of

4    his marriage, the loss of his practice?

5    A.   So, in a two-part answer, to me, it never reached a

6    cognitive disorder, because, again, picking out these two

7    things, that over a period of time, he ends up getting a

8    divorce with his wife, who -- where there seems to have been

9    problems even before this happened and then, secondly, with

10   this progression to the sovereign citizen movement, that's a

11   clear progression from not having trouble paying taxes to

12   then starting to believe in these views, that is not what we

13   normally describe or define as a cognitive disorder.

14           A cognitive disorder is something that is daily, you

15   see daily, there's problems daily and not just something that

16   just kind of progresses over time.  And then, taking into

17   account that there is no evidence on the MRI.  The results of

18   the psychological and neuropsychological testing shows that

19   he's in the normal to superior range makes it very hard to

20   believe that he has a cognitive disorder.

21   Q.   One of the things you had testified about is the aspect

22   of executive function, correct?

23   A.   Yes.

24   Q.   Is executive function something that is addressed in

25   Dr. Cervantes' addendum?

1   A.  Yes.

2   Q.  Directing your attention to page 7 of the addendum to

3   Dr. Cervantes' report, which is Government Exhibit 3, do you

4   see --

5   A.  Yes.

6   Q.  -- the bolding term "executive function" there?

7   A.  Yes.

8   Q.  And then, there's a listing beginning on page 7 and

9   continuing through page 8 of certain domains, correct?

10  A.  Yes.

11  Q.  Are these domains different than the ones you had

12  testified about before?

13  A.  Some of this is overlap in these areas.

14  Q.  And the domains referenced in Dr. Cervantes' addendum

15  report are inhibition, shift, emotional control and self-

16  monitoring, correct?

17  A.  Correct.

18  Q.  Have you reviewed Dr. Cervantes' analysis of these

19  domains as they relate to the defendant?

20  A.  Yes.

21  Q.  And did you agree with her conclusion as to these

22  domains?

23  A.  No.

24  Q.  And why not?

25  A.  So, we have -- just to explain this a lite bit further,

1  executive functioning is the area of thinking that has to do

2  cognitive control.  It's the area of cognition where somebody

3  has the ability to take in information.  Just like when I am

4  talking right now, that other people can take it in,

5  understand it and then organize it in their own mind and have

6  some kind of opinion about it in their mind and then produce

7  reasonable answers based on what I am saying and what other

8  people are saying.  So, it is part of decision making and

9  it's part of, what we call, cognitive control.

10          So, in terms of what -- and then, what we're looking

11  for with somebody with executive functioning problems, this

12  is somebody who has daily problems specifically with making

13  decisions; decisions as to starting activities, ending

14  activities and I think we talked about this, cooking, eating

15  and other just daily things that they do and this includes --

16  so they have trouble structuring and organizing their

17  thinking.

18          So, the examples that Dr. Cervantes is talking about

19  are specific to the case and she is pulling out a couple of

20  incidents that she feels is related to this inhibition or

21  poor decision making, shifting the flexibility in thinking,

22  or poor flexibility in thinking, emotional control and so on,

23  but, again, there's no evidence that this is a daily problem.

24          It just doesn't have any impact on his daily

25  functioning.  And these are common and I picked out examples

1    that in most of the cases he's reached this decision based on

2    reasoning, based on, again, this progression of reasoning or

3    research that he's gotten to.  So, it just doesn't really

4    reflect what we know about executive functioning problems.

5    Q.  And this decision that Dr. Weber has come to is the

6    decision to pursue the sovereign citizen ideology, to his

7    detriment or not to his detriment, but to pursue it to its

8    logical end, as he sees it?

9    A.  Correct.

10   Q.  And so, is it your opinion that the examples cited by

11   Dr. Cervantes under these various domains are not reflective

12   of what's really relevant to those domains?

13   A.  In my opinion, no.

14   Q.  And the idea of executive function, is that something

15   that is important to determine whether somebody is competent

16   to stand trial?

17   A.  It's certainly important because it does speak to

18   somebody's ability to make decisions and rational decisions.

19   Q.  And similarly, with respect to a person's competence to

20   represent themselves --

21   A.  Correct.

22   Q.  -- executive functioning would be important in that arena

23   as well, correct?

24   A.  Correct.

25   Q.  And again, it's your opinion that Dr. Weber did not

1  exhibit any deficit in terms of executive function?

2  A.  Correct.

3  Q.  In terms of Dr. Cervantes' diagnosis in her addendum, if

4  you turn to page 9 of Exhibit 3, under the heading

5  "Diagnosis", if you can read that first paragraph.

6  A.  "It is highly unusual"?

7  Q.  Yes.

8  A.  "It is highly unusual for an individual with no premorbid

9  history of unusual thinking to suddenly change their belief

10  system in such a dramatic manner in their 50's in a manner

11  that has led to significant conflict and stress in his

12  personal and professional.  In particular, Dr. Weber's

13  perception on his personal health issues, the lack of

14  validity of the treatments he is subjecting himself to and

15  his endorsement of anti-vax conspiratorial theories goes

16  against his background in education in such a dramatic

17  fashion that a cognitive disorder must be considered."

18  Q.  And then, does she go on to diagnose him with a -- and I

19  believe you mentioned it earlier -- an unspecified

20  neurocognitive disorder?

21  A.  Correct.

22  Q.  And what is an unspecified neurocognitive disorder?

23  A.  It's a neurocognitive disorder where you -- essentially,

24  you are not sure exactly what it is or what the ideology is

25  and because you are suspecting that there are certain

1    cognitive problems, you can diagnose this, but you do have to

2    at least be certain that there is some sort of ideology and

3    you also certainly have to be certain that there is some

4    functional impairment.

5    Q.   And here, there is no ideology, there's nothing that

6    shows on the MRI, correct?

7    A.   There is no ideology that we know of.

8    Q.   And there's no functional impairment in terms of how

9    functional impairment is actually defined and categorized in

10   the DSM, for example?

11   A.   Correct.  There is no clinical distress, which is another

12   area that they look at.

13   Q.   What kind of distress?

14   A.   Clinical distress.  There has to be significant clinical

15   distress and again, there's no evidence that he is distressed

16   about his cognitive functioning.

17   Q.   And is that something that you would measure through his

18   self-reporting?

19   A.   Self-reporting, certainly and also, just what we are

20   doing throughout the testing and his responses and so on.

21   And as I mentioned, he was concerned about his short-term

22   memory.  Interestingly, in the last report by Dr. Cervantes,

23   he is saying that the supplements that he's taking is

24   actually helping with his memory problems, too.

25   Q.   Right.  And so -- and we talked about this earlier in

1   your testimony, the fact that he feels, he, Dr. Weber, feels,

2   that these supplements that he's taking and these holistic

3   kind of unorthodox measures are helping him removes the

4   somatic category from something that impacts him negatively

5   in term of his competence, for example?

6   A.   Correct.

7   Q.   And when Dr. Cervantes says that a cognitive disorder

8   must be considered, I mean, what does that mean?

9   A.   I mean, I think as a psychiatrist or a psychologist when

10  you are doing the testing, you have to consider all

11  diagnoses, that's -- so, when somebody like Dr. Weber is

12  talking about things that may sound irrational or illogical,

13  one has to consider a different diagnosis.  So, in her case,

14  initially she considered a delusional disorder and now she's

15  moved into a cognitive disorder.

16  Q.   And in your opinion, neither of those diagnoses is

17  accurate?

18  A.   Correct.

19  Q.   In your assessment, does the defendant's cognitive

20  function render him not competent to stand trial?

21  A.   No.

22  Q.   Why not?

23  A.   Again, just in itself, with his cognitive functioning

24  being in the normal to superior range, most people would say

25  this is somebody who meets the very low threshold of

1  competence, just based on the fact he has a normal to

2  superior cognitive function and intellect.

3  Q.  Right.  And is there a correlation or association between

4  competence to stand trial and cognitive functioning?

5  A.  There is.  This is something we have studied and

6  published on, where if you see somebody with poor cognitive

7  functioning and you actually test for it, there's a higher

8  likelihood that that person would be found not competent, but

9  now we're talking about functioning that is in the low

10  average to borderline range, kind of like in the 75 to 80's

11  on an IQ, those people are more likely to be found not

12  competent.

13         And we also found and published on that if you have

14  low cognitive functioning, true low cognitive functioning,

15  you are more likely to produce an invalid protocol.  So,

16  again, one of the tests that I did is this personality

17  assessment inventory, where it's shown if you have low

18  cognitive functioning, you are more likely to have an invalid

19  protocol on the personality assessment inventory.  His

20  protocol was valid.  Again, his cognitive functioning was

21  high.  So, again that in itself says that he very likely

22  would be found competent.

23  Q.  And again, this is research that you, yourself, have

24  conducted regarding the association between competence to

25  stand trial and cognitive functioning?

1   A.   Yes.

2   Q.   And you talked about people with low cognitive

3   functioning.  So, is the flip-side also true, that people

4   like Dr. Weber who have high cognitive functioning who are

5   highly intelligent are less likely to be found not competent

6   to stand trial?

7   A.   Correct.  That's a fair assumption.

8   Q.   And if you look at your evaluation, Government Exhibit 1,

9   did you do testing to determine -- specific testing to

10  determine if the defendant was competent to stand trial?

11  A.   Yes.

12  Q.   And if I could direct your attention to -- again, we're

13  on Exhibit 1, which is your report, page 12.  There a heading

14  "Competency to Stand Trial Assessment and Evaluation".  Do

15  you see that?  Page 12?

16  A.   Yes.

17  Q.   Is the testing that you conducted reflected here in this

18  section of your report?

19  A.   Yes, it is.

20  Q.   What test did you perform?

21  A.   I performed the Evaluation of Competency to Stand Trial

22  Revised version.

23  Q.   And what is that test designed to show or to test?

24  A.   It tests for competency; competency to stand trial and it

25  follows the *Dusky* Standard that Your Honor referenced earlier

1    today.  And again, it's a semi-structured interview that taps

2    into somebody's factual understanding of the legal system,

3    their rational understanding of the legal system as it

4    pertained to their case, as well as whether they have the

5    ability to communicate with their defense counsel.

6    Q.  And so, you have touched on it, but under the *Dusky*

7    Standard, which is the controlling Supreme Court case, what

8    is the standard for determining whether or not somebody is

9    competent to stand trial?

10   A.  The determining factor is, again, if somebody -- that

11   somebody has the factual and rational understanding of their

12   case and the ability to work with an attorney.

13   Q.  And is this the standard that you apply whenever you do a

14   competency evaluation?

15   A.  Yes.

16   Q.  And what were the results of this testing relevant to

17   Dr. Weber?

18   A.  The overall results were that he was competent to proceed

19   with the adjudication process and is competent to stand

20   trial.

21   Q.  And is it a heavy -- let me ask it this way.  Is it a

22   difficult showing to make in order to find somebody competent

23   to stand trial?

24   A.  I would say it has a pretty low threshold.

25   Q.  Were the results of the testing that you did consistent

1   with your observations of the defendant during your various

2   meetings with him?

3   A.   Yes.

4   Q.   During your meetings with the defendant, did you inquire

5   of him regarding his understanding of the charges against

6   him?

7   A.   Yes.

8   Q.   And he understood what the criminal charges were that

9   were pending against him?

10   A.   Absolutely.

11   Q.   They related to the fact that he had failed to report

12   income and had filed fraudulent tax returns?

13   A.   Yes.

14   Q.   Did you inquire of Mr. Weber his understanding of the

15   courtroom and how the legal case would proceed?

16   A.   I did.

17   Q.   And did he understand those aspects of the trial?

18   A.   Yes.

19   Q.   And the courtroom?

20   A.   Yes.

21   Q.   Did you inquire of Mr. Weber regarding his ability to

22   work with Mr. Comerford?

23   A.   I did.

24   Q.   And what was your assessment in that regard?

25   A.   That -- at the time, that he certainly did.  We even

1    talked about that he had considered representing himself, but

2    when I met him, he still felt he was better off with an

3    attorney that knows the legal system better than he does.

4    Q.  And those conversations with Mr. Weber relating to his

5    ability to work with his assigned attorney, Mr. Comerford,

6    are they reflected in your report?

7    A.  Yes.

8    Q.  And specifically, if we turn to page 13 of Government

9    Exhibit 1, at the bottom of that page, is that the section

10   where you address Mr. Weber's dealings with Mr. Comerford?

11   A.  Yes.

12   Q.  And in that paragraph, is there the reference to the fact

13   that Mr. Weber had considered going pro se and had re-

14   evaluated that?

15   A.  Yes.

16   Q.  And the answers that Mr. Weber gave relative to his

17   dealings with Brian Comerford as his assigned attorney, did

18   he indicate to you that he understood what the role of

19   Mr. Comerford would be as his representative?

20   A.  Yes.

21   Q.  And that Mr. Comerford had an understanding of the law

22   that was better -- the law and procedures that was better

23   than Mr. Weber himself had?

24   A.  Yes.

25   Q.  Now, are you aware that according to Dr. Cervantes'

1  addendum evaluation, which is Exhibit 3, that as of August

2  2017, which was two months after your evaluation, the

3  defendant claimed again that he wanted to represent himself?

4  A.  Yes, I read that in the record.

5  Q.  And that two months after you evaluated him, Mr. Weber

6  was saying that he did not want to be represented by Brian

7  Comerford?

8  A.  Correct.

9  Q.  And according to Dr. Cervantes' addendum report, what was

10  the basis for Mr. Weber's change in his position on that, if

11  it's addressed?

12  A.  I don't recall that it was -- that she wrote about the

13  reason why he now wants to represent himself.

14  Q.  Simply that he did want to represent himself?

15  A.  Yes.  So, my reading of it was that now he said that he

16  wants to proceed pro se and she considered there are some

17  problems with that and then she has a different finding.

18  Q.  And in terms of Mr. Weber's desire to represent himself,

19  does it -- did he reference in his meetings with you an

20  ability to make arguments that would lead to the dismissal of

21  his case?

22  A.  He talked -- he believes he can present arguments that

23  will result in the dismissal of his case.  He did talk about

24  that he would have liked to see his attorney pursue some of

25  this evidence that he believes he's got to have this -- his

1   case dismissed.

2          But at the same time, when I saw him, he felt he was

3   better represented by having the defense counsel,

4   Mr. Comerford, to the point where he also was going along

5   with Mr. Comerford's strategy in the legal case, including

6   having the mental health evaluations completed.  He was

7   fully -- he does not believe that has any psychiatric

8   disorder, but he felt that going along with this, again, was

9   part of the strategy, in his terms, that's the game that

10  attorneys play.

11  Q.  And that's reflected in your report on page 13, correct?

12  A.  Correct.

13  Q.  Based on -- assuming it's true that Mr. Weber now wants

14  to represent himself, does that indicate in any way that

15  perhaps he is he not competent to stand trial at this point?

16  A.  No.

17  Q.  Why not?

18  A.  For a couple reasons, in my opinion.  First off, I don't

19  think that he has a cognitive disorder that somehow is

20  interfering with his ability to be competent or proceed

21  pro se.  Again, his intellect is in the normal to high

22  average superior range.  Secondly, from all my conversations

23  with him, he has certainly spent a lot of time researching

24  his legal case and the laws regarding it.  Although some may

25  have different opinions, that does not render him not

1   competent.  He is -- I would say, if he started to represent

2   himself, his strategy -- and again, whether or not that's

3   going to be successful in a court of law, that's not up to

4   me, that's up to Your Honor.

5          And when we talked about that, for example, taking a

6   plea versus proceeding to a trial, was fully aware that other

7   people might have different opinions and he may be facing

8   more serious consequences if he does not accept a plea versus

9   taking it to trial.

10  Q.  So, the foolishness of a person's beliefs or legal

11  arguments does not render somebody incompetent to stand

12  trial?

13  A.  Correct.

14  Q.  Nor does it render somebody incompetent to represent him

15  or her self?

16  A.  Right.  And I would like to explain that a little

17  further, if I may.  The idea of representing one's self or

18  proceeding pro se is, again, not new to sovereign citizens.

19  There's other legal cases where that had been -- come up and

20  where they have represented them self.  Again, courts are not

21  favorable to this and Dr. Weber is aware of that because that

22  was discussed both with me and Dr. Cervantes.

23          The other thing, there is a -- within the sovereign

24  citizen movement, there is the idea that because you adhere

25  to what -- because you adhere not to federal law but you

1   adhere to what is called common court law, which is a sort of

2   a people's tribunal, attorneys are actually irrelevant.  So,

3   the fact he needs an attorney, in his view, at this point,

4   may be part of his reason why he wanted to proceed pro se.

5   Q.  So, potentially part of his reasoning for why he can

6   proceed pro se that if he's not a United State's citizen, he

7   should not be represented by the federal public defender?

8   A.  Correct.

9   Q.  And so, again, these bases for wanting to proceed pro se

10  are well within the parameters of sovereign citizen ideology?

11  A.  That is correct.

12  Q.  Turn to your conclusions and opinions in your report,

13  which is Government Exhibit 1, page 14.  I don't want to have

14  you read everything, obviously, so let me direct you to the

15  bottom of page 14, the paragraph that begins, "Although

16  Dr. Weber unquestionably expresses".  Do you see that?

17  A.  Yes.

18  Q.  If you could read that first sentence.

19  A.  "Although Dr. Weber unquestionably expresses some

20  unconventional and some may argue unusual beliefs, it is

21  critical to determine if these beliefs are not better

22  accounted for by a person's cultural or religious background

23  or his level of intelligence and/or whether they are not

24  simply overvalued ideas."

25  Q.  This is something you did as part of your analysis?

1  A.  Yes.

2  Q.  And concluded that it was better accounted for by his

3  adherence to a particular cultural ideology or background?

4  A.  Correct.

5  Q.  That being the cultural background of sovereign

6  citizenship?

7  A.  Correct.

8  Q.  And then at the top of page 15, if you could read,

9  actually, the very first sentence on that page, "instead".

10  A.  "Instead, one has to look beyond this and determine if

11  Dr. Weber's ideation emerged over time and from preceding

12  events and whether his change in ideation and subsequent

13  decisions were judgment experience based.  Furthermore, can

14  his thinking and unconventional ideas be understood from his

15  personality and life events, which would be suggestive of

16  overvalued ideas, or are his ideas something that came

17  abruptly without explanation and are non-understandable, for

18  example, a delusional disorder."

19  Q.  And your conclusion in that regard was what?

20  A.  That he does not meet the criteria for a delusional

21  disorder, that his ideas are -- may be unconventional, but

22  they are at the most an overvalued idea.

23  Q.  And on page 15, with respect to the paragraph beginning,

24  "With respect to Dr. Weber's medical beliefs and health

25  concerns", your conclusion in that regard was what?

1    A.  "With respect to Dr. Weber's medical beliefs and health

2    concerns, it's my opinion that one sees a clear progression

3    in his symptoms, worry and decision making that is not

4    uncommon among individuals with difficult to explain health

5    problems.  The fact that he is an intelligent man with a

6    degree from a dental school does not, in my opinion, change

7    this or equate to his thinking being delusional."

8            "In Dr. Weber's case, he began experiencing health

9    concerns, dizziness, lightheaded, increased heart rate,

10   around 2009 or 2010, which were concerning to him.  He

11   continued to have infrequent episodes of health concerns for

12   which he initially sought conventional medical advice;

13   however, as the years passed and the conventional medical

14   advice did not improve his condition, he sought alternative

15   advice from a chiropractor and a nutritionist, Dr. Steven."

16   Q.  I can stop you there.  And so, again, you found that

17   there was nothing delusional about seeking outside advice or

18   treatment for what he perceived to be his health problems?

19   A.  Correct.  It, again, does not constitute a delusional

20   disorder.

21   Q.  And then you say at the bottom of that paragraph,

22   "Dr. Weber stated he has felt better and healthier ever since

23   changing his diet and taking the supplements", right?

24   A.  Correct.

25   Q.  And then the next paragraph relates to, "With respect to

1    his unconventional ideas on federal taxes, legitimacy of his

2    U.S. citizenship, anti-government ideology and the sovereign

3    citizen movement", what is your opinion?

4    A.   It's also my opinion that one sees a clear progression of

5    events, change in ideation and judgment-based decisions

6    rather than ideas that came abruptly and without explanation.

7    Furthermore, his unusual belief about federal taxes, the

8    government and the legal system can, in my opinion, be

9    explained through the views of sovereign citizen movement and

10   thus, represent a cultural belief system and not a delusional

11   disorder."

12   Q.   So, again, defendant's medical beliefs and health

13   concerns, in your opinion, do they render him incompetent to

14   stand trial?

15   A.   No.

16   Q.   Do they render him incompetent to represent himself?

17   A.   No.

18   Q.   Do the defendant's sovereign citizen ideology and

19   political beliefs render him incompetent to stand trial?

20   A.   No.

21   Q.   Do they render him incompetent to represent himself?

22   A.   No.

23   Q.   Is it your opinion to a reasonable degree of medical

24   certainty that the defendant understands the crimes he's

25   charged with committing?

1   A.   Yes.

2   Q.   That he understands that he is charged, for example, in

3   an indictment?

4   A.   Yes.

5   Q.   He understands that at a trial of the case, this judge

6   would preside over the trial?

7   A.   Yes.

8   Q.   And he understands that he would have to comply with the

9   rules of the court, even if he did not agree with them?

10  A.   Yes.

11  Q.   Are you -- is it your opinion to a reasonable degree of

12  medical certainty that Charles Weber understands that he

13  has -- at this moment, that he has an attorney who represents

14  his best interests and who has a better understanding of the

15  law and the procedures and is tasked with assisting him

16  during the trial?

17  A.   When I did my report, yes.

18  Q.   And is it your opinion to a reasonable degree of medical

19  certainty that the defendant understands the role of the

20  government as the prosecutor who would have to prove the

21  charges against him?

22  A.   He understands that.

23  Q.   Does he understand that he will be tried by a jury?

24  A.   Yes.

25  Q.   Does he understand the consequences of being found

1  guilty, that he could end up going to jail?

2  A.   Yes.

3  Q.   Does he understand that his ideas of the law are not

4  necessarily accepted by the Court and my not be able to be

5  presented in the fashion --

6  A.   Yes, he has an understanding of that.

7  Q.   And if, in fact, the defendant is found incompetent, what

8  would happen to him?

9  A.   He would go to a forensic psychiatric hospital for

10  restoration.

11  Q.   And that is a process that involves being put -- being

12  forced to undergo treatment for a period of time, correct?

13  A.   You could.   Again, you are sent away to a forensic

14  hospital for a certain time and if the staff doctors at the

15  hospital feel that he would benefit from treatment, then they

16  can do a so-called *Sell* hearing and try to get forced

17  treatment.

18  Q.   If the treatment it refused, correct?

19  A.   Yeah.   Again, individuals have the right to refuse

20  treatment and there are also cases where people are found

21  competent without actually receiving any pharmacological

22  treatment in these facilities.

23  Q.   The period of being housed in a forensic institution,

24  that could be up to four months initially, correct?

25  A.   Yeah, it could.

1    Q.  And in your opinion, in the event that Dr. Weber were

2    found to be not competent to stand trial, do you believe

3    there is any treatment, medical treatment or psychological

4    treatment, that would restore him to competency, assuming

5    that that was the finding?

6    A.  Again, I don't believe that he does meet the criteria for

7    a disorder, so I don't think there's any treatment that would

8    necessarily make him better.  He has a very good

9    understanding of his legal case and the legal system.  So,

10   when we're looking at his ability to be competent, his

11   ability to proceed representing himself, again, would any

12   treatment make a difference to that?  Probably not.  It would

13   be him changing his mind over time, but that's, again, a

14   volitional thing on his part, that he's making a decision to

15   change his mind.

16   Q.  To change his mind regarding an ideology that he has

17   accepted and believes in?

18   A.  Correct.

19   Q.  And just some questions specific to proceeding on his

20   own, the reason -- in your opinion, is the reason that he

21   wants to represent himself because of his adherence to

22   sovereign citizen beliefs about lawyers and about courts of

23   law?

24   A.  Yes.

25   Q.  Does he have -- despite that, does Mr. Weber have the

1    capacity to follow the Court's instructions and directions

2    during the trial?

3    A.   He does.  And even observing him a little bit here today,

4    he has the demeanor of listening very carefully and taking

5    notes and so on.  There's also, he very recently managed

6    to -- or had his name changed, too, from a state court, I

7    believe, again, telling me that he does have the ability to

8    put together information and research that is needed for

9    courts.

10   Q.   And that's one of the things that Dr. Cervantes

11   references in her addendum, like an ability to organize your

12   thoughts and organize your arguments, correct?

13   A.   Correct.

14   Q.   Are you pointing out the fact that Dr. Weber has been

15   able to organize his thoughts and arguments well enough to

16   successfully make an application in another court?

17   A.   Exactly.

18   Q.   One of the issues regarding representing yourself is

19   whether or not he would be disruptive during the trial.

20   Based on your evaluation of him and your observations of him,

21   do you have any opinion as to whether or not he would be

22   disruptive?

23   A.   Again, I don't think he would be disruptive.  I do not

24   see anything that in my evaluation or when I saw him over the

25   four times or, again, here today, I have not seen any

1  disruptions on his part.

2  Q.  And in terms of his ability to convey his beliefs or his

3  legal arguments regardless of how flawed they may be, is he

4  capable of doing that on his own?

5  A.  Yes.

6  Q.  And again, he understands that these are beliefs that are

7  not accepted by many people, correct?

8  A.  Yes.

9  Q.  And is he able, for example, to -- when he's questioning

10  witnesses, is he able to ask questions coherently, get

11  responses to questions and do follow up; does he have the

12  capacity to do that?

13  A.  He has the capacity to do that.

14  Q.  And he understands that would have the right to put on

15  his own case and would he be able to do that?

16  A.  Yes.

17        MS. KRESSE:  Your Honor, could I have a moment?

18        THE COURT:  Yes.

19  BY MS. KRESSE:

20  Q.  If you can tell the Court, what your opinion and why it

21  is your opinion about Mr. Weber's ability to represent

22  himself at trial?

23  A.  Again, my opinion is that he does have the mental

24  capacity, capacity and cognitive functioning to, based on the

25  testing that I did, to represent himself.  He has a strategy.

1  I think he's probably thought about his strategy in terms of

2  how he is going to represent himself in the case.  We may

3  disagree with it, but that is his strategy.

4        He meets all the criteria in terms of having a

5  factual and rational understanding of the case and he has

6  also shown that he can work with an attorney.  And again, I

7  have not seen anything here today that tells me he that he is

8  not able to have the demeanor in being able to represent

9  himself.

10        MS. KRESSE:  Thank you.  No further questions.

11        THE COURT:  We'll take a 15-minute recess.

12        THE CLERK:  All rise.

13  (Brief recess)

14        THE CLERK:  All rise.

15        THE COURT:  All right.  Mr. Comerford?

16        MR. COMERFORD:  Thank you, Judge.  And Judge, before

17  we get started, I spoke briefly with Dr. Cervantes, if the

18  Court is available, she and Ms. Kresse would be available on

19  next week Tuesday, the 23rd anytime that day.  I understand

20  the Court has a trial that may or may not be going then.

21        THE COURT:  We'll schedule it for Tuesday.

22        MR. COMERFORD:  Okay.  Thank you, Judge.

23        THE COURT:  What time?

24        MR. COMERFORD:  Whenever the Court wants us here,

25  Judge.

1          THE CLERK:  Nine o'clock is available, Judge.

2          THE COURT:  We'll make it 10 o'clock.

3          MR. COMERFORD:  Thank you, Judge.

4

5                    CROSS-EXAMINATION

6

7     BY MR. COMERFORD:

8     Q.  Good afternoon, Dr. Antonius.

9     A.  Good afternoon.

10    Q.  One thing you mentioned, I think, this morning was that

11    you had performed -- it was somewhere in well over 1,000

12    competency evaluations, correct?

13    A.  Correct.

14    Q.  Was it like 1,500?

15    A.  Yeah, somewhere between 14 and 1,500.

16    Q.  Somewhere around there.  And you estimated finding maybe

17    25 percent of them were incompetent for one reason or

18    another?

19    A.  Correct.

20    Q.  Do you know whether -- I guess have you evaluated

21    individuals before who present the same sovereign citizen

22    ideas as Mr. -- as Dr. Weber?

23    A.  I have evaluated people that have anti-government views.

24    Some of them do have views that share some of the sovereign

25    citizen beliefs.

1    Q.  I mean, people that -- I mean, anti-government is pretty

2    broad.  Would they be people though that you would classify

3    as sovereign citizens at least using the criteria in the

4    Parker article, Government Exhibit 4?

5    A.  No.

6    Q.  No.  Have you evaluated people -- I guess let me rephrase

7    that.  So, you have not evaluated people before that would

8    fall under the criteria in the Parker article, Exhibit 4?

9    A.  Correct, in the Parker article, no.

10   Q.  So, Dr. Weber is the first?

11   A.  Dr. Weber is the first.

12   Q.  Okay.  You testified that you -- how many tests would you

13   say you performed on Dr. Weber?  And by "test", I mean the

14   RBANS, the various tests you list in your report.

15   A.  The overall tests is the RBANS -- and if I may just look

16   at my --

17   Q.  I'll pull up your report, Government Exhibit 1 and I

18   can -- feel free to refer to it.  I know you have it right

19   there.

20   A.  Okay.  So, the total number -- this is page 9.

21   Q.  Okay.

22   A.  The total number of tests I performed is nine.

23   Q.  And you found that as a result of those tests, he did not

24   meet the criteria for any disorder and in particular, the

25   disorders that Dr. Cervantes found?

1   A.  Yeah, including -- in that determination, I would include

2   my interviews, clinical interviews with him, as well as the

3   documentation and information that I had available at the

4   time.

5   Q.  Now, Dr. Cervantes in her report -- I think Ms. Kresse

6   was asking and you were agreeing that she was somewhat

7   critical of either the tests you selected or that you didn't

8   select other tests.  Is that fair to say?

9   A.  That's fair to say.

10  Q.  And as a -- one of the differences -- and correct me if I

11  am wrong, but is one of the differences between a

12  psychologist, which you were and a psychiatrist, which

13  Dr. Cervantes is, is the access to and expertise in testing?

14  A.  It depends on -- are you referring to psychological

15  testing?

16  Q.  Yes, psychological testing.

17  A.  Yes.

18  Q.  So, are there tests that -- and I don't know if "access

19  to" is the right word, but are there tests that you are able

20  to give that she would not be able to give?

21  A.  That's a correct statement.  Yes.

22  Q.  Is that because those tests are owned by companies and

23  that's their proprietary information and those are provided

24  to psychologists and she would not have access to them?  Is

25  that how --

1    A.   No.   The difference is training.   They don't have

2    training in psychological testing and as part of a

3    psychologist's training, you get trained in how to conduct

4    and interpret psychological testing.   And so --

5    Q.   I'm sorry.   Go ahead.

6    A.   Okay.   So, typically, a psychiatrist, as part of their

7    evaluation, if they have concerns about cognitive functioning

8    will then call in and have a psychologist do that part of the

9    testing.

10   Q.   So, it is not unusual that she would not have performed

11   that testing herself.   She would not have been able to.   Is

12   that accurate?

13   A.   She would have had a psychologist do that part of the

14   testing for her.

15   Q.   But she would not have been able to it herself in her

16   report?

17   A.   I hope not.

18   Q.   In Exhibit 1, page 11, so that's your report, at page 11,

19   you talk about the repeatable battery for -- I'll zoom in

20   here -- for assessment of neuropsychological status, RBANS.

21   Do you see where I am referring to?

22   A.   Yes.

23   Q.   And can you -- Dr. Cervantes took issue with how that

24   test is normed.   Is that fair to say?   Do you know -- she

25   brought up -- can you explain, what does it mean how a test

1   is normed?  What does that even mean?

2   A.   It refers to the scores that you get and you have to

3   compare them to, in Dr. Weber's case, people at the same age,

4   because comparing his testing with somebody who is 25 is just

5   not fair, because the person at 25 is in a different level of

6   his cognitive functioning and we know people when they turn

7   60 and above, or even earlier than that, that there may start

8   being some cognitive decline.  It has to be age related, so

9   you have to norm it to your age.

10  Q.   Now, so that test will look at the results and take into

11  account your age and then, that's how you interpret the

12  result is taking into account Dr. Weber's age?

13  A.   Correct.

14  Q.   Is there a normal for -- say, for instance, education

15  level?

16  A.   You could norm it for educational level.  Educational

17  level, it's a little bit tricky, because age -- we know that

18  age can have an impact of cognitive functioning, but your

19  education does not have an impact on your cognitive

20  functioning.  It's the other way around; your cognitive

21  functioning will have an impact on probably how far you go in

22  school.  Somebody with higher cognitive functioning, like

23  Dr. Weber, is more likely to have of a higher education.

24  Q.   Is someone like Dr. Weber, who I believe you found had --

25  and I may be paraphrasing here -- a superior intelligence or

1   very high functioning, is that something that -- I mean, in

2   that test, he's being normed against people in the same age

3   group who do not have that same education, don't have the

4   same functioning and those sorts of things?

5   A.  It could be.  Again, I don't have access to the norms

6   that they used for -- to developing the norms, but the norms

7   are developed in terms of their age because that's a primary

8   thing.  And again, like I just said, it's important because

9   age, again, can have an impact on cognitive functioning, but

10  when it comes to education, it goes the other way around.

11          So, typically, we don't really look at age when we

12  do these forensic evaluations.  In research settings, you

13  absolutely do and you can control for age, you can control

14  for whatever you want to control for as long as you are going

15  to be looking at those factors.

16          When you are in a forensic setting, especially to

17  diagnose somebody with a cognitive disorder, you have to be

18  certain, you know, that there actually is something going on

19  to related to the age, or related -- I guess we're suspecting

20  that it might be something related to educational level.

21  Q.  So, someone like Dr. Weber who is -- let me rephrase

22  that.  Is this test, is it one that's trying to, you know,

23  set a baseline and if you fall below that, then maybe there

24  is some disorder, but as long as you are not falling below

25  that line, you would not have that disorder?  Is that a good

1    way of looking at it?

2    A.   No, that's not the way it's used.  It could be and so

3    certainly some -- now, we're getting into different

4    disorders, but neurodevelopmental disorders, which we refer

5    to as mental retardation, there are certain norms in terms of

6    how high you are scoring on IQ, but then, you also have to

7    look at adaptive functioning and other things.  But in

8    certain disorders, yes, but what we're talking about today,

9    it's not that there's a certain threshold for diagnosing

10   somebody with a cognitive disorder or not.

11   Q.   So, there might not be a threshold, but if you are

12   starting off at a pretty high functioning level, is it

13   possible that you could still have some significant

14   deterioration but still appear on that test to be fine;

15   appear to not have any cognitive impairment?

16   A.   You could, yes.

17   Q.   As far as -- you talked a little bit about executive

18   function in your direct examination?

19   A.   Yes.

20   Q.   Do any of the tests that you administered specifically

21   test for executive function?

22   A.   Yes.

23   Q.   Which test?

24   A.   Both of them; both the WAIS and the RBANS do.

25   Q.   And how do they test for executive functioning?

1    A.   I understand where this is coming from.  There's a

2    statement in Dr. Cervantes' report that, in fact, the tests

3    that I chose do not test for executive functioning, so I

4    understand the line of questioning.

5            So, executive functioning, again, like I talked

6    about before, is as related to cognitive control and the

7    ability to make decisions.  And actually, if you look at my

8    evaluation, you can see there is an area that is tested by

9    both tests that is called working memory.

10   Q.   Which page are you on?

11   A.   So, I am on page 11.  If you look at the third

12   paragraph -- actually, in the second paragraph, you can see

13   that one of the sub-scales that you look at is working memory

14   and similarly -- I'll get to my point here in just one

15   second.  And in the last paragraph and this is related to the

16   RBANS, halfway through, you can see that the attention and in

17   parentheses it says "(which assess working memory and

18   concentration)".  And the reason I bring up working memory is

19   because that is one of the main components of executive

20   functioning and the DSM will talk about this.

21           So, in the WAIS, there are two tests that

22   specifically taps into this.  One is digit span and the other

23   one is arithmetic.  And in the -- and we can talk about the

24   executive functioning here.  On one of the tests, he did

25   about normal and the other one he actually was two standard

1   deviations above the normal, which puts somebody in the

2   superior range.

3          In the one where he was in the superior range of his

4   working memory, again, part of executive functioning, is the

5   ability to take these kind of logic problems that you give

6   them, think about it and they are given a certain amount of

7   time and then produce an answer based on that.  So, that's,

8   again, like, Bob had two balls and Cory had five and then

9   Aaron takes four away, how many are left for Sue.  And again,

10  there he performed in the superior range.

11         In the other one, we look at attention and one of

12  the tests that I used there is word fluency.  So, that is the

13  ability to produce words based on either a category that

14  you're given or a letter that you're given.  And again, he

15  did in the average normal range in that.

16         So, there are specific tests within this battery

17  that look into executive functioning.

18  Q.   That test where you come up with a word, is that a part

19  of RBANS or a part of WAIS?

20  A.   RBANS.  Specifically, you are given the category here of

21  produce as many words as you can that are fruits and

22  vegetables.

23  Q.   Got you.  I understand.  Thank you.  The tests you

24  administered to address his memory concerns, I think you

25  discussed that on page 12, the second paragraph of your

1   report.  And I just want to -- I think you testified that you

2   found he wasn't trying real hard or he maybe wasn't as

3   motivated on that test.  Is that accurate?

4   A.  I suspected that day -- and again, I think it had to do

5   with what was going on that day, but I did discuss with him,

6   the filing of legal papers and so on.  This was just a test

7   that he did not put a whole lot of concentration into.

8   Q.  But there was nothing indicating, from what you saw, that

9   he was feigning any sort of disorder or trying to appear as

10  those he had some problem?

11  A.  Correct.

12  Q.  Correct.  He -- I mean, if anything, he -- I think you

13  testified to this -- he is of the opinion that there is no

14  disorder; that he is perfectly competent to proceed?

15  A.  Yes.  Yes.

16  Q.  You testified that -- on direct about his somatic

17  concerns?

18  A.  Yes.

19  Q.  And that's -- I mean, what is that?

20  A.  It's a concern about a physical ailment.  So, in his

21  case, it was dizziness, an increased heart rate and some

22  nausea.

23  Q.  And I think you testified and I think this was a quote,

24  that his somatic concerns were not crazy, that they didn't

25  appear to be anything delusional.  Is that accurate?

1    A.  Correct.

2    Q.  And did he discuss with you any of his concerns about the

3    wireless router in his house?

4    A.  He did not discuss that part with me.

5    Q.  Are you familiar with Dr. Cervantes', I guess, recitation

6    of that concern by him, where she talks about his pancreas

7    and radiation?  Does that sound familiar?

8    A.  Yes.

9    Q.  Was that in line with the concerns that he spoke to you

10   about, or does that seem to you a little more -- a little

11   less rational than the ones he was talking to you about?

12   A.  He gave me some reasons.  Again, I think it was the

13   mercury poisoning.  He talked about with me.  And again, when

14   you consider these somatic concerns, we're not talking about

15   a somatic delusion per se.  We're just talking about issues

16   that he has.  And I agree that some of it sounds irrational

17   to most of us, but the important thing was that he went out

18   and got this alternative treatment and he felt that he was

19   getting better.

20   Q.  And you testified that a lot of people look into

21   alternative medicines and that this is not something that's

22   really uncommon at all, correct?

23   A.  Correct.

24   Q.  Did you -- looking at the concerns he raised to

25   Dr. Cervantes, do you think that his somatic concerns that

1    he's sought out alternative medicine for are more extreme

2    than what's normal?

3    A.  We're talking about the range of normalcy here.  To most

4    of us, his -- some of these rationales for why he is doing it

5    can sound illogical; however, it's not uncommon that people

6    have certain beliefs of how they're developing a cancer or

7    other things and they seek out alternative treatment and they

8    get better and then at the end of the day, there might be

9    some psychological issues related to that.  But, again, what

10   you are looking then as a doctor is their psychological

11   issues are getting better, speaking to well-being and

12   psychological health.

13   Q.  When you prepared this report and I guess when you were

14   testifying though about how his somatic concerns were not

15   crazy, were you taking into account his specific concern

16   about the wireless router in his house, the radiation from it

17   and how it had affected his pancreas and he now had to take

18   supplements to correct that?

19   A.  Yes.  It is a two-part answer, because, again, the

20   somatic concerns themselves are not crazy, that someone is

21   feeling dizzy, that if somebody is, again, feeling the

22   increased heart rate an so on.  And when we talk about it, we

23   talk about stress as well and I think most of us understand

24   why a doctor would suggest that maybe it's related to stress.

25          And I think in Dr. Cervantes' report, the wife, at

1  the time his ex-wife, had mentioned maybe it's related to

2  stress as well.  He did not feel it was related to stress.

3  He felt there were other issues.  And then he, again, sought

4  out the alternative medicine.

5  Q.  I want to look at Government Exhibit -- actually, I am

6  sorry.  I believe you testified that he had problems with

7  taxes prior to 2006.  Does that accurately -- what you

8  testified to?

9  A.  That's the term I used.  And what I mean by that is he

10 has concerns about paying taxes prior to 2006.

11 Q.  "Concerns" meaning he didn't just like paying them?

12 A.  Didn't like paying them.  There are some reports, I think

13 from Dr. Cervantes, that they tended to file late and then

14 within those couple years, they started filing separately as

15 well.

16 Q.  But nothing indicating an unwillingness to pay them or a

17 belief that he did not have to pay them?

18 A.  Before 2006?

19 Q.  Before 2006.

20 A.  No.

21 Q.  Nothing.  It was more just that he didn't like paying

22 them, which is probably true for most people?

23 A.  Fairly accurate, yes.  I don't know if the last statement

24 is true.

25 Q.  That most people don't like paying taxes?

1   A.   Some of us actually think it's a good idea to help out

2   the government to pay for resources, so --

3   Q.   Looking at Government Exhibit 5 -- and I'll pull it up

4   here.  This is the article by Pytyck and Chaimowitz.  Are you

5   familiar with this article?

6   A.   Yes.

7   Q.   And this article goes through two case studies, patient A

8   and Patient B.

9   A.   Correct.

10  Q.   I want to look at -- it's listed as page 152 in the

11  article and I will highlight it here.  It gets into this idea

12  of a delusion versus an extreme belief.  Are you familiar

13  with this section of the article?

14  A.   Yes.

15  Q.   And these authors, they bring up certain factors that

16  they and others feel are significant in trying to distinguish

17  between when is a sovereign citizen possibly delusional

18  versus when are they more likely exhibiting extreme belief.

19  Is that accurate, as far as what's contained in the article?

20  A.   Yes.

21  Q.   They list these factors?  And I just want to look at --

22  and maybe you can explain this better than my understanding

23  of it, but the one thing they bring up is concomitant

24  deterioration in social or occupational functioning.  Do you

25  see that?  I highlighted it on the screen.

1   A.   Yes.

2   Q.   What is that?

3   A.   It is just referring to the deterioration in both areas.

4   Q.   In both their --

5   A.   Social and occupational functioning.

6   Q.   So, kind of their -- would I be --

7   A.   Can I --

8   Q.   Sorry.  Go ahead.

9   A.   Page 152.

10  Q.   Yeah, 152.  I can come up there and point it out to you

11  if you want.

12  A.   I remember reading this.

13  Q.   So, that says one of the factors they look at is whether

14  there's also deterioration in, I guess, the guy's personal

15  relationships and his professional life.  Is that a fair

16  way -- am I talking about that right?

17  A.   Yes.

18  Q.   Yes.  Okay.  So, Patient A, that's the first case study

19  they get into.  And I am just in the next paragraph here.

20  A.   Sorry.

21  Q.   I'll blow it up on the screen and I'll highlight it.

22  Patient A -- do you see where it says, "We remark upon the

23  absence of a prodromal period."  What's a prodromal period?

24  A.   It's a period before these ideas are taking place.

25  Q.   Okay.  And then they also look at, "as well as the

1    relative preservation of social and occupational functioning.

2    Do you see that part?

3    A.  Correct.

4    Q.  So, there's these authors saying that this individual,

5    Patient A, was able to preserve -- or, I guess, relatively

6    preserve their social and occupational functioning?

7    A.  Yes, essentially.

8    Q.  And that supports a finding that the person is not

9    delusional but rather had these extreme beliefs?

10   A.  In this case, yes.

11   Q.  In that case.  I want to look at Patient B, the next case

12   study, which is just on the following page.  I'll blow that

13   up as well.  Patient B, I'll just highlight here.  It says,

14   "She had, in fact, managed to develop and sustain a career as

15   an artist and literary figure of some modest international

16   repute."  Do you see that?

17   A.  Yes.

18   Q.  So, just like Patient A, they're saying that this person

19   was able to maintain their social and occupational

20   functioning, to preserve that.  Is that that accurate?

21   A.  Yes, that's correct and that's what they're saying.

22   Q.  Okay.  And they view that as supporting a finding that

23   this individual, Patient B, was exhibiting these extreme

24   beliefs, but not having a delusional disorder?

25   A.  Correct.

1    Q.   Now, Dr. Weber, after 2006, when he -- he kind of over a

2    period of time, you testified, he starts to implement more of

3    his beliefs about taxes?

4    A.   Correct.

5    Q.   And I think first it's with his own tax returns and then

6    it involves the withholding for the taxes for the individuals

7    in his business --

8    A.   Yes.

9    Q.   -- is that correct?

10   A.   Yes.

11   Q.   And that he spends a lot of time researching this,

12   sometimes maybe 40 hours a week, researching the laws and

13   things like that, is that accurate?

14   A.   Yes.

15   Q.   And that after he starts implementing these ideas in his

16   business, his dental hygienist quits, is that accurate?

17   A.   Yes, there was one person that quits first and a

18   receptionist, I believe, that quits a little bit later, yes.

19   Q.   Well, at least one of the employees quits because it does

20   not sound right to them.  They don't like that arrangement?

21   A.   Yes.

22   Q.   He sees a decline in the number of patients, which I

23   believe you or he attribute to him spending so much time on

24   these matters, on the sovereign stuff?

25   A.   I actually think that's in Dr. Cervantes' report, but

1    I -- again, what ends up happening is that he -- well, first

2    of all, if you lose one of your employees and then two of

3    your employees, it's going to be difficult to see as many

4    patients as you used to see.  So, there's a decline because

5    of that.  And you are correct, he did a lot of research on

6    sovereign citizens and taxation and that probably interfered

7    with his practice as well.

8    Q.  So, eventually, his -- you are aware he failed to

9    maintain his dental license?

10   A.  Yes.

11   Q.  And his -- eventually, he had to close his business.  I

12   believe they sold -- they either closed it or sold it.  He's

13   not in business anymore as a dentist?

14   A.  Yes, I understand he is not in business anymore.  The

15   dental license, again, we have to put into context here that

16   it's probably a license that was written in capital letters

17   and that, again, within the sovereign citizen view is not

18   something that you need.

19   Q.  Is that significant to you in answering whether he has a

20   dental license?

21   A.  Whether he wants to continue to have it, absolutely.

22   Q.  I just asked, are you aware that he -- you know, as a

23   result of what he's doing from 2006 to present, he is no

24   longer licensed to practice dentistry in New York state.  Are

25   you aware of that?

1   A.  Yes.  Well, from the reports, I understand that he no

2   longer carries or has a license.

3   Q.  Is it fair to say then that in contrast to Patient A and

4   B in this article that Dr. Weber did not successfully

5   preserve his social and occupational functioning at least to

6   the same level that they did?

7   A.  So, again, I did read these case studies and they're a

8   little bit skinny, to be honest with you.  So, I don't know

9   what the time period we're talking about here and I think

10  that's a concern of the article.  So, I don't know how long

11  they kept this up.

12          I understand what they're saying is that there seems

13  to be this modest decline in social and occupational or --

14  maybe there's no decline in occupational and social

15  functioning or maybe a modest one, but, again, I don't know

16  how long this went on for, what time period we are talking

17  about here and it might have gotten worse.

18  Q.  Is it fair to say that Dr. Weber though was not able to

19  or did not preserve his professional business, right?  He

20  didn't preserve that?

21  A.  Yes.  There's a progression of it where, again, starting

22  in 2006 and then 12 years later, because of his views and

23  some of the decisions that he makes, he's unable to preserve

24  it, which looks similar to other sovereign citizen cases like

25  the Glen Unger case I mentioned earlier.

1   Q.  And he was not able to preserve the occupational

2   functioning in the sense that he's no longer able to practice

3   dentistry.  Is that fair to say?

4   A.  He doesn't have a license to do it.  When I spoke to him,

5   he did talk a little bit about the future and wanting to

6   teach, so he may be able to do that.

7   Q.  Is it fair to say that he -- that there was definitely

8   some deterioration in his personal and his social

9   relationships in this time period?

10  A.  Again, it depends who you ask.  If you ask him, he would

11  say that just comes with the territory.  To some of us, we

12  would say it seems like having -- getting a divorce could be

13  part of some social issues.  And again, with regards to that,

14  the only thing we really know is that he seems to have had

15  problems prior to this.  There's been some evidence of

16  counseling.  He talked about growing apart.  So, I don't know

17  how much of that was just a natural progression of the

18  marriage.  Again, we live in a country where the -- I think

19  the rate of divorce is about 54 percent.

20  Q.  Thank you.  I just got maybe one or two more quick things

21  from this article.  One of the other factors they look at and

22  this is another one I might need some explanation as to what

23  it actually means, it talks about how -- I am zooming in on

24  the bottom right of page 152.  And one of the other factors

25  it looks at is this idea that the person's beliefs are

1    amplified and I am quoting the quote here, "amplified by

2    their salience in the content ever his immediate legal

3    situation."  Do you see the part I am talking about?  I'll

4    highlight it here.

5    A.  Yes.  I am reading it.

6    Q.  Does that -- and I am going to try to paraphrase, so

7    correct me if I'm wrong.  Does that mean that when they get

8    into legal trouble, they get a lot more serious about their

9    beliefs and start researching it more and it becomes much

10   more important to them?

11   A.  I think that's a good way of describing the salience.

12   Q.  Is that -- is it fair to say here that Dr. Weber, he had

13   these beliefs or at least was researching them prior to

14   having any legal trouble with the government, with the IRS?

15   Is that fair to say, based on your research?

16   A.  He started researching them probably around '06, '07,

17   after he listened to this radio show.  That's the timeline

18   that we have.  So, that is before he had trouble with the

19   government, correct.

20   Q.  Right.  And did he give you a sense of how much time he

21   was spending researching it, I guess, in those early years?

22   Was it an inordinate amount of time or was it just a little

23   bit here and there?

24   A.  Actually, earlier on, he didn't give it a whole lot of

25   thought, is what he told me.  So, he had listened to this

1   radio program with this fellow from We the People and was

2   talking and there was something that piqued his interest

3   related to taxes and he didn't give it a whole lot of

4   thought, initially.  And then later on when he had time, he

5   got back to it, looked at the website and then started

6   researching it more and more and more.  It seems like it's an

7   idea that initially started relatively small and then it

8   became stronger as time went on.

9   Q.  If you know, was it something he was spending a lot of

10  time on prior to getting involved in this criminal case?

11  A.  I don't know.

12  Q.  You don't know?  Okay.  Just real quick, about your --

13  you testified a lot about your qualifications this morning as

14  a forensic psychologist.  Do you recall that?

15  A.  Yes.

16  Q.  Are you board certified as a forensic psychologist?

17  A.  I am not.

18  Q.  Is that something that -- is there a board certification

19  for forensic psychology?

20  A.  Yeah, after you practice for a certain number of years

21  and if you're eligible for it and it costs a certain amount

22  of money, then you can get a board certification.  It's

23  different from a board certification for a psychiatrist,

24  which is something that comes initially and when they're done

25  with their degree.

1  Q.  Is it something you would be eligible for now or would

2  you have to wait a while to apply for it?

3  A.  I became eligible a couple years ago.

4       MR. COMERFORD:  Okay.  I do not have any further

5  questions.  Thank you.  Thank you, Judge.

6       MS. KRESSE:  Just a couple questions, Judge.

7

8                    REDIRECT EXAMINATION

9

10 BY MS. KRESSE:

11 Q.  Dr. Antonius, in terms of board certification, you

12 indicated that you were qualified a couple years ago to

13 become board certified in forensic psychology, correct?

14 A.  Yes.

15 Q.  But you have not done that?

16 A.  No.  It has not been high on my to-do list because most

17 experts that testify do not have it and the guidelines for

18 board certification has kind of like changed over the years

19 and it has become more expensive, where it used to be

20 something that was very simply handed out and I think it's

21 kind of like, taken a life on of its own and at this point,

22 it's a bigger process.

23       THE COURT:  What does it mean if you are board

24 certified versus not being board certified?  What is the

25 significance of it in the real world?

1    THE WITNESS:  All the materials that I did in my

2  master's degree in forensic psychology is the exact same thing

3  that I would have to go over again and then there's a test

4  that you do and you have to also produce a couple of reports.

5    THE COURT:  What does it give you?

6    THE WITNESS:  It gives you another acronym behind

7  your name.

8    THE COURT:  Okay.  Thank you.

9  BY MS. KRESSE:

10 Q.  What is the acronym that would be behind your name?

11 A.  ABPP.

12 Q.  Which stands for?

13 A.  Board of professional -- actually, I forgot.

14 Q.  All right.  I shouldn't have sprung that on you.  I just

15 want to ask you a follow-up question on Government Exhibit 5,

16 which is the Pytyck article "The Sovereign Citizen Movement

17 and Fitness to Stand Trial".  And specifically, if you turn

18 to page 152 of that article at the bottom right,

19 Mr. Comerford was asking you some questions about some of the

20 analyses that were conducted relative to the two people who

21 were the subject of the study.  Do you recall that?

22 A.  Yes.

23 Q.  And first of all, I think you referred to the case

24 studies as being skinny?  Is that your word or did I make

25 that up?

1    A.   Yes.

2    Q.   What do you mean by that?

3    A.   This is a relatively short article.  Actually, even the

4    whole background and talking about sovereign citizens is --

5    there's not a whole lot of information.  The case studies,

6    although they describe cases of people with sovereign citizen

7    views, it certainly describes two out of 3 to 800,000 that we

8    know have these views.  This, in my mind, doesn't represent

9    what you could normally see with a sovereign citizen.  The

10   other thing is -- not to compare, but the other journal --

11   the other article that we were talking about from the Journal

12   of American Academy on the Psychiatry and the Law.

13   Q.   That is the Parker article which is Government Exhibit 4?

14   A.   That's the Parker article.  It comes from a journal that

15   has, what we call, more impact.  There is a certain impact

16   factor that goes with journals.  This journal here, the

17   International Journal of Forensic Mental Health related to

18   the Pytyck article, the requirements to get something

19   published there is lower than getting something published

20   with the other journal.

21          So, to explain my point, so I am not surprised that

22   it is somewhat skinny, what we see in terms of these case

23   studies, because the requirement, again, to get it published

24   in this journal is just lower than the other journal.

25   Q.   And so, if we were going to analogize to a legal context,

1  would it be fair to say that a journal -- or an article in

2  the journal, which is the same journal as Exhibit 4 and I

3  don't have that in front of me --

4  A.  The American Academy of Psychiatry and the Law.

5  Q.  Thank you.  That that would have more precedential value

6  than an article in the in International Journal of Forensic

7  Mental Health?

8  A.  Yes.

9  Q.  Okay.  And one thing I'll just point out and ask if

10  illustrates your adjective of "skinny", if you go to page 153

11  of this article, in the upper left, there's a paragraph that

12  begins "In the case of Patient B?

13  A.  Yes.

14  Q.  And it goes on to say "Due to the limited nature of our

15  single clinical contact with these individual".

16  A.  Correct.

17  Q.  And it goes on to say, "relatively less information was

18  available to inform a similar analysis", correct?

19  A.  Yes.  That speaks exactly to "skinny."

20  Q.  Mr. Comerford asked you with respect to -- and now I am

21  on page 152 of that article, Government Exhibit 5.  It talks

22  about concomitant deterioration in social and occupational

23  functioning.  And Mr. Comerford asked you if, in fact,

24  Mr. Weber was not able to preserve, for example, his

25  professional business as a result of his adherence to

1   sovereign citizen belief.  Do you recall being asked that?

2   A.  Yes.

3   Q.  Is the issue here though whether he was able to, like he

4   had the ability to, or that he chose not to?

5   A.  In his case, I think it's more important that he chose

6   not to based on his beliefs.

7   Q.  So, this is not a situation where if there were an

8   identifiable psychoses, a delusion, or a cognitive disorder,

9   where he would be unable to change his beliefs, correct?

10  A.  Correct.  And what you normally would see with a

11  delusional disorder is somebody who that day when they --

12  when this -- these beliefs start manifesting themselves, that

13  they will take off from their wife, family, friends, children

14  and so on, or that they will -- that they take off from their

15  job and no longer come back to their job.

16  Q.  And that was not the case with Dr. Weber?

17  A.  No.  Again, there is a clear progression here based on

18  his rational, whether we like it or not, I guess is another

19  questions, but based on his rationale, there's progression

20  here on why he made the decision that eventually led to, I

21  guess, lose his license and practice.

22  Q.  Right.  So, for example, with respect to his business, he

23  chose to adhere to the belief that he didn't have to withhold

24  taxes from his employees, correct?

25  A.  Correct.

1   Q.  And he chose then the consequence of that, which was some

2   employees, one employee in particular, said I am not going to

3   work for you, correct?

4   A.  One employee did and the other one stayed with him for a

5   while because it was not important to her, but then over

6   time, she left as well.

7   Q.  And the natural result of not having anybody working for

8   you is that you cannot handle your business, correct?

9   A.  Correct.

10  Q.  So, this is not a situation where he was not able to

11  preserve his professional business, but rather he chose to

12  take actions that had as a natural result that he would be

13  unable to continue as a dentist?

14  A.  Correct.

15  Q.  And that includes not keeping up with your licensure?

16  A.  Correct.

17  Q.  He chose to believe that he no longer was required to

18  have a dental license?

19  A.  So, again, that's one possibility.  The other things with

20  the license, as I mentioned before, again, this fits with the

21  sovereign citizen views that you do not need a license.

22  Q.  Okay.  And so --

23  A.  Because it relates to your straw man, the other you, the

24  fake you.

25  Q.  The capital letters --

1   A.   The capital letters.

2   Q.   Having the lower capped letters.  So, as a result of

3   that, deciding to adhere to that belief, he does not have a

4   license and he knows that he then cannot practice dentistry

5   without a license?

6   A.   Correct.

7   Q.   If we talk about his issues with driving and his being --

8   I think he had some arrests or whatever for various driving

9   issues, vehicle and traffic issues?

10  A.   Correct.

11  Q.   Mr. Weber decided -- and again, this is a progression.

12  So, after his legal troubles began, he made a decision that

13  he did not need a driver's license, correct?

14  A.   Yes.  So, again, this is a common -- the common belief is

15  if anybody picks up their driver's license, you can see that

16  your name is written in capital letters.  So, again, the

17  drivers license is something that relates to not you, the

18  straw man, the fake you.  So, in that view, you do not need

19  your driver's license.

20  Q.   And he also explained to you some Archean interpretation

21  of the law whereby if he wasn't a chauffeur as defined under

22  the New York State public law, then he did not need a

23  license?

24  A.   Yeah.  Dr. Cervantes actually briefly mentions it, too

25  and I think it's mentioned in her report as unusual, but what

1   Dr. Weber presented to me was actually information from the

2   DMV, talking about the definition of a driver, the definition

3   of a motor vehicle and then, related that to an article from

4   1909 by the Attorney General's Office of New York where it

5   talks about the definition of a chauffeur, that only

6   chauffeurs are the ones who need driver's licenses.  So,

7   again, relating these to the idea that you do not need a

8   driver's license.

9   Q.  And so, the choice to adhere to that ideological belief

10  and interpretation of the law such that he didn't need a

11  driver's license resulted in him having vehicle and traffic

12  issues, correct?

13  A.  Yes.  I don't know the exact nature of those charges, but

14  that's when I --

15  Q.  But it could and that's a choice?

16  A.  Yes.

17  Q.  So, if, in fact, he can't drive, for example, that's not

18  because he is unable to preserve his social functioning, it's

19  because he's made choices that have negative impacts?

20  A.  Yes.

21          MS. KRESSE:  One second, Judge.

22  BY MS. KRESSE:

23  Q.  On cross-examination, you were asked if Dr. Weber was the

24  first sovereign citizen that you had evaluated forensically.

25  A.  Yes.

1   Q.   And you indicated that he was?

2   A.   He is the first sovereign citizen with those clear and

3   crystalized views.

4   Q.   And I believe you explained your answer in that you had

5   evaluated some individuals who, for example, had anti-

6   government ideations?

7   A.   Yes.

8   Q.   And some other extreme beliefs?

9   A.   Yes.

10  Q.   But not a "sovereign citizen" and the whole gamut of

11  their belief system?

12  A.   Correct.

13  Q.   Okay.  Were you familiar with the sovereign citizenship

14  movement and ideology before you evaluated Dr. Weber?

15  A.   Yes.

16  Q.   And how were you familiar with that?

17  A.   So, again, it is a topic that over the last couple years

18  has come up more and more in both psychology and psychiatry

19  circles.  And in our annual conferences now both in forensic

20  psychology and forensic psychiatry, there's several

21  presentations on the topic and it's all presentations related

22  to extreme beliefs, sovereign citizens, cults and similar

23  organizations.

24          So, it's something that we the mental health

25  professionals are aware of and it's something that seems to

1   be on the incline, so yes.

2   Q.  Is that something that's particularly relevant in your

3   field of forensic psychology?

4   A.  Yes.

5   Q.  Because the issue comes up in the context of a competency

6   issue, for example?

7   A.  Yes, exactly.

8   Q.  Had you conducted research on sovereign citizenship

9   beliefs before you selected and conducted the tests that you

10  chose to conduct on the defendant?

11  A.  We started doing a little bit of research because it is a

12  topic of interest within my group and then, when I was

13  assigned this case, I certainly did a lot more research on

14  the topic.

15  Q.  And did your research on the topic influence the choices

16  of tests that you administered to Dr. Weber?

17  A.  A lot of the tests I would have conducted anyway because

18  you are conducting the tests to essentially look for

19  psychiatric symptoms and again, testing whether he has a

20  delusional disorder or not.  So, the choice of tests was not

21  really impacted on the sovereign citizen views.

22  Q.  But in terms of those nine tests, were they appropriate

23  and relevant to determining whether or not, in fact,

24  Dr. Weber had a delusional disorder, for example?

25  A.  Yes.

1    Q.  And whether or not he had any cognitive impairment?

2    A.  Yes.

3    Q.  And within cognitive functioning is the issue that you

4    were asked about on cross-examination as well as on direct

5    about executive functioning, correct?

6    A.  Correct.

7    Q.  And so, it is your testimony that the tests that you

8    performed tested for Dr. Weber's executive functioning and

9    his capacity to do so?

10   A.  It's certainly tapped into that as well.

11   Q.  And the fact that Dr. Cervantes does not herself conduct

12   neuropsychological testing, would that have prevented her

13   from ordering or suggesting that additional tests along those

14   lines be done?

15   A.  No.

16   Q.  The fact that Mr. Weber became interested in the

17   sovereign citizen movement before he was in legal trouble,

18   does that indicate that he is delusional?

19   A.  No.

20   Q.  Does it indicate he lacks or lacked cognitive function?

21   A.  No.

22   Q.  That he lacked executive function?

23   A.  No.

24        MS. KRESSE:  Can I have a moment, Judge?  Nothing

25   further.

1          THE COURT:  All right.  Thank you.  Thank you,

2    Doctor.  We'll see you next Tuesday, Tuesday at 10 o'clock.

3          MR. COMERFORD:  We'll be here, Judge.  Thank you.

4          THE COURT:  All right.  Thank you.

5    (Proceedings concluded at 4:01 p.m.)

1                    *    *    *    *    *    *    *

2

3              I certify that the foregoing is a

4         correct transcription of the proceedings

5         recorded by me in this matter.

6

7

8

9                              s/ Megan E. Pelka, RPR

10                             Court Reporter,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25