1

2

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

3

4    UNITED STATES OF AMERICA,          )
                                        ) Case No. 1:15-CR-00010
5                                       )            (RJA)(HBS)
                     Plaintiff,         )
6                                       )
     vs.                                ) January 23rd, 2018
7                                       )
     CHARLES WEBER,                     )
8                                       )
                     Defendant.         )
9

10

11

**TRANSCRIPT OF COMPETENCY HEARING**
**BEFORE THE HONORABLE RICHARD J. ARCARA**
**SENIOR UNITED STATES DISTRICT JUDGE**

12

13

APPEARANCES:

14

15    For the Plaintiff:    JAMES P. KENNEDY, JR.
                            ACTING UNITED STATES ATTORNEY
                            BY:  MARYELLEN KRESSE, ESQ.
16                               PATRICIA ASTORGA, ESQ.
                            ASSISTANT UNITED STATES ATTORNEYS
17                          138 Delaware Avenue
                            Buffalo, NY 14202
18
      For the Defendant:   FEDERAL PUBLIC DEFENDER'S OFFICE
19                          BY:  BRIAN COMERFORD, ESQ.
                            300 Pearl Street, Suite 200
20                          Buffalo, New York 14202

21    Court Reporter:       MEGAN E. PELKA, RPR
                            Robert H. Jackson Courthouse
22                          2 Niagara Square
                            Buffalo, NY 14202

23

24

25

1                          **I N D E X**

2    WITNESSES                                              PAGE

3    DEFENSE

4    ANA NATASHA CERVANTES
         Direct Examination by Mr. Comerford            170
5        Cross-Examination by Ms. Kresse                210
         Redirect Examination by Mr. Comerford          315
6

7                        **E X H I B I T S**

8    DEFENSE                                                PAGE

9        Exhibit 1 CV of Ana Natasha Cervantes          173
         Exhibit 4 Audio CD                             179
10

11   GOVERNMENT

         Exhibit 6 Article entitled "A Proposed Model For Assessing
12                 Defendant Competency to Self-Represent."    305

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THE CLERK:  All rise.  The United States District
2   Court is now in session.  Criminal action 2015-10A.  United
3   States v. Charles Weber.  Criminal competency continuation.
4   Counsel, please state your name and the party you represent
5   for the record.
6      MS. KRESSE:  Good morning, Your Honor.  MaryEllen
7   Kresse and Patricia Astorga for the United States.
8      THE COURT:  Good morning.
9      MR. COMERFORD:  Good morning, Your Honor.  Brian
10  Comerford for Charles Weber.  He's present this morning.
11     THE COURT:  All right.  Good morning.
12     MR. COMERFORD:  We're prepared to continue with the
13  hearing, Judge.
14     THE COURT:  Okay.  Let's go.
15     MR. COMERFORD:  And we call Dr. Ana Natasha
16  Cervantes.
17  (The witness was sworn at 10:00 a.m.)
18     THE CLERK:  If you could please state your name and
19  spell your first and last name for the record and make sure
20  you speak into the microphone.
21     THE WITNESS:  It's Ana Natasha Cervantes,
22  C-E-R-V-A-N-T-E-S.
23
24
25

1                        DIRECT EXAMINATION

2

3    BY MR. COMERFORD:

4    Q.  Good morning, Dr. Cervantes.

5    A.  Good morning.

6    Q.  What is your profession?

7    A.  Forensic psychiatry.

8    Q.  Where are you presently employed?

9    A.  I am presently self-employed with my own forensic

10   practice.  I also work for Crime Care part-time in a

11   correctional setting at the Niagara County Correctional

12   Facility.

13   Q.  And what is your role in that job with Crime Care?

14   A.  I am a treating psychiatrist at the jail and I am also

15   employed by University Psychiatric Practice, the University

16   of Buffalo as the fellowship director for the forensic

17   psychiatry program.

18   Q.  And what is your role as the fellowship director for the

19   forensic psychiatry program?

20   A.  Well, as the training director, I am in charge of

21   arranging all the didactic and generally the teaching areas

22   for the forensic fellow.

23   Q.  And in terms of your private practice, what is your role

24   in that?

25   A.  I do a variety of forensic evaluations for different

1    clients, be it attorneys, different agencies, companies,

2    insurance companies as well.  So, I do a variety of criminal

3    and civil work.

4    Q.  And did you do -- in criminal work, it's primarily cases

5    where either -- I guess can you tell us who typically hires

6    you to do criminal work?

7    A.  I have done work for various agencies.  The majority of

8    my work locally is either private attorneys or assigned

9    counsel, but I have done some work in Monroe County for the

10   Monroe County Public Defender's Office, a couple of cases

11   that involved the U.S. Attorney's Office here locally as well

12   and for the Federal Public Defender's Office.

13   Q.  And have you been retained by the U.S. Attorney's Office

14   in the past to work on cases?

15   A.  Yes.  Some of those have been joint cases that have been

16   agreed upon by both parties and court ordered.

17   Q.  In terms of your educational background, could you give

18   us just a briefly summary of that?

19   A.  Sure.  I completed by bachelor's in psychology from

20   Loyola University in 1997.  I then went on to medical school

21   at Case Western Reserve University from 1997 to 2001.  From

22   2001 to 2002, I completed an internship in internal medicine

23   at Metro Health Medical School, also thorough University

24   Hospital in Cleveland.  And then, I completed a general

25   psychiatry residency at John Hopkins Hospital in Baltimore,

1    Maryland.  After that, I completed a forensic fellowship at

2    the University of Maryland, also in Baltimore, Maryland.

3    Q.   Now, you are a psychiatrist as opposed to a psychologist?

4    A.   Correct.

5    Q.   Can you explain a little bit the difference between, I

6    guess, the training involved in becoming a psychiatrist

7    versus becoming a psychologist?

8    A.   Sure.  So, the main difference is that psychiatrists must

9    go to medical school first, so all psychiatrists complete a

10   medical degree, which is four years after graduation from an

11   undergraduate program.  Then, in order to be a psychiatrist

12   and call yourself that, you must complete an approved

13   training program in psychiatry, which is four years duration.

14   Q.   Okay.  And what -- as a forensic psychiatrist, what's

15   different about what you do versus what a forensic

16   psychologist would do, if there is a difference?

17   A.   Well, there is a difference.  Because psychiatrists are

18   physicians, a lot of what we do is treatment that involves

19   medication management.  In most states, psychologists cannot

20   do that.  So, a lot of our experience is that most people

21   don't start out doing only forensic psychiatry, it comes from

22   treating patients.  So, as doctors, that's a big part of our

23   background that we don't share in common with psychologists.

24   So, we tend to think about more -- when there's

25   abnormalities, we try to rule out medical issues first before

1  calling something psychiatric.

2  Q.  Thank you.

3          MR. COMERFORD:  Judge, I am handing up to the witness

4  a copy of Defendant's Exhibit 1.

5          THE COURT:  Okay.

6  BY MR. COMERFORD:

7  Q.  Dr. Cervantes, do you recognize that document?

8  A.  Yes.

9  Q.  Can you tell us what it is?

10 A.  This is a copy of my CV.

11 Q.  And did you provide that to me in our preparation for

12 this case?

13 A.  Yes, I did.

14 Q.  And is a -- I guess it's accurate and up-to-date, to the

15 best of your knowledge?

16 A.  Yes, it is.

17 Q.  And does it detail your professional and educational

18 background?

19 A.  Yes, it does.

20         MR. COMERFORD:  Judge, we would move into evidence

21 Defendant's Exhibit 1.

22         MS. KRESSE:  No objection.

23         THE COURT:  All right.  It will be received.

24 (Defendant's Exhibit 1 was received in evidence.)

25

1      MR. COMERFORD:  Thank you, Judge.  And I'll pull it

2 up on the screen here.  Try to.

3 BY MR. COMERFORD:

4 Q.  Okay.  Dr. Cervantes, could you talk a little bit

5 about -- I'll zoom in down here -- just this section on board

6 certification?  What's involved in that?

7 A.  Well, in order to become board certified, you must

8 complete an approved training program in a medical

9 speciality.  So, I am board certified in general psychiatry

10 and forensic psychiatry.  In order to do that now, you must

11 complete that training and then sign up for an examination.

12 If you pass that case examination, you are considered board

13 certified.

14      And in order to maintain your certification, there

15 has to be a certain number of continuing medical education

16 credits throughout.  And in my case, based on the year that I

17 become board certified, there's a recertification examination

18 every ten years.

19 Q.  And your -- I'm sorry if you didn't mention this -- your

20 certification is in the specialty of forensic psychiatry?

21 A.  Both general and forensic psychiatry.

22 Q.  I am going to -- have you testified before in state

23 court?

24 A.  Yes.

25 Q.  And in federal court?

1   A.   Yes.

2   Q.   And specifically on the issue of competency?

3   A.   Yes.

4   Q.   And have you been found to be an expert in forensic

5   psychiatry in those cases?

6   A.   Yes.

7   Q.   I want to look -- I know we talked a little bit about

8   your employment practice or -- your employment history.  Can

9   you tell us a little bit about the work you have done both at

10  Erie County Medical Center and at the Erie County -- the CPEP

11  and any -- basically any of your work with Erie County?  If

12  you could talk about that.

13  A.   Sure.  When I first came to Buffalo, my first employment

14  was full-time with the correctional facility.  So, I worked

15  as both a treating psychiatrist and an evaluating

16  psychiatrist for Erie County.  So, I would treat patients and

17  do their 730s, which are competency to stand trial

18  evaluations, for state and local courts.  I did that for five

19  years in additional to growing my private forensic practice.

20          Then, after leaving Erie County, I went to Erie

21  County Medical Center, ran the partial hospitalization

22  program and the extended observation unit for approximately a

23  year and a half.

24  Q.   Can you put an estimate as to the number of individuals

25  you have performed a competency evaluation for?

1   A.   Everywhere, total?

2   Q.   Everywhere, total.

3   A.   I would estimate that I have probably done between 5 and

4   600 evaluations, at least.

5   Q.   And how many of those were -- would you say were in your

6   role with Erie County?

7   A.   Probably about 150 to 200.

8   Q.   Do you have experience before dealing with what, I guess,

9   we call sovereign citizen cases?

10  A.   I have.

11  Q.   And have you evaluated sovereign citizens or people that

12  might be classified as sovereign citizens previously?

13  A.   Yes.

14  Q.   And I don't want to jump ahead, but, you know, we'll get

15  into what your opinion is as to Dr. Weber, but can you tell

16  us what your expert opinion has been in those other sovereign

17  citizen cases as to the defendant's ability to stand trial or

18  competency to stand trial?

19  A.   So, the two -- there's two cases; one which I was not --

20  I did not testify in.  I was sort of a consultant, but not --

21  was not actually put on the stand.  I did not believe that

22  person was competent and I recently completed another

23  evaluation, which was court-ordered in federal court for

24  another attorney from your office and the U.S. Attorney's;

25  so, kind of joint request and I found that person competent

1    to proceed.

2    Q.  And have you done any professional activities involving

3    this issue of sovereign citizens?

4    A.  Yes.  I put together a presentation for the American

5    Academy of Psychiatry and the Law annual meeting, which

6    occurred in October of 2017.

7    Q.  And can you talk about what that group is, the -- I'm

8    sorry.  What -- the group that you --

9    A.  The American Academy of Psychiatry and the Law?

10   Q.  Yes.

11   A.  That is the professional organization for forensic

12   psychiatrists.  It is the main one.  And they have an annual

13   meeting.  And as part of the submissions, I recommended a

14   panel to discuss the issue of sovereign citizens.

15   Q.  And can you talk about who else was on that panel?

16   A.  Yes.  George Parker, who is a psychiatrist who published

17   on this matter in the past and Mohad Singh, another resident

18   from Yale who recently finished his fellowship and two

19   other -- and one -- no --

20   Q.  I guess --

21   A.  One other forensic psychiatrist.

22   Q.  As to Dr. Parker, is that the same Dr. Parker that

23   authored Government Exhibit -- I don't know if it is 4 or 5.

24   I believe it's 4.

25            THE COURT:  Four.

1    BY MR. COMERFORD:

2    Q.  Four.  Government Exhibit 4.  I'll hand up a copy to you.

3    I'm sorry.  Well, here, we can do this.

4    A.  Yes.

5    Q.  Same guy?

6    A.  That's him.

7    Q.  Okay.  And you and he and some other professionals spoke

8    on a panel at this meeting?

9    A.  Yes.

10   Q.  And did you provide me with an audio copy of that

11   presentation?

12   A.  Yes, I did.

13   Q.  I just want to hand it up.  And did you listen to the

14   audio presentation?

15   A.  I did.

16   Q.  And was it a true and accurate copy of what took place at

17   that -- during the presentation?

18   A.  Yes.

19           MR. COMERFORD:  Judge, we'd offer Defendant's

20   Exhibit 4 into evidence.

21           MS. KRESSE:  One second, Judge.  No objection, Judge.

22           MR. COMERFORD:  Thank you.

23           THE COURT:  All right.

24   (Defendant's Exhibit 4 was received in evidence.)

25

1    BY MR. COMERFORD:

2    Q.  Now, specific to Dr. Weber, did you conduct an evaluation

3    of Dr. Weber?

4    A.  I did.

5    Q.  And --

6         THE COURT:  Are you going to show this or are you

7    going to play this or what?  I mean, it's an exhibit.  What am

8    I supposed to do with it?

9         MR. COMERFORD:  I'd like to refer to portions of it

10   in a post-hearing brief, Judge.  It's about two hours long.  I

11   don't want to play the whole thing.  There's about 20 minutes

12   wherein Dr. Cervantes talks about Dr. Weber's case.  I think

13   it might be helpful, but I don't want to take up two hours

14   talking about it.

15        I provided it to the government.  I believe we both

16   listened to it.  I can play the 20 minutes or so that

17   Dr. Cervantes provides, talking about this specific case,

18   doing so anonymously.  I don't know if that's helpful to the

19   Court in terms of the hearing.  If the Court would like me to,

20   I certainly will.

21        THE COURT:  Well, I don't know whether it would be

22   helpful or not because I don't really know what's in there.

23        MR. COMERFORD:  It's similar to the testimony that

24   Dr. Cervantes will be providing now.  It's more a discussion

25   generally of --

1           THE COURT:  Why don't we -- well, let's not play it

2   now, but let's reserve decision on that as to whether you want

3   to play it or not.

4           MR. COMERFORD:  Thank you, Judge.

5           THE COURT:  Because right now, I can't intelligently

6   make a decision.

7           MR. COMERFORD:  Thank you, Judge.  Judge, I was

8   thinking about it in terms of -- along the lines of some of

9   the articles that -- because there's so much limited material

10  on this in terms of the psychiatric community, professional

11  work on sovereign citizens, that it's pretty limited.  There's

12  two, maybe three articles and then, this audio tape.  So, I

13  just wanted the Court to have a complete record of what's out

14  there.

15          THE COURT:  Okay.

16  BY MR. COMERFORD:

17  Q.  Now, Doctor, in terms of your evaluation of Dr. Weber,

18  how did that come about?

19  A.  Your office contacted me and you spoke with me personally

20  about the questions.

21  Q.  Now, did you prepare two reports in that case?

22  A.  I did.

23  Q.  And I'll pull up a copy of the Government Exhibit 2

24  already in evidence.  Is this the first report that you

25  prepared?

1    A.  Yes, it is.

2    Q.  And this one, you had the assistance of Dr. Heffler as

3    well?

4    A.  Correct.  She was a forensic psychiatry fellow at the

5    time.

6    Q.  And in this report, did my office -- I guess what were we

7    asking you to evaluate Dr. Weber for?

8    A.  Well, the main question was whether this was merely

9    someone who was subscribing to sovereign citizen beliefs or

10   if there was something more, whether there was a psychiatric

11   diagnosis or whether there was something that was different

12   about this case.

13   Q.  And after reviewing this report, did we, at some point,

14   ask you to specifically address Dr. Weber's competency to

15   stand trial?

16   A.  Yes.  And that came about because the relationship

17   between you and Dr. Weber was fluctuating.  At times, there

18   was cooperation; at times, there's wasn't.  So, then there

19   was a secondary question as to competency to stand trial.

20   Q.  Is that Government Exhibit 3 here, is that the second

21   report?

22   A.  Correct.

23   Q.  And do you have a copy of those reports with you?

24   A.  I do.

25   Q.  Okay.  Can you tell me -- in preparing both of those

1  reports, about how much time did you spend with Dr. Weber,

2  both speaking with him and administering tests, if you can

3  kind of put an estimate on it?

4  A.  Well, for the first two interviews, which were August

5  18th and August 25th, it was a total of approximately five

6  and a half hours.  And then, when I saw him for the third

7  visit on August 22nd, 2017, I saw him for another two hours

8  and 30 minutes.

9  Q.  And can you talk about any testing that you did or sent

10  away results of to review as part of your evaluation?

11  A.  Sure.  When we first evaluated him in 2016, we

12  administered an MMPI-2, which is a personality test,

13  Minnesota Multiphasic Personality Inventory-2.  And we sent

14  this off for electronic scoring and interpretation and

15  incorporated that into the first report as well.

16  Q.  And did you also ask for an MRI to be done?

17  A.  I did.  So, we requested Dent Neurological Institute to

18  do a brain MRI.

19  Q.  And did you review the results or the reading of that

20  MRI?

21  A.  I did.

22  Q.  And did that indicate anything unusual about Dr. Weber?

23  A.  Well, it wasn't completely normal.  There were a couple

24  of abnormalities that were noted, the clinical significance

25  of which is unclear.  For example, they noted that his

1    temporal lobes were asymmetrical and his hippocampus was

2    slightly abnormal, but the main thing was there was no

3    evidence of something like a tumor, evidence of vascular

4    ischemic changes that would indicate that he had vascular

5    pathology diseases applicable or that there was some kind of

6    obvious brain deterioration.

7            And specifically, we were looking for any evidence

8    of mercury poisoning of which there are certain MRI findings

9    that are pathognomonic or specific to that if it's present

10   and those were not present.

11   Q.  And did you do any research into the sovereign citizen

12   cases, the sovereign citizen movement, those sorts of things?

13   A.  Yes.  And I'd like to mention there's not a lot out

14   there, but yes, I did do some research and because I have --

15   my colleagues that I did the presentation with were

16   interested.  I did discuss the case anonymously with them and

17   this led to us putting together an educational presentation

18   for the APAL meeting.

19   Q.  And I guess prior to providing you with the reports, did

20   you review some of the literature out there, specifically

21   Government Exhibits 4 and 5, which are the Parker article and

22   then the other article by Pytyck and Chaimowitz?

23   A.  Yes.

24   Q.  Did you do any other research online or anything like

25   that that you can tell us about into sovereign citizens?

1    A.   Well, there's various websites online that talk about

2    sovereign citizens.  So, givemeliberty.org is a website that

3    is often referred to, that sovereign citizens often refer to.

4    There's a number of YouTube videos that show sovereign

5    citizens in court and are certainly very conducive to being

6    educational in that sense.  And again, consulting with

7    colleagues who have had expertise in evaluating.

8    Q.   And did you -- you reviewed those materials --

9    A.   I did.

10   Q.   -- the things that were available online?

11   A.   Well, I did.  And in fact, I was the one that provided

12   those articles to our forensic psychiatry core group for

13   discussion.  The fellow Dr. Heffler prepared, again

14   anonymous, a presentation regarding this case for our

15   department to discuss and as part of these case

16   presentations, we usually provide background literature for

17   people to become familiar with, so those articles were

18   provided by us.

19   Q.   And by "those articles", you mean Government Exhibits 4

20   and 5?

21   A.   Correct.

22   Q.   Now, ultimately, did you reach a diagnosis of Dr. Weber?

23   A.   Yes.

24   Q.   And what -- can you tell us what that diagnosis is in

25   your report?

1    A.   Right.  In my second report, I diagnosed Dr. Weber with

2    cognitive disorder; unspecified cognitive disorder.  In my

3    first report, I diagnosed delusional disorder, mixed type and

4    I want to explain that -- why these are two different

5    diagnoses in two different reports.  Not all cases are

6    straightforward.  Individuals with mental illness are complex

7    and sometimes, they don't fit into neat categories.

8          When we first evaluated Dr. Weber in 2016, the

9    picture to us seemed to be a mixed picture of different types

10   of delusions; so, not only beliefs about the government and

11   his lineage and about tax-related issues, but also very

12   prominent somatic -- meaning physical complaints -- beliefs

13   and beliefs about treatments that were not reality-based,

14   that were very unusual and specifically unusual for him to

15   believe.

16         After -- as the case went on, because this case went

17   on for quite a while and after discussion with you and as

18   more information emerged as to how he was trying to manage

19   his case, I concluded that there was also some cognitive

20   dysfunction, which is difficult to put into a very specific

21   category at this point.  So, the specific ideology is

22   unclear, but I believe it is present.

23   Q.   And what -- in interviewing Dr. Weber, did he tell you

24   about how he got involved in this whole idea about taxes and

25   sovereign citizen?  Can you talk about that?

1  A.  Yes.  He remembered very clearly where it started.  It

2  was around 2006.  He was driving either to or from a golf

3  tournament and he recalled listening to a radio show where

4  this was being discussed and he recalls thinking that this

5  sounded very bizarre, very off, but he still made a note and

6  a few weeks later, went to do some research on it himself.

7        And he become very engrossed in this, spending

8  anywhere from 25 to 40 hours a week doing research on this.

9  So, he become very interested in researching his lineage and

10  became convinced that the beliefs the sovereign citizens had

11  were, in fact, what is true and what should be true for him.

12  So, he began adopting this over the next several years.

13  Q.  And do you recall where he was working at the time?

14  A.  Dr. Weber was employed in his own private dental practice

15  at the time.

16  Q.  And was he married?

17  A.  He was.

18  Q.  Did he have employees?

19  A.  He did.  He had at least three employees.

20  Q.  And if you know from what he's told you or from other

21  information about the case, was there any indication that he

22  was in, you know, some sort of financial trouble or anything

23  like that at the time?

24  A.  There was no indication that there was any financial

25  trouble or crisis at the time.

1   Q.  Now, what -- from what you have learned about this case,

2   what happened when he started putting these sovereign citizen

3   ideas into practice?

4   A.  Well, from his own report, he acknowledged that he

5   alienated a lot of his family and friends; that they didn't

6   want to have anything to do with those concepts, that they

7   would tell him to cool off or back off from that, which he

8   did not.  He admits that his pursuing this was ultimately the

9   reason for his divorce.

10         He attempted to change the payment structure for his

11   employees in his dental practice.  So, he decided that he was

12   not going to withhold the taxes.  They were going to be

13   responsible for that.  He was going to give them a straight-

14   up hourly rate.

15         This, apparently, was met with a lot of surprise and

16   one employee quit pretty promptly.  Another waited, but

17   eventually quit.  And ultimately, he wound up having to run

18   the practice himself because none of his employees agreed to

19   this structure.  And there may have been other reasons, but

20   that was certainly a big part of it.

21         He also did not continue renewing his dental --

22   continuing dental education and did not renew his dental

23   license.  So, when I evaluated him initially in October of

24   2016, he was practicing -- essentially practicing without a

25   license.  I'm sorry.  August of 2016.

1   Q.  You mentioned that in your report about -- I think you

2   just mentioned it now, that he continued doing these things

3   even though other people were telling him they wanted nothing

4   to do with it.  Why is that significant?

5          MS. KRESSE:  Objection.  Can we just have a

6   clarification on what report we were referring to?

7          MR. COMERFORD:  Sure.  I'll get to the specific part.

8   I believe it is in the second report, so Government Exhibit 3.

9          MS. KRESSE:  Thank you.

10  BY MR. COMERFORD:

11  Q.  And in this -- I guess I am referring to pages 7 and 8

12  where you talk about executive function and specifically

13  shift.

14  A.  Correct.

15  Q.  So, I am referring to this, but what's the significance

16  of his -- that when he's doing these things and other people

17  are reacting poorly and things are falling apart around him

18  and his business is falling apart, that he continues going

19  forward?  What's the significance of that in your opinion?

20  A.  Right.  Well, it shows an inability for him to really be

21  able to adapt and flexibly respond to a situation as the

22  needs arise for him to do that.  So, despite things going

23  badly, he is unable to take a step back, think about how to

24  handle things and do things differently.  So, he's very fixed

25  on his way and his way being the only way and not take other

1   viewpoints into account.  So, not being able to kind of

2   depart and take another strategy is what that refers to.

3   Q.  And is that -- does that support your conclusion that

4   there's some sort of disorder here?

5   A.  It's certainly a big part of it, yes.

6   Q.  Okay.  And what -- I guess apart from his beliefs on

7   taxation and sovereignty, do you see any other behavior

8   that's indicative of some underlying disorder?

9   A.  Yes, I do.  And in fact, it is something that Dr. Weber

10  wanted to talk about first, before we even got into the

11  sovereign citizen beliefs and that was a belief over the last

12  few years that there are some physical problems that he has.

13  And the way he's approached dealing with these problems is

14  very unusual, certainly for somebody who is trained

15  scientifically.  He's gone to dental school, which has a lot

16  of overlap with basic sciences, you know, like medical school

17  does.

18          Dr. Weber described a pattern of several years,

19  starting around 2010, of believing that there was some

20  physical ailments that he had.  He told me that he went to

21  see his primary doctor on one occasion and had some basic

22  blood work done.  I didn't have any records to see what kind

23  of workup he actually had and he did not give me the name of

24  this provider.  But even before the lab results were back, he

25  acknowledged that he sought consultation from a chiropractor

1    or naturopath, or perhaps the person was doing both.  Again,

2    we don't know this provider or their qualifications.

3              And he was prescribed some alternative medicine

4    treatment such as bentonite clay and more recently,

5    chlorella, which is an algae.  And he subjected himself to

6    some very unusual diagnostic testing.  I don't know that I

7    would even call it diagnostic testing, because that almost

8    gives it too much credibility, but some interesting

9    procedures that he claimed diagnosed things such as mercury

10   poisoning, which we have no medical documentation to actually

11   backup.

12   Q.  Is that the medical -- the reflex testing you are talking

13   about?

14   A.  Yes.  So, Dr. Weber described a procedure which is

15   referred to as muscle reflex testing where a chiropractor or

16   a naturopath has the person hold a glass vial that has a

17   diluent with some kind of chemical in it.  And apparently,

18   they do different chemicals in these little glass vials.  The

19   person holds the vial in their hand and then, a downward

20   pressure of approximately two pounds is applied.  And when

21   the person's arm gives to that pressure, that means that

22   that's diagnosing a toxicity of whatever element is in that

23   glass vial.

24   Q.  And what did -- I guess what was Dr. Weber told about the

25   results of that reflex testing?

1   A.   So, Dr. Weber was diagnosed, based on this type of

2   testing, with mercury poisoning.

3   Q.   And how did he follow up with that diagnosis?

4   A.   He was prescribed a supplement called bentonite clay,

5   which, as he explained it, is something that absorbs heavy

6   metals in the system and are then excreted.  So, he took this

7   for what sounded like several years.

8   Q.   In your report, so Exhibit 3, page 4 -- I'll try to zoom

9   in on the part here -- did he have some complaints about his

10  pancreas?

11  A.   Right.  So, when I saw him for the third interview, he

12  had been referred for an MRI, which we already discussed.

13  And he claimed that after the MRI, he had had some additional

14  symptoms and he had gone back to see this naturopath.  But

15  this paragraph in particular refers to what he was told after

16  he started going back to the naturopath and he had a mercury

17  scan.

18        Again, I think when he refers to a mercury scan, I

19  think it is the same concept of holding these little vials in

20  the hand.  He was told that the mercury poisoning had been

21  "dealt with" and he hadn't been taking the bentonite clay

22  because it wasn't readily available.

23        But he said that Dr. Steven told him his pancreas

24  was unable to metabolize carbohydrates.  And Dr. Weber

25  believes this was due to the wifi network in his house that

1   was sending radiation waves to his body and impeding

2   carbohydrate metabolism.  So, he had his home hardwired as

3   far as all computers and other electronics to prevent this

4   from continuing.  And he was prescribed yet a different

5   supplement called chlorella, which is essentially seaweed or

6   algae, to help with this issue of carbohydrate metabolism.

7   Q.  And if he told you -- did he tell you whether or not that

8   fixed the problem that he was having?

9   A.  Well, he said that he was feeling better after taking it,

10  but, again, we don't have any actual testing or valid workup,

11  diagnostic workup, that would support, number one, the claim

12  that there was any evidence of carbohydrate metabolism or

13  pancreatic dysfunction, which labs could certainly show, or

14  that there was any kind of radiation in the house.  I mean,

15  there's -- we don't have any confirmation of that, any

16  radiation that was particularly problematic.

17  Q.  I want to look at Dr. Antonius' report, which is

18  Government Exhibit 1, which is in evidence.  I am going to go

19  to page 15 and I'll pull it up on the screen here, Judge;

20  specifically, the first full paragraph, but I'll zoom in

21  here.  And you mentioned in questioning earlier that he went

22  to see his primary care and had some blood testing.  What --

23  can you tell us again what he said about that?

24  A.  Well, he didn't say much.  He said that he went to his

25  primary doctor at the time, had some basic blood work done

1   and before even getting the results of that blood work, had

2   gone to see this alternative provider.

3   Q.  And you see Dr. Antonius' statement here, "However, as

4   the years passed and conventional medical advice did not

5   improve his condition, he sought alternative advice from a

6   chiropractor and nutritionist."  From what Dr. Weber told

7   you, is that what happened?

8   A.  That was not the timeline that Dr. Weber discussed and

9   certainly, there was no years of conventional medical advice

10  that were talked about.  So, he was not given a diagnosis by

11  his primary care doctor and he was not prescribed any

12  specific medications for any specific conditions, because he

13  said that he never followed up.

14  Q.  Okay.  Dr. Weber, he's a dentist?

15  A.  Correct.

16  Q.  He was a licensed dentist.  To your knowledge, he went to

17  dental school?

18  A.  Went to dental school and not only that, but stayed on as

19  faculty for a number of years.

20  Q.  And what's the significance of that in -- or does that

21  have any significance, in your opinion, about these

22  treatments that he was seeking?

23  A.  Well, I think it is very significant, because here is

24  someone who has trained conventionally in basic sciences,

25  which you have to have a solid background in before you even

1    apply to dental school.  And the first year or two, like

2    medical school, there's a lot of basic science.  There's a

3    lot of chemistry, biology, physics that are -- well, maybe

4    not so much physics, but there's a strong background in that.

5           So, I think it is significant that someone with that

6    background believes that some of these treatments are

7    actually legitimate and is not taking a different approach to

8    his health, which we have no evidence that he wasn't doing in

9    the past.

10   Q.  Was there -- and did that support your conclusions that

11   there was some sort of a disorder here?

12   A.  Yes.

13   Q.  You mention about anti-vax conspiracy theories.  Did

14   Dr. Weber talk to you about that?

15   A.  Yes.  That came up in the context of discussing his

16   health problems and Dr. Weber looking for alternative

17   explanations for things.  And he had become very interested

18   in a naturopath who had been doing some YouTube presentations

19   and videos on the issue of vaccines and how it fits into some

20   conspiracy theories.

21   Q.  And was this something that you felt was a long-time

22   belief by him or something that had come along more recently?

23   A.  No, this was not a long-term belief and he confirmed that

24   fact.  For example, with his own children, he certainly did

25   not do any kind of alternative vaccination schedule or avoid

1   vaccinations with them.  So, this was not something that was

2   long-standing.  This is something that came about over the

3   last few years.

4   Q.  You mentioned about his -- did he talk to you about his

5   tattoos that he had gotten?

6   A.  Yes, he did.

7   Q.  What specifically did he tell you about those?

8   A.  Well, those, again, were fairly recent.  He has a fairly

9   large tattoo over -- I believe it was his left arm.  And

10  there were some dates, there were some names.  He talked

11  about that being part of his lineage and some sovereign

12  citizen concepts that he had permanently tattooed, which,

13  again, was not something that he had done in the past.  He

14  has no other tattoos to speak of.

15  Q.  So, in reviewing this case and in speaking with

16  Dr. Weber, was there any indication that he had sought out

17  any alternative medicine prior to 2006?

18  A.  No.

19  Q.  Was there any indication that he had done any research

20  into or sovereign citizen type practices prior to 2006?

21  A.  No.

22  Q.  And was -- I guess, in your opinion -- I guess what's

23  your opinion of the progression from him being a practicing

24  dentist; he's trained, he licensed, he's on the faculty at UB

25  Dental School as you mentioned and then he is getting body

1    scans and talking about the wifi interfering with the

2    pancreas?  What is your opinion of that progression?

3    A.  Well, it's highly unusual.  I mean, here is someone with

4    no history of psychiatric issues or cognitive problems.  At

5    age 51 or 52, somewhere along those lines, which would be

6    around 2006, he has this dramatic change in his approach as

7    to how he views his life in general and his health.  And it's

8    such an extreme departure from his premorbid level of

9    functioning, that it's just not normal.  So, it does warrant

10   a question as to why this happened.

11          People usually don't wake up at 50 or 55 and have

12   such a radical departure from how they believe things should

13   be.  So, I think it's highly unusual and does indicate

14   there's some cognitive dysfunction and I do believe that some

15   of the beliefs that he has are delusional in nature.

16   Q.  And did you try to speak with any family or any other

17   collateral witnesses as part of your evaluation of Dr. Weber?

18   A.  Yes.  There were many efforts made to do that.

19   Q.  Did you or Dr. Heffler have any success speaking with any

20   of those other people?

21   A.  So, Dr. Heffler did reach out and was able to connect

22   with Mr. Weber's wife, Peggy Weber, to obtain collateral

23   information.

24   Q.  What did you learn from his wife?

25   A.  Well, the wife confirmed that prior to this, he was a

1    very honest person, very respectful, nothing really unusual.

2    She confirmed that she knew nothing about the tax things that

3    were happening until the agent came to her to talk about it

4    around 2011.  She confirmed that he has alienated, to a

5    certain extent, friends and family because he was talking

6    about the tax issues and the sovereign citizen concept and

7    people really did not sign on to that.

8              And she also believed that his physical complaints

9    were possibly anxiety-related, but that his approach was

10   certainly at odds with his training and education and

11   background as a dentist.  She was pretty shocked by the

12   approach he had taken to manage his health.  She thought that

13   was very unusual.

14   Q.  Do you recall what her profession was?

15   A.  She's a nurse.

16   Q.  I want to look again at Dr. Antonius' report, Government

17   Exhibit 1, that's in evidence.  Have you reviewed this

18   report?

19   A.  Yes.

20   Q.  I want to look at -- I'll jump to your report, actually.

21   I'm sorry, Judge.  And basically, I guess I can explain.

22              THE COURT:  What report are you looking at now?

23              MR. COMERFORD:  I am going to look at Government

24   Exhibit 3, Dr. Cervantes' report.

25

1   BY MR. COMERFORD:

2   Q.  So, you reviewed Dr. Antonius' report and then his --

3   your report, you kind of criticized some of the findings he

4   made in your report?

5   A.  I commented on them, yes.

6   Q.  You commented on them.  Okay.  So, let's look at page 7,

7   the first paragraph.  I'm going to zoom in here.  And you

8   state, "Although the results on the cognitive tests selected

9   by Dr. Antonius did not show evidence of cognitive

10  dysfunction, this does not mean that it does not exist.

11  Negative results do not conclusively prove there's nothing

12  wrong."  Can you tell us what you mean by that?

13  A.  Yes.  Just because a test does not show positive results

14  or a particular finding, it does not mean that the finding is

15  not there and there can be many reasons for this.  So, all

16  tests and psychological tests are not any different.  They

17  have a certain number of false negative rates.

18        So, that means there are a certain number of people

19  that will test as normal, but there will be some

20  abnormalities the test isn't sensitive enough to pick it up,

21  or the test that is being picked is not the best test to look

22  at the particular impairment that's in question.

23  Q.  In the second paragraph here, you talk about the WAIS-IV

24  test indicating he is in the average to superior range when

25  compared with other men his age.  Was that significant to you

1   in forming your opinion?

2   A.  Yes, it is.

3   Q.  And what's the significance of that?

4   A.  The significance of this is that Dr. Weber's general

5   intelligence tests quite high and this was not a surprise.

6   So, this would be expected in somebody with his educational

7   level and his professional career and with no history of any

8   cognitive problems in the past.  That was not surprising.

9        This was actually a very appropriate test to include

10  to see what his baseline is and the results show that he is

11  in the average or high average for most of the subtests of

12  that.  And in fact, I think Dr. Antonius commented that some

13  of his numbers were in the superior range and that is

14  significant, because when you have somebody who is starting

15  off very high, they can have significant decline in their

16  individual level of functioning, but still fall within the

17  normal range in the test norms in general.

18       And the test is normed with people of different --

19  people of certain ages.  So, certainly within people his own

20  age, he might test within normal range, but individually,

21  that would still represent a significant decline from where

22  he was prior.  And because we don't have prior testing to

23  compare it to, we don't know how significant that decline is,

24  but I do believe it is significant.

25  Q.  Did you have a similar concern about the RBANS test?

1  A.  Yes.

2  Q.  And what was your concern there with how -- I guess what

3  was your opinion of how that test should be interpreted or

4  how it could be misinterpreted for Dr. Weber?

5  A.  Right.  So, this particular test is considered to be a

6  screening test for different cognitive domains and it's a

7  very thorough screening test, but it's a screening test.  So,

8  it tests things like attention, concentration, memory, some

9  construction ability.  There's a figure drawing component to

10 it, but there's some limitations to it.

11        The first one is that it compares people to other

12 people of the same age.  It does not take into account

13 educational level.  So, that's a limitation, because someone

14 with a certain education might do a lot better on this test

15 than somebody that does not, but they're all in sort of this

16 normal range.

17        And the other issue is that it does not include any

18 measures of executive function, which is some of the more

19 complex cognitive abilities that I discuss in my report later

20 on.  It does not test for executive dysfunction at all.  And

21 because I believe executive function is a big part of

22 Dr. Weber's problem, I think that would have been important

23 to include.

24 Q.  Can you talk about what executive function is?

25 A.  So, executive function refers to some higher order of

1   cognitive ability.  So, these are things like inhibition.

2   So, there is a shift, which we talked about earlier,

3   emotional control and also self-regulation.  And when you

4   have problems in these areas, you have issues with people

5   having problems with planning, organization and problem

6   solving.  And that is what I see evidence of in Dr. Weber's

7   life.

8   Q.  And was any testing specific to executive function done

9   on Dr. Weber?

10  A.  None of Dr. Antonius' tests touch on executive function.

11  Q.  You mentioned a few areas and I am just going to try and

12  get down to those.  So, you talked about shift already.  Can

13  you talk about inhibition?  What were your findings with

14  respect to inhibition?

15  A.  Well, in my opinion, inhibition is -- well, first of all,

16  I'll define it.  It's the ability to really stop one's own

17  behavior when it needs to stop.  When somebody has

18  disinhibition, it means that they're unable to pull back or

19  control that behavior.  I felt that Dr. Weber showed evidence

20  of disinhibition because he's not able to really consider a

21  rational treatment.  He sought fairly impulsively some

22  consultation from alternative medicine and latched onto that.

23          I thought the behaviors like the tattoo may have

24  shown impulsivity, also the inability to realize that his

25  practice was on -- really not doing well and not being able

1   to pull back and reverse that.  I think that's evidence of

2   disinhibition.  I saw some evidence of disinhibition last

3   week when we were in court.  He attempted to come from into

4   the courtroom and give some papers to the U.S. Attorney and

5   was fairly persistent and insistent on doing so, but was

6   stopped by the officer at the door, but he was more

7   persistent than he should have been given the circumstances

8   and difficult to redirect, I would say.

9   Q.  I am going to go to the next page here, page 8 of

10  Government Exhibit 3.  Can you talk about emotional control

11  and what is that and what were your findings?

12  A.  So, when we talk about emotional control, it is the

13  ability to regulate someone's feelings and emotions with

14  regard to things like organization and planning and also

15  being able to consider other people's emotions and how

16  they're reacting to your behavior and being able to adapt

17  your behavior to what you are seeing.

18         And I did not -- I felt that, in my opinion, that

19  Dr. Weber showed some impairment in that, that he was very

20  dismissive of other's concerns, was not able to see the

21  emotional impact not only that he was having on others, but

22  that he was having pretty strong emotions related to some of

23  the cognitive beliefs that he had that were really out of the

24  ordinary.

25  Q.  Thank you.  And then the last one here, self-monitoring,

1   can you tell us what that is and what your findings were?

2   A.   Right.  So, again, it's the ability to conform your

3   behavior to the expectations of what's needed at a specific

4   time.  And Mr. Weber historically was very compliant with

5   things such as maintaining his license; not only his dental

6   license but his driver's license, paying bills, doing all the

7   things that he was supposed to do until he began latching

8   onto the sovereign citizen beliefs.

9           So, not realizing that you are doing the wrong thing

10  when the expectations are a certain way shows an impairment

11  in self-monitoring and sort of being able to pull back and

12  revert to doing what's correct and not realizing that it is a

13  problem.  I mean, that's the other aspect of this.

14  Q.   Did your findings in these categories support your

15  eventual diagnosis?

16  A.   I believe they do.

17  Q.   And what was that -- what diagnosis do these categories

18  support, your findings, I meant?

19  A.   Right.  So, I believe that he meets the criteria for a

20  cognitive disorder and it's an unspecified neurocognitive

21  disorder because the exact reason for this is not clear.

22  Q.   And is that typical of neurocognitive disorder?

23  A.   Well, there's some neurocognitive disorders that have

24  some well-defined findings, that there is testing that you

25  can do that will show the pathology, but there are some

1  cognitive disorders where we're not there yet, where there is

2  no image, there's no lab, there's no workup that's going to

3  definitively give you a conclusion.

4          That being said, Dr. Weber has not had, by any

5  means, a comprehensive medical workup to try to figure out if

6  there is not some other reason for his cognitive decline.

7  So, that's an important caveat.  There could still be

8  something yet untested that could explain some of the

9  deficits, but a lot of times, it's different factors and

10  they're not necessarily visible on an x-ray or visible on an

11  MRI or detected in lab work.

12  Q.  Or in a test, would you say?

13  A.  And sometimes the tests that we use don't pick up certain

14  cases.

15  Q.  In Dr. Antonius' report and I am looking at Exhibit --

16  this is your report -- page 3 -- sorry -- page 9 of Exhibit

17  3.  You talk about Dr. Antonius' report and his concerns that

18  delusional disorder would be overdiagnosed.

19          THE COURT:  Where are you reading from?

20          MR. COMERFORD:  Page 9, the second paragraph here,

21  Judge.  I zoomed in on it here.  Exhibit 3, page 9, second

22  paragraph.

23          THE COURT:  All right.

24  BY MR. COMERFORD:

25  Q.  Do you see this, Dr. Cervantes, what I am referring to?

1   A.  Yes.

2   Q.  And he -- Dr. Antonius makes this point about delusional

3   disorder being overdiagnosed and gives an example of people

4   with eating disorders.  Can you explain your opinion on that

5   conclusion and that analogy?

6   A.  Yes.  So, I believe Dr. Antonius was trying to draw in

7   other psychiatric disorders where people have unusual beliefs

8   that are not based in reality and trying to draw the

9   distinction between delusion and the beliefs in those types

10  of disorders.

11         And he talked about eating disorders where people

12  with eating disorders believe that they are usually too thin

13  and have a very distorted body image, but, in fact, most

14  psychiatrists do consider this to be a very serious

15  psychiatric disorder and at times, those beliefs do rise to

16  psychotic levels or delusional levels and treatment is

17  treatment with anti-psychotic medication.

18         So, we don't necessarily call them a delusional

19  disorder, but we treat it as if it were psychotic and

20  delusional when it becomes extreme.  I will mention one of

21  the other examples he used, which was people believing that

22  their spouse is cheating on them when there is no evidence of

23  that.  There are many people who are diagnosed with

24  delusional disorder where that is what they believe and it's

25  not based in reality.

1          So, I am not sure what he was trying to do with that

2     example because certainly, there are people with delusional

3     disorder where that is the focus of attention.

4     Q.  So, delusional disorder doesn't have to mean you think

5     there's dinosaurs and pterodactyls flying through the

6     courtroom.  It can mean things that other people believe that

7     seems typical, but could be -- could still a delusional

8     disorder?

9     A.  Well, absolutely.  You can have things that are grossly

10    bizarre and call it delusional disorder.  So, things that

11    are -- to call it delusional disorder, it really should be

12    something that could be based in reality, but it is not and

13    it's verifiably not, but it can't be bizarre.  Then, you

14    start getting into a different type of psychotic disorder.

15    Then, you wonder, are we talking about schizophrenia?  Are we

16    talking about something else that is psychotic?  But

17    delusional disorder, for the most part, the people that are

18    diagnosed with it, their beliefs are not bizarre at all.

19    Q.  So, in terms of -- I don't know if I'd say it's widely

20    held, but there are a lot of other people who subscribe to

21    these sovereign citizen beliefs, right?

22    A.  Correct.

23    Q.  And also to alternative medicine; even more out there

24    fringe alternative medicine, reflex testing, things like

25    that?

1    A.  Yes.

2    Q.  And was it -- is it your opinion that because Dr. Weber

3    believes these things that other people believe that he,

4    therefore, cannot have some sort of delusional disorder or

5    cognitive disorder?

6    A.  No.  No.  I don't not believe that's mutually exclusive.

7    I think it's important to focus on why is Dr. Weber, with his

8    background, all of a sudden is taking such a sudden turn in

9    how he perceives things and believing these issues.  So, what

10   made him vulnerable starting around 2006 where now he

11   actually believes this stuff?

12   Q.  Now, you testified that you had evaluated other sovereign

13   citizens and I think you said you evaluated two of them

14   previously?

15   A.  Yes.

16   Q.  And you are familiar with other sovereign citizen type

17   cases?

18   A.  Right.

19   Q.  So, you have reviewed the literature that says most of

20   them at least are found by other experts to not be

21   delusional?

22   A.  Correct.

23   Q.  And at least one of the -- the other person you mentioned

24   reviewing for a federal case you found was competent.  You

25   found that that person was not delusional.  He was competent?

1   A.   Competent and not delusional, right.  So, the sovereign

2   citizen beliefs were not.

3   Q.  So, how is Dr. Weber different from those cases?  Why are

4   these just extreme beliefs?  Why is it different?

5   A.   Well, I think what makes this case different is that

6   Dr. Weber began believing this stuff when there was no clear

7   precipitant or vulnerability that we can identify, so there

8   wasn't a crisis.  There wasn't a financial crisis

9   specifically that could explain why somebody would want to

10  start doing this stuff.

11        And the other thing is his background and his

12  premorbid functioning up to that point.  Here is somebody

13  with no history of unusual beliefs or alternative bend to his

14  philosophy.  He's conventionally trained in scientific --

15  presumably the regular scientific method, practicing

16  conventional dentistry and he's taking such a departure from

17  what is considered good science.  I think that makes him very

18  different.

19        And it's also not particularly self-serving.  A lot

20  of sovereign citizens that subscribe to these beliefs derive

21  a lot of benefit from it and they get very self-serving and

22  there -- this is a case where I think things went south very

23  quickly.  And it has, in my opinion, been extremely

24  detrimental to his life.  So, it does show significant

25  impairment and negative consequences, which there was no

1   precipitant for.

2   Q.  Now, you have talked about your diagnosis both of

3   possibly delusional disorder, but then a neurocognitive

4   disorder.  Am I saying that right?

5   A.  Yes.

6   Q.  Did you reach an opinion to a reasonable degree of

7   medical certainty as to his competency to stand trial?

8   A.  Yes.

9   Q.  And what was that opinion?

10  A.  My opinion is that he's not competent to stand trial.

11  Q.  And did you also reach an opinion to a reasonable degree

12  of medical certainty as to his competency to represent

13  himself at trial?

14  A.  Yes.

15  Q.  And what was that opinion?

16  A.  That he's not.

17          MR. COMERFORD:  Judge, I just want one second.

18  Judge, I have no further questions on direct.

19          THE COURT:  All right.  We'll take a 15 minute

20  recess.  Court will be recess.

21          THE CLERK:  All rise.

22  (Brief recess.)

23          THE CLERK:  All rise.  You may be seated.

24          THE COURT:  All right, Ms. Kresse?

25          MS. KRESSE:  Thank you, Judge.

1                        CROSS-EXAMINATION

2

3    BY MS. KRESSE:

4    Q.  Good morning, Dr. Cervantes.

5    A.  Good morning.

6    Q.  My name is Maryellen Kresse.  I am one of the prosecutors

7    in this case.  One of the of last things you testified about

8    on direct examination by Mr. Comerford is you -- he inquired

9    about why in your opinion you felt that Dr. Weber was

10   different than other sovereign citizens that present.  Do you

11   recall that?

12   A.  Correct.

13   Q.  And one of the things that you mentioned is that he began

14   believing out of the -- basically, out of the blue?

15   A.  Correct.

16   Q.  And there was no crisis that precipitated it?

17   A.  Correct.

18   Q.  There were no financial crisis that would precipitate

19   this method of thinking, correct?

20   A.  Correct.

21   Q.  Okay.  Do you know, however, about the history of

22   Mr. Weber's dealings with the IRS in this case?

23   A.  I am not sure what specific part of it you mean.

24   Q.  Prior to you evaluating and meeting with Mr. Weber, you

25   obtained some information about the criminal charges in this

1  case, correct?

2  A.  Correct.

3  Q.  So, you are aware that the criminal charges emanate from

4  a failure of Mr. Weber and allegation that Mr. Weber had

5  failed to comply with the tax laws, correct?

6  A.  Correct.

7  Q.  And specifically that in two tax years, 2006 and 2007, he

8  filed non-resident alien tax returns?

9  A.  Correct.

10  Q.  And you are aware of that?

11  A.  I am.

12  Q.  And so, in terms of your evaluation of the manifestation

13  of this ideology by Mr. Weber, you are going by the tax years

14  of 2006, 2007, correct?

15  A.  Well, I am going by those tax years, but obviously, 2006

16  is filed in 2007 and 2007 is filed if 2008 and there's some

17  delay.  So, it is -- some of the stuff may have started as

18  early at 2006.

19  Q.  Right.  And in fact, Mr. Weber tells you about and has a

20  very specific recollection of a radio broadcast, I believe it

21  is, where he first hears about these issues, these tax

22  protestor issues, whereas there are ways you can get out of

23  paying your taxes, correct?

24  A.  Correct.

25  Q.  And based on what Mr. Weber to you, this was what

1   precipitated his move into sovereign citizen territory,

2   correct?

3   A.   Correct.

4   Q.   Okay.  But did you know that his troubles, his issues

5   with the IRS, began years before that?

6   A.   I was not aware of trouble with the IRS before that.  I

7   was aware that at times there was some delay in paying taxes,

8   but they were always paid.  And that was the information we

9   obtained from his wife.

10  Q.   Do you know that 2003 was the last tax return that

11  Mr. Weber actually filed with the IRS?

12  A.   I don't know if I knew that.

13  Q.   Did you know that in 2004 and 2005, for those tax years,

14  the IRS actually filed substitute returns for Dr. Weber?

15  A.   No.

16  Q.   So, you didn't know that Dr. Weber did not file returns

17  in those two years and so the IRS, what they did is they

18  determined how much money he made by 1099 from insurance

19  companies, determined how much income he had and actually

20  filed returns for him?  You did not know that?

21  A.   I was not aware of that.  I was aware that subsequent to

22  2006 and 2007, he had not filed any returns.  That's what was

23  I told; that there was no further submissions of returns

24  after that.  I don't know that I knew anything about between

25  2003 and 2006.

1   Q.  Right.  So, what I am trying to do is to give you some

2   background information, because it may have an impact on your

3   opinion that -- or your belief that the sovereign citizen

4   ideology of Dr. Weber began without any precipitation,

5   without any crisis, because, in fact, prior to 2006, he was

6   having issues with the IRS.  Did you know that in 2006 and

7   2007, those returns were not filed by Mr. Weber until 2009?

8   Did you know that?

9   A.  I did know that and that -- I know that there was a

10  delay.

11  Q.  And did you know that the reason Mr. Weber filed in 2009

12  was because the IRS told him that he needed to file those

13  returns by a certain date?

14  A.  I didn't have that information.

15  Q.  And did you know that they specifically directed him that

16  he needed to mail those returns to a particular person at a

17  particular address?

18  A.  I didn't have anything pertaining that.

19  Q.  So, prior to 2006 and continuing until 2009, Mr. Weber,

20  in fact, did have a crisis in his life and that was that the

21  IRS was onto him and they were after him for failing to file

22  his tax returns, correct?

23  A.  Again, I did not receive information about prior tax

24  years, so this is the first I am hearing about this.

25  Q.  But if you had known that the IRS from 2004 to 2009 was

1   after Mr. Weber to file his tax returns, would that change

2   your statement that this was something that was unprecedented

3   and unprecipitated by any crisis?

4   A.   Well, I did not know this information, but my

5   understanding was that there really wasn't financial issues

6   before then.   It still wouldn't change my opinion that

7   there's something cognitively impaired here, because there's

8   all these other beliefs surrounding his health and these

9   treatments that he is subjecting himself to, which have

10  nothing to do with this.

11  Q.   But what I am focusing on right now is the sovereign

12  citizen ideology that Mr. Weber glommed onto at a certain

13  point, correct?

14  A.   Mm-hmm.

15  Q.   And one of the issues among psychiatry, one of the

16  aspects section that psychiatrists and psychologists look at

17  what evaluating sovereign citizens is the method of

18  development of that ideology, correct?

19  A.   Correct.

20  Q.   And whether or not someone falls outside of that cultural

21  belief, right?

22  A.   Correct.

23  Q.   And it's your determination that Mr. Weber fell outside

24  of the typical sovereign citizen?

25  A.   Yes.

215

1   Q.  And one of the reasons why you felt that he fell outside

2   of the typical sovereign citizen ideology, that cultural

3   belief, was because you felt there was no crisis, no

4   financial reason or motivation that caused him to all of a

5   sudden start believing in these things?

6   A.  Well, among other things.  That was one of the reasons,

7   right.

8   Q.  But we're talking now about the sovereign citizen piece

9   of it.

10  A.  Right.

11  Q.  Okay.  So, in 2006, when Mr. Weber hears that there might

12  be an excuse for his failure to file his tax returns for 2004

13  and 2005 and his 2006 is probably due, he picks up on that

14  because he's going to try to use that to his benefit, isn't

15  that true?

16  A.  It's possible.

17  Q.  So, you are trained as a forensic psychiatrist and you

18  went through your background with Mr. Comerford and for the

19  Court, correct?

20  A.  Correct.

21  Q.  And in that capacity, you evaluate defendants to

22  determine whether they're competent to stand trial?

23  A.  Correct.

24  Q.  You testified on direct examination that you conducted

25  between 500 and 600 evaluations in total?

1   A.   Throughout my career, yes.

2   Q.   And then, you were asked to on direct examination about

3   experience you had with sovereign citizens?

4   A.   Mm-hmm.  Yes.

5   Q.   Do you recall that?

6   A.   Yes.

7   Q.   And I believe you testified that you have been -- other

8   than Dr. Weber's case, that you have been involved in two

9   cases involving sovereign citizens, is that accurate?

10  A.   Yes.

11  Q.   And in one of the cases, you found the individual to be

12  competent and in one, you found the individual not to be

13  competent, correct?

14  A.   Correct.  No.  Wait.  I'm sorry.  The previous two cases,

15  one of them with a state case and in that case, I believe,

16  the opinion was ultimately competent.  The federal case that

17  I recently did was also found competent.  So, there was no

18  finding of incompetency.

19  Q.   Oh, both of those were found competent?

20  A.   Mm-hmm.

21  Q.   Okay.  Thank you.  Now, your involvement with those

22  cases, when was that involvement in relationship to your

23  request to become involved with Mr. Weber's case?

24  A.   The first one was several years ago, probably around

25  three or four years ago.  And the second one was six months

1  ago.  So, it was kind -- this case had already started when I

2  was asked to see that other case.

3  Q.  And the one that was, I believe, you said was six months

4  ago?

5  A.  Yes.

6  Q.  Was that the state case?

7  A.  No.  That was federal.

8  Q.  That was the federal case?

9  A.  Yes.

10  Q.  And did the individuals -- and I am going to talk about

11  the one that was six months before, because that one was

12  before Dr. Weber's case, okay?

13  A.  Well, it is six months from now, so six months ago from

14  now that was I conducted, I believe, approximately.

15  Q.  Okay.  All right.  So, let me ask a different question.

16  Prior to the Public Defender's Office contacting you and

17  asking you to evaluate Mr. Weber, had you ever evaluated a

18  person who presented with sovereign citizen beliefs?

19  A.  Yes.  One.

20  Q.  One.  And who was that?

21  A.  That was a state case.  I don't recall the name.

22  Q.  No, no, that's fine and I don't actually mean to ask you

23  that.

24  A.  Okay.

25  Q.  But that was the state case?

1    A.   Yes.

2    Q.   Okay.  Was that state case a sovereign citizen who was a

3    tax protestor?

4    A.   No.  I don't believe that was the issue.

5    Q.   Did the individual that you evaluated in terms of the

6    state case, did that person manifest the same sovereign

7    citizen beliefs as Mr. Weber?

8    A.   They weren't as complex.  There was some of it, but not

9    the intricate, in-depth, convoluted mess that this is.

10   Q.   Was the person who you evaluated for state court, was

11   that a person who had anti-government beliefs?

12   A.   Anti-government, anti-court.  They did not believe that

13   the court had jurisdiction over his case, if I recall

14   correctly, but this -- I don't recall a lot of the details.

15   That was a state 730 and it was very narrow.  I did not get

16   into a lot of background information on that person.

17   Q.   In your training to be a psychiatrist, had you ever

18   received training regarding sovereign citizens and the types

19   of specific problems that they present in terms of diagnosing

20   psychosis?

21   A.   No.  This was not the specific curriculum item in my

22   training.

23   Q.   And so, the first time you become aware of the sovereign

24   citizen sort of ideology was in the state case?

25   A.   Yes.

1  Q.  And when was that?  And again, just because I'm

2  confused --

3  A.  Three or four years ago.  It was several years ago,

4  because I was still working for Erie County.  It was a 730

5  and it would have been ordered through Erie County.

6  Q.  Prior to evaluating Mr. Weber, were you aware of groups

7  that espoused the belief that you didn't have to pay taxes?

8  A.  Yes.

9  Q.  And was that in conjunction with this umbrella of

10  sovereign citizen ideology?

11  A.  Right.  That comes up.  When you look up one, then you

12  usually get that.

13  Q.  Right, because there are different groups in there.  Some

14  groups that are specific tax protesters like posse comitatus.

15  That was their modus operandi, right?  They were mostly tax

16  protestors, correct?

17  A.  Correct.

18  Q.  And sovereign citizens, you -- people who accept that

19  ideology are not necessarily tax protestors?

20  A.  No.  And it's just not about taxes.  It's broader.

21  Q.  So, prior to evaluating Mr. Weber, had you heard of posse

22  comitatus?

23  A.  I don't know if I've known about that specific group, no.

24  Q.  Had you known about the term "tax defiers"?

25  A.  I don't know if I knew it as tax defiers, but I knew

CERVANTES -- MS. KRESSE -- 01/23/18

220

1   there were tax protesting groups.

2   Q.  And what was your understanding of tax protesting groups?

3   A.  Well, I mean, in general, they find reasons to justify

4   not paying taxes.  There very varied in their reasons for it.

5   Some of them trace it back to their lineage.  Some of them

6   trace it back to the wars and what their family did and

7   trades that were made with Europe.  It's messy and

8   complicated.

9   Q.  True, but isn't it fair to say that many of those

10  arguments about lineage and tracing things back to wars, that

11  it deals with citizenship and how they define citizenship,

12  correct?

13  A.  Right.

14  Q.  And for Mr. Weber, it's whether or not he's a citizen of

15  the United States versus a citizen, for example, of the State

16  of New York or some other entity that he defines?

17  A.  Correct.

18  Q.  Prior to evaluating Mr. Weber, had you heard of the group

19  We the People?

20  A.  I knew that they had a group.  I wasn't -- I mean, I had

21  not had a case where that came up before, specifically.

22  Q.  Had you done any research into We the People?

23  A.  Before this case?

24  Q.  Yes.

25  A.  No.

1    Q.  But obviously, you had heard of sovereign citizens, for

2    example, right?

3    A.  Correct.

4    Q.  And you are aware of the existence of the Ku Klux Klan in

5    this country, correct?

6    A.  Yes.

7    Q.  And the Aryan Nation?

8    A.  Yes.

9    Q.  Neo-Nazis correct?

10   A.  Yes.

11   Q.  And you would agree these type of white supremacy groups

12   adhere to ideas about various races and religions that most

13   people would consider delusional, correct?

14   A.  Are you talking about all those groups?

15   Q.  I am talking about white supremacy groups, whether they

16   manifest them selves under a tile of Ku Klux Klan or Neo-

17   Nazi, but they have beliefs about religions and about races

18   that most people in society would consider to be delusional?

19   A.  Well, I don't know that most people in society consider

20   it to be delusional.  We certainly don't diagnose them as

21   that.

22   Q.  And that is because it's a cultural belief system,

23   correct?

24   A.  It is a cultural belief system, yes.

25   Q.  And so, the lay person might consider somebody who says

1   that a minority is not equal by virtue of color of his or her

2   skin to be delusional, a lay person might say that is

3   delusional, correct?

4   A.  Using that as a lay term, yes.

5   Q.  Yes.

6   A.  But professionally, we couldn't call that delusional.

7   Q.  Right.  So, there's a difference between delusional, like

8   crazy; like when we say somebody is crazy and delusional for

9   purposes of a diagnosis by a psychiatrist or psychologist,

10  correct?

11  A.  Correct.

12  Q.  And where you are looking at the belief systems of white

13  supremacy groups, you have to consider that there are

14  hundreds of thousands of people who, for whatever reason,

15  accept this ideology that that is the same amongst a group of

16  people, correct?

17  A.  Correct.

18  Q.  And the DSM, which is the diagnostic manual utilized by

19  psychologists and psychiatrists, tells psychiatrists and

20  psychologists that prior to diagnosing somebody with a

21  delusional disorder, you must take into consideration this

22  cultural phenomenon; so that if this is a craziness or a

23  strange idea that's adopted by a culture of people, a

24  movement of people, that it is not delusional, correct?

25  A.  Well, for an individual person, however, that individual

1   person adopting certain beliefs can be delusional.

2   Q.   And then, we get back to what we talked about a few

3   moments ago, which is sort of the onset of that delusion,

4   correct?

5   A.   Right, what makes people vulnerable to believing certain

6   things.

7   Q.   And your belief that, in your opinion, that what made

8   Mr. Weber different than the culture of sovereign citizens

9   was because there was no motivation for him to glom onto this

10  ideology?  That was the basis of opinion, correct?

11  A.   That was part of it, yes.

12  Q.   Right.  But, in fact, as I have asked you these

13  questions, you didn't know about the fact that he had tax

14  problems and he was being contacted routinely by the IRS

15  before he ever decided to adopt the beliefs of the sovereign

16  citizens?

17  A.   I didn't have any information, no.

18  Q.   Right.  You did not know that?

19  A.   I did not know that.

20  Q.   So, that's something that is relevant to whether or not

21  Mr. Weber is just your typical sovereign citizen who falls

22  within that culture or whether there's something about him

23  that takes him outside of that culture, correct?

24  A.   Correct.

25  Q.   You testified on direct that you are familiar with the

1    Parker article, for example, correct?

2    A.  Yes.

3    Q.  Okay.

4            MS. KRESSE:  And Your Honor, before the witness are a

5    number of -- are all of the reports, but I actually have the

6    ones that have the exhibit numbers on, so with the Court's

7    permission, if I could just substitute the marked Government

8    Exhibits for what she has before her.

9            THE COURT:  I'm not following you.

10           MS. KRESSE:  The witness had during her direction --

11           THE COURT:  She has Government Exhibit 4, the Parker.

12           MS. KRESSE:  She does not have that in front of her.

13   She does have the reports, her two reports.

14           THE COURT:  Okay.  You can show her the Government

15   Exhibit 4.

16           MS. KRESSE:  Okay.

17           THE COURT:  It is in evidence.

18           MS. KRESSE:  And I am also going to put before her

19   the other exhibits, because she was referring --

20           THE COURT:  What other exhibits are you referring to?

21           MS. KRESSE:  Her two evaluations.

22           THE COURT:  Okay.  All right.

23           MS. KRESSE:  Dr. Antonius' evaluation.

24           THE COURT:  That's Exhibits 2 and 3?

25           MS. KRESSE:  1, 2 and 3.

225

1            THE COURT:  Okay.

2            MS. KRESSE:  And then 4 and 5 are the two articles.

3            THE COURT:  In other words, all the government's

4   exhibits?

5            MS. KRESSE:  Yes.

6            THE COURT:  Okay.  They're all in evidence.

7            MS. KRESSE:  I know, but the ones she has in front of

8   her don't have exhibit stickers on them.

9            THE COURT:  Okay.  Well, give her the ones that are

10  exhibits that are in evidence here.

11  (An off-the-record discussion was held.)

12            THE COURT:  You have seen all these exhibit before?

13            THE WITNESS:  I have.

14            THE COURT:  Okay.

15  BY MS. KRESSE:

16  Q.  So, on direct examination, you were asked about

17  Government Exhibit 4, which is the Parker article, correct?

18  A.  Correct.

19  Q.  Okay.  Did you know about this article before you

20  evaluated Mr. Weber?

21  A.  I did not.

22  Q.  And Government Exhibit 5 is an article by two authors,

23  one of whom is Pytyck.  Do you see that?

24  A.  Correct.

25  Q.  Is that an article that you were aware of before you

1  evaluated Mr. Weber?

2  A.  No.

3  Q.  And in fact, in your first report, which is Government

4  Exhibit 2 -- and if you have that in front of you.  If you

5  look at -- so, this is Government Exhibit 2, your report

6  dated October 30th of 2016.  On the bottom of page 1 and

7  continuing to page 2, there's a reference to the sources of

8  information for your report, correct?

9  A.  Correct.

10  Q.  Is there any reference in there to any research that you

11  did relative to sovereign citizens?

12  A.  No.

13  Q.  There's no reference there to the Parker article, for

14  example?

15  A.  No.  I wouldn't typically do that.  I would not put

16  scholarly articles as references unless I am specifically

17  pointing to them in my report.

18  Q.  And you don't point to any scholarly articles regarding

19  sovereign citizens in your report?

20  A.  I don't think -- I don't believe I did.  I know

21  Dr. Antonius did, but I don't believe that I specifically

22  pointed to those articles, but they were reviewed prior to

23  submitting the evaluation, but I don't typically put

24  scholarly articles in my sources of information.  I have

25  never done that.

CERVANTES -- MS. KRESSE -- 01/23/18                              227

1    Q.  And just to clarify something.  So, you evaluated

2    Mr. Weber on August 18, 2016 and August 26th, 2016, correct?

3    A.  Correct.

4    Q.  And that's notated on Government Exhibit 2 under dates of

5    evaluations?

6    A.  Yes.

7    Q.  And again, just because I want the record to be clear,

8    your testimony is that before you evaluated Mr. Weber in

9    August of 2016, you had not read the Parker article or the

10   Pytyck article about sovereign citizen and psychiatry,

11   essentially?

12   A.  Well, I don't know if I read the article before seeing

13   him or not.  I may have pulled the article in anticipation of

14   interviewing him.  I don't know at what point in the

15   evaluation process I pulled the article.  I don't know.

16   Q.  Right.  And that's what I want to clarify, because I

17   think I created the impression that you hadn't looked at

18   either of these articles prior to doing the report and I

19   don't think that's what you were saying.

20   A.  No, that is not what I'm saying.  There were absolutely

21   already reviewed and I know this because we did a case

22   conference on this case anonymously.  Obviously, we didn't

23   use names.  And as part of this, the fellow and I pooled the

24   research that was out there.  And by the way, these articles

25   are 2013 and 2014.  These would not have been available at

1    the time I did my prior sovereign citizen evaluation because

2    it was three or four years ago.  These probably weren't even

3    out there.  These are pretty recent.

4    Q.  Right, but you are referring to the state evaluation you

5    did a few years ago?

6    A.  Right.

7    Q.  Okay.  But they were available at the time you were asked

8    to evaluate Mr. Weber?

9    A.  Yes.  And I reviewed them.

10   Q.  Right.  So, I think I've clarified that although you may

11   not have read them before you met Mr. Weber, you read them

12   prior to authoring your report dated October 30th, 2016?

13   A.  I don't recall.  I could look that up, but I don't have

14   the electronic with me to do that, if you really need to know

15   that.

16   Q.  No, no.  You may or may not have then?

17   A.  Yes.

18   Q.  But at some point, you become familiar with the Parker

19   article, for example?

20   A.  Yes.

21   Q.  And in fact, in October of this -- of 2017 rather, you

22   sat on a panel in Colorado with Dr. Parker?

23   A.  Correct.

24   Q.  All right.  But, again, there's no reference to any sort

25   of research that you did in terms of sovereign citizens in

1  your first report, which is Government Exhibit 2?

2  A.  Correct.

3  Q.  In your diagnosis -- after you met with Mr. Weber in

4  August of 2016, your diagnosis was that he had a delusional

5  disorder mixed type, correct?

6  A.  Correct.

7  Q.  And is it -- correct me if I am wrong.  That was based on

8  sort of two prongs; one, his sovereign citizen beliefs and

9  secondly, his somatic complaints?

10  A.  Correct.

11  Q.  Dr. Heffler, Melissa Heffler, she was a fellow of yours

12  at the time?

13  A.  Yes.

14  Q.  And when you met with Mr. Weber, was Dr. Heffler also

15  present?

16  A.  The first two interviews, yes.

17  Q.  But not the third that is the basis for your addendum?

18  A.  Correct.

19  Q.  So, the first two interviews that formed the basis for

20  your October 30th, 2016 report, Dr. Heffler was present

21  during those interviews?

22  A.  Yes.

23  Q.  And at that time, I believe you met with Mr. Weber in

24  total of five and a half hours?

25  A.  Correct.

1    Q.  And that included the administration of that personality

2    test, the MMPI-2, correct?

3    A.  Correct.

4    Q.  How long does that take?

5    A.  Most people can do it in about an hour.  I think that's

6    about -- took about an hour.

7    Q.  So, if we deduct an hour for that test, you and

8    Dr. Heffler spent about four and a half hours talking with

9    Dr. Weber, correct?

10   A.  Yes.

11   Q.  Now, prior to evaluating Mr. Weber, you understood that

12   he was a middle-aged man, right; that he was in his -- at the

13   time of his interview, that he was 60?

14   A.  Correct.

15   Q.  And at the time of sort of the manifestation of this

16   sovereign citizen ideology, he was in his 50's, correct?

17   A.  Correct.

18   Q.  And he was a white male, you knew that, correct?

19   A.  Yes.

20   Q.  And that he had been born in the United States?

21   A.  Yes.

22   Q.  He had been educated in the Buffalo area, went to

23   Canisius High School, correct?

24   A.  Yes.

25   Q.  Went to UB Dental School?

1  A.  Yes.

2  Q.  And yet he claimed that he was a non-resident alien of

3  the United States, correct?

4  A.  Correct.

5  Q.  And prior to meeting with Mr. Weber, did you have an

6  understanding that this claim of not being a citizen of the

7  United States was sort of a typical sovereign citizen

8  argument?

9  A.  Yes.

10  Q.  You knew that.  One of the things that you focused on

11  during your direct was the fact that, at the time, Dr. Weber

12  who was an educated dentist and his own practice, all of a

13  sudden in his 50's, based on what you understood to be no

14  precipitating factors, suddenly adopted the sovereign citizen

15  ideology, correct?

16  A.  That and the health issues --

17  Q.  Right.  And --

18  A.  -- around the same time.

19  Q.  And I understand the health issues are always part of

20  your analysis and we'll get to those.  So, at this point, I

21  am just focusing on the sovereign citizen piece of it.

22  Doesn't a man in his 50's who suddenly has a change of

23  viewpoint in terms of his life and his career and his family,

24  isn't that not atypical?  Isn't that what we call commonly a

25  midlife crisis?

1    A.  Well, I think that's a very superficial way of doing it.

2    I think this became more extreme than what we refer to as a

3    midlife crisis and it warranted some further investigation.

4    Q.  I am not suggesting that it doesn't, but in terms of

5    those factors, a man in his 50's, otherwise successful, who

6    suddenly goes off the rails and decides I am not going to --

7    I am leaving my family, I don't care about my career anymore,

8    that happens to men in midlife.  It does happen, correct?

9    A.  I suppose it does, but it's concerning.

10   Q.  Right, but it's not a delusional disorder?

11   A.  Well, in and of itself, no, that would not be delusional.

12   Q.  And again, all I am suggesting is there are other

13   explanations and I am inquiring whether you considered the

14   other explanations prior to diagnosing Dr. Weber with a

15   delusional disorder.  And you are aware that he was having

16   some marital problems before he decided to get a divorce?

17   A.  Yes.

18   Q.  And those were somewhat long-standing.  I am not going to

19   put a number of years, but it was somewhat long-standing,

20   correct?

21   A.  Yes.

22   Q.  Okay.  And at the point -- and I am going to focus on

23   Dr. Parker's article --

24          THE COURT:  I think what we're going to do -- I have

25   some other matters and I think we're going to take a break

1    until 1:30.  We'll resume at 1:30.

2            MS. KRESSE:  Okay.  Thank you, Judge.

3            THE CLERK:  All rise.

4    (Brief recess)

5            THE CLERK:  Criminal action 2015-10A.  United States

6    v. Charles Weber.  Continuation of competency hearing.

7    Counsel, please state your name and the party you represent

8    for the record.

9            MS. KRESSE:  Good afternoon, Judge.  MaryEllen Kresse

10   and Patricia Astorga for the United States.

11           MR. COMERFORD:  Good afternoon, Your Honor.  Brian

12   Comerford for Dr. Cervantes.  He's present.

13           THE COURT:  Okay.  Ms. Kresse, everybody ready?

14           MS. KRESSE:  Yes, Judge.  Thank you.

15   BY MS. KRESSE:

16   Q.  Dr. Cervantes, earlier in my cross-examination I asked

17   you and you had told us a little bit about the federal court

18   case that you had where you had evaluated a defendant who

19   exhibited some sovereign citizen ideology.

20   A.  Correct.

21   Q.  Do you recall that?  Was that the case of Valentino

22   Shine?

23   A.  Yes.

24   Q.  And that's a case, if you know -- do you recall if it was

25   in front of Judge Geraci?

1   A.   I don't know the judge's name.

2   Q.   No problem.  Now, the evaluation of Mr. Shine, that was

3   after you evaluated Dr. Weber?

4   A.   Correct.

5   Q.   Do you recall that Mr. Shine was indicted on drug

6   distribution and human trafficking counts?

7   A.   Yes.

8   Q.   And what he was accused of doing is drugging women and

9   then prostituting them, correct?

10  A.   Correct.

11  Q.   And in terms of his sovereign citizen ideology that he

12  exhibited, is it fair to say that it focused primarily on the

13  jurisdiction of the court?

14  A.   Yes.

15  Q.   And this federal court did not have jurisdiction over

16  him?

17  A.   Yes.

18  Q.   And you concluded that despite this ideology, that he was

19  not delusional?

20  A.   Correct.

21  Q.   And, in fact, that he was competent to stand trial?

22  A.   Correct.

23  Q.   And I understand that each defendant that you evaluate is

24  different, so there are aspects of Mr. Shine's evaluation

25  that I am not asking you questions about that I am sure were

1  relevant to your evaluation and your conclusion, but I am

2  just focusing on this particular aspect of the sovereign

3  citizen ideology.  Okay?

4  A.  Okay.

5  Q.  So, with respect to Dr. Weber, in your first report, you

6  did diagnose him -- and this was the report that you did with

7  Dr. Heffler -- you diagnosed him with delusional disorder

8  mixed type, correct?

9  A.  Correct.

10 Q.  And then in your addendum, which is Government Exhibit --

11 and it's in front of you -- Government Exhibit 3, which is

12 dated November 2nd of 2017, you submit that after you have

13 had an opportunity to review Dr. Antonius' report, correct?

14 A.  Correct.

15 Q.  And that's the report that's marked as Government

16 Exhibit 1?

17 A.  Correct.

18 Q.  You also submit that after you have had an opportunity to

19 interview Mr. Weber on another occasion for another two hours

20 and 30 minutes, correct?

21 A.  Correct.

22 Q.  And in that forensic examination addendum, Government

23 Exhibit 3, you move away from the delusional disorder mixed

24 type diagnosis, don't you?

25 A.  I move away from it, but I don't disregard that there are

1   still some delusional beliefs that he has, but I believe that

2   they're part of a larger cognitive disorder as opposed to

3   just delusional disorder and nothing else.

4   Q.  And delusional disorder and cognitive disorder are

5   completely separate, correct?

6   A.  They are two separate diagnoses, yes.

7   Q.  And in terms of the DSM, which is the diagnostic tool

8   used by psychologists and psychiatrists, a cognitive disorder

9   is one that has physiological links or physiological evidence

10  typically, correct?

11  A.  Well, it has psychological links, but it might not

12  necessarily be visible.

13  Q.  And are you referring to the fact that there could be,

14  for example, an MRI that would not exhibit changes indicative

15  of a cognitive disorder?

16  A.  Correct.

17  Q.  How typical is that, in your experience?

18  A.  Well, it depends on what type of cognitive disorder you

19  are talking about.  So, people with advanced age who have

20  certain cognitive disorders like Alzheimer's dementia or

21  Parkinson's-related dementia or Huntington's disease that

22  lead to dementia, those cognitive disorders do have certain

23  markers you can see on imaging.  It's a little more difficult

24  when you are talking about younger people that don't have

25  visible changes, though more unusual.

237

1          So, you can have people with cognitive impairment

2    that don't have any visible changes on imaging or on other

3    tests.  There are some people who have abnormal labs, for

4    example, people with very abnormal thyroid function or

5    vitamin B12 or folate deficiency that are extreme, or carry

6    syphilis.  I mean, all of these are reasons for cognitive

7    impairment that have lab markers, but those are fairly rare.

8    Q.  And the cognitive disorders that you refer to, like

9    Alzheimer's and dementia, those are types of cognitive

10   disorders that would have findings on an MRI typically?

11   A.  Not necessarily.  In the early stages, it might be

12   completely normal.  You might not see any evidence of it.

13   But later stages, there might be some evidence of, you know,

14   brain changes, but not necessarily early on.  So, the older

15   somebody is, the more likely there is to be changes that are

16   visible.

17   Q.  And did you conclude at some point that Mr. Weber had

18   signs of early onset of dementia?

19   A.  I wouldn't call it dementia.  I would say cognitive

20   impairment.  And yes, I did believe after -- when I re-

21   evaluated him for the second part of the evaluation, based on

22   additional information that had come about based on how he

23   was handling his case, things that he had submitted, the

24   problems that he was having with the law in state court, the

25   deterioration or the relationship with his attorney, all of

1    those things factored in to me believing that there was some

2    cognitive impairment.  And after reviewing Dr. Antonius'

3    report, I believe that perhaps the tests that were picked

4    were not sensitive enough to pick up on some of those subtle

5    impairments.

6    Q.  And in terms of -- you referenced Dr. Antonius' testing

7    that he performed.  If you look at Government Exhibit 1,

8    which is his report, under "Sources of Assessment" which is

9    on -- beginning at the bottom of page 1 and continuing to

10   page 2 --

11   A.  Yes.

12   Q.  -- do you see at the very top of page 2 there's a

13   reference that reads, "Email from defense counsel on January

14   13, 2017 to Ms. Kresse referencing a case presentation by

15   Dr. Cervantes received on April 17, 2017"?

16   A.  Yes.

17   Q.  Do you see that?  Do you know what that's referring to,

18   your case presentation?

19   A.  Yes.

20   Q.  And then if you go to page 10 of Exhibit 1, under the

21   heading -- it's at the very bottom of the page, under the

22   heading "Cognitive Functioning" --

23   A.  I am sorry.  Which page?

24   Q.  Page 10 of Government Exhibit 1.

25   A.  Yes.

1    Q.  At the very bottom of the page, do you see the heading

2    "Cognitive Functioning"?

3    A.  Yes.

4    Q.  And under that heading, Dr. Antonius -- is it fair to say

5    that he explains why he did assessments of Dr. Weber's

6    cognitive functioning?

7    A.  Yes, it does.  It says, "Dr. Weber complained of short-

8    term memory problems and collateral information, makes

9    mention the possibility of a memory disorder."

10   Q.  And then where you left off reading in a parenthetical,

11   do you see the part where it says, "In an email from defense

12   counsel Brian Comerford to Ms. Kresse, Mr. Comerford refers

13   to a case conference in which the possibility of, quote, an

14   unusual presentation of an early dementia, end quote, was

15   brought up"?  Do you see that?

16   A.  Yes.

17   Q.  And so this reference to the presentation of an early

18   dementia, that was something that you brought up in your case

19   presentation, correct?

20   A.  Well, I want to be clear we're talking about the same

21   case presentation.  This is not this October's presentation.

22   Q.  Right.

23   A.  This is the fellowship case presentation that we put

24   together much earlier.  And these suggestions were

25   actually -- or these diagnostic considerations were brought

240

1    up by numerous faculty members.  It wasn't me personally.  It

2    was a discussion that we had amongst the group of attending

3    that go to this conference.

4    Q.  So, is it fair to say -- and again, this is not October

5    of 2017.  This is prior to Dr. Antonius' report, which is

6    dated July of 2017?

7    A.  Correct.

8    Q.  Okay.  So, is it fair to say that at that conference that

9    Dr. Antonius refers to, there was a suggestion relative to

10   Dr. Weber that he presented an unusual presentation of early

11   dementia?

12   A.  It was discussed as one of the possibilities, yes.

13   Q.  And you presented that information then to Mr. Comerford,

14   Mr. Weber's attorney, correct?

15   A.  Correct.

16   Q.  So, you thought -- you believed that it had sufficient

17   validity to present it to defense counsel?

18   A.  Yes.

19   Q.  Okay.  But when you did the MRI or when you had the MRI

20   performed, because obviously you don't do that -- and that

21   was an MRI of Mr. Weber's brain, correct?

22   A.  Correct.

23   Q.  -- there were no signs of dementia?

24   A.  Nothing that was obvious.

25   Q.  And then you talked about another way of diagnosing

1   cognitive or neurocognitive disorder is through

2   neuropsychological testing, correct?

3   A.   Correct.

4   Q.   And on direct examination, you talked about some of the

5   tests that were performed by Dr. Antonius?

6   A.   Correct.

7   Q.   And is it fair to say that -- well, let me ask you this.

8   Do you know how many tests there are available to

9   psychologists and psychiatrists that test neuropsychological

10  disorders?

11  A.   It's probably dozens, if not hundreds.  There's numerous.

12  Q.   And would you also agree that in terms of the difference

13  between a psychiatrist and a psychologist, it is the

14  expertise, to use that word, of a psychologist to perform

15  testing including neuropsychological testing?

16  A.   Well, testing is definitely more in the psychologist's

17  area.  Neuropsychologists have additional training to perform

18  some of the more complicated and thorough tests.  But yes, as

19  opposed to psychiatrists, if that's what you are asking.

20  Q.   Correct.  So, Dr. Antonius is a psychiatrist?

21  A.   No.

22  Q.   I'm sorry.  Dr. Antonius is a psychologist?

23  A.   Yes.

24  Q.   And he's a forensic psychologist?

25  A.   He calls himself that, yes.

1   Q.  Well, are you suggesting he's not --

2   A.  No.

3   Q.  No, no, I'm serious.  Are you suggesting that he's not?

4   A.  When physicians call ourselves forensic psychiatrists,

5   usually they have board certification that goes along with

6   that, but I think psychologists treat the nomenclature

7   differently.  So --

8   Q.  In fact, they do, right?  I mean, doctors, MDs are always

9   talking about what they are -- they are board certified and

10  board certified in what, correct?

11  A.  Correct.

12  Q.  And isn't it fair to say that physicians have to be board

13  certified in their speciality?

14  A.  No, they don't.

15  Q.  They don't have to, but most are?

16  A.  If they've done the subspecialty training, they usually

17  go along and do that.

18  Q.  And in psychology it's not the same?

19  A.  It's not the same.

20  Q.  Okay.  So, when we talk about whether or not Dr. Antonius

21  was board certified, it's really not the same suggestion that

22  you are making that somehow that is indicative of less

23  training or less expertise in the area, correct?

24  A.  No.

25  Q.  Okay.  So, Dr. Antonius is a psychologist.  His

243

 1   speciality is in performing psychological testing to include

 2   neuropsychological testing, correct?

 3   A.   Correct.

 4   Q.   And as a psychiatrist, you do not perform testing

 5   yourself -- I mean, I know you did the personality test --

 6   A.   Right.

 7   Q.   -- for Mr. Weber, but that was something where you sent

 8   the results to be analyzed by a company, correct?

 9   A.   Correct.

10   Q.   But in terms of neuropsychological testing, like the

11   RBANS, for example, or intelligence tests, that's not

12   anything you are involved in giving to a patient?

13   A.   No.  If I feel that that's needed, that's something I

14   would refer to a psychologist or neuropsychologist to do.

15   Q.   And in fact, you have had a working relationship with

16   Dr. Antonius in the past working on a case, *United States vs.*

17   *Baschmann*, where you felt that psychological testing for

18   Mr. Baschmann was necessary, correct?

19   A.   Yes.

20   Q.   And you referred that testing to Dr. Antonius to perform,

21   correct?

22   A.   Correct.

23   Q.   And so, that's not out of the ordinary for you to -- for

24   a psychiatrist and psychologist working together to utilize

25   all the tools that are available in order to be able to

1   properly diagnose somebody with a disorder, if one exists?

2   A.   If it's something we feel is needed, we will collaborate.

3   Q.   And you are not suggesting there was no basis for

4   Dr. Antonius to perform the neuropsychological testing he

5   performed, correct?

6   A.   No.

7   Q.   Your issue is the tests that he chose were not designed

8   to properly evaluate whether or not Mr. Weber had a cognitive

9   disorder?

10  A.   Well, that's not a yes-or-no question and I can qualify

11  that.   The tests are adequate.   The tests are frequently

12  used.   They're normed.   The issue I have with these tests is

13  that for individuals who have a very high level of education

14  or who start out with a very high level of intellectual

15  functioning, often these tests will not show impairment on

16  the test.   Somebody can still test within the normal range

17  but still have a significant decline from their premorbid

18  level of function that that test will not pick up.

19           And one of the other issues I have with the testing

20  is that none of the tests that he selected really focussed on

21  executive functioning.

22  Q.   And that's based on your understanding of the testing?

23  A.   Yes.

24  Q.   But, again, you are not an expert in testing?

25  A.   I am not.

1  Q.  Okay.  And you don't administer the tests, correct?

2  A.  Well, a lot of the tests I can't administer.  You have to

3  be a psychologist to obtain them and be trained to use them.

4  Q.  Right.  And you are not trained to use the tests?

5  A.  I am not.

6  Q.  So, it goes without saying then that if you are not

7  trained to give the tests, you are not trained to read the

8  results, correct?

9  A.  Well, I am not trained to read the raw results, but I can

10  certainly read and understand the interpretation and I know,

11  generally speaking, what those tests are supposed to look

12  for.  So, for example, if I order an MRI -- I am not a

13  radiologist, but if I order an MRI of the brain and I tell

14  the radiologist that I am concerned about a stroke or I am

15  concerned about a vascular disease, I expect the radiologist

16  will protocol that test to look for that.  I don't tell them

17  how to do that protocol.  I leave that up to them to chose

18  the protocol that's indicated.

19         And the same with a psychologist.  I would never

20  tell a psychologist I want this, this, this and this exact

21  test.  I tell them these are the concerns we have and you

22  know, you select the tests for this.  This did not happen in

23  this case because Dr. Antonius was not somebody I was

24  directly collaborating with.

25  Q.  Right.  And so, you leave it to the psychologist to

1   select the tests, correct?

2   A.   Correct.

3   Q.   And Dr. Antonius, based on the suggestion that perhaps

4   there was an early manifestation of dementia as well as the

5   subjective complaints by Mr. Weber of memory problems, he

6   chose to administer neuropsychological testing?

7   A.   He selected the tests that he wanted to administer.

8   Q.   Right.  And he administered those and he got the scores

9   and he interpreted them, correct?

10  A.   Correct.

11  Q.   And he looked at the raw data, the raw test scores, yes.

12  A.   Correct.

13  Q.   You did not, but you are questioning his interpretation

14  of the raw data?

15  A.   I do question it.

16  Q.   Right.  Even though --

17  A.   Not because it is inaccurately scored, but just how that

18  fits into this individual case relative to how this

19  individual may have been functioning earlier on.

20  Q.   Isn't there a big difference between reading a

21  psychological or neuropsychological test which is dealing

22  with things of the mind as opposed to what you were

23  testifying about a moment ago, an MRI and a radiologist

24  reading the MRI where there's actual physiological changes in

25  the brain that are going to be documented or should be

CERVANTES -- MS. KRESSE -- 01/23/18                    247

1   documented, it's a totally a different realm?

2   A.  It's a different realm, but I know which tests test for

3   what.  I know, for example, that the RBANS has no test of

4   executive functioning, so it's not going to show executive

5   dysfunction.

6   Q.  And so, if Dr. Antonius were to testify that the RBANS

7   does test for executive functioning, you would say that he is

8   incorrect?

9   A.  I would.

10  Q.  Even though he is an expert in RBANS and scoring and

11  interpreting RBANS?

12  A.  I would.  It's not a test that is known to test for

13  executive functioning.

14  Q.  So, again, this is your opinion that is based on

15  something that's not your area of expertise?

16  A.  It's based on other cases that I have had where I have

17  reviewed neuropsych testing and incorporated neuropsych

18  testing into the opinion and whenever executive function is

19  of significant concern, there's always other tests that are

20  added if the RBANS is being used.

21  Q.  And was executive functioning something that you

22  mentioned in your original report?

23  A.  In the first report?  No.

24  Q.  So, executive functioning is something that was mentioned

25  for the first time by you in your second report, your

1  addendum, correct?

2  A.  Correct.

3  Q.  So, it is not that Dr. Antonius would know that executive

4  functioning, for example, was an issue relative to your

5  evaluation of Dr. Weber?

6  A.  Correct.

7  Q.  Because it wasn't an issue at that time?

8  A.  It wasn't an issue and there weren't any -- you know,

9  there was almost a year in between the two evaluations that I

10  did.  So, that evaluation happened before -- his evaluation

11  happened after my first evaluation, but he certainly would

12  not have known the concerns that we had in the interim,

13  between the first and section evaluation.

14  Q.  Right.  And your second evaluation came after his

15  evaluation and his report?

16  A.  Correct.

17  Q.  In your first report, Government Exhibit 2, you don't

18  talk about cognitive disorders?

19  A.  No.

20  Q.  So, that's also not in your report.  The only thing in

21  your first report is a delusional disorder mixed type,

22  correct?

23  A.  Correct.

24  Q.  All right.  Nevertheless, Dr. Antonius, based on the

25  subjective complaints of the defendant about memory as well

1   as a reference in an email to an early onset of dementia,

2   takes it upon himself to administer neuropsychological

3   testing, correct?

4   A.   Correct.

5   Q.   Neuropsychological testing is valid for the diagnosing of

6   cognitive disorders, correct?

7   A.   It is a tool used to diagnose cognitive disorders.

8   Q.   For example, neuropsychological testing wouldn't be used

9   to diagnose a delusional disorder, would it?

10   A.   No.

11   Q.   Okay.  And although you take issue with the testing that

12   Dr. Antonius performed, nowhere in your addendum do you

13   suggest any other tests that should have been performed, do

14   you?

15   A.   No.  I don't suggest any other specific tests.

16   Q.   So, you take the position that his testing was not done

17   in a way that would have valid results, but you don't suggest

18   there are tests that could be performed to give you that

19   information?

20   A.   Oh, there are.

21   Q.   But you --

22   A.   But that's not something that I would do.

23   Q.   You wouldn't do it.  And you also don't say anything

24   about further testing for -- further neuropsychological

25   testing should be done?

1  A.  I didn't say that, but it should.

2  Q.  But it should?

3  A.  Yes.

4  Q.  All right.  So -- and now, I am focusing on your

5  addendum, which is Government Exhibit 3.  So, despite no

6  evidence of abnormalities relative to cognitive disorders on

7  the MRI, despite no finding in the neuropsychological testing

8  that Dr. Antonius performed, you conclude in your addendum

9  that the defendant now is suffering from an unspecified

10  cognitive disorder, correct?

11  A.  Correct.

12  Q.  And in terms of the MRI, just to go back to that for a

13  moment, you are linking the cognitive disorders to the

14  manifestation of two things; the defendant's sovereign

15  citizen beliefs, that's one, right?

16  A.  Not just holding the beliefs, but the fact that he was

17  vulnerable and accepted these beliefs as a reality.

18  Q.  So, his -- would it be more correct to say, to his

19  adherence to the ideology of sovereign citizens?

20  A.  Whatever vulnerability or predisposition he developed to

21  latch on to that ideology, not the idealogy itself.  I am not

22  calling that specifically delusional.  And from a cognitive

23  standpoint, what I am worried about is what precipitates

24  somebody to latch on to that kind of belief system when

25  there's no history of having that tendency.

CERVANTES -- MS. KRESSE -- 01/23/18

251

1   Q.  And in your experience, do sovereign citizens or people

2   who latch on to that ideology, do they usually have a

3   predisposition to strange idealogical beliefs?

4   A.  Well, you asked in my experience and my experience,

5   personal experience, is very limited and the literature on

6   this is very limited.  So.  There is no large fund of data

7   that goes into whether there's a certain predisposition,

8   although it is known that some individuals that are sovereign

9   citizens have a tendency to believe conspiracy theories and

10  other things like that.

11  Q.  Yes.  Because some of those things go hand in hand,

12  correct?

13  A.  They do.

14  Q.  And is it fair to say that the research, though limited,

15  had found that relative to sovereign citizens, that it's sort

16  of a gradual indoctrination; that they buy into one belief,

17  maybe the one about being a non-resident alien and then they

18  do more research and then they think oh, well, I don't need a

19  driver's license and then it continues, so it's a continuum

20  of beliefs that sovereign citizens follow?

21  A.  I think the cases vary wildly.  There's no one typical

22  path.

23  Q.  But you would agree that sovereign citizens hold a myriad

24  of different beliefs and not all of them hold the same

25  beliefs?

1   A.  Correct.

2   Q.  Right.  And then, it's not unusual for a person who

3   latches on to sovereign citizens to begin by manifesting, for

4   example, an issue regarding jurisdiction of the court and

5   then to proceed to another manifestation which would be that

6   the Thirteenth Amendment and the Sixteenth Amendment are not

7   valid because of some Archaic reading the of the law?

8   A.  I am sure there's cases where that happened.

9   Q.  Right.  And Mr. Weber is one of those cases where he

10  starts out believing he is a non-resident alien and then he

11  latches on to more and more sovereign citizen beliefs,

12  correct?

13  A.  Correct.

14  Q.  So, in terms of Mr. Weber's sovereign citizen beliefs,

15  would you agree that -- to be conservative, he manifested --

16  he began to manifest those beliefs as early as 2009?  And if

17  you want, I can explain why I am giving you that date.

18  A.  Okay.

19  Q.  So, 2006, he hears on the radio about why you don't have

20  to pay taxes.

21  A.  Correct.

22  Q.  Do you recall that year?

23  A.  Yes, he pinpointed that.

24  Q.  But in terms of taking action on those beliefs, we have

25  2009 as the year in which he files the 2006 and 2007 non-

1   resident alien returns.

2   A.  Okay.

3   Q.  So, that's in 2009.  So, if we used 2009 as a clear

4   manifestation that he had adopted sovereign citizen beliefs,

5   would you agree that those sovereign citizen beliefs

6   continued from 2009 until the present?

7   A.  Yes.

8   Q.  And in terms of Dr. Weber's somatic complaints, for

9   example, memory issues, dizziness, the mercury poisoning, the

10  router issue, which was more recent, I believe.

11  A.  Pancreatic damage due to the radiation.

12  Q.  Due to the router, right.  But those somatic complaints,

13  they began several years before you ordered the MRI of the

14  brain, correct?

15  A.  Yes.

16  Q.  Okay.  And yet -- so, we have these sovereign citizen

17  beliefs and the somatic complaints, all of which precede the

18  conducting of the MRI by a number of years and yet, there's

19  no evidence on the MRI of any cognitive issue?

20  A.  Well, there's no obvious reason.  There's only a limited

21  number of things you are going to be able to see on imaging,

22  but none of those were --

23  Q.  But you diagnosed him with a cognitive disorder, correct?

24  A.  Correct.

25  Q.  And it's not based on sovereign citizen beliefs that

1    existed for a number of years before the MRI?  I mean, there

2    would be some -- if the basis of the cognitive disorder is

3    the belief -- his personal beliefs relative to sovereign

4    citizenry and his personal beliefs as to his somatic and

5    health-related issues, then nothing physiological changed

6    from 2009 to 2016 when he had an MRI and there's still no

7    evidence on the MRI?

8    A.  So, we don't know that.  I mean, he has not had a real

9    medical workup in years.  So, you may not see something on

10   neuro images.  There may be other things that are causing

11   these cognitive problems.  We don't know.  He had not gone to

12   a regular doctor or had a regular medical workup.

13   Q.  But, again, we're talking about cognitive disorders,

14   we're talking about diagnostic tools that include an MRI and

15   we're talking about another diagnostic tool which is

16   neuropsychological testing, correct?

17   A.  Correct.

18   Q.  Those are the tools that are used to determine whether

19   somebody has a neurocognitive disorder?

20   A.  Well -- and it's also about clinical history and the

21   nature of the progression of the symptoms.  You don't always

22   see cognitive problems on an MRI.  Psychiatric diseases in

23   general are pretty low as far as being obvious on imaging, in

24   general.  You don't see mental illness, you don't see

25   cognitive illness in a picture.  We're not there yet.

1   Q.  And when you diagnosed him with a cognitive disorder, you

2   diagnosed it as an unspecified cognitive disorder, correct?

3   A.  Correct.

4   Q.  And that's because it does not fit into any category of

5   cognitive disorders that's typically set forth in the DSM,

6   correct?

7   A.  It's not clean cut.

8   Q.  Because there is no evidence in an MRI?

9   A.  But you wouldn't say that somebody doesn't have a

10  cognitive disorder just because they have a normal MRI.  You

11  wouldn't say that.

12  Q.  But most cognitive disorders are things like dementia and

13  Alzheimer's and whatever other diseases you mentioned that

14  actually do have changes in the brain?

15  A.  Well, some of them do.  Some of them are developmental

16  disorders and don't really have any obvious imaging changes

17  at all.  People are -- you know, have cognitive difficulties.

18  They are intellectually what used to be called mental

19  retardation.  But intellectual functioning, you can't see

20  that on a MRI or a CT scan.  You don't say that there's

21  nothing wrong with them.

22  Q.  So, then presumably, the neuropsychological testing would

23  exhibit some sort of sign of a cognitive weakness or a

24  cognitive disorder?

25  A.  Not necessarily.

256

1   Q.   Okay.  So, there's no way to know whether somebody has a

2   cognitive disorder?

3   A.   I look at the history and the progression of somebody's

4   behavior and thought process and that history is given a lot

5   of weight in this case.

6   Q.   All right.  But we talked a little bit about the history

7   and in terms of the part of the history that you thought was

8   important was that he had no motivation for latching on to

9   sovereign citizen beliefs and it turns out that he did have a

10  motivation because the IRS was focused on him beginning in

11  2004.

12  A.   Okay.  I have already said that I didn't have any

13  information relating to that, so I can't comment on that.

14  Q.   You can't comment on that because you don't have

15  information, but it is relevant to whether or not your

16  understanding of the manifestation of this ideology in him is

17  correct?

18  A.   It could be.

19          MR. COMERFORD:  Objection.  If I could just note our

20  objection that the only evidence as to Mr. Weber's taxation,

21  you know, whether he filed stuff or didn't prior to 2006,

22  2005, 2004, 2003 is what's present in Ms. Kresse's question,

23  and it's -- to the extent she's assuming facts that aren't in

24  evidence in making that question, we'd object to that, Judge.

25          THE COURT:  Overruled.

```
 1          MS. KRESSE:  Thank you, Judge.
 2   BY MS. KRESSE:
 3   Q.  And you talked about, I believe on your direct
 4   examination, that Mr. Weber began adopting sovereign citizen
 5   beliefs over time.  It was gradual, it was not immediate.  Do
 6   you recall that?
 7   A.  Yes.
 8   Q.  Isn't it true that in the literature and in particular
 9   the Parker article that talks about competency and sovereign
10   citizens that a display of sovereign citizen beliefs over
11   time, gradual, not immediate, means -- is indicative of it
12   not being a psychological disorder?  In other words -- I'll
13   just ask that question.
14   A.  Can you -- are you looking at a specific part of that
15   article?
16   Q.  You have read the Parker article, correct?
17   A.  Yes.
18   Q.  I just want to take the time to find it in this article,
19   but what I will do is direct your attention to the talk that
20   you gave in Colorado in October of 2017.
21   A.  Yes.
22   Q.  And the audio of that has been marked as Government
23   Exhibit 4, correct?
24   A.  I don't know, but, yes it's been marked.
25          MR. COMERFORD:  That's the right number.  Yes.
```

                                                                    258

1            MS. KRESSE:  All right.

2    BY MS. KRESSE:

3    Q.  One of the speakers at that -- what would you call it?

4    Would you call it a symposium?  Would you call it a group

5    discussion?

6    A.  It was labelled a panel.

7    Q.  A panel.  One of the speakers at the panel was

8    Dr. Parker, the author of Government Exhibit 4, which is

9    "Competence to Stand Trial Evaluations of Sovereign Citizens:

10   A Case Series and Primer of Odd Political and Legal Beliefs".

11   Correct?

12   A.  Right.

13   Q.  And do you recall -- and were you there -- were you

14   present for Dr. Parker's portion of the presentation?

15   A.  Of course.

16   Q.  And do you recall that he described the adoption of

17   individuals of sovereign citizen beliefs is akin to a

18   religious conversion?

19   A.  He may have said something like that.

20   Q.  But you don't recall it specifically?

21   A.  I don't know that specific language, but he may have said

22   something along those lines.

23   Q.  Do you recall that he said that once a person adopts

24   sovereign citizen beliefs, it becomes their lifestyle?

25   A.  Yes.

1    Q.  Do you recall that he said that each sovereign citizen is

2    uniquely different?

3    A.  Yes.

4    Q.  Okay.  And that each individual sovereign citizen

5    presents with his or her own assembly of the beliefs that

6    make sense to him or her?

7    A.  Yes.

8    Q.  And in general, when you are talking about delusional

9    disorders, is a delusional disorder something that comes on

10   quickly?

11   A.  It can.  It does not necessarily have to be, you know,

12   one day or one week.  It can certainly happen gradually over

13   time.  And it's hard to know because individuals with

14   delusional disorder often are under the radar for a long

15   period of time before coming to anybody's attention.  So,

16   it's really not clear that all of those are necessarily quick

17   onset.

18   Q.  Okay.  So, delusional disorder can happen over time?

19   A.  They can.

20   Q.  Now, you interviewed -- re-interviewed the defendant on

21   August 22nd of 2017.  Do you recall that?

22   A.  Yes.

23   Q.  And at that time, you spent two and a half hours with

24   him?

25   A.  Yes.

1    Q.   Now, your report was not submitted until -- submitted to

2    the defense until November of 2017?

3    A.   Correct.

4    Q.   And that was -- and so, the date on that report and

5    that's Government Exhibit 3, is November 2nd of 2017, just so

6    you have that in front of you?

7    A.   Yes.

8    Q.   So, you interview Dr. Weber for a second time on August

9    22, 2017 and don't issue the report until after you

10   participate in the panel at the conference in October of

11   2017, correct?

12   A.   Yes.

13   Q.   And so, you had the benefit in preparing your addendum of

14   the various presentations during that panel discussions?

15   A.   Well, I had already had ongoing discussions with the

16   panel presenters for months leading up to this.  The panel

17   presentations are put together at least six months in advance

18   as far as submitting a topic and preparing materials and

19   because I was the one that proposed the panel presentation, I

20   reached out to the other presenters to discuss what we would

21   include, which included putting this particular case in as a

22   very specific example to discuss.  So, I -- there was nothing

23   new from that panel in October if -- that I didn't already

24   know.

25   Q.   Okay.  And again, trying to understand the basis for your

1    opinion that Dr. Weber falls outside of the norm of sovereign

2    citizens.  If you go to the Parker article, Government 4 and

3    specifically page 346 of that article, in the left column, do

4    you see the heading "Discussion"?

5    A.  Yes.

6    Q.  And then do you see, it's about almost halfway down in

7    that first paragraph under the heading "Discussion", it

8    reads, "it therefore appears likely that there is no typical

9    sovereign citizen."  And you agreed with that?

10   A.  Correct.

11   Q.  Okay.

12          THE COURT:  Where are you reading from?

13          MS. KRESSE:  Page 346 of the article, Judge.

14          THE COURT:  Right.

15          MS. KRESSE:  And then under the heading on the left-

16   hand column, do you see "Discussion" in bold?

17          THE COURT:  I'm there.

18          MS. KRESSE:  It is the third full sentence beginning

19   "It therefore appears".

20          THE COURT:  Oh, okay.  I got you.

21   BY MS. KRESSE:

22   Q.  And then, with a semicolon, it says, "rather there is a

23   core group of beliefs that are adopted and adapted by each

24   sovereign citizen."  And you are aware that Dr. Parker used

25   as a basis for this article nine case studies that he

1    personally performed, right?

2    A.  Correct.

3    Q.  And he goes on to write, "Within the case series, all but

4    one of the sovereign citizen defendants referred to for

5    competence evaluations were male, reasonably well-educated,

6    most were middle-aged, which is consistent with what little

7    is known about sovereign citizens.  None of them had a known

8    history of psychosis.  And of the six who cooperated with the

9    evaluation, most appeared to have a relatively normal

10   upbringing.  None showed any significant cognitive disorders

11   on mental status examinations.  From a clinical perspective,

12   the defendants in this group were unremarkable."  Doesn't

13   that sound just like Mr. Weber?

14   A.  It's very similar to Dr. Weber, yes.

15   Q.  So, you participated in this conference in October of

16   2017, and then you submit the report and it's dated November

17   2nd, 2017.  And again, this is Government Exhibit 3, correct?

18   A.  Correct.

19   Q.  And in the addendum, you change your diagnosis from your

20   first report, correct?

21   A.  Yes.

22   Q.  And you change your diagnosis to a cognitive disorder

23   unspecified?

24   A.  Correct.

25   Q.  And is that because you realized that, in fact,

1   Mr. Weber's sovereign citizen beliefs are not delusional for

2   purposes of that diagnosis?

3   A.  The beliefs regarding the sovereign citizenship are not

4   necessarily delusional; although, I do believe that some of

5   the beliefs that he has surrounding that are so idiosyncratic

6   and specific to him that they could be called delusional;

7   specifically the family history and the family lineage that

8   he talks about, but I do still believe there is delusional

9   beliefs here.

10  Q.  In the sovereign citizen arena?

11  A.  In the sovereign citizen arena as well as somatic

12  preoccupation.

13  Q.  And going back to the one example of sovereign citizen

14  belief that you think is idiosyncratic, he talked about

15  tracing the lineage, correct?

16  A.  Mm-hmm.

17  Q.  But isn't that a very typical sovereign citizen analysis

18  where they study and they want to be able to trace themselves

19  back as far as possible so that they can show that they are a

20  sovereign citizen and not a United States citizen?

21  A.  It is, but in his case, he was very specific about where

22  he was getting that lineage.  It seemed a bit disorganized

23  the way he was presenting it.

24  Q.  Is that because you didn't understand what he was saying

25  in terms of how he traced it?

1  A.  You could understand what he was saying, you just

2  couldn't logically connect where he was going with it.

3  Q.  But --

4  A.  It was difficult to understand, so there was some

5  disorganization in how he approached that.

6  Q.  Isn't that the same as all sovereign citizen beliefs;

7  like the idea that although you are born and raised in

8  Buffalo, New York, you are not a citizen of the United

9  States?  I mean, that does not make sense.

10  A.  Right.  I mean, it's definitely a broadly-held theme

11  within the sovereign citizen culture.

12  Q.  I'm sorry.  I don't --

13  A.  It's a broadly-held theme belief that that culture has.

14  Q.  Right, the lineage issue?

15  A.  Right.

16  Q.  And being able to trace yourself back to as far back as

17  possible, the Revolution, if you can?

18  A.  Right.

19  Q.  And some sovereign citizens go all the way back and they

20  talk about Britain and what their relationship to Britain

21  before the Revolution was, correct?

22  A.  Yes.

23  Q.  Okay.  Now, in your addendum, you conclude that the

24  defendant is not competent to represent himself at trial,

25  correct?

1  A.  Correct.

2  Q.  But you don't specifically opine on the issue of whether

3  he is competent to stand trial, do you?

4  A.  Well, here's the issue.  The question of competency came

5  up after the first report was submitted.  The question was,

6  is he competent to proceed with trial.  There was a lot of

7  back and forth as to whether Dr. Weber was being cooperative

8  with counsel or not and whether he would allow counsel to do

9  certain things or not and opined that my competency opinion

10  would be conditional based upon whether he would accept

11  certain recommendations of counsel.  So --

12  Q.  And where was that conditional opinion?

13  A.  In the second report.

14  Q.  In the second report?

15  A.  In the second report, I addressed that.

16  Q.  Right.  So, if we go to Government Exhibit 3 and I

17  believe maybe page 8.

18  A.  It is on page 11, it starts.  Second paragraph.

19  Q.  Yes.  Okay.  And then, that's the sentence that reads --

20  so, again, Your Honor, we're on Government Exhibit 3, page

21  11, the second full paragraph beginning, "With regard to" and

22  I can read that for you.  "With regard to assisting in his

23  defense, I opined that his competency was conditional

24  depending on whether or not he would accept the introduction

25  of a mental health diagnosis as a possible defense."  That's

1    what you are referring to, right?

2    A.   Correct.

3    Q.   So, where had you opined that before?

4    A.   Well, I had discussions with counsel about that.  They

5    did not want a competency opinion at the time of the first

6    report.  That report was merely for diagnostic opinions.  So,

7    we had discussions between the time the first report was

8    prepared and the second report was prepared as the case

9    evolved as to whether the behavior of Dr. Weber was being

10   competent or not.  And competency is fluid depending on

11   what's happening, so that's where the conditional comes.

12   Q.   So, to be clear, in your first report, which is

13   Government Exhibit 2, there's no discussion at all about

14   Mr. Weber's competency to stand trial or to represent

15   himself, correct?

16   A.   Correct, because they did not want that opinion at that

17   point.

18   Q.   You were not asked to do that?

19   A.   I was not asked to put that opinion in a report.

20   Q.   Okay.  Did you, in fact, make an assessment at that time

21   of Mr. Weber's competence to stand trial?

22   A.   I asked questions that would be relevant to that

23   assessment.  Yes, I did.

24   Q.   And is it fair to say that based on the questions that

25   you asked that are relevant to that assessment that -- as of

1  your first report, you would have found Mr. Weber competent

2  to stand trial?

3  A.  It was conditional based on whether he would allow

4  counsel to introduce certain evidence that would be favorable

5  to him and whether he would contemplate certain scenarios

6  that might be favorable to him.  And he was ambivalent and

7  refused to discuss certain things that would confirm or deny

8  whether he was truly on board with those things.

9  Q.  And is that based on subsequent information you obtained

10  from defense counsel relative to his dealings with the

11  defendant?

12  A.  In part, yes.

13  Q.  Okay.  Because if we go to Government Exhibit 2, which is

14  your October 30th, 2016 forensic examination and

15  specifically, I'll direct your attention to page 8.

16       THE COURT:  This is exhibit -- which exhibit?

17       MS. KRESSE:  Exhibit 2, page 8.  And I am just going

18  to pick out some things here that are relevant to competency

19  issues.

20  BY MS. KRESSE:

21  Q.  You found under "Mental Status Examination", which is at

22  the bottom of page 8, that Dr. Weber's thoughts were well-

23  organized, correct?

24  A.  In a grammatical sense.

25  Q.  What does that mean, in a grammatical sense?

1   A.  Well, I could understand the words and the sentences that

2   he was saying, but they did not logically make a lot of sense

3   sometimes.

4   Q.  Right, because sovereign citizen beliefs don't really

5   make sense to the rest of us, do they?

6   A.  Well, not only the sovereign citizen, but also the health

7   issues and the workup and the stuff that he was dealing with

8   from a medical standpoint was pretty bizarre.

9   Q.  And that's his belief that he had mercury poisoning, for

10  example?

11  A.  Well, at that point, the mercury poisoning had taken a

12  backseat.  At that point, he was talking about pancreatic

13  dysfunction and carbohydrates being metabolized.

14  Q.  Well, that happened in the second assessment, didn't it?

15  A.  Correct.

16  Q.  But in the first assessment when we're talking about --

17  A.  Oh, I'm sorry.  You're talking about the first

18  assessment.  At that point, it would have been the mercury

19  poisoning and the reflex muscle testing and the bentonite

20  clay and other types of things he was doing at that point.

21  Q.  And in that regard, would you not agree that there are

22  many people in this country who subscribe to non-medical,

23  non-traditional treatments for various real and imagined

24  physical ailments?

25  A.  There are many people, but they are not dentists who are

1  scientifically trained and don't have a history of believing

2  in this.  This is a big departure for somebody who should

3  know better.

4  Q.  So, in your opinion, a dentist should be absolutely

5  like -- let me phrase this better.  In your opinion, no

6  dentist or no doctor could subscribe to non-traditional

7  medical treatment?

8  A.  I'm not saying that.

9  Q.  It is what you said.

10 A.  The things he is subscribing to are so far out there as

11 having any scientific validity that it would absolutely raise

12 questions as to why somebody would believe that.

13 Q.  But there is such a thing as mercury poisoning, isn't

14 there, because you asked on the MRI that they have a protocol

15 to identify that?

16 A.  There were a couple of reasons for that.  Did I expect

17 them to find mercury poisoning on the MRI?  No.  I was

18 interested to see what Dr. Weber would do with that

19 information, whether he would let that go based on evidence

20 that there wasn't evidence of mercury poisoning in the MRI,

21 number one.

22        And number two, if there was a rare -- you know, the

23 rare bird, the zebra and it did have mercury poisoning, then

24 we would have some confirmation of that.  Obviously, I didn't

25 expect that to be the case.  I was more interested to see how

1    Mr. Weber would react to the no findings of mercury poisoning

2    on the MRI that he was so convinced of.  He let that go and

3    put it on the backseat, but replaced that with other bizarre

4    somatic beliefs that have no basis in reality that we know of

5    either.

6    Q.  But you understand the ramification of a statement that a

7    dentist or somebody with some sort of medical training

8    couldn't possibly believe that he or she had mercury

9    poisoning, I mean, how did you prove that?

10   A.  Well, if that were truly an occupational hazard to

11   dentistry, as Dr. Weber believes it was and that's how he

12   acquired it, we would have an epidemic of mercury poisoning.

13   That doesn't exist.

14   Q.  So, smart people who should know better should not have

15   any delusions about their health?  That's what you are

16   saying?

17   A.  No.  I am saying that they are vulnerable to developing

18   delusions.  I mean, he is not immune to developing some kind

19   of cognitive disorder or psychiatric disorder that has

20   delusions as part of the symptoms.  He's not immune to that

21   because he's high functioning and intelligent to begin with.

22   I'm saying it is very concerning and unusual that somebody

23   with his background starts believing this without seriously

24   questioning it.

25   Q.  So, a regular educated, smart person who is not medically

1    trained, if they believe in some sort of homeopathic remedy

2    for some make-believe ailment, that's not delusional.  But as

3    soon as you have somebody who has some medical training and

4    should know better, because of their medical training, that

5    person is delusional?

6    A.   I think it depends on how they understand that and how

7    much impact it is having on their life.

8    Q.   And what impact did that have on his life?  He said he

9    was feeling better with his homeopathic remedies, didn't he?

10   A.   He made some other changes that might explain why he was

11   feeling better, or he may have had the placebo effect from

12   the homeopathic remedy that he was using.

13   Q.   But that's not relevant though, is it?  The bottom line

14   is he felt better.  He felt that the steps that he was taking

15   made him feel better, correct?

16   A.   He said so.

17   Q.   And that's what he reported to you?

18   A.   He reported that.

19   Q.   Okay.  And one of the things that -- in terms of somatic

20   complaints, one of the things that becomes relevant in terms

21   of whether those somatic complaints are delusional or not is

22   what impact that actually have on your life, correct?

23   A.   Correct.

24   Q.   Do they impair your ability to function, correct?

25   A.   Correct.

1  Q.  And Dr. Weber's somatic complaints do not impact his life

2  because he feels better, he does not see them as an issue?

3  A.  They impacted his life plenty.  In fact, right after he

4  had the MRI, he developed new somatic complaints for several

5  weeks after, complaining of things he attributed to the MRI

6  that could not possibly be introduced by the MRI and he went

7  back to the naturopathic doctor to get yet another supplement

8  to treat these vague complaints and then got diagnosed with

9  carbohydrate dysfunction due to his pancreas not working.

10  Q.  Yes, but then he took algae and he felt better?

11  A.  He says.

12  Q.  Well, that's what it's about, his subjective statements

13  to you; that's how you analyze whether somebody is delusional

14  in their somatic complaints, you have to go by what they tell

15  you, correct?

16  A.  I'm saying his concern about the pancreatic dysfunction

17  and carbohydrate metabolism is gone.  He feels better.  He

18  still has that belief.

19  Q.  But let's look at the totality of his somatic complaints.

20  The purpose of this proceeding is to determine -- is to

21  determine whether Mr. Weber is competent, first of all, to

22  stand trial, correct?

23  A.  Correct.

24  Q.  And there is nothing in his somatic complaints for which

25  he feels better that rendered him not competent to stand

1  trial, correct?

2  A.   No, not specific, no.

3  Q.   No.  And in terms of his sovereign citizen beliefs, there

4  is nothing about that set of ideological beliefs that he puts

5  in papers and that he wants to advocate in front of this

6  Court that render him not competent to stand trial, correct?

7  A.   Well, I think that's up for debate.  He certainly plans

8  to draw on that.  If this proceeds eventually, he certainly

9  plans to draw on those concepts as part of his defense, which

10  is problematic.

11  Q.   Well, it's problematic in your opinion because you see it

12  as a losing argument, correct?

13  A.   It's a losing argument.  It also prevents him from seeing

14  other possible avenues of working his case or defending

15  himself.

16  Q.   And you talk about the good faith defense?

17  A.   I don't know that I did, but in which report?

18  Q.   In your report and you also mentioned a few moments ago

19  about your conditional competency finding, that it was

20  conditioned on whether or not he would allow the mental

21  issues to be formulated in support of a good faith defense?

22  A.   Correct.

23  Q.   Do you recall that?

24  A.   Yes.

25  Q.   Okay.  Because I don't want to put words in your mouth.

1   So, are you aware that a defendant can present a good faith

2   defense regardless of whether he or she has mental issues?

3   A.  Yes.

4   Q.  Okay.  So, Mr. Weber's decision as set forth in your

5   report that he does not want to talk about his mental health

6   because he does not think he has a problem, does not mean

7   that he will be unable to argue a good faith defense in front

8   of the jury, does it?

9   A.  I don't know.  I assume that's more of a legal question

10  between him and his attorney, whether it has merit or not.

11  Q.  But your decision regarding competence was based on the

12  fact that you thought that he would not be able to make that

13  defense?

14  A.  In part.  There were other things that would be

15  problematic that would condition his competency too, but

16  certainly that was a big part of it.

17  Q.  If we look at your report, Government Exhibit 3, the only

18  thing you say here and this is the paragraph beginning, "With

19  regard to assisting in his defense", you said, "I had opined

20  that his competency was conditional depending on whether or

21  not he would accept the introduction of mental health

22  diagnosis as a possible defense."  That's the only thing that

23  you say?

24  A.  Well, the other thing that was in the first paragraph I

25  address is a few other issues that could be relevant to the

CERVANTES -- MS. KRESSE -- 01/23/18

275

1   competency as well.  That includes issues with plea

2   bargaining and issues about providing information that he

3   proposes his attorney use and wouldn't really go into detail

4   as to what it was, but eluded to the fact that if his

5   attorney refused to use the information that he wanted to use

6   that he would ask the attorney to go off the case.

7   Q.  But, again, that goes to issue number two, which is

8   whether or not he is competent to represent himself, correct?

9   A.  Well, it goes to assisting in your defense, but if you

10  are not competent generally, I think the -- you know, then

11  competency pro se is a higher bar, so, if he's not competent

12  to work with an attorney, then he is not competent to

13  represent himself, either.

14  Q.  Well, is that necessarily the case?  Well, if you are not

15  competent to stand trial, then you're not competent to stand

16  trial?

17  A.  Correct.

18  Q.  And in fact, if somebody is found not competent to stand

19  trial, they end up going into a hospital, essentially

20  incarcerated in a mental facility for a period of up to four

21  months, correct?

22  A.  Correct.

23  Q.  And is Mr. Weber somebody who would be benefitted from

24  some sort of treatment, whether it's medicinal or otherwise,

25  that would somehow -- I can't think of the right word, not

1    reform him, but restore him to mental competency?

2    A.   It is possible.  I do think that's it's possible that a

3    trial of an antipsychotic may be beneficial.  We don't know

4    because Dr. Weber has never taken any of those medications.

5    Because this has been going on for so many years, that's

6    usually a poor prognostic sign as far as restoring somebody,

7    is you are treating delusional beliefs, but it's possible,

8    and that's really the -- the only way to know is to try.

9    Q.   Right.  So, it is your opinion that -- in believing

10   that -- in your medical opinion that he is not competent to

11   stand trial, that he should, in fact, be placed someplace, in

12   a mental facility, where he can be evaluated and where

13   treatment could be imposed on him?

14   A.   Right.  And just to clarify, I think that, again, a more

15   thorough medical workup needs to be done, because he has not

16   seen a regular physician.  He's not had a thorough workup

17   of -- for cognitive -- for medical reasons that could cause

18   cognitive impairment.  He has not had any record of this

19   being done.  I think it's worthwhile having more thorough

20   neuropsychological testing and possibly a trial of an

21   antipsychotic medication.

22   Q.   Okay.  You would agree that the standard for determining

23   whether somebody is competent to stand trial is pretty low,

24   isn't it?

25   A.   It is.  It's a lower threshold.

1    Q.   Right.  And it's a pretty low threshold in terms of what

2    has to be demonstrated, correct?

3    A.   Yes.

4    Q.   So, it is whether the defendant has a rational as well as

5    factual understanding of the proceedings against him?

6    A.   Correct.

7    Q.   And whether the defendant has sufficient presentability

8    to consult with an attorney with a reasonable degree of

9    rational understanding.  That's the second component,

10   correct?

11   A.   Correct.

12   Q.   And you talked a little bit about the ability to consult

13   with an attorney, but clearly even in your observations here

14   over the course of the last two days of this hearing, that

15   Mr. Weber has been able to consult with his attorney and work

16   with his attorney, Mr. Comerford, relative to and in

17   conjunction with this hearing?

18   A.   Well, I don't know.  I think you'd have to ask

19   Mr. Comerford that.  I don't know what all has been said or

20   what all Dr. Weber wishes Mr. Comerford to bring forth.

21   My -- in my conversations with Mr. Comerford, Mr. Comerford

22   was not optimistic that anything that Dr. Weber wanted to

23   present was going to be particularly helpful in his defense.

24   Q.   Well, that may be because his legal beliefs are not

25   beliefs that anybody else except sovereign citizens adhere

1    to, right?

2    A.  It is true, but it's also this inability to really take a

3    look at what other options there are; again, this ability to

4    shift cognitively to a different strategy that's really

5    missing.

6    Q.  Well, during the course of this hearing -- and obviously,

7    you were not here for most of the proceedings on Friday, but

8    certainly you have been here today and you've been able to

9    observe Mr. Weber here -- he has not been disruptive in any

10   way to the Court or to the proceedings, correct?

11   A.  Correct.

12   Q.  He's allowed Mr. Comerford to ask you questions on direct

13   examination, correct?

14   A.  Correct.

15   Q.  He has allowed -- without any sort of issues or outbursts

16   or demonstrations of any kind, he's allowed me to ask

17   questions in cross-examination of you, correct?

18   A.  Correct.

19   Q.  And so this is demonstrative, is it not, of a person who

20   is able at this moment to work with his attorney in this

21   context?

22   A.  I don't think that what's only happened today is the only

23   thing that needs to be considered.

24   Q.  Well, as you said, competency is fluid?

25   A.  It is.

1  Q.  And one of the considerations -- and now we're jumping

2  ahead a little bit.  One of the considerations in determining

3  if somebody is competent to represent them self, which in

4  your opinion Mr. Weber is not, but one of the considerations

5  is their ability to sit in a courtroom without disrupting the

6  proceedings, correct?

7  A.  That's one consideration.

8  Q.  But it is a consideration?

9  A.  Sure.

10  Q.  Okay.  And Mr. Weber has done nothing but sit there

11  appropriately and listen to the proceedings in this case for

12  hours, correct?

13  A.  Correct.

14  Q.  But going back to just competency to stand trial, because

15  if we don't get past that, then it does not matter whether

16  he's competent to represent himself.  In your first -- I'm

17  sorry -- in your addendum, which is Government Exhibit 3, at

18  the top of the page 11 -- this is a paragraph that you

19  referred to a few moments ago -- you talked about during the

20  first evaluation how Mr. Weber had -- Dr. Weber had

21  demonstrated the rational and factual understanding of his

22  charges, correct?

23  A.  A factual understanding of his charges.  Rational -- yes,

24  at the beginning he did; he did, yes.

25  Q.  Because I am actually just reading from your report.

1   A.  Yes.

2   Q.  Okay.  So, what you said is, Dr. Weber demonstrated a

3   rational and factual understanding of his charges.  Okay.

4   And you set forth what he says about what the government's

5   point of view is, correct?

6   A.  Correct.

7   Q.  And then you set forth, he stated that the charges are

8   serous.  So, he understands the seriousness of the charges?

9   A.  Yes.

10  Q.  He understands that he could be sent to prison for up to

11  two and a half years if found guilty, correct?

12  A.  Yes.

13  Q.  And all of these things are relevant to the determination

14  of whether he is competent to stand trial?

15  A.  Yes, they are.

16  Q.  And you are not suggesting that sitting here today

17  Mr. Weber suddenly doesn't know how serious this offense is,

18  does he?  I mean, that has not changed?

19  A.  Not that I know of.  Not since I saw him last.

20  Q.  So, he still understands what the charges are against

21  him?

22  A.  Right.  The factual understanding has never been an

23  issue.

24  Q.  One of the other factors and you address it in your

25  report, is that Dr. Weber understood the roles of a defense

1   attorney, the United States Attorney, the Judge, jury and

2   witnesses, correct?

3   A.  Yes.

4   Q.  And that's important to whether he is competent to stand

5   trial, correct?

6   A.  It is.

7   Q.  And has he -- based on your subsequent interview of him

8   for two and a half hours, did he give you any indication that

9   he no longer understands the roles of defense attorneys, the

10  Court, the prosecution?

11  A.  He understands the roles, but he no longer believes that

12  he is able to use the services of the public defender.

13  Q.  I know --

14  A.  So, he's shifted a little bit there.

15  Q.  I understand that, but that's conflating the issue.

16  That's talking about then whether or not he can represent

17  himself.  The only thing that I asked is, it's something that

18  is very relevant to whether somebody is competent to stand

19  trial.  It's the factor that you, yourself, set forth in your

20  report, "He understands the role of the defense attorney, the

21  United States Attorney, the Judge, the jury and witnesses",

22  correct?

23  A.  Correct.

24  Q.  Okay.  Now, what you are getting to is that now although

25  he understands what the role of the defense attorney is, he

1   is choosing or wants to choose not to avail himself of those

2   services, correct?

3   A.  That is correct.  That is correct.

4   Q.  In terms of -- and you address the whole issue, the

5   second part of competency to stand trial, of assisting in his

6   defense and you say in that same paragraph, "With regard to

7   assisting in his defense, he understands the concept of a

8   plea bargain."

9   A.  Yes.

10  Q.  And granted -- then, you go on to say how there is

11  information and defense-oriented arguments that he wants to

12  be able to make and he realizes that his defense counsel is

13  not or may not be willing to make those arguments, correct?

14  He understands that?

15  A.  Yes.

16  Q.  So, that demonstrates an understanding on his part that

17  his legal arguments are not arguments that are accepted by

18  the Court and by counsel, correct?

19  A.  He demonstrates an understanding that historically, those

20  arguments have not succeeded, but he was absolutely convinced

21  that in his particular case they would succeed.

22  Q.  Right, because he believes that if he's allowed to make

23  the arguments, that he'll be successful?

24  A.  He does believe that.

25  Q.  He understands that historically those arguments have not

1  been winners?

2  A.  He says he understands that, yes.

3  Q.  Did you --

4  A.  Well, he's done the research and he agreed when I

5  confronted him with that, yes.

6          THE COURT:  Let's take a 15-minute break.  Court will

7  be recess.

8          THE CLERK:  All rise.

9  (A recess was taken from 2:39 to 2:55 p.m.)

10          THE CLERK:  All rise.  You may be seated.

11          MS. KRESSE:  Thank you, Judge.

12  BY MS. KRESSE:

13  Q.  Dr. Cervantes, in talking about your concerns regarding

14  Dr. Weber's ability to stand trial and represent himself, you

15  talk about the switch in his thinking away from using the

16  public defender.  Do you recall the question or do you want

17  me to re-ask it, the switch?

18  A.  The switch from wanting to work with a public defender?

19  Q.  Yes.

20  A.  Yes.

21  Q.  And so, we were talking about that before the break.

22          THE COURT:  Keep your voice up, please.

23          MS. KRESSE:  I will, Judge.  Thank you.

24  BY MS. KRESSE:

25  Q.  And in fact, in your addendum, which is Government

1    Exhibit 3, there's a whole section of your opinion regarding

2    competency about the decision to -- or desire to represent

3    himself going forward to trial, correct?

4    A.  Correct.

5    Q.  Okay.  Now, the notion of not using a public defender,

6    are you aware that that in and of itself is sort of a typical

7    sovereign citizen belief?

8    A.  It is.  And it's generally -- even if you are not a

9    sovereign citizen, it's not an uncommon thing that comes up.

10   Q.  The desire to represent yourself?

11   A.  Represent yourself, yes; pro se, yes.

12   Q.  And for a sovereign citizen and typical of Dr. Weber

13   because he does not believe he's a federal citizen, he does

14   not believe that a federal public defender is allowed to

15   represent him going forward, correct?

16   A.  Correct.

17   Q.  So, his desire to represent is kind of twofold.  One,

18   it's sort of a manifestation of his beliefs about the federal

19   government and also a desire on his part because he thinks he

20   can do it better than his attorney?

21   A.  Correct.

22   Q.  Okay.  And in terms of the second report, if you go to

23   Government Exhibit 3, the bottom of page 12, as it goes on to

24   page 13, is it fair to say that that last paragraph beginning

25   with the word "therefore" is your opinion that you stated in

1    this report?

2    A.   Yes, the word "opinion" is duplicated, but, yes.

3    Q.   Okay.  And if you can read that paragraph, please?

4    A.   Yes.  "It is my opinion that Dr. Weber is presently

5    suffering from a metal disease or defect rendering him

6    mentally incompetent to the extent that he is unable to

7    understand the nature and consequences of the proceedings

8    against him and to assist properly in his defense pursuant to

9    18 U.S.C. 4241(b).

10   Q.   Correct.  And that's the standard that you use when you

11   analyze somebody forensically relative to competence,

12   correct?

13   A.   Yes.

14   Q.   But in terms of that opinion, we just went through the

15   fact that as to the first part of the analysis, the

16   consequences of the proceeding, that Dr. Weber does

17   understand the consequences of the proceeding; that's there's

18   no evidence that that has changed since your first

19   evaluation?

20   A.   Well, no.  I would argue that he's believes that the

21   consequence is going to be a favorable outcome to him, if

22   things go the way he believes they should go.

23   Q.   True, but he understands the consequences if they don't,

24   that he faces two and a half years in jail, according to him?

25   A.   He can't even contemplate that it's not going to go his

1   way at this point.  He cannot incorporate that possibility

2   into his thinking right now.  He believes he is going to

3   succeed if he is allowed to proceed the way he wishes to

4   proceed, no two ways about it.

5   Q.  Isn't that the case of every sovereign citizen who has

6   these beliefs that they vociferously believe?

7   A.  Well, I don't know about every single sovereign citizen.

8   The other one that I evaluated recently certainly could look

9   at other options other than representing himself.

10  Q.  But, again, other than representing himself, so you are

11  talking about representation and not about competence to

12  stand trial?

13  A.  Correct.  That person could also contemplate things not

14  having the outcome he desired, things not going his way.

15  Dr. Weber cannot envision any other outcome other than him

16  being successful.

17  Q.  Right, but he understands that if he's not successful --

18  A.  He does not.  He doesn't think that he's not going to be

19  successful at this point.

20  Q.  But if he understood in -- when -- your first evaluation

21  in 2016, if he understood then that -- what the charges were

22  and what the penalty was, there's no reason for him to

23  believe that the penalties and the crimes are any different

24  than they were before?

25  A.  He does not believe that the penalties for those crimes

1   are different per se.  He just does not believe it is going

2   to be a factor in his case at all.

3   Q.  Well, that may be, but the relevant analysis is whether

4   he understands the charges against him and he does understand

5   the charges.  He thinks he can beat them, but he understands

6   the charges?

7   A.  He understands the charges.  He believes he can beat them

8   and he does not see any other possible outcome, which is

9   problematic.

10          THE COURT:  What do you mean when you say "beat

11  them"; that he can beat the charges?

12          THE WITNESS:  That he's going to be acquitted, that

13  he will not be found guilty of any of these charges.

14          THE COURT:  Does he understand that he'll have to

15  follow the rules, not as he would like the rules to be, but

16  the way the Court must interpret them fairly and impartially

17  under the rules of evidence that the Court must apply during

18  the trial?

19          THE WITNESS:  I know that that's the way it's

20  supposed to be --

21          THE COURT:  Well, it is not the way it supposed to

22  be.  It's the way it's going to be.

23          THE WITNESS:  Right, but he does not believe that --

24  he has a vision of how he thinks it's going to go if he is

25  allowed to present what he wants to present and he believes

1   that if he's prevented from doing that because there's

2   objection or the Court does not allow something to be entered,

3   that his method of resolving that would be to appeal that to

4   the Supreme Court.  That's his answer to -- if you pose the

5   hypothetical that there might be a barrier to him introducing

6   something that he thinks is relevant, he's going to kick it up

7   to the Supreme Court.  Period.

8           THE COURT:  Okay.

9   BY MS. KRESSE:

10  Q.  But the things that the Judge is referring to are the

11  only things that are relevant to determining whether this

12  defendant is competent to stand trial.  He -- forget about

13  what he thinks is his success rate and about how good he will

14  be at presenting his case.  Does he understand that he is in

15  federal court?

16  A.  I think so.  I haven't talked to him recently but yes, he

17  understands he's in federal court.

18  Q.  He knows where he is, right?

19  A.  He knows where he is.

20  Q.  I mean, there is no suggestion that this individual is

21  not oriented to place and time?

22  A.  No, no.  No, I am not saying that.

23  Q.  And he understands that this is a federal court?

24  A.  Yes.

25  Q.  And that tax crimes are federal offenses, correct?

1    A.   I think he theoretically knows that.

2    Q.   That's all --

3         THE COURT:  Does he understand that he may be

4    convicted, that's it's going to be ultimately up to the jury

5    despite his beliefs?

6         THE WITNESS:  When I last spoke with him, he did not

7    believe that be could convicted.  He believes that his

8    argument has to be successful and would be successful.

9    BY MS. KRESSE:

10   Q.   Well, he also believes that this case is going to -- this

11   Court is going to throw out his case before it even gets to

12   the jury, isn't that right?  He didn't make that argument to

13   you?  He didn't tell you about that?

14   A.   Early on in one of the first two evaluations, he

15   mentioned that he thought that's what should happen.

16   Q.   Did he tell you that he went about a proceeding in state

17   court to change his name from capital Charles Weber to lower

18   case Charles Weber?

19   A.   He eluded to doing something like that and I found out

20   that that had actually happened because he had the papers

21   hand delivered to my home address on a Saturday morning in

22   person -- well, not him, but some person actually handed them

23   to me in person.

24   Q.   So, besides that, the bottom line is that you are aware

25   that he proceeded to change his name from capital letters to

1  small letters, correct?

2  A.  Correct.

3  Q.  And you know that that's typical sovereign citizen about

4  capital letters indicative of a corporation versus the lower

5  case letters, correct?

6  A.  Correct.

7  Q.  And but you're saying that Mr. Weber, when you talked to

8  him in August of 2017, did not tell you that based on his

9  name change that this Court, this federal court, would no

10  longer be able to exercise any jurisdiction over him because

11  he had remedied any issue about his citizenship?

12          THE COURT:  What do you mean his name change?

13          MS. KRESSE:  Mr. Weber, at some point during the

14  summer, submitted an application to State Supreme Court asking

15  for a name change and it was a name change from Charles Weber

16  in capital letters to Charles Weber in lower case letters and

17  for some reason, that petition or motion, whatever it was

18  termed, was granted.

19          THE COURT:  All right.

20  BY MS. KRESSE:

21  Q.  So, what I am getting at, Dr. Cervantes, is that

22  Dr. Weber is stubborn about his ability to be successful in

23  this case, correct?

24  A.  Correct.

25  Q.  But you don't know whether it's because he feels he can

1  convince the jury of that or because he has some legal

2  argument that's going to cause this Judge to throw his case

3  out?

4  A.  I am not sure we discussed at what stage he thought he

5  would be successful in either getting the case dismissed or

6  having being found not guilty.  I don't think we got into

7  that level of detailed discussion.

8  Q.  But there's a difference, right, in terms of your success

9  on the law and your success on a legal argument in front of a

10 jury.  They are two different things?

11 A.  Correct.

12 Q.  And you don't know what he was talking about?

13 A.  During the second -- the third interview that I had with

14 him, I don't recall if the case being dismissed was something

15 he discussed in detail.  I know that the name change papers

16 was something that he delivered after that.  So, I don't

17 remember the exact date of that actually being done, like the

18 name change being done.  He thought that would have some

19 benefit and merit.

20      What he did discuss was that if he were allowed to

21 present his arguments the way he wants to present them, he

22 would not be found guilty of what he was charged with.

23 Q.  And based on his determination to proceed with sovereign

24 citizen beliefs, you're finding that he is not competent to

25 stand trial because he does not understand the implications

1  of the case?

2  A.  Well, he does understand the implications.  He's not able

3  to consider other possible avenues that might actually be

4  helpful in his defense.  He's not willing to consult with an

5  attorney who can --

6  Q.  That's not the standard.

7  A.  Okay.  Well, are we talking about individually, going

8  pro se?

9  Q.  Well, we talked about going pro se, but it's not a

10  qualitative analysis.  It's not whether he will -- he can

11  meet with an attorney and advocate for something that's going

12  to work.  It's not about the quality of his argument.  It's

13  just about whether or not he understands the proceeding and

14  whether he can assist in his defense by very specific things.

15  Can he speak with his attorney, can he have -- can he comport

16  to the proper behavior in front of this Court.  And I

17  don't -- and your answer to that is what?

18  A.  I think it depends.  I think that's varied.  His ability

19  to communicate with his attorney has been variable over the

20  last year.

21  Q.  But you are being asked to decide and render an opinion

22  to a reasonable degree of medical certainty whether this

23  defendant is competent to stand trial --

24  A.  Right.

25  Q.  -- in front of this Court.

1    A.   Right.

2    Q.   That's what you are being asked to do first and foremost.

3    And it's not about whether or not he's -- it's a good idea

4    for him to represent himself.  That's not the issue.  The

5    issue is whether he understands what the charges are against

6    him?

7              MR. COMERFORD:  We object to Ms. Kresse telling the

8    witness what the issue is, what the standard is.  I think

9    it's -- I understand that it's tough with an expert witness

10   because we don't want to go on and on with questioning, but

11   this seems like just argument by the government.

12             THE COURT:  I agree with that.

13   BY MS. KRESSE:

14   Q.   Is it your opinion that Charles Weber during the trial,

15   assuming he has counsel, will be unable to understand what

16   the role of Judge Arcara is in terms of presiding over the

17   trial?

18   A.   No.  I think that he would understand that.

19   Q.   Is it your opinion that Mr. Weber will be unable to

20   understand what the role of the government as a prosecutor is

21   in terms of presenting the evidence through testimony of

22   witnesses?

23   A.   No, he would understand that.

24   Q.   And he would understand that there would be exhibits that

25   will be shown to witnesses, correct?

1    A.   Yes.

2    Q.   And he understands that his attorney, assuming he's

3    represented, would then have the opportunity to cross-examine

4    those witnesses and to impeach credibility.   He understands

5    that, correct?

6    A.   Yes.

7    Q.   He understands what the role of a defense attorney in

8    federal court is, doesn't he?

9    A.   I believe he does.

10   Q.   So, he understands that Mr. Comerford's role is to be his

11   attorney and to represent his best interests within the

12   parameters of the law?

13   A.   Correct, but there's a disagreement as to what that

14   should be, what those interests are.

15   Q.   And Mr. Weber understands that Mr. Comerford is better

16   versed on what the applicable law is as this Court is going

17   to follow, he understands that?

18   A.   I don't know, because at some point, he made argument

19   that he felt that he had done more research and had more

20   information and was in a better position to present the

21   arguments that need to be presented.

22   Q.   What I am referring to actually is the -- it's not so

23   much the type of the arguments, but the strategy presented,

24   that Brian Comerford, as his legal representative, would have

25   a better ability to have a strategy going forward within the

1    confines of a federal proceeding?

2    A.   I am not sure he believes that; that Mr. Comerford would

3    be better than he would be.

4    Q.   I direct you to Dr. Antonius' report, which is Government

5    Exhibit 1.  I just need to find the right -- bear with me for

6    a moment, please.  Oh, okay.  Page 13 of Government Exhibit

7    1, the last full paragraph on that page.

8    A.   Okay.

9    Q.   Okay.  Now, this was Dr. Antonius who interviewed and

10   evaluated Mr. Weber on four occasions between May 2017 and

11   July 2017 and I am just referring to the first page in terms

12   of the date of examination.

13   A.   Okay.

14   Q.   So, after those four occasions on which Dr. Antonius

15   evaluated the defendant, he stated that -- okay.  He

16   addressed the competency issue and he talks about -- do you

17   see the sentence that begins "With regard to his ability to

18   consult with counsel"?

19   A.   Yes.  Yes.

20   Q.   Okay.  And at that time, he said to Dr. Antonius that he

21   had talked about having considered representing himself,

22   however, he explained that he is hoping that he will do

23   better with an assigned attorney who better understands the

24   legal system.  Do you see that?

25   A.   Yes.

1   Q.   So, that's what Dr. Weber reported -- and let's just go

2   by the last date -- June 19 of 2017.

3   A.   Okay.

4   Q.   You interviewed him and re-evaluated him two months

5   later?

6   A.   Right.

7   Q.   And two months later, he no longer had an understanding

8   that an assigned attorney has a better understanding of the

9   legal system?

10  A.   I am not sure what is referred to by assigned attorney.

11  Q.   That's Mr. Comerford.

12  A.   Okay.  He does not deny that Mr. Comerford has an

13  understanding of the legal system.  Dr. Weber just cannot see

14  himself using that method for what he wants to do to present

15  evidence in this case.

16  Q.   As an example of Dr. Weber's trust in Mr. Comerford,

17  Dr. Antonius notes that Dr. Antonius [sic] went along with

18  the health evaluation, the mental health evaluation, even

19  though that he didn't believe it was necessary, correct?

20  A.   That's what it says.

21  Q.   And does that not indicate -- in addition to being

22  evaluated by Dr. Antonius, he was evaluated by you on two

23  separate occasions.  I mean, I am not talking about

24  individual occasions, but two separate periods of time?

25  A.   Correct.

1    Q.   Right.

2    A.   Yes.

3    Q.   And does Mr. Weber believe that he's not competent to

4    stand trial?

5    A.   No.  He does not believe that he is not competent to

6    stand trial.

7    Q.   Does Mr. Weber believe that he has a delusional disorder

8    of any type?

9    A.   No.

10   Q.   Does Mr. Weber believe he has a cognitive disorder of any

11   type?

12   A.   No.

13   Q.   Does Mr. Weber believe that he is competent to represent

14   himself?

15   A.   Yes.

16   Q.   Okay.  And yet, he allowed himself to succumb to

17   interviews by multiple mental health professionals as well as

18   subjected himself to multiple neuropsychological testing,

19   correct?

20   A.   Yes.

21   Q.   And that was at the advice of his attorney?

22   A.   Yes.

23   Q.   And you talk in -- now, I am going back to your second

24   report, Government Exhibit 3.  The second part of your

25   finding on page 1 is you say, "to assist properly in his

1  defense."  Do you see that?

2  A.  Yes.

3  Q.  But that's not the standard, is it?

4  A.  The "properly"?

5  Q.  Correct.

6  A.  Right.

7  Q.  Okay.  So, "the properly" is something that you added

8  because you think that's relevant?

9  A.  I do think that's relevant.

10  Q.  But that's not the standard under the law?

11  A.  Right.

12  Q.  Okay.  There is no requirement for competency purposes

13  that Mr. Weber's legal arguments make sense to anybody but

14  himself.

15        MR. COMERFORD:  Objection, Judge.  It's calling for a

16  legal conclusion, I think.

17        MS. KRESSE:  I don't think it is.

18        THE COURT:  Rephrase your question, Ms. Kresse.

19  BY MS. KRESSE:

20  Q.  Is there any requirement for purposes of assessing

21  somebody's competence that the argument that person wants to

22  make makes sense to other people?

23  A.  Well, an argument could be made that it could be self-

24  defeating to have something that does not make sense to other

25  people and that if someone is not able to properly articulate

1   a defense that other people can understand, they're not going

2   to benefit from that.  So, it could be one aspect of

3   competency, especially if someone is going pro se and it is

4   up to them to draft that argument or that point.

5   Q.  In proceeding to trial, strategical decisions have to be

6   made by a defense attorney in terms of what defenses to

7   present and what not to present, correct?

8   A.  Correct.

9   Q.  And those are matters of strategy.  Those aren't matters

10  of competence?

11  A.  Okay.  Yes, I would agree.

12  Q.  And so as a matter of strategy, if Mr. Weber wants to

13  make arguments that another person would not think is legally

14  valid or legally good, that does not render him incompetent?

15  A.  Well, I guess the answer is still it depends.  It depends

16  if he's ignoring other things that he should be using to make

17  those arguments rather than what he shouldn't use.  And I

18  think that is where he is going to struggle, he's going to

19  struggle with being able to shift and consider other

20  strategies and other information other than what he has in

21  mind going forward right now.

22  Q.  Right.  And that assumes that he is found competent to

23  represent himself?

24  A.  I think that if he is found competent to work with an

25  attorney, the minute his attorney does not do what he wants

1    him to do, there's going to be friction and there's going to

2    be another attempt to try to go on his own.

3    Q.  Respectfully, but that's speculation on your part,

4    although that happened?

5    A.  That has happened over the last year.  This is in part

6    why this has taken so long, because he has been ambivalent

7    about whether he wants to work with his attorney or not.

8    He's been variably cooperative with his attorney at different

9    points in time, so it's gone back and forth.  And I think as

10   soon as he hits a roadblock or he feels that something

11   critical is not being presented the way he wants it to be

12   presented, he's going to want to bail again from working with

13   counsel.

14   Q.  And he may -- at that point, he may decide that he again

15   he may raise the issue of wanting to be represented -- or to

16   want to represent himself, but representing himself is not

17   competence to stand trial.

18          You talk about that he -- you give the standard on

19   page 12 and 13.  You give the standard about competence to

20   stand trial, but your whole analysis that precedes that,

21   beginning at page 11 and continuing through page 12, talks

22   completely about self-representation and about whether

23   Mr. Weber because of his beliefs is able to represent

24   himself.

25          MR. COMERFORD:  Objection, Judge.  There's no

1   questions there.  It's just argument.

2          THE COURT:  Is that a question, Ms. Kresse?

3          MS. KRESSE:  I'll rephrase it, Judge.

4   BY MS. KRESSE:

5   Q.  Is there anything in your second report, Government

6   Exhibit 3, beginning with the "Competency Opinion" heading on

7   page 11 and continuing through the conclusion that Dr. Weber

8   is not competent to stand trial that supports that particular

9   finding on your part?

10  A.  I think there are several things that support that

11  opinion that he is not able to -- that it's my opinion he's

12  not competent to stand trial.

13  Q.  Well, let me direct your attention to page 11.  The first

14  paragraph we went through under "Competency Opinion" and you

15  are talking about how when you first evaluated him, he had

16  all the indicia of being able to stand trial, correct?

17  A.  Well, he had some.  Again, I am not disputing the factual

18  understanding of the charges and understanding the different

19  roles of individuals, I mean, that certainly was okay.

20  Q.  Yes, but --

21  A.  But as far as putting forth --

22          MR. COMERFORD:  Objection.  Can she finish her

23  answer, please?

24          THE WITNESS:  The assisting in his defense has always

25  been the problem.  He vacillated as to what information he

1    thinks is critical for his attorney to use and what his

2    strategy is.

3    Q.  Well, first of all, let's go back to the first sentence.

4    You say that he demonstrated a rational and factual

5    understanding of the charges.  Now you are saying it wasn't

6    rational, it was just factual, but this is what's in your

7    report?

8    A.  During the first evaluation, he did; he demonstrated a

9    rational and factual understanding of the charges.

10   Q.  Okay.  So, we're clear on that.  He did have --

11   A.  Right.

12   Q.  And that's what I was asking you.  I was asking you about

13   when you first met with him, he demonstrated the indicia of a

14   person who was competent to stand trial in terms of a

15   rational and factual understanding of the charges?

16   A.  Correct.

17   Q.  Okay.  And you also found that in terms of those other

18   relevant factors, the role of the Court, the role of the

19   parties, the consequences of the crime, that he understood

20   those at that time?

21   A.  Yes.

22   Q.  Okay.  The next paragraph addresses assisting in his

23   defense and your issue -- isn't it true that your issue there

24   becomes his desire at this point to proceed pro se?

25   A.  Yes, that is one of the issues.  And the other issue is

1   that he is not going to allow introduction of information

2   that he doesn't think is going to be helpful but might

3   actually be helpful.

4   Q.  You believe it would be helpful?

5   A.  Well, his attorney also might think it would be helpful.

6   Q.  And then beginning after that paragraph -- and so now

7   we're in the paragraph, "During this follow up evaluation".

8   You iterate all of the Mr. Weber's arguments for why he wants

9   to represent himself?

10  A.  Correct.

11  Q.  So, now we're not -- now, we have moved off of competence

12  to stand trial.  Now you are talking about competence to

13  represent himself.

14  A.  Because that was where he was during the last interview.

15  That was his decision at that point.

16  Q.  And then, if we go to page 12, the paragraph that begins,

17  "Given that there are differences in the skill set needed to

18  proceed pro se compared to merely assisting in one's defense

19  led by an attorney, it is useful to focus on certain skills

20  that are not typically required of defendants who are working

21  with attorneys."  Do you see that?

22  A.  Yes.

23  Q.  Okay.  So, here, you're not addressing the standard of

24  competence to stand trial.  You are addressing the standard

25  of whether he's competent to represent himself?

1    A.  Well, yes.  I thought that was an important carveout,

2    because he's been going back and forth as to whether he's

3    going to work with counsel or not.

4    Q.  But you understand that they are not the same thing; that

5    you were asked to find whether he was competent to stand

6    trial and his desire to represent himself or not is not an

7    issue for purposes of whether he's competent to stand trial?

8    A.  If there's a rational reason why he wants to represent

9    himself, it may not be, but it could be very self-defeating

10   for a defendant to reject the assistance of counsel and that

11   could impact on somebody's ability to effectively assist in

12   their defense.

13   Q.  When you spoke at the -- on the panel in October of 2017,

14   do you recall that you referenced a particular article that

15   you had found regarding competency of self-representation by

16   defendants?

17   A.  Yes.  I believe that during the question-and-answer

18   session there was a question that I answered and I give a

19   reference, yes.

20   Q.  Okay.

21          MS. KRESSE:  And if I could approach, Judge?

22          THE COURT:  Yes.

23   BY MS. KRESSE:

24   Q.  Showing you what's been marked as Government Exhibit 6.

25   During the break, you had an opportunity to look through this

1  for a moment or two, correct?

2  A.  Yes.

3  Q.  Okay.  And do you recognize that article?

4  A.  Yes.

5  Q.  Is that the article that you referenced in your comments

6  during the panel discussion in October 2017?

7  A.  Yes.

8  Q.  Is this an article that you are familiar with?

9  A.  Yes.

10        MS. KRESSE:  Your Honor, the government offers

11  Government Exhibit 6 into evidence.

12        MR. COMERFORD:  No objection.

13        THE COURT:  All right.  It will be received.

14  (Government Exhibit 6 was received in evidence.)

15

16        MS. KRESSE:  Thank you, Judge.

17        THE COURT:  Do I have a copy of it?

18        MS. KRESSE:  You do.

19        THE COURT:  Here it is.  I found it.  Okay.  I have

20  it.

21        MS. KRESSE:  Okay.

22  BY MS. KRESSE:

23  Q.  Dr. Cervantes, looking at Government Exhibit 6, can you

24  read the title of that article?

25  A.  "A Proposed Model For Assessing Defendant Competency to

1    Self-Represent."

2    Q.  And that was an article found in what journal?

3    A.  "The Journal of the American Academy of Psychiatry and

4    the Law."

5    Q.  And the year of that article?

6    A.  2016.

7    Q.  And you indicated that you have read this article?

8    A.  I have.

9    Q.  Okay.  Is it fair to say that the article deals with

10   competence of defendants to represent themselves generally,

11   correct?

12   A.  Well, it starts without that general concept, yes.

13   Q.  And the question I have is, is this an article that

14   specific, for example, to the competency of sovereign

15   citizens to represent themselves?

16   A.  No.

17   Q.  Okay.  So, this is an article about competent to

18   represent yourself across the board regardless of some

19   defendant's ideological beliefs, correct?

20   A.  Correct.

21   Q.  And is it fair to say that the article sets forth sort of

22   a list of questions that are relevant for determining the

23   issue of whether somebody is competent to stand trial?

24   A.  Well, it does not set forth specific questions, but it

25   goes into assessing the differences of what a defendant might

1   have to do if they are representing them self as opposed to

2   passively working with an attorney.

3   Q.  And let me direct you to page 432 of this article.

4   A.  Yes.

5   Q.  And do you see the heading A, "Five-Five Part Mental

6   Competency Model"?

7   A.  Yes.

8   Q.  And then if you actually look directly to the right-hand

9   column, do you see "the questions are"?

10  A.  Yes.

11  Q.  And if you want to take a moment to look at those

12  questions, because I don't want to ask you a question by

13  taking it out of context.

14          THE COURT:  Page 432?

15          MS. KRESSE:  432, Your Honor.  There's a heading

16  "Five-Part Mental Competency Model."

17          THE COURT:  Okay.

18          MS. KRESSE:  And then if you look directly to the

19  right, there's a paragraph that begins, "The questions are".

20          THE COURT:  I've got it.

21          THE WITNESS:  Yes.

22  BY MS. KRESSE:

23  Q.  Dr. Cervantes?

24  A.  Yes.

25  Q.  The question -- so, this paragraph lists a number of

1   questions that are relevant to determining whether a

2   particular defendant is competent to represent him or

3   herself, correct?

4   A.  Yes.

5   Q.  If you could go through what those questions are?

6   A.  Can the defendant engage in goal-oriented behaviors?

7   Does the defendant have sufficient oral and written

8   communication skills?  Does the defendant have the ability to

9   conform his social behavior to accepted norms?  Is the

10  defendant able to control his emotions in an adversarial

11  arena?  Is the defendant able to perform the basic cognitive

12  functions needed to construct a legally logical defense and

13  to make arguments in support of his position?

14  Q.  Did you consider these questions when you were analyzing

15  whether or not Dr. Weber was competent to represent himself?

16  A.  I did.

17  Q.  And in terms of the defendant's ability to engage in

18  goal-oriented behavior, what was your opinion regarding that?

19  A.  Well, his goals are different than what I think the

20  actual goals are supposed to be for this case, so he could

21  engage in goal-oriented behavior as far as what he thinks the

22  goal is, but it's not goal-oriented as far as furthering the

23  resolution of the case, so he would struggle with that.

24  Q.  Is goal-oriented behavior in the context of the trial

25  acquittal?

1  A.  Well, it could be a dismissal, perhaps starting with

2  that.  If that didn't work and it went forward, then it could

3  be an acquittal or a hung jury.  He's talked about making

4  arguments to convince the jury that he's correct and knowing

5  that he's going to be successful with that, but he has not

6  talked about how he would handle things if he were prevented

7  from doing thing his way, which I think would be very likely

8  to happen if this case were to move forward under the current

9  circumstances.

10         So, I think he's going to focus on irrelevant

11  information that is not going to be pertinent to the case.

12  And while that's may be goal-directed for him, it's not going

13  to be goal directed for anybody else in the courtroom.  He's

14  going to get distracted.  He's going to go on off on

15  tangents.  He's going to present information that no one else

16  is going to think is relevant except him.

17  Q.  And all of the things you just talked about, you think

18  are part of the analysis of whether he's able to engage in

19  goal-oriented behavior?

20  A.  Yes.

21  Q.  But for the purpose of the trial, the goal is to -- as

22  you said, to dismiss the case or to argue and obtain an

23  acquittal.  The defendant believes that he has the tools,

24  does he not, by which he can actually achieve those goals.

25  He believes he does?  That's the question?

1    A.   He believes he does.

2    Q.   Okay.  Does the defendant have sufficient oral and

3    written communication skills?  I mean, here, you -- when you

4    met with Dr. Weber, he was able to communication with you,

5    correct?

6    A.   Yes.

7    Q.   He was able to convey his thoughts and answer your

8    questions, correct?

9    A.   Yes.

10   Q.   He was able to -- in terms of written communication, he

11   has filed things in this case he's written himself?

12   A.   Yes.

13   Q.   And in fact, he, unfortunately for you, delivered one to

14   your home, something that he had written and put into writing

15   relative to this case, correct?

16   A.   Well, I think it was the name change, so it is not

17   federally filed, but it was the state court documents, yes.

18   Q.   Thank you for correcting that.  The next question, does

19   the defendant have the ability to conform his social behavior

20   to accepted normas.  I mean, there was no indication

21   Dr. Weber has an inability to conform to accepted norms in

22   the context of this proceeding?

23   A.   Not so far.

24   Q.   Is the defendant able to control his emotions in an

25   adversarial arena?  That's the next question.  Has there been

1    any indication that this defendant is unable to control his

2    emotions in an adversarial arena?

3    A.  Well, not so far, but this is not the most stressful part

4    of what is to come.

5    Q.  Both competency to stand trial and competency to

6    represent yourself are fluid.  They change, correct?

7    A.  Correct.  So, so far, I would say that no, there's been

8    no indication that he can't control his emotional state.

9    Q.  And then, the least question set forth in this article,

10   is the defendant able to perform the basic cognitive

11   functions needed to construct a legally logical defense and

12   to make arguments in support of his position, correct?

13   A.  Correct.

14   Q.  And is it true that what you would take issue with in

15   this last question is the phrase "legally logical defense"?

16   A.  Absolutely.  I think he would fail miserably on that

17   particular question.

18   Q.  But in order to understand the phrase "legally logical

19   defense", do we not have to go back to the fact that this is

20   an idealogical belief that this defendant has agreed to and

21   bought into and so, in his mind, it is a logical defense?

22   A.  In his mind, it's a logical defense, but also, by

23   proceeding that route makes him completely disregard other

24   arguments that might be helpful or other strategies, or

25   contemplate the possibility of plea bargaining, because for

1    him, the blinders are on, you know?  He has an idea of what

2    he wants to do.  He can't go to the left.  He can't go to the

3    right.  There is no departure from what his plan is, so he's

4    not going to be able to use any other information except what

5    he thinks is relevant and that's going to be self-

6    detrimental.  It's going to be self-defeating.

7    Q.  But there's no requirement that somebody's strategy at

8    trial not be self-defeating, is there?

9    A.  Well, I think that requires some examination as to if

10   somebody is going down that path as to why they are doing

11   that.

12   Q.  Do you recall during the panel that you participated in

13   in October 2017 that one of the presenters talked about a

14   sovereign citizen that he evaluated where the individual was

15   pulled over for a speeding ticket and ended up -- because of

16   his sovereign citizen beliefs that the plaintiff had no

17   authority to speak to him, ended up assaulting a police

18   officer?  Do you remember that example?

19   A.  Yes.

20   Q.  And as a result of this individual's sovereign citizen

21   beliefs, he ended up in jail for seven years as opposed to

22   like, a $40 ticket, is how it was described.  Do you recall

23   that?

24   A.  Yes.

25   Q.  And so, it is not uncommon for adherence to sovereign

1  citizen belief when they intersect with the law to end up
2  having adverse consequences, is it?
3  A.  Well, I think you have to look at how you get to that
4  point, because here is somebody who clearly demonstrated lack
5  of ability to conform his behavior and restraint and was
6  disinhibited to some extent and was not able to complete
7  other options to resolve his case or to de-escalate the
8  situation so it didn't get to the point that it did.  So,
9  yes.  I mean, it can become something that becomes very
10 radical, but I think it does impair somebody's ability to
11 effectively assist in their defense if it gets to that point.
12 Q.  Well, because it turns out they're their own worst enemy,
13 right?
14 A.  I guess you could say that.
15 Q.  I mean, in a lay person's term, they become their own
16 worst enemy?
17 A.  I guess.
18         THE COURT:  Ms. Kresse, how much longer are you going
19 to be?
20         MS. KRESSE:  I am finishing up, Your Honor.  If I
21 could just have a moment to look at my notes?
22 BY MS. KRESSE:
23 Q.  There's one area I wanted to ask you about.  Doctor, I
24 believe you said in your direct examination that Dr. Heffler
25 had been able to get in touch with Dr. Weber's wife?

1   A.  Yes.

2   Q.  Is it accurate that what Dr. Weber's wife reported at

3   that time was that she believed that Dr. Weber's somatic

4   complaints related to anxiety relative to his legal troubles?

5   A.  That was her opinion of at least some of the somatic

6   complaints at that time, is what she told Dr. Heffler, yes.

7   Q.  And so, I cannot ask you about it in isolation, I am

8   talking about Government Exhibit 2, which is your first

9   report, page 9 and specifically the second paragraph.  Do you

10  see that?

11  A.  Yes.

12  Q.  Okay.  And she felt his health concerns were actually --

13  and I am reading, if you see, if the middle of the paragraph.

14  A.  Yes.

15  Q.  "She felt that his health concerns were actually anxiety-

16  related because of his arrest for the instant offense",

17  correct?

18  A.  Yes.

19  Q.  Okay.  And one of the things that you were concerned

20  about -- and correct me if I am wrong -- in terms of making

21  an evaluation of Dr. Weber is the lack of information from, I

22  believe, it is collateral sources.  Is that the right term?

23  A.  Yes.

24  Q.  And was that a concern of yours?

25  A.  Well, it was because we had more questions as the case

1   progressed and the only time that we were able to make

2   contact with Ms. Weber was that one telephone call.

3   Q.  Right.  And it's because the people that have known the

4   person in question can provide meaningful insight into things

5   that are relevant to your diagnosis, correct?

6   A.  Correct.

7   Q.  And so in this case, the defendant's now ex-wife opined

8   in her opinion, having lived with him, that his health

9   concerns were actually anxiety-related because of his arrest

10  in the instant case, correct?

11  A.  That's what she told Dr. Heffler, yes.

12          MS. KRESSE:  Nothing further, Judge.

13

14                      REDIRECT EXAMINATION

15

16  BY MR. COMERFORD:

17  Q.  Dr. Cervantes, concerning Dr. Weber's status with the IRS

18  prior to 2006, did I provide you with any documents about

19  that?

20  A.  No.

21  Q.  Did I provide you any information about that other than

22  the indictment or what Mr. Weber told us?

23  A.  No.

24  Q.  So, I know the government asked you a few questions about

25  this, but, say, if you were to learn that in 2003 he was due

1   a refund and elected not to receive it and then, so,

2   basically, he told the IRS he didn't want it and to use it

3   toward prior taxes, would you view that as the sort of crisis

4   that you were talking about earlier today?

5   A.  No.

6   Q.  Are you in a position to even give an opinion on whether

7   he would have been in a crisis or not pre-2006?

8   A.  No.

9   Q.  You did need more information to do that?

10  A.  Absolutely.

11  Q.  And does any of that change your ultimate opinion as far

12  as his diagnosis?

13  A.  No.

14  Q.  And as far as his -- your opinion on his competency to

15  proceed to trial?

16  A.  No.

17  Q.  Or your opinion on his competency to represent himself?

18  A.  No.

19  Q.  In Government Exhibit 3, which is your second evaluation,

20  the last 2 pages, pages 12 and 13?

21  A.  Yes.

22  Q.  The government pointed out that you phrase it as, "He's

23  mentally incompetent to the extent that he's unable to

24  understand the nature and the consequences of the proceedings

25  against him" -- I guess this is the important part I'm

1    getting to here, "and to assist properly in his defense".

2    And you testified that you had included the word "properly"

3    in there?

4    A.   Yes.

5    Q.   If you took that word out, would that change your

6    conclusions?

7    A.   No.

8    Q.   Would you still be of the opinion, yes or no, that he's

9    able to assist in his defense?

10   A.   I don't think he's able to assist in his defense at this

11   point.

12   Q.   Thank you.   In terms of the panel discussion in Colorado,

13   which is the -- we talked a little bit -- that's contained in

14   Defendant's Exhibit 4, you testified that you prepared -- you

15   don't prepare the report until after -- rephrase that.   The

16   government asked about that you hadn't prepared that report

17   until after you had the benefit of that discussion, is that

18   correct?

19   A.   Correct.

20   Q.   And I guess what, if anything, did you take away from

21   that panel based on your discussion of Dr. Weber's case?

22   A.   So, first of all, none of the information that the other

23   experts presented was news that I didn't already know was

24   going to be presented.   Again, these things were discussed

25   months in advance.   The presentation was done weeks in

1   advance of that.  I think what is not necessarily obvious

2   from the audio is that the audience of forensic psychiatrists

3   that went to this particular panel, when they were discussing

4   this particular case -- Dr. Weber, with the facts -- I asked

5   the question at one point how many people believe that this

6   was more than just another sovereign citizen based on all the

7   other information that I discussed -- such as the medical

8   stuff and the premorbid functioning, his occupation, all of

9   that -- and virtually every forensic psychiatrist in the room

10  raised their hand, thinking that this was something more than

11  sovereign citizen beliefs.

12  Q.  And in terms of your opinion on -- sorry.  Let me

13  rephrase that.  To your knowledge, when Dr. Antonius

14  evaluated Dr. Weber, was Dr. Weber intent on going pro se or

15  did he have my office representing him at that time, if you

16  know?

17  A.  I believe that your office was representing him at that

18  time, but I think there was some ambivalence about where he

19  was going.

20  Q.  And when you evaluated him again in your second report,

21  what was his position on my office representing him?

22  A.  His position at that point was that he wanted to

23  represent himself.

24  Q.  So, that had been a change from when Dr. Antonius

25  evaluated him to when you spoke to him for the second

1    evaluation?

2    A.   Yes.  He seemed much more definitive on that when I

3    valued him most recently.

4         MR. COMERFORD:  I have no further questions, Judge.

5    Thank you.  Thank you, Doctor.

6         THE COURT:  All right.  Were any other witnesses,

7    Mr. Comerford?

8         MR. COMERFORD:  Yes, Judge.  Dr. Weber had indicated

9    that he would like to testify.  Under the statute, he does

10   have that right.  He and I have spoken at some length about it

11   and he does intend on testifying.  I would still represent

12   him, but he's provided me with some questions that he wants me

13   to ask him.  I think they may be relevant to the Court's

14   assessment of whether or not he's able to aid in his defense,

15   understand the charges against him.  It's about eight

16   questions, but he would like to testify for the competency

17   hearing.

18        THE COURT:  I am thinking maybe 9:30 tomorrow

19   morning.

20        MR. COMERFORD:  I can do that, Judge.

21        THE COURT:  Let's do it 9:30 tomorrow morning.  I

22   think we have heard enough today.

23        MR. COMERFORD:  Thank you, Judge.  I don't know that

24   this is going to matter.  I just want to put on the record.

25   In terms of the pre-2006 tax return, I spoke briefly with

320

 1   Ms. Kresse about that.  I didn't let Dr. Cervantes know about

 2   anything with him filing or not filing in 2004, 2005 because I

 3   personally didn't know that.  That may be contained in some

 4   exhibits that were provided to Dr. Weber when he was pro se,

 5   but it's unclear to me at this point.  If it's an issue five

 6   years from now, I just want to make the record that that's why

 7   she didn't know.  I didn't tell her.

 8            THE COURT:  All right.

 9            MR. COMERFORD:  I didn't know it from the exhibits

10   either.  So, thank you.

11            THE COURT:  Okay.  Thank you very much.

12            MR. COMERFORD:  Thank you, Judge.

13            MS. KRESSE:  Thank you.

14   (Proceedings concluded at 3:50 p.m.)

1             *     *     *     *     *     *     *

2

3              I certify that the foregoing is a

4        correct transcription of the proceedings

5        recorded by me in this matter.

6

7

8

9                              s/ Megan E. Pelka, RPR

10                             Court Reporter,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25