**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

```
UNITED STATES OF AMERICA,        )
                                 ) Case No. 1:15-CR-00010
                                 )             (RJA)(HBS)
                Plaintiff,       )
                                 )
vs.                              ) January 24th, 2018
                                 )
CHARLES WEBER,                   )
                                 )
                Defendant.       )
```

**TRANSCRIPT OF COMPETENCY HEARING**
**BEFORE THE HONORABLE RICHARD J. ARCARA**
**SENIOR UNITED STATES DISTRICT JUDGE**

APPEARANCES:

For the Plaintiff:    JAMES P. KENNEDY, JR.
                      ACTING UNITED STATES ATTORNEY
                      BY:  MARYELLEN KRESSE, ESQ.
                      ASSISTANT UNITED ATTORNEY
                      138 Delaware Avenue
                      Buffalo, NY 14202

For the Defendant:    FEDERAL PUBLIC DEFENDER'S OFFICE
                      BY:  BRIAN COMERFORD, ESQ.
                      300 Pearl Street, Suite 200
                      Buffalo, NY 14202

Court Reporter:       MEGAN E. PELKA, RPR
                      Robert H. Jackson Courthouse
                      2 Niagara Square
                      Buffalo, NY 14202

1                          **I N D E X**

2       WITNESSES                                         PAGE

3       DEFENSE

4       CHARLES WEBER
             Direct Examination by Mr. Comerford          325
5            Cross-Examination by Ms. Kresse              353
             Redirect Examination by Mr. Comerford        388
6

7                        **E X H I B I T S**

8       DEFENSE                                           PAGE
             Exhibit 5 Camel cigarette advertisement      339
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Mr. Comerford?

2           MR. COMERFORD:  Judge, when we finished yesterday, I

3    indicated that Mr. Weber did want to testify on his own behalf

4    in this case.  He would like to do that.  We have discussed

5    it.  He's prepared to testify at this point, so we would call

6    Charles Weber.

7           THE COURT:  All right.  Before you do that, you have

8    had some discussions with him?

9           MR. COMERFORD:  We have, Judge.

10          THE COURT:  And you have been able to communicate

11   successfully?  I know the issue here about competency is what

12   the purpose of the hearing is, but have you had a chance to

13   talk to him about testifying and what his rights are and the

14   dangers that are involved in testifying?

15          MR. COMERFORD:  Yes, Judge.

16          THE COURT:  And you are satisfied he understands it?

17          MR. COMERFORD:  I am, Judge.

18          THE COURT:  He comprehends everything you say, as far

19   as you can determine?

20          MR. COMERFORD:  As far as I can determine, Judge.  I

21   told him what the potential dangers are with testifying, how

22   in certain circumstances, things could be used against him and

23   how if he were to perjure himself, that could certainly lead

24   to new charges and he has indicated he understands that.

25   There are a select number of topics he would like me to ask

1    him about on direct examination.  He's given me a list of

2    those questions.  I have looked them over and I am prepared to

3    ask those.

4         THE COURT:  Is there anything that I should be asking

5    him?

6         MR. COMERFORD:  At this point, I don't think so,

7    Judge.

8         THE COURT:  You think you have covered everything?

9         MR. COMERFORD:  Yes, Judge.

10         THE COURT:  As far as you can understand, at least at

11    this point in time, there's nothing further for the Court to

12    inquire about or ask Mr. Weber about?  You are satisfied he

13    understands all the dangers that are inherent in testifying?

14         MR. COMERFORD:  I am, Judge.

15         THE COURT:  And that I don't have to ask him

16    anything?

17         MR. COMERFORD:  I agree.

18         THE COURT:  Okay.

19         MR. COMERFORD:  Thank you, Judge.

20         MS. KRESSE:  Your Honor, it looks as if Mr. Weber has

21    a handful of papers that I -- the government has no idea what

22    those papers are, whether they have been marked as exhibits or

23    whether they are reference materials and you know --

24         THE COURT:  I can assure you that if there's any need

25    for you to see them, it will be made available to you and

1    you'll have as much time as needed to review them.

2            MS. KRESSE:  But if Mr. Weber is going to be

3    referring to documents during his testimony that I don't have,

4    then --

5            THE COURT:  Well, let's cross that bridge when we get

6    to it.

7            MS. KRESSE:  Thank you, Judge.

8    (The witness was sworn at 9:35 am.)

9            THE CLERK:  Please state your full name and spell

10   your first and last name for the record and make sure you

11   speak into the microphone.

12           THE WITNESS:  Charles Weber, C-H-A-R-L-E-S,

13   W-E-B-E-R.

14           MR. COMERFORD:  May I proceed, Judge?

15           THE COURT:  Yes, please.

16

17                       DIRECT EXAMINATION

18

19   BY MR. COMERFORD:

20   Q.  Good morning, Dr. Weber.

21   A.  Good morning.

22   Q.  You provided me a list of questions this morning, is that

23   correct?

24   A.  Yes.

25   Q.  And that you wanted me to ask these questions as part of

1   your competency hearing, that's correct?

2   A.   Yes.

3   Q.   Okay.  So, the first question here, when did your somatic

4   complaints start?  And I know you have these all together.  I

5   am just going to break them up.  So, when did your somatic

6   complaints start?

7   A.   About 2012, I was in Phoenix, Arizona and we had a

8   baseball tournament out there.  Some of us old guys get

9   together and decide to have a little fun for about a week.

10   And before one of the games, I was checking my email at the

11   computer in the lobby of the hotel and I really -- I got

12   dizzy and I didn't understand what it was.  There were guys

13   that wanted to know if I wanted to go to breakfast.  I said,

14   no.  I walked for about two hours to walk it off and I didn't

15   understand what was going on.

16          Later on, we had a game and I went in to pitch and I

17   just did not feel well.  It passed the next day.  I didn't

18   pitch the next day.  I pitched the following day.  The third

19   day of the tournament, played against San Jose and I went to

20   the ninth inning and I felt better.  I didn't have that

21   feeling again for a long time.

22          In 2013, it was bad.  It was the same tournament out

23   in Arizona.  I was catching -- at this time, I was catching a

24   guy that used to play football, kind of a AAA, was a good

25   thrower, good pitcher.  And about the fourth inning, I had a

1   hard time feeling my arms, my heart started to race and I

2   didn't know what was going on.  I took off the catching gear

3   and just laid down on the bench for four or five innings.

4   They wanted to know if I wanted to go to the hospital.  I

5   said, no.  My heart was still racing.  It slowed down a

6   little bit.

7          I went to a supermarket and picked up two gallons of

8   water and some -- a bottle of red cayenne pepper and I just

9   took a capsule of the red cayenne pepper with the water.

10  Slowly, things started to dissipate.

11         The next day, I was still a little dizzy, so I

12  didn't play the next day.  Tuesday, I felt better and I

13  started playing more, but it was the red cayenne pepper that

14  really helped me out.  It seemed to settle down the heart

15  rate.  So, at that time, there was no diagnosis in 2013 and

16  later on -- I went to see the doctor later on that year.

17  Q.  Was that your physician you saw?

18  A.  I saw the physician first.  They took blood tests and

19  when the blood tests came back, it came back normal.  But

20  whatever I would eat, either immediately or a couple hours

21  after, my heart would start to race.  So, the heart racing is

22  usually the result of my eating something.

23  Q.  And then -- so, you got results from that doctor?

24  A.  Yes.  I went to the physician first and when I started

25  having more episodes -- I had gone to a seminar in 2012,

1   earlier, about a year earlier and the reason I did that was

2   because one of my patients was a chiropractor and this fellow

3   came in one day and the guy looks great, I said, David, you

4   are always in good shape, but you look ripped.  What's going

5   on?  He's a chiropractor and he went on a two to three-week

6   cleansing program and -- because in his practice, he deals

7   with peoples' spines that are problematic.

8           So, sometimes, what he has to do is get people on a

9   diet to reduce their excess abdominal weight so he could work

10  on their back.  So, he decided to go on the program before he

11  put his patients on the program.  His wife came in a week

12  later.  She looks great.  I go, what are you guys doing.  So

13  they told me and I said whatever you are doing, I want to do,

14  because I had some weight I wanted to lose.

15          So, I went on this program and it was basically that

16  he gives you some liver detox pills and they are made out of

17  all natural supplements.  They put you on a whey protein

18  that's purified and then, you eat vegetables.  And it's just

19  a very solid nutritional basis to get some of the toxins that

20  are built up in your system.  So, I did that and I was -- at

21  the time, I was 235.  Two days later, I am 225.  And

22  eventually, I went all the way down to 215.

23          So, as a result of that -- as a result of me

24  ordering that product, I saw the rep.  The rep came in and

25  says, you might want to check out this muscle testing

```
 1   program.  So, I said all right.  I'll do that.  And the
 2   muscle testing program was after my trip to Arizona in 2012.
 3   So, I had done a fair amount of pitching and right after that
 4   was the seminar.  And in the seminar, we had mostly
 5   naturopathic contractors.  There was a pharmacist there and
 6   there was another dentist that I paired up with.  So, he was
 7   going there for review.  I was going there for the first
 8   time.
 9           Well, he just did a basic body scan as part of his
10   training and the first thing he says is to me is, what's
11   going on with your right arm?  I said, what do you mean?  He
12   said, it's weak.  I said yeah, I just spent a week pitching.
13           Earlier, in my earlier life, it was either me going
14   to dental school or getting drafted.  I was being scouted by
15   a number of teams.  I had a fastball between 88 and 92.  But
16   an injury in my senior year prohibited me from going any
17   further.  So, to this day, I still can't bend my arm.  I have
18   bone chips in my arm and I still can't extend my arm.
19           Anyhow, I said well, I just finished pitching a
20   week.  He said.  I can tell.  So.  He picked this up without
21   any x-rays.  He had never known me before.  He had never met
22   me before.  Then, I had a body scan done by the person what
23   was conducting the seminar.  She was a naturopath from
24   New York.  And she picked up, you know, what's going on with
25   your left kidney?  I said, I have a history of kidney stones.
```

1  To this day, I think I have had five surgical procedures to

2  just remove kidney stones.  Some of them are lithotripsies

3  where it's not invasive.  Some of it, they had to put me

4  under, throw a tube up in me and I have a device put in my

5  ureter to open up the ureter between the kidney and the

6  bladder so that any stones will go through and it's very

7  uncomfortable.

8        So, she picked that right up.  Now, these are two

9  people who are skilled in a technique that physicians don't

10 know.  So, I went through this program with the nutritionist

11 in 2013 where they found out certain things by doing the

12 muscle testing and it helped me quite a bit.  It's not

13 failsafe.  It's a technique to help you out.

14       So, I want to make this perfectly clear.  I still

15 saw my regular physician and he was all for that.  My regular

16 physician, although I haven't seen him in a few years, is a

17 man named David Miller.  He is from Jamaica.  He is

18 wonderful.  He works with me.  He trusts me.  I trust him.

19 So, I don't know.  Like I said, I haven't seen him in a few

20 years, but we have good rapport and I trust his judgment.

21       So, we worked together.  I used the nutritional

22 supports because it's really for both our benefits.  And the

23 reason why we do the nutritional supports and supplements is

24 just simply this:  Through the agricultural farming methods

25 that we have in our country today, they're constantly

1   pounding the soil with increased yields, which means you put

2   the crop together more closely.  That deprives the soil of

3   the nutrients and the minerals.  All they are doing is taking

4   those products in a capsulated or a pill form that have been

5   dehydrated and taking them to make up for what our foods are

6   missing.  And it's common knowledge.  It's not anything

7   that's secret.  We -- everybody knows or should know the

8   mineral composition of our soils has been comprised.

9           So, I don't want to be characterized as somebody who

10  has an extreme view of medicine.  It's just -- it has its

11  proper place.  There are some very good things about the

12  medical profession and there are some things that I found out

13  that are not so good.

14  Q.  Dr. Cervantes talked about something with your pancreas.

15  Do you have any comment on that?

16  A.  Well, it appears at this time that my pancreas is

17  underperforming and the reason I say that -- and it has to do

18  with some of the symptoms that I just described.  I don't do

19  so well when I eat things like bread; if I have a candy bar.

20  I stay away from all donuts, crackers, pretzels.  I have

21  to -- I take a supplement to break it down.  And I also to

22  help with the -- my body's reaction to it, the glycemic

23  reaction, I take cinnamon.  It's a natural assist to your

24  insulin.  It increases the ability of insulin to handle your

25  sugar, your carbohydrate loads in the bloodstream.

1          So, one of the problems that we researched when I

2    found out that I had the mercury in the body was that mercury

3    somehow has an effect on the proteolytic or the enzymes that

4    help digest you carbohydrates that make insulin effective.

5          In other words, if you go into the biochemical

6    backgrounds and the 3D structures of your enzymes and even

7    through your immune system, it is a three-dimensional fit.

8    It's almost like a lock and key fit.  Your antibodies have

9    certain receptor sites that perceive and recognize antigens

10   and toxins and the same with your enzymes that are produced

11   by the pancreas.

12         So, if they are -- if mercury gets into these

13   molecules, which it has an affinity for -- in other words,

14   mercury has an affinity for certain bonds.  Going to organic

15   chemistry, some elements are more attractive than others, but

16   if the mercury gets into these bonds in the pancreatic

17   enzymes, it can distort the 3D molecular figure.  And so, if

18   that happens, your enzymes are not going to be effective in

19   metabolizing the glucose or the sugars in your bloodstream,

20   so it gets into your cells, it does get into your brain.

21         And if your body is deprived of that -- and like I

22   have, I do get dizzy at times, but it's -- usually, it's not

23   based on nerves.  It's based on food.  It always, always,

24   always happens after food.  Always.

25   Q.  Was it -- she testified that you had told her there was

1    something with the wireless router in your house?

2    A.   Oh, okay.  Well, one of the times I went in, within the

3    last summer and I hadn't been in for two years, I tested out

4    for radiation in the pancreas.  Now, this is the first time

5    that that came up and the explanation for that is, when you

6    go through this -- it's basically a test for your autonomic

7    nervous system competency and it does not always show things

8    initially, but as you -- it prioritizes your needs.  So, this

9    didn't show up initially.  It showed up last summer.

10         We don't know at this time what caused it.  It could

11   have been a faulty x-ray machine in my office, which is

12   possible because one of the master circuit boards went out

13   without us knowing it and I had to get it repaired.  The

14   other thing that is possible is when I do my computer work,

15   I'll do it on a desk like this, but when I get tired of that,

16   I'll go to the bed and lay back and place the computer on my

17   chest.

18         Now, if I am using a wireless router, the wireless

19   router is going to bring in the transmission -- I don't know

20   how to describe it by -- the transmission of the radio waves

21   into a certain portal.  And if that portal is near when I am

22   laying on my chest, I am going to get ionizing radiation.  We

23   don't know if that's true.  I don't know if that's true.  I

24   don't know if that's the cause.  I just took a precaution to

25   take an ethernet cable and hardwire the connection to the

1  router.  So, I will literally turn off the router and I will

2  take my ethernet and put it right into the -- I can't

3  remember the name of the device.  It has a cable going into

4  it.

5  Q.  The router?

6  A.  Not the router, no.  The modem.  Is that the right word?

7  Q.  Yes.

8  A.  Okay.  So.  I'll get rid of the router, but see, I don't

9  live in my own house, so they use a router for other

10  purposes.  So, at night, I turn it off and -- but when other

11  people in the house are using it, I have to just get the hell

12  out of the way.

13  Q.  And I'll move on in a second, but did you have concerns

14  about -- any similar concerns about your ankle bracelet?

15  A.  I did one day and I don't know what happened.  My leg

16  started to -- it almost went numb up to my knee and I don't

17  know what it was.  It went away in about three or four hours.

18  I talked to Peter, the parole officer and I explained I may

19  have to come down and get it taken off or changed or

20  whatever.  I didn't know what to do.

21  Q.  Is that Peter Lepiane?

22  A.  Yes.  Yes.  He's a nice guy.  We had a good rapport

23  going.  He's a straight arrow.  I like him.

24  Q.  Moving on to your next question, what are your views on

25  the allegation of being characterized as a "sovereign

1  citizen"?

2  A.  Well, I guess the first thing you have to realize is

3  which citizen are they talking about; citizen of the

4  United States or the Fourteenth Amendment or citizen of the

5  sovereign states?  That's never really been put forth in

6  testimony and I'll just read it straight from a court case.

7          MS. KRESSE:  Your Honor --

8          THE WITNESS:  Like the citizens --

9          MS. KRESSE:  Objection.

10          THE COURT:  Sustained.

11          THE WITNESS:  Why?  Excuse me.

12          THE COURT:  Just ask the next question,

13  Mr. Comerford.  I don't give explanations.  I make rulings.

14  BY MR. COMERFORD:

15  Q.  What is your -- without reading from something,

16  Dr. Weber, without reading from something you have prepared,

17  what are your views on being characterized as a sovereign

18  citizen; you personally, not reading from something?

19  A.  Well, I was just going to use that as background, but

20  I'll move on.  The Court cases that I am referring to are

21  Supreme Court cases or court cases that cite court cases,

22  Supreme Court cases.  And this one is citing the

23  *Slaughterhouse* cases, which were approximately in the 1870's.

24  And this case was a Susan B. Anthony case.  And in the Susan

25  B. Anthony case, she was arrested for voting and she promoted

1     the fact that as a citizen of the United States, she had the

2     right to vote.  And the Court said no, the citizen of the

3     United States does not apply to you and your right to vote.

4     Your elected franchise is not in the United States

5     Constitution for you.  It's in your New York State

6     Constitution.  And so, she was denied that right.

7            And they explained that the citizens of the

8     United States have privileges and immunities that are

9     different than the privileges and immunities from the

10    citizens of the several States, their rights are not

11    protected by the Fourteenth Amendment and that is what was

12    held in the *Slaughterhouse* cases.

13           It's been held in other cases since then too, the

14    *United States v. Quickshank*, *Twining v. New Jersey*, *Maxwell*

15    *v. Dow.*  You have *Toshiro vs. Georgia*.  And recently, you

16    have the case of *Demer v. Jones* in 1993.  It's well-known

17    that the two are not equivalent.

18    Q.  Now, in 2015, did you make a discovery demand on the U.S.

19    Attorney?

20    A.  Yes, I did.

21    Q.  What was that about?

22    A.  The demand was to produce a statute where the people were

23    made liable for any income taxes and where the term "the

24    people" were actually introduced.

25    Q.  And what -- was there a hearing on that motion?

1    A.   There was a hearing, yes.

2    Q.   And what happened in that?

3    A.   Well, the -- I brought up the fact that -- well, first,

4    the answer to that from the U.S. Attorney was that there

5    wasn't any that existed, that people are never mentioned in

6    statutes, or something to that effect.  And after had she

7    made the answer, I countered and said no, no, that's not

8    true, because when the states or the territories were making

9    a petition to the people for inclusion into the statehood,

10   that would petition the people and I brought out certain

11   examples of that.

12        So, in other words, what they were doing was the

13   first 13 states that formed the union would accept the

14   petition on territories.  They would have 60,000 or more

15   citizens in that territory and then they would set up their

16   government, their judicial system and their executive system

17   and then they would apply it to the people.  And the people

18   would either approve or disprove of the application.

19        And when they did approve, the enabling acts were

20   brought forth.  And the enabling acts brought those

21   territories into statehood under the Constitutional scheme

22   and that they would be on equal footing with the original 13

23   states.

24        And then at that time, the result of that motion was

25   that it was granted in part and denied in part.  Now, at that

1    time, I don't believe that Judge Scott had my genealogy to

2    prove that I was posterior people and I think that came in a

3    month or so later.  So, when I did receive the answer, he

4    inside it in part and granted it in part.  So, I wrote an

5    objection and then the objection, they answered that from the

6    U.S. Attorney.  She stated that, yes, okay, you are one of

7    the people, but you do owe -- you know, why don't you owe

8    federal income tax?

9           And my answer to that was -- and I don't know if

10   it's ever really been heard today.  I don't think we have

11   heard it.  My answer to that was well, under Subchapter A of

12   Title 26 in the Code of Federal Regulations, the implemented

13   statute on Section 1.1 specifically limits individual income

14   taxes to citizens of the United States or residents -- or

15   citizens and residents of the United States.

16          The people are not there.  It had nothing to do with

17   the citizens of the several States.  Only -- in our

18   situation, only the Fourteenth Amendment citizens, which

19   brings up a problem because in order to be a Fourteenth

20   Amendment citizen, you have to be naturalized.  Congress only

21   has one power to naturalize anybody and that's to naturalize

22   aliens.

23          And the conditions at birth that cause the

24   Fourteenth Amendment to be attached are located in Title 8,

25   Section 1401 through 1409.  And that -- the allegation of me

1  being a Fourteenth Amendment citizen has never been supported

2  by any of those conditions or anything else by the U.S.

3  Attorney.  So, right now as it stands, the Fourteenth

4  Amendment citizenship that they accuse me of being has never

5  been supported.

6  Q.  Your next question deals with the allegations that your

7  views on medical care and supplements are extreme.  That's

8  something I think you already talked about, right?

9  A.  Well, yeah, that is -- I did a little bit.  There is a

10 little bit more.

11 Q.  If you have an exhibit, maybe I can show it to the

12 government and then offer it and we'll see if it's relevant

13 or not.

14 A.  I'll explain it very simply.

15 Q.  Why don't you let me show it to her?

16 A.  Oh, okay.

17       MR. COMERFORD:  Judge, I will mark this as

18 Defendant's Exhibit 5.  I'm handing it back to the witness.

19 (Defendant's Exhibit 5 marked for identification.)

20

21 BY MR. COMERFORD:

22 Q.  So, what is that that you showed me?

23 A.  This is an ad that apparently used to be quite prevalent

24 in magazines back in the time when -- there's a Camel

25 cigarette ad.  And at that time, if you read the history --

1   Q.  Can I stop you for one second?  Maybe I'll put it on the

2   monitor.  And this isn't in evidence yet; just so everyone

3   can kind of see what you are talking about.  I am going to

4   take it out of the -- so tell me again, what is this?

5   A.  This is an ad for Camel cigarettes and this is typical of

6   that time.  The different tobacco companies were fairly

7   competitive and looking for market share.  And so, what Camel

8   came up with was to -- this more doctors campaign.  More

9   doctors smoke Camels than any other cigarettes.

10          And it goes on to say, "Doctors in every branch of

11  medicine were asked what cigarette do you smoke."  The brand

12  named most was Camel.  And then they talk about how cool --

13  what kind of cool milds they have, rich full flavor pack

14  after pack and how they sooth your throat as a steady smoke.

15  Then, they have a couple movie stars at the bottom Maureen

16  O'Hara, Robert Bellamy.  I know of Maureen O'Hara.  I don't

17  know of the other two.

18  Q.  What does this have to do with anything?

19  A.  Right.  You have doctors promoting a carcinogenic

20  material.  And so, what people have to understand is

21  sometimes, doctors make mistakes and you are responsible for

22  whatever type of treatment that your doctor promotes and you

23  are responsible ultimately for your own health.  Now, this is

24  a misleading statement.  As we all know, back in the '80s or

25  '90s, there was a huge lawsuit against the smoking, the

1    tobacco companies and they paid states reparations -- I am

2    not sure of the legal term, but there are some things that

3    doctors promote that are unhealthy for you.  So, while there

4    are good things about the medical profession, you know,

5    sometimes, there are some things that doctors promote that

6    are not so good.

7    Q.  Okay.  So, this is kind of -- informed your opinion about

8    where medicine is today and alternative medicines and things

9    like that?

10   A.  Well, it does.  And also on my sheet there, you'll see a

11   mention of the drug Vioxx.  Now, I had a front row seat with

12   one of my patients to the Vioxx problems.  He's a young kid

13   from the area, went to school in the midwest and after

14   graduation, he and his fiance went to Washington, D.C. and he

15   worked on Capitol Hill.  He worked for the Senate Majority of

16   the finance committee Charles Grassley during the Vioxx

17   scandal.

18          Vioxx was a drug and that drug was supposedly safe.

19   It went through all the FDA safeguards and was passed as a

20   safe drug.  Well, all the heart attacks that were caused by

21   this drug were an embarrassment and people died.  So, this --

22   my patient, this young man's job was to interview the

23   pharmaceutical company.  I believe it was Merck.  I'm not

24   sure, but he would go over certain aspects and ask questions

25   of these pharmaceutical companies.  Then, it had to do with

1   the testing protocol.  There's usually about three or four

2   different testing protocols that a drug has to go through to

3   get approved.  I am not similar with everything.  I just know

4   it generically.  He found out that he was being shutdown.  He

5   couldn't get answers that Senator Grassley wanted.  And

6   ultimately, he told me he stated that Senator Grassley was

7   the chairman sued the FDA for answers.  The FDA being a

8   separate branch of the government was not liable for the

9   answers and the suit was shot down.

10          And the statement to me was quite -- well, it was

11  educational.  And basically, what he said -- and I am

12  paraphrasing here -- that the FDA is not interested primarily

13  in patient safety.  When push comes to shove, they're going

14  to choose profits in the pharmaceutical industry.  He was

15  disgusted about it.

16          He said other than that, he loved his job.  He said

17  he dealt with Americans every day in his capacity as a

18  staffer and he said I am just so proud of working in D.C.

19  for people that want to do good for this country.  He said,

20  other days I deal with these other issues that are -- he just

21  feels -- he said I got to take a shower at the end of the

22  day, I feel so dirty.  I just don't want to deal with some

23  people.  So, I learned a little bit about how the FDA works

24  there and I learned a little bit how Washington works.

25          I had another patient who was a retired Philharmonic

1  player here in Buffalo and he had a condition called

2  Dupuytren's.  Now, Dupuytren's for the people that know it is

3  otherwise known as trigger finger.  And trigger finger looks

4  something like this (indicating).  Can you see that where the

5  last two or three fingers are curled into palm?

6          And what that is, Dupuytren's Syndrome has a large

7  amount of collagen that is placed -- or it overgrows and the

8  only way to restore your full function of those digits is to

9  go through a surgical procedure where basically it's a

10 dissection.  The surgeon has to hold back the hand, the skin

11 on the hand, palm of hand and he has to go in there and has

12 to dissect all the extra collagen fiber numbers that are

13 there.  So, if I may make a crude analogy, it's almost like

14 going into the jungle and cleaning it away with a machete.

15          There was another drug that was introduced and he

16 was part of that study.  The study was in Stony Brook and the

17 study involved an enzyme called Collagenase.  Collagenase

18 breaks down collagen.  And they would inject it in certain

19 digits and one afternoon, they would bring the patient, the

20 next day, back into the office and they would attempt to

21 straighten his finger out.

22          And so, what would happen is it was successful, the

23 Collagenase would go in there and it would snap the bands of

24 the collagen, the network fiber in excess and that were

25 broken down by the enzyme.

1   Q.  And you have similar views on vaccines and statin drugs.

2   Can you talk briefly about that?

3   A.  I don't have a problem with vaccines.  The vaccines are

4   good.  It's the spacing apart, but it's the additives they

5   put in there, the aluminum.  Aluminum causes -- my term is

6   apoptosis.  If it gets into a brain cell, which they have an

7   affinity for, it will destroy the brain cell.

8            Aluminum -- or mercury is one of the most toxic

9   neurotoxins known to mankind.  Also, they have what they call

10  adjuvet, which is an immunological accelerator to kick in

11  your immune system.  And one is named squalene and sometimes,

12  the immune system overreacts.  So, it is not necessarily the

13  vaccine itself.  It is the additives that are causing

14  problem.  And right now, there's a vaccine court.  I believe

15  it's in D.C. and the last time I heard, they were paying out

16  $4 billion in vaccine injuries.

17  Q.  And what about statin drugs?

18  A.  Statin drugs are the cholesterol drugs and they, over

19  along period of time have, been known to cause a few

20  problems.  Actually, one of the problems is diabetes.  They

21  actually induce diabetes, I guess get a Type 2 diabetes.  And

22  the other one is hardening of the arteries.  A third

23  consequence of using those cholesterol drugs is a condition

24  called rhabdomyolysis and rhabdomyolysis is almost like a

25  chemical blender on your muscles.  It breaks down your muscle

1  tissues.

2        I had a patient that had to be taken off of -- I

3  think it was Lipitor.  My memory may be a little bit faulty

4  on that, but she had to go to Johns Hopkins because her

5  immune system -- or muscular system just shut down.  She

6  couldn't walk from the parking lot into my office.  So, she

7  had to go to John Hopkins.  And I think they studied her and

8  I think they put her on the protocol of steroid therapy for a

9  while.  I think she had to go back and forth between here an

10  there.

11  Q.  Now, you already told us about the muscle testing and why

12  that's useful, right?

13  A.  Yes.

14  Q.  Now, the government has used Southern Poverty Law Center

15  technique labelling some Americans as sovereign citizens,

16  thereby -- so let me rephrase this.  So, you disagree with

17  the Southern Poverty Law Center's label of sovereign citizen

18  as anti-government "lunatics", is that accurate?

19  A.  Yes.  The Southern Poverty Law Center is an interesting

20  organization.  The man that started named Morris Dees,

21  D-E-E-S.  And initially, he was a crusader for civil rights,

22  which is great.  I mean, he did the right thing.  He brought

23  some civil right actions against Ku Klux Klan members and it

24  was very successful.  So, he started off great.  And what he

25  did was he based his lawsuits on the hate group basis, not --

1    I don't know anything particularly about that.  I just read

2    his history, but his business model was set up on the

3    formation of hate groups and taking them down.  And if it's a

4    legitimate hate group, that's fine.  But what he did was,

5    besides his law practice, along side that in parallel, he had

6    a mail order business that I read about.

7            And his mail order business used to do shotgun

8    mailing and basically, you know, alert people to these so-

9    called hate groups and that, you know, you need to -- we will

10   accept donations and fight them on your behalf.

11           Lately, he has sort of gone overboard and crossed

12   the line and I believe that I read an article where he had a

13   banner of the Southern Poverty Law Center on the FBI's

14   website and the FBI just -- apparently, he had crossed the

15   line and they removed it from the website.  This is a man who

16   apparently is on his fifth wife.  He's a little bit on an ego

17   trip, it looks like and I think maybe he has lost course.  If

18   he went back to doing pure civil rights movement, I think he

19   would fall back in the good graces of people and become more

20   legitimate.

21   Q.  So, would you agree or disagree that you are anti-

22   government?

23   A.  No.  My forefathers started this government.  I just want

24   it to return to the way it is supposed to be.  I would never

25   be anti-government.  I want the government that my

1  forefathers helped create.  Those are my grandfathers, my

2  great-grandfathers.

3  Q.  And Dr. Cervantes talked about -- I guess what you say

4  here is the overreliance of diagnostic imaging modality to

5  make a determination of fact leading to a viable diagnosis.

6  Can you please explain what that means?

7  A.  I think I actually agree with Dr. Cervantes on that, when

8  she was talking about the MRI.  In my profession, we would

9  have x-rays that would come back negative or normal or

10  negative and apparently normal, but the patients would have

11  problem.

12          And one of the -- and just as an example of that, my

13  cousin is a quadriplegic and after his -- he failed to find a

14  dentist that was going to help him out, so I said, look, come

15  to my office.  I'll do what I can, see what I can do.  He

16  works in a library and he does data entry, but he can only do

17  data entry with a maxillary mouth piece that has an extension

18  on it.

19          And over the years, because he has to keep his teeth

20  clenched in order to do the data entry for the library,

21  there's a long-term pressure on those roots and his

22  complaints was that his teeth were so sore and sensitive, he

23  couldn't chew.  Hot and cold bothered him.  And the dentists

24  that were treating him apparently couldn't find anything

25  wrong.

1          So, I said well, come on in and I said -- like I

2   said, he's in a wheelchair and we put planks to get up to the

3   front door and he would have to hire a healthcare worker.

4   We'd have to pick him up and put him in the chair because he

5   couldn't move and I would shut the whole office down just to

6   see him.  I ended up treating him with four or five root

7   canals that did the trick, but nothing showed up on the

8   x-rays.

9          And it just goes to the general advice that was

10  given to us years ago by one of the best teachers I ever had

11  Dr. Allen, someone from Great Britain.  He said, always

12  observe your patient and listen to them.  Listen to your

13  patient and you know, don't just rely on one test.  You have

14  got to put everything together.

15          That also happened recently with my mother.  She

16  needed a new heart valve.  The tests that were being

17  conducted by the assistants and the nurses were forwarded to

18  the physician and they thought everything was great, but it

19  wasn't, because if you would observe my mother, she would

20  walk and she would run out of breath.  So, we finally

21  convinced the doctor to take a look at her and it turns out,

22  they did further testing and she needed a new valve.  The

23  valve was faulty.

24          The doctor didn't see my mother.  He didn't observe

25  the patient.  You need to observe the patient and take

1  everything in total.  You don't rely on just imaging, so I

2  agree with Dr. Cervantes on that.

3  Q.  Okay.  You agree with Dr. Antonius regarding the board

4  certified "credentialing letters" signifying additional

5  expertise.  Can you please explain that?

6  A.  Yeah.  I have seen a lot of dental work over the years

7  and teaching up at UB, I was exposed to some of the best,

8  most skilled dentists around.  If you go into a prosthetic

9  lab for the specialist there, or for the graduate students

10  there, you'll see -- and I won't mention their names

11  directly, but you'll see cases of some of the more prominent

12  citizens in our area and I have seen their work.  I have also

13  seen the work of other specialists in the area and some of

14  their work is very good.  Some of their work is not so good.

15      And you have some general practicers who just happen

16  to have a certain talent or a certain interest in a specialty

17  and they have taken their talents to that speciality and

18  perform extremely well.  And their -- when I compare the work

19  of one general practitioner sometimes over a specialist, the

20  work looks better from the general practitioner.  Not always,

21  but the important thing is, it's not the letters after your

22  name, it's the skill you bring to your patients.

23  Q.  Okay.  And just before I forget, you told us that

24  Defendant's Exhibit 5 here had, I guess, contributed to your

25  understanding of questioning modern medicines, is that

1   correct?

2   A.   Is this number 5 right here?

3   Q.   Yeah.   It's something that you take into account in it,

4   right?

5   A.   Right.   It's not an overwhelming philosophy that

6   everything is bad, no.   You have to understand what's going

7   on.

8   Q.   Okay.

9        MR. COMERFORD:   I'd move exhibit 5 into evidence,

10  Judge.

11       MS. KRESSE:   No objection, Judge.

12  (Defendant's Exhibit 5 was received in evidence.)

13

14  BY MR. COMERFORD:

15  Q.   And then the last question you have here, what was

16  your -- I guess, can you explain the name change petition and

17  by that I mean.   The petition that you filed in State Supreme

18  Court I believe last summer?

19  A.   Yes.   The petition was made on three grounds.   One is

20  there's talk about, you know, the all capital name and

21  sometimes it takes on a life of its own.   And it occurred to

22  me over the years that whenever I go into a court case, I get

23  this all upper case name.   That's not -- how is that related

24  to me?   And I didn't understand.   And to this day, I don't

25  understand 100 percent.   I think I am getting a better

1    understanding, but I just wanted to be known as my upper and

2    lower case name, not the all upper case name, whatever that

3    attachment has to me, because I am not sure what it is.

4         So, I petition the Court on three grounds; number

5    one, I want my name to be the name that my parents gave me,

6    not the name that somebody else gives me.  Number two --

7    well, that's more Biblical.  That's honor your mother and

8    father.  Number two, I want a name that's a personal noun,

9    not a legal entity and number three, I wanted that name to

10   represent the fact that I was a citizen of the sovereign

11   states under Article 4, Section 2, Clause 1 of the

12   United States Constitution and under original jurisdiction of

13   the 1777 Constitution of New York.

14        And I did not consent to being in any way connected

15   to any legal term that designated me as a Fourteenth

16   Amendment citizen because the privileges and immunities are

17   different.  The privileges and immunities of the Fourteenth

18   Amendment citizens do not include full access to the Bill of

19   Rights 1 through 8.  They don't even include 9 and 10.  They

20   are totally out on 9 and 10.  One of the rights that our

21   forefathers fought for was to have those amendments on the

22   Bill of Rights applicable to the citizens of the several

23   States.

24        So, as it turns out, that all upper case name, you

25   can buy those names at the county clerk's office and it's

1    what they call an assumed name.  And it costs $35.  You fill

2    out an assumed name application form.  You give your

3    certificate and you get to operate your business under that

4    name.  And my question is, why would I want to operate under

5    my somebody else's name when I can operate a business on my

6    own?

7           And I looked back and I realize that when I was

8    setting up my practice out in Clarence that my attorney had

9    gotten an assumed name certificate for a DBA, doing business

10   as.  And I really didn't understand what that meant.  And

11   it's not your name.  It's a name that somebody gives you or

12   you can buy and they can refer to you as.  So, I just wanted

13   to be known as myself and I wanted to represent my political

14   status correctly and that's the reason for that.

15   Q.  And that petition was granted?

16   A.  That petition was granted.

17   Q.  And what's your understanding of the legal effect of that

18   in terms of this proceeding?

19   A.  It should be where if I am going to be brought under any

20   court action, I'll be brought under common law.  Common law,

21   you are going to be in state court.  I don't know if common

22   law is applicable here.  And even if I am a citizen of the

23   several States, I don't even know if I am recognized here.

24          If you go into the criminal statutes of -- there's

25   this court case and it explains the difference between a

1    citizen of the several States and a citizen of the State.

2    And the court case is *United States v. Powe*, P-O-W-E.  And it

3    says when they construct the statute, the term "citizen"

4    means citizen of the United States, not person generally and

5    not that of a state.  So, if that's true, why am I here?

6    Q.  Given that, can you be convicted of these charges?

7    A.  I don't believe so.  If I believe that if the law is

8    applied, then I am innocent.  And it has to do with the fact

9    that the Fourteenth Amendment just does not apply to me and

10   there's been no evidence supporting that allegation

11   whatsoever.  It's not -- the evidence is not here.  The U.S.

12   Attorney has not brought forth that evidence.

13          MR. COMERFORD:  I have no further questions, Judge.

14

15                      CROSS-EXAMINATION

16

17   BY MS. KRESSE:

18   Q.  Good morning, Mr. Weber.

19   A.  Name is Charles.  Just call me Charles.  No title.  Is

20   that okay?

21   Q.  I will call you Mr. Weber.

22   A.  I prefer Charles, but whatever is legal.

23   Q.  It's not a matter of legality or illegality.  It's a

24   matter of respect and we're in a court of law and I will

25   refer to you as Mr. Weber.  Sir, you understand that the

1   proceedings that we have been involved in last Friday,

2   yesterday and today is a competency hearing?

3   A.  Yes.

4   Q.  You understand that we're here before the Court to

5   determine whether you are competent to stand trial?

6   A.  Yes.

7   Q.  You understand that in the event the Court determines

8   that you are competent to stand trial, the next issue is

9   whether or not you are competent to represent yourself at

10  trial.  Do you understand that?

11  A.  Correct.

12  Q.  Do you know if the Court determines that you are not

13  competent to stand trial, that you will be sent to a facility

14  where you will be evaluated and you could be in custody for

15  up to four months?

16  A.  I understand that's a possibility, but I do not consent

17  to that.

18  Q.  But you understand if you are found to be not competent,

19  that's what happens?

20  A.  It may happen.  Like I said, I don't consent.  I

21  understand that.

22  Q.  But you understand that?

23  A.  Yes.

24  Q.  And you believe that you're competent to stand trial, do

25  you not?

1   A.   Yes.

2   Q.   And you believe you're competent to represent yourself?

3   A.   I believe so.

4   Q.   And is it your desire to represent yourself going forward

5   in this matter?

6   A.   If it has to go forward, yes.

7   Q.   And when you say "if it has to go forward," are you

8   referring to the fact that you don't believe you can be tried

9   on the charges that have been brought against you?

10  A.   I believe that there has not been any evidence to prove

11  your allegation I am a Fourteenth Amendment citizen.

12  Q.   So, this goes back to your argument regarding what you

13  are a citizen of, correct?

14  A.   Correct.

15  Q.   Right.  You say you are not a citizen of the

16  United States, correct?

17  A.   Under the Fourteenth Amendment.

18  Q.   And the arguments that you made regarding the Fourteenth

19  Amendment, those arguments were made before Magistrate Judge

20  Scott, were they not?

21  A.   I don't know how far we got in that hearing because it

22  was cut short.

23  Q.   Let me back up.  You filed motions before Magistrate

24  Judge Scott in which you raise the argument regarding your

25  citizenship and regarding the Fourteenth Amendment, correct?

1    A.   To be honest, I don't remember that much about the

2    hearing.  I remember a few things, but I don't remember --

3    Q.   Sir, just so that I can be clear, what I am asking first

4    is not about the hearing.  I am asking about the papers that

5    you filed, your motion, okay; not the hearing in front of the

6    judge.

7    A.   Okay.

8    Q.   So, before we got to the hearing before Judge Scott, do

9    you recall that you filed some motions, some papers, you

10   filed some papers?

11   A.   Yes.

12   Q.   Okay.  And in those papers, you raised the argument

13   regarding your citizenship and the Fourteenth Amendment, did

14   you not?

15   A.   I guess I would have to the see the papers.  I can't

16   recall specifically.  I would have to see them.

17   Q.   Your position all along has been that you are not a

18   citizen of the United States such that you are required to

19   pay income taxes, correct?

20   A.   Correct.

21   Q.   All right.  And the basis for that belief goes back to

22   your interpretation of the Fourteenth Amendment, among other

23   things, correct?

24   A.   No, it's not my interpretation.  I read the court cases.

25   One of the them was the Susan B. Anthony court case and they

1  said the same thing.  Citizen of the states does not have the

2  same privileges and immunities of the citizens of the

3  Fourteenth Amendment.

4  Q.  And that's your interpretation, sir; because, of course,

5  the law is something that has to be interpreted by the Court.

6  So, you understand that, right?

7  A.  Well, I believe it already has been.

8  Q.  But it is the role of the Court to interpret the laws,

9  you understand that?  That's the role of the court?

10  A.  Right.

11  Q.  Okay.  And you believe that under the Supreme Court cases

12  that you cite that the law has been interpreted in a

13  particular way?

14  A.  Correct.

15  Q.  Okay.  At the hearing in front of Judge Scott, are you

16  suggesting that you were not -- that the issue of your

17  citizenship was not discussed?

18  A.  I don't think I had my genealogy at that time to prove my

19  citizenship went all the way back to the 1600's here.  I

20  don't think that that was available to Judge Scott at the

21  time.

22  Q.  And you feel that your genealogy is relevant on the

23  issue, correct?

24  A.  Absolutely.

25  Q.  All right.  But, again, that is a belief that you have

1   regarding your ability to be tried of the charges that you

2   have been charged with?

3   A.   Well, the Supreme Court speaks to birthright inheritance

4   of citizens of several States as opposed to the Fourteenth

5   Amendment is not birth right inheritance.  The Fourteenth

6   Amendment is naturalization law.

7   Q.   And these are ideas that you -- you didn't come up with

8   these ideas by yourself.  You have done research, correct?

9   A.   Correct.

10  Q.   And some of your research has been research and websites

11  involving people who don't pay taxes, correct?

12  A.   No.  I go to UB Law School.  I go to the O'Brien Center.

13  If you go to the O'Brien Center, the second floor, you'll see

14  that the federal stacks are right in the middle, the New York

15  State stacks are on the left and then you have other

16  accessory volumes like dictionaries and other --

17  Q.   It turns out, I have been to the law library, but thank

18  you.

19  A.   Well, I am just saying that I get my information from

20  various sources, not just from the Internet.

21  Q.   And in 2006 -- what you told both Dr. Cervantes and

22  Dr. Antonius was that in 2006, you heard a radio broadcast

23  regarding taxes and how people did not have to pay taxes,

24  correct?

25  A.   Yeah, a couple -- the last 45 seconds.  I didn't hear the

1    whole program.  I heard the ending of it.

2    Q.  And the program was about people telling people that

3    actually, you don't have to pay your taxes, correct?

4    A.  Well, there was a claim that was made and when I heard

5    that, I was sitting in the car and I looked, I go, what are

6    you nuts?  It has to be done.

7    Q.  But that piqued your interest, didn't it?

8    A.  Well, not really; not that one.  As I was sitting there,

9    it was more -- the program was also about recruiting people

10   for the New York State Legislature.  And that piqued my

11   interest more.  I just happened to have a sheet of paper and

12   pencil and I wrote down the names of the two websites and I

13   put it in the consol and I didn't look at it for another

14   month or so.

15   Q.  And one of the websites was We the People, correct?

16   A.  That's correct, yes.

17   Q.  And We the People is an organization of people who

18   profess that people are not required to pay their income

19   taxes, correct?

20   A.  Yes.  And they were former IRS agents.

21   Q.  The question was, We the People is a group of people who

22   are -- what we would call tax protestors, correct?

23   A.  No.  No.

24   Q.  Tax defiers?

25   A.  No.

1   Q.  All right.  So, you don't accept either of those terms?

2   A.  No.

3   Q.  They are just people that just don't pay their taxes?

4   A.  No.  They are people who want to know the truth about who

5   is liable for the --

6   Q.  And do they pay their taxes?

7   A.  I don't know.

8   Q.  Okay.  You, in 2006, were already having issues with the

9   IRS, were you not?

10  A.  Apparently, I was.  I couldn't remember, but you brought

11  that up yesterday and yes, but I don't -- my memory of that

12  was not so good.

13  Q.  You didn't like to pay taxes, did you?

14  A.  Nobody does.

15  Q.  Well, I asked about you.

16  A.  Right.

17  Q.  You did not like to pay taxes, did you?

18  A.  They don't prove --

19  Q.  Just answer the question.

20  A.  No.  And I'll tell you the reason why.

21  Q.  I just asked the question.

22  A.  Right.

23  Q.  You did not like to pay your taxes, did you?

24  A.  I did not like to pay income taxes, no.

25  Q.  Well, you don't pay income taxes now or you did not?

1  A.  I did back then, but they were on Schedule C, I believe.

2  Q.  Past tense, because you don't pay your taxes now.  You

3  haven't paid your taxes since 2005, right?

4  A.  I don't believe I have any money markets that earn any

5  interests on that.

6  Q.  Right, which is your position.  So, when you were paying

7  taxes -- and the last tax return you filed was 2003 by

8  yourself.  And when you were paying taxes, you didn't like

9  it, did you?

10  A.  No.

11        MR. COMERFORD:  I just object to Ms. Kresse

12  testifying about the last time he paid taxes.

13        THE COURT:  Overruled.

14  BY MS. KRESSE:

15  Q.  Was the last tax return you filed the tax return for the

16  tax year 2003?

17  A.  I am going to say yes.  I'll take your word for it.

18  Q.  Well, don't take my word for it.  If you don't know, you

19  don't know.

20  A.  I don't know.  I'm guessing.

21  Q.  Okay.  You made a fair amount of money as a dentist, did

22  you not?

23  A.  Yes.

24  Q.  And you had your own practice?

25  A.  Yes.

1   Q.  So, you were earning a lot of money, correct?

2   A.  About 140.

3   Q.  And you didn't like to pay taxes on that, correct?

4   A.  Well, I did.  I mean, nobody likes to pay taxes, but I

5   did until I knew better.

6   Q.  So, isn't it fair to say that you were looking for a

7   reason why you might not have to pay your taxes?

8   A.  No.

9   Q.  But the We the People website provided you with a reason,

10  did it not?

11  A.  It was brought to my attention and I followed up on it,

12  but the only questions I followed up on was the fact that

13  when they held a hearing between the We the People

14  organization and the government and they had a list of 200

15  questions and the government was the IRS, the Treasury and

16  the Justice Department and it was sponsored by a member of

17  Congress.  And once this meeting was supposedly held and the

18  200 questions was put by the We the People congress into the

19  government, the government backed out.

20  Q.  Okay.  I am not --

21  A.  Why would they back out?

22  Q.  Mr. Weber, try to answer the question that I am asking

23  you without going on to other explanations.  Okay?  We the

24  People website suggested ways that a person could not pay

25  their taxes, correct?

1   A.   I don't remember that.  I just remember the arguments and

2   research that went into it and I decided to follow up on

3   that.  I don't remember that part at all.

4   Q.   And you followed up on it?

5   A.   I followed up on the research.

6   Q.   And you began to do your own research into We the People

7   and the other groups that did not believe in filing taxes,

8   correct?

9   A.   I didn't really follow other groups.  I just tried to

10  take the laws that I knew about and how they applied to me,

11  so I really wasn't following a group.

12  Q.   Are you aware of the term "sovereign citizen"?

13  A.   Yes.

14  Q.   Do you consider yourself to be a sovereign citizen?

15  A.   Under which I consider myself a sovereign.

16  Q.   I am talking about the group; the ideology of sovereign

17  citizens.  Are you familiar with that ideology?

18  A.   It depends on the person's political status and it would

19  have to be on an individual basis.  I cannot believe into a

20  group.  I don't know them.

21  Q.   So, in terms of -- in 2009, you filed two tax returns

22  with the IRS, correct?

23  A.   I believe so, yes.

24  Q.   And those are tax returns for 2006 and 2007.  Do you

25  recall that?

1   A.   Yes.

2   Q.   And both those tax returns are non-resident alien tax

3   returns, right?

4   A.   Right.

5   Q.   You were instructed at that time to file tax returns for

6   those tax years by the IRS.  Do you recall that?

7   A.   I don't recall that, no.

8   Q.   Do you recall that there was a revenue agent with whom

9   you were working?

10  A.   I had a visit from somebody.

11  Q.   Was it a revenue agent?

12  A.   Yes.  Yes.

13  Q.   Do you understand a revenue agent is an employee of the

14  Internal Revenue Service?

15  A.   Yes.

16  Q.   And you recall that that revenue agent was asking you

17  about the failure to file your income taxes for the tax years

18  2006 and 2007?  Do you recall that, right?

19  A.   I think he left a card and he's -- look, this is what you

20  have to do.  That's about the best of my memory.  You are

21  right, there was somebody that visited, but our meeting was

22  very brief, if I can remember correctly.

23  Q.   But it was about your paying your taxes, wasn't it?

24  A.   Yes.  Yes.

25  Q.   Okay.  And do you recall that the revenue agent told you

1  that you had a deadline for filing your 2006 and 2007

2  returns?

3  A.   That, I don't remember.

4  Q.   Do you remember that the revenue agent told you that not

5  only were the returns -- well, strike that, because you say

6  you don't remember that.  Do you remember the revenue agent

7  telling you that you were to mail the tax returns to him at a

8  particular address?

9  A.   I don't remember.

10  Q.   Okay.  And do you recall that when you did decide to file

11  your 2006 and 2007 tax returns, you mailed them to the basic

12  general IRS service center?

13  A.   That's the only place I remember sending them to.

14  Q.   And prior to 2000 -- prior to you filing your 2006 and

15  2007 returns, you had never before claimed that your were a

16  non-resident alien, had you?

17  A.   That's correct.

18  Q.   Because you paid your taxes and you marked the box that

19  you were a U.S. citizen, did you not?

20  A.   I did.

21  Q.   And so, suddenly, after you began doing research about

22  your rights as a Fourteenth Amendment citizen or whatever the

23  claim is -- I may not be getting it completely correct -- you

24  come up with a method by which you think that you do not have

25  to file or pay taxes, correct?

1    A.   I don't know if it was a method.  I just tried to apply

2    the law as I knew it at that time and I tried to figure out

3    what form to fill out, because the 1040 apparently when it

4    says U.S. citizen, it does not tell which one.  It does not

5    tell you if you're a Fourteenth Amendment or a citizen of the

6    several States.  So, at the time, I found out I was making

7    mistakes all these years by declaring myself a U.S. citizen

8    and that's my honest-to-God opinion.  I was making a mistake

9    all those years.

10   Q.   So, you unlike your family members and your parents, you

11   are not a U.S. citizen?

12   A.   That's up -- you know, I don't make declarations for

13   anybody else.  I remember we used to have discussions about

14   it and after a while people go, Charlie, you may be right.

15   There's something funny going on here, but they wouldn't ever

16   go any further than that.

17   Q.   You would agree, sir, that most people do not believe

18   that if they're born in the United States and raised in the

19   United States and work in the United States that they are not

20   citizens the United States, correct?

21   A.   Well, which one?  There's two citizenships.  How do you

22   know to fill out the form?  I am trying to get the answer

23   from you.  Which one?

24   Q.   And I am asking you, do most people believe there are two

25   kinds of citizens?  That's what I am asking you.

1  A.  I don't know.  I think they think -- the original citizen

2  of the United States, it was set out in the Constitution.

3  Q.  Sir --

4  A.  It only meant one thing.

5  Q.  I am not asking you about your explanation of

6  citizenship.  I am asking you if your opinion about your

7  citizenship, for example, is the majority opinion held by

8  most Americans?

9  A.  I guess not.

10  Q.  Well, you guess not because most people pay their taxes,

11  don't they?

12  A.  Well, but they also don't do research either.

13  Q.  You were present and your heard the testimony of

14  Dr. Antonius, correct?

15  A.  Yes.

16  Q.  And you understand that it's his opinion to a reasonable

17  degree of medical certainty that you are competent to stand

18  trial, correct?

19  A.  Mm-hmm.

20  Q.  You have to answer yes or no.

21  A.  I'm sorry.  Yes.

22  Q.  And you understand that Dr. Antonius' opinion to a

23  reasonable degree of medical certainly is that you are also

24  competent to represent yourself if you chose do so?

25  A.  Yes.

1   Q.  You were present and you heard the testimony of

2   Dr. Cervantes, correct?

3   A.  Yes.

4   Q.  And Dr. Cervantes is a -- she was hired by the defense to

5   evaluate you and make a determination regarding your ability

6   to, in part, stand trial, correct?

7   A.  Yes.

8   Q.  And you understand that it was her opinion to a

9   reasonable degree of medical certainty that you are not

10  competent to stand trial?

11  A.  Correct.

12  Q.  And you understand that it is her opinion to a reasonable

13  degree of medical certainty that you are not competent to

14  represent yourself, correct?

15  A.  Correct.

16  Q.  And you disagree with that, do you not?

17  A.  Yes, I do.

18  Q.  And you feel that you're competent to go to trial?

19  A.  Yes.

20  Q.  And you feel that you are competent to represent

21  yourself?

22  A.  Yes.

23  Q.  Going back to the arguments that you made before the

24  magistrate court regarding your citizenship and now we're

25  talking about Judge Scott.  Do you understand what I am

1  referring to?

2  A.  Yes.

3  Q.  And Judge Scott issued a decision, a report and

4  recommendation is what the specific term is, in which he

5  recommended denying your motion to dismiss based on your

6  citizenship argument.  Do you recall that?

7  A.  Well, one was denied in part, but granted in part.

8  Q.  You had made a motion essentially arguing that you could

9  not be prosecuted in this court for a number of reasons

10 including your citizenship, correct?

11 A.  Yes.

12 Q.  And that was recommended to be denied by Judge Scott, was

13 it not?

14 A.  I haven't seen in that in about two and a half years and

15 so, I would have to go over those papers.  I just thought of

16 it the other day and I told Brian about it.  I just

17 remembered and I think those papers are in storage, so I'd

18 have to go get them.

19 Q.  But you are here today in federal court, correct?

20 A.  Yes.

21 Q.  So, presumably, the motion was denied?

22 A.  When I made my objections, I don't think that was ever

23 heard in court.

24 Q.  Okay.  And so, when you refer to the objections, you are

25 referring to after there was a decision by Judge Scott, you

1   filed objections and they came before this court, Judge

2   Arcara.  Do you recall that?

3   A.  I remember I came before here, but I don't remember the

4   specific -- what was done.

5   Q.  Okay.  But you remember filing something called

6   objections?

7   A.  For Judge Scott, yes.

8   Q.  In front of Judge Scott?

9   A.  Yes.

10  Q.  Do you recall filing objections to Judge Arcara regarding

11  Judge Scott's decision?

12  A.  I don't know.

13  Q.  And your testimony is that all of these records regarding

14  your case, your prior filings are in storage somewhere?

15  A.  I believe so, yes.

16  Q.  And prior to your testimony here, you didn't review them

17  to see what had happened previously in this case?

18  A.  No, I -- when you said it yesterday, I remembered it and

19  I told Brian about it and I said I think that there's some

20  issues here that haven't been brought up to this court.  And

21  I don't think all the information was in for Judge Scott and

22  there's been additional information since then.

23  Q.  But we are now in front of Judge Arcara, the District

24  Court Judge?

25  A.  Right.

1  Q.  And you recall in October of 2015, this case was

2  scheduled to go to trial?  Do you recall that?

3  A.  Yes.

4  Q.  And at the time, you were going to represent yourself.

5  Do you remember that?

6  A.  Right.

7  Q.  And then at the last moment, I think it was a day or two

8  before jury selection, you decided that you would prefer to

9  proceed with Mr. Comerford as your attorney.  Do you recall

10  that?

11  A.  I don't think it was with Mr. Comerford at the time.  I

12  think we tried to go outside to get an attorney, a private

13  attorney.

14  Q.  I stand corrected.  I do recall that.  You wanted an

15  opportunity to see if you could find an attorney to represent

16  you?

17  A.  Right.

18  Q.  And ultimately -- I apologize for that.  And ultimately,

19  you were not able to find somebody to represent yourself,

20  correct?

21  A.  Correct.

22  Q.  And you have consulted with lawyers about your legal

23  theory in this case, have you not?

24  A.  Yes.

25  Q.  And you were unable to find a lawyer who would represent

1    you making the legal arguments you wished to make, correct?

2    A.   Correct.

3    Q.   And so, ultimately -- I'm not going to put a timeframe on

4    it but, ultimately, Mr. Comerford became your attorney?

5    A.   Yes.

6    Q.   All right.  And since that time, again, whenever that

7    was, you have worked with Mr. Comerford in terms of this case

8    and moving it forward, have you not?

9    A.   So far, yes.  Yes.

10   Q.   And it was Mr. Comerford's suggestion that you undergo an

11   evaluation by Dr. Cervantes, was it not?

12   A.   Yes.

13   Q.   And you agreed to do so?

14   A.   Yes.

15   Q.   And because -- and isn't it true that you understand that

16   Mr. Comerford has an understanding of the legal system that's

17   better than your understanding of the legal system?

18   A.   I believe he knows more about court procedure,

19   definitely.  I did have a misunderstanding about the purpose

20   of the psychiatric evaluations.  My thoughts were that I was

21   going to undergo psychiatric evaluations to see if I was

22   telling the truth about my beliefs.  I didn't understand it

23   was really -- I thought that, you know, that it was about

24   whether or not I was being truthful to the Court about my

25   statements and my research.  I really didn't understand at

1   that time it was for mental competency, that there might be

2   some kind of psychological event that would prevent me from

3   doing this.  So, initially, I thought it was -- it took on a

4   life of its own that was different than my initial

5   understanding.

6   Q.  And just to go back, you heard Dr. Cervantes talk about

7   her first report that she did.  Do you remember?

8   A.  Vaguely.

9   Q.  Okay.  And if you want, I can hand you the exhibits, if

10  you would prefer, but Dr. Cervantes issued an initial report

11  in October of 2016.  Does that sound right to you?

12  A.  I know I went there, but I don't think we had the reports

13  until later on that year or early next year.

14  Q.  Well, just because I think it's better if you have the

15  documents in front of you --

16          MS. KRESSE:  Your Honor, if I could approach?

17          THE COURT:  Yes.

18  BY MS. KRESSE:

19  Q.  Mr. Weber, I am handing you a number of exhibits, Exhibit

20  1 -- these are all in evidence -- Exhibit 2, Exhibit 3.  All

21  right.  You can take a look at those.  Are you good?

22  A.  I am looking at them.  I am looking at the October 30th.

23  Q.  And you see that that's marked as Government Exhibit 2,

24  correct?

25  A.  Yes.

1  Q.  Okay.  And you see that the date on it, the date of the

2  report, not the date on which she saw you, but the date of

3  the report is October 30th of 2016?

4  A.  Yes.

5  Q.  And in that initial report, Dr. Cervantes does not talk

6  about whether or not you are competent to stand trial.  Do

7  you recall that?

8  A.  You know, yesterday, I am going to have to admit I was

9  listening, but it was hard to follow and testimony got a

10 little dry, too, so I was basically here just -- I was

11 writing my own thoughts about other things.  So, was I

12 listening to her testimony?  Not really.  She was almost

13 putting me to sleep.  I hate to say it.

14 Q.  All right.  And what I want to touch on is that you

15 indicated that your understanding initially was that you were

16 just going to be evaluated in terms of the validity of your

17 beliefs and the legitimacy of your beliefs in terms of that

18 you truly believe it?

19 A.  Yes, the truthfulness of what I held.

20 Q.  And your testimony is that you're not sure whether or not

21 your competency was evaluated by Dr. Cervantes in her first

22 report, Government Exhibit 2?

23 A.  No, I never read it.

24 Q.  Okay.

25 A.  I never read that.

1   Q.  You were present for the testimony of Dr. Antonius,

2   right?

3   A.  Yes.

4   Q.  And in terms of Dr. Antonius' testimony, do you recall

5   that part of his evaluation of you was to determine whether

6   you were competent to stand trial?

7   A.  Yes.

8   Q.  And he made a determination in his report, which is

9   Government Exhibit 1, which is in front of you, that you were

10  competent to stand trial?

11  A.  Yes.  I was able to follow his testimony.  It was a

12  little bit more interesting.

13  Q.  And then Dr. Cervantes interviewed you after the report

14  by Dr. Antonius, correct?

15  A.  Yes.

16  Q.  And issued a -- what she called an addendum to her

17  forensic examination.  Do you recall that?

18  A.  Yes.  Is that number 3?

19  Q.  Yes, it is.  Government Exhibit 3 and you have that in

20  front of you, right?

21  A.  Yes.

22  Q.  And did you read that report, sir?

23  A.  Actually, I think I did.  I did.

24  Q.  Okay.  And do you remember --

25  A.  Once -- I didn't go over it and make notes on it, but I

1    remember I read it once and I just did a once over on it.

2    Q.  And do you recall, based on your once-over of the report

3    that she, Dr. Cervantes, made a finding that you were not

4    competent to stand trial?

5    A.  Yes.

6    Q.  And she -- in her findings, she talked also about your

7    ability to proceed pro se or on your own?

8    A.  Right.

9    Q.  Okay.  But getting back to the initial question on this

10   topic, it was you following the advice of your counsel in

11   terms of the issue of being evaluated by Dr. Cervantes?

12   A.  Yes.  I went along with that.  I didn't feel like I had a

13   choice, but earlier last year -- you know, you read the -- it

14   wasn't really the case that I wanted to go forward with.  I

15   didn't want to go forward on this.  I wanted to go forward on

16   my case.

17   Q.  You don't want to go forward on -- are you referring to

18   raising like, a mental health type defense?  Is that what you

19   didn't want to go forward on?

20   A.  That's correct.

21   Q.  Okay.  And --

22   A.  Again, just to reiterate the point, when I went through

23   these evaluations, I thought it was based whether or not they

24   were going to tell me -- or make a report on whether I was

25   telling the truth about what I believed or just, you know,

1   trying to bring out an elaborate defense, you know, a fake

2   one.  So, that was my initial understanding and I guess I

3   made a mistake.

4   Q.  Well and again, the initial evaluation by Dr. Cervantes

5   was just to assess you in terms of whether or not there was

6   something that was like, some sort of manifestation of a

7   psychosis, for example.  Do you understand that?

8   A.  I only remember taking a test.  I remember talking to

9   them and they were trying to get my ideas and you know, just

10  so there was kind of a rapport, like a relationship between

11  us.  But, you know, I don't know what they do with their

12  work.  I have never really worked with a psychiatrist before.

13  I thought maybe they were making a basic mental calculation

14  of what's this guy's baseline so we can see whether or not

15  he's telling the truth.  So, that was my understanding.

16  Q.  Where you say "them", are you referring to Dr. Cervantes

17  and Dr. Heffler?

18  A.  Yes.

19  Q.  Okay.

20  A.  And Dr. Antonius, too.

21  Q.  So, you are referring to all of your evaluations?

22  A.  Right, right, right.

23  Q.  Okay.  You understand -- or do you understand that

24  Dr. Cervantes in her initial report diagnosed you with having

25  a delusional disorder of a mixed type?

378

1   A.  Yes.

2   Q.  And do you feel, sir, that you have a delusional

3   disorder?

4   A.  God, I hope not.

5   Q.  And let me just -- do you know the basis for her

6   diagnosis of you having a delusional disorder?

7   A.  No.

8   Q.  All right.  Well, do you recall her testimony that her

9   original diagnosis was based on your what she termed

10  sovereign citizen beliefs as one component and the second

11  component were your somatic complaints?  Do you recall that

12  from her testimony?

13  A.  I remember the somatic complaints.  I remember the

14  sovereign citizen tag.

15  Q.  And do you consider your beliefs regarding citizenship,

16  for example and the Fourteenth Amendment and your

17  interpretation of the law, do you consider those to be

18  delusional ideas?

19  A.  No.

20  Q.  In terms of your somatic complaints, you testified on

21  direct examination about sort of the -- of how you came to

22  approach holistic remedies as an alternative, correct?

23  A.  I would not say an alternative, because I was seeing my

24  physician at the same time, so it's a balance.  You need

25  both.  And my physician was okay with that.  In other words,

1    if I am going to be a diagnosed with a certain condition and

2    I don't have the proper nutritional support to aid my doctor

3    in treatment, you're sort of spitting into the ocean, if I

4    may make that analogy.  You know, the nutritionists help

5    support the physicians.

6    Q.  Would you agree that your decision to, for example, have

7    the muscle testing and to take some steps relative to the

8    router, that that was a well-reasoned approach by you to

9    maintaining your own health?

10   A.  Sure.

11   Q.  Sir, one -- there are certain requirements that have to

12   be met to determine whether or not you are competent to stand

13   trial.  Do you understand that?

14   A.  Mm-hmm.  Yes.

15   Q.  Yes.  Thank you.  Do you understand the crime you are

16   charged with in this case?

17   A.  I understand the charges.

18   Q.  And you understand that they relate to you filing the

19   non-resident alien tax returns in 2006 -- for 2006 and 2007,

20   correct?

21   A.  That's correct.

22   Q.  And do you understand that you have been charged in an

23   indictment that was returned by a Grand Jury?

24   A.  Yes.

25   Q.  Do you understand that at a trial of the case, Judge

1  Arcara would preside over the trial?

2  A.  That's the way it's going now, yes.

3  Q.  And that he -- that you would have to comply with

4  whatever ruling that Judge Arcara made, do you understand

5  that?

6  A.  Whatever rulings, yes, unless there was an appeal.

7  Q.  Right, but within the confines of a trial --

8  A.  Yes.  Yes.

9  Q.  -- you understand that Judge Arcara would make a ruling

10 and you would have to comply with that?

11 A.  You are talking about the in-trial rulings?

12 Q.  Yes.

13 A.  Okay.  Yes.  Yes, I know there's a distinction.

14 Q.  Because in the event of a conviction, there's an appeal,

15 for example?

16 A.  Yes.

17 Q.  And right now, I am only talking about the parameters of

18 the actual trial.

19 A.  Right.

20 Q.  Okay.  And during the course of the trial, it's Judge

21 Arcara's job to run the trial and to make rulings from time

22 to which you are required to comply with?

23 A.  Yes.

24 Q.  And you understand that?

25 A.  Yes.  And now I know what you mean.

1    Q.  And you understand that if you are represented by

2    Mr. Comerford, that he will represent you throughout the

3    trial?

4    A.  Well, I haven't consented to that yet.  I will consent to

5    him as being counsel, but I haven't consented where he would

6    run the trial.

7    Q.  Is it your belief, sir, that Mr. Comerford actually

8    cannot represent you because he is employed by the Federal

9    Public Defender's Office?

10   A.  Yes.  Because there's an assumption I am a federal

11   citizen and the federal citizen didn't appear until 1868.

12   It's a separate citizenship.

13   Q.  And if you are not a federal citizen, is it your argument

14   that you cannot be represented by the federal public

15   defender?

16   A.  That's correct.

17   Q.  Okay.  Would it be your preference to be represented by

18   someone who is not the public defender?

19   A.  I do have somebody in mind that I haven't been able to

20   reach yet, but it's also my position that if anything is

21   going to be -- any court cases, it's my understanding that I

22   am to be heard under common law.  And I don't know if they

23   have common law here, but my understanding is that my rights

24   under the Constitution of New York provides for a jury of my

25   own peers and to be held in New York State court, not here.

1   Q.  But right now, you are in federal court and you

2   understand that, right?

3   A.  At this time, I understand that that's where I am, yes.

4   Q.  And the only way that you would not be in federal court

5   would be if some motion on your part was granted saying this

6   court did not have jurisdiction over you?

7   A.  That's correct.  That's being made.

8   Q.  You are --

9   A.  I am constructing it now.

10  Q.  So, you haven't made that motion yet?

11  A.  That's correct.

12  Q.  But you intend to do so?

13  A.  Yes.

14  Q.  But if that motion is denied and you are in federal

15  court, this proceeding will be governed by federal law, not

16  common law.  Do you understand that?

17  A.  If it's in here, it's not under common law, correct.

18  Q.  And you understand that if Mr. Comerford continues to

19  represent you, that he is somebody who understands federal

20  law, federal procedure, et cetera?

21  A.  Yes.

22  Q.  And again, you have been able to work with Mr. Comerford

23  from the time of your indictment -- or strike that.  You have

24  been able to work with Mr. Comerford as your attorney for a

25  number of years now, have you not?

1   A.  Yes.

2   Q.  You understand what my role is as the prosecutor,

3   correct?

4   A.  Yes.

5   Q.  That it's my job at trial to prove the charges against

6   you beyond a reasonable doubt.  Do you understand that?

7   A.  Yes.

8   Q.  You understand that you will be tried by a jury of your

9   peers?

10  A.  Define "peers".  I don't understand what you're saying.

11  Q.  I am using your term.  You referred to a jury of your

12  peers.  You will be tried by a jury in federal court.  Do you

13  understand that?

14  A.  But they might not be my peers, because I am supposed to

15  be able to have a jury of state citizens, not U.S. citizens.

16  Q.  And that's how you define "peers"?

17  A.  Yes, by political status, correct.

18  Q.  But you understand there will be 12 people plus an

19  alternate or two sitting in this box during your trial?

20  A.  Yes.

21  Q.  And that you will have an opportunity, whether you are

22  represented by Mr. Comerford or not, to have input into which

23  of the jury panel is chosen to sit on your case.  Do you

24  understand that?

25  A.  That's correct.

1   Q.  You understand the consequences of being found guilty,

2   don't you?

3   A.  Yes, I do.

4   Q.  And you understand, I believe, what you reported to

5   Dr. Antonius was that you face two and a half years if you

6   are convicted?

7   A.  Correct.

8   Q.  And you understand that two and a half years means you

9   could go to jail for two and a half years?

10  A.  Yes, I do.

11  Q.  You understand that -- well, let me ask it this way.  You

12  understand that your ideas regarding the law are not accepted

13  by this Court and have not been accepted by this Court?

14  A.  Up to this point in time, yes.

15  Q.  And you understand going forward that your ideas, your

16  notions of the law may not be accepted by this Court?

17  A.  I understand that.

18  Q.  And you will still be required to go forward with the

19  trial of this case if you're found competent to proceed?

20  A.  That's correct.

21  Q.  Now -- and again, this is a two-step analysis.  So, the

22  first is whether you are competent to proceed to trial and

23  that analysis assumes that you are represented by

24  Mr. Comerford.  Do you understand that?

25  A.  Yes.

1  Q.  Okay.  So, now moving to the issues of whether or not you

2  are competent to represent yourself, I am going to ask you

3  some questions about that.  Okay?

4  A.  Yes.

5  Q.  Do you believe that you have the cognitive ability to

6  represent yourself?

7  A.  Yes.

8  Q.  Do you believe that you have the capacity to follow the

9  Court's directions?

10  A.  Yes.

11  Q.  Do you feel that you will be disruptive during trial if,

12  for example, there's a ruling that isn't in your favor?

13  A.  Correct.  Yes.

14  Q.  You will not be disruptive?

15  A.  No.

16  Q.  Do you feel you can put together key arguments to

17  articulate what your defense is?

18  A.  Yes.

19  Q.  Do you feel that you can file whatever motions are

20  necessary prior to trial?

21  A.  Yes.

22  Q.  Do you feel that you can examine witnesses that the

23  government presents?

24  A.  Yes.

25  Q.  Do you feel that you can read the exhibits, the documents

1  that the government presents and question witness about those

2  exhibits?

3  A.  Yes.

4  Q.  And you understand, sir, that there has been what's

5  called discovery in this case?

6  A.  So far, yes.

7  Q.  And you understand that actually all of the government's

8  exhibits that it would use at trial have already been marked

9  and turned over to the defense because the case was going to

10 go to trial in October of 2015?  Do you understand that?

11 A.  I know that there was quite a bit of material that you

12 had, yes.

13 Q.  And do you feel that you could go through that material

14 and use it in terms of questioning government witnesses?

15 A.  Yes.

16 Q.  And do you believe that you could go through those

17 exhibits and those documents and use them to support your

18 defense if that's possible?

19 A.  Correct.

20 Q.  Do you feel that you are disorganized and will be

21 disorganized in your ability to present your case?

22 A.  No.

23 Q.  You understand other people have different opinions than

24 you regarding your citizenship?

25 A.  Yes.

1 Q. And sir, you mentioned that you have been on an ankle

2 bracelet?

3 A. Yes.

4 Q. And how long has that been for at this point, if you

5 remember?

6 A. Last April.

7 Q. So, for a period of months, you have been on -- and it's

8 called home detention, right?

9 A. Yes.

10 Q. And you have mentioned Peter Lepiane as the probation

11 officer who supervises you?

12 A. Yes.

13 Q. And I think -- and if I am quoting you wrong, correct

14 me -- you called him a standup guy?

15 A. Yes.

16 Q. And you have been able to work with Mr. Lepiane in terms

17 of your supervision and the ankle bracelet, correct?

18 A. Yes.

19 Q. You have been able to comply with the rules and

20 regulations regarding being on home detention, correct?

21 A. Right.

22 Q. You understand that if you represent yourself, that you

23 can present a defense?

24 A. Yes.

25 Q. And you understand that you are not required to?

1  A.  Yes.

2  Q.  Okay.  So, you understand that the burden is all the

3  government's burden?

4  A.  Yes.

5  Q.  That you don't have to do anything?

6  A.  Right.

7  Q.  Okay.  And similarly, you understand that you could take

8  the stand and testify on your own behalf?

9  A.  Yes.

10  Q.  But you know that nobody can make you do that; that

11  that's a decision that you would make, correct?

12  A.  Yes.

13  Q.  And if you are represented by Mr. Comerford, could you

14  follow Mr. Comerford's advice regarding strategy in terms of

15  presentation of evidence at trial?

16  A.  I could, yes.

17          MS. KRESSE:  Your Honor, no further questions.

18          MR. COMERFORD:  Just two minutes, Judge.

19          THE COURT:  Okay.

20

21                    REDIRECT EXAMINATION

22

23  BY MR. COMERFORD:

24  Q.  Dr. Weber, Ms. Kresse asked about you having a jury of

25  your peers.  Do you recall that?

1  A.  Yes.

2  Q.  And in your understanding, who are your peers?

3  A.  Fellow state citizens of New York State.

4  Q.  And who would be selected to -- I guess who would be the

5  potential jurors in your criminal case in federal court?

6  A.  People who properly identified their political status.

7  Q.  As what?

8  A.  As a citizen of New York, not a Fourteenth Amendment

9  citizen of New York.  I can add one thing to that.

10  Q.  Sure.

11  A.  People who know that their birthright citizenship is

12  different than the naturalization citizenship under the

13  Fourteenth Amendment.  Those are my peers.

14  Q.  What if I told you that the jury pool are citizens

15  selected from the counties that are within the Western

16  District of New York regardless of their political views?

17  A.  Well, then they wouldn't be competent -- they wouldn't be

18  a jury of my peers.

19  Q.  Would you -- and beyond -- I am not saying you couldn't

20  object to that at trial, but would you -- all the questions

21  that Ms. Kresse asked you about, would you follow the rules

22  and accept a trial, if the jury was one that was U.S.

23  citizens, residents of New York, but not as you deem them

24  New York citizens, would you be able to -- would you accept

25  that at trial?

1   A.   I have the right to demand that under the New York State

2   Constitution, that I have a jury of my peers.  That's in the

3   Bill of Rights.  So, I would not accept and I would not

4   consent to a jury not of my peers.

5   Q.   Do you -- so, what's your plan if we go to trial and you

6   make that objection and lose and the jury ends up being

7   people who are residents of New York, citizens of the U.S.

8   and regardless of their political status and I'll go a step

9   beyond that, not just that, but what if during voir dire

10  questioning -- that's where the Judge and sometimes the

11  parties can ask questions of the jurors -- if people who have

12  views similar to your own are excused from the jury, so that

13  those people are specifically not on the jury, what is your

14  plan then?

15  A.   That -- I'm sorry.  Which citizens would be excused?

16  Q.   If someone is a prospective juror and that person says, I

17  don't think I should have to pay taxes on the Fourteenth

18  Amendment and I am not a U.S. citizen and I'm a citizen of

19  the several States, let's presume for the purposes of this

20  hypothetical that that person is excused, that they are

21  not -- that the government gets certain challenges, that they

22  ask for that person to be kicked off and they are kicked off

23  and the only people remaining on the jury are people who are

24  residents of New York, but do not identify with your

25  political status; rather they are just citizens of the

1  United States.  If we go forward with a criminal trial with

2  that jury, what's your plan?

3  A.  Well, I would object to the jury and make a motion for

4  that to be ruled on.

5  Q.  And assuming that you lost that motion, do you think the

6  Court could still go forward with the trial?

7  A.  I think I would put that to appeal.  That's the legal

8  remedy, you know, stay civil, don't get mad, keep everything

9  cool, go ahead with your legal remedy.

10         MR. COMERFORD:  I have no further questions.  Thank

11  you.

12         THE WITNESS:  Thank you.

13         THE COURT:  All right.  The witness is excused.

14         THE WITNESS:  Thank you.

15         THE COURT:  We'll get transcripts.  I want written

16  briefs on this.  How long will it take, Megan?

17         THE REPORTER:  One week.

18         THE COURT:  One week?  So, how long would you need to

19  file a brief?

20         MR. COMERFORD:  Is it simultaneous filings, Judge?

21         THE COURT:  Yeah, I think so.

22         MR. COMERFORD:  I guess three weeks would be

23  sufficient.

24         THE COURT:  All right.  Let's set forth the schedule.

25         THE CLERK:  February 21st, Judge.

1          THE COURT:  Okay.  They can file one week for any

2    responses to each other's briefs, but that will be limited to

3    five pages.

4          THE CLERK:  February 28th.

5          THE COURT:  And we'll have -- if argument is

6    necessary, we'll have that about a week or two later.

7          THE CLERK:  Judge, that would be in March.

8          THE COURT:  Let's say the end of March.

9          THE CLERK:  Friday, March 30th at 9 o'clock for oral

10   argument.

11         THE COURT:  All right.  Anything further?

12         MR. COMERFORD:  No, Your Honor.

13         MS. KRESSE:  Your Honor, in terms of the exclusion of

14   time, is the time until the 30th continued to be excluded due

15   to the fact in that competency issue is outstanding?

16         THE COURT:  Well, at least until then, but then I'll

17   have at least 30 days after any argument.

18         MS. KRESSE:  Yes.

19         THE COURT:  So, up to that point in time, yes.

20         MS. KRESSE:  And I will provide a proposed speedy

21   trial order then, Judge.

22         THE COURT:  That will be fine.  Court will be recess.

23         THE CLERK:  All rise.

24   (Proceedings concluded at 11:14 a.m.)

25

1                    *     *     *     *     *     *     *

2

3              I certify that the foregoing is a

4        correct transcription of the proceedings

5        recorded by me in this matter.

6

7

8

9                              s/ Megan E. Pelka, RPR

10                             Court Reporter,

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25